1  Matthew J. Norris, Esq. (SBN 257505)
2  NORRIS LAW GROUP, P.C.
   10940 Wilshire Boulevard, Suite 1600
3  Los Angeles, CA 90024
   (310) 443-4159  (phone)
4  (310) 443-4220 (facsimile)
5  mjnorris@norrislglaw.com

6  Attorneys for Defendants Micah A. Cohen and Nancy Sidonie Cohen

7

8              UNITED STATES DISTRICT COURT
9              CENTRAL DISTRICT OF CALIFORNIA

10

11  SWARM, LLC, a California limited        Case No. CV 10-3188 DDP (FFMx)
    liability company, dba Shades of
12  Greige,

13           **Plaintiff,**

14       **vs.**                            **DECLARATION OF MATTHEW J.**
                                            **NORRIS IN SUPPORT OF MOTION**
15  **MICAH A. COHEN, an individual,**      **TO CONFIRM FINAL ARBITRATION**
    **dba Shades of Grey by Micah Cohen;**  **AWARD**
16  **NANCY SIDONIE COHEN, an**
17  **individual,**                         **[9 U.S.C. § 9]**

18

19                                          [Notice of Motion and Motion;
           **Defendants.**                  Memorandum of Points and Authorities;
20  _____          [Proposed] Order Filed Concurrently
21                                           Herewith.]
    AND RELATED CROSS-CLAIMS.               Assigned to: Hon. Dean D. Pregerson
22                                          Date: December 10, 2012
23                                          Time: 10:00 a.m.
                                            Location: Courtroom 3, Los Angeles-
24                                          Spring Street
25                                          Complaint Filed: April 28, 2010

26

27

28

## DECLARATION OF MATTHEW J. NORRIS

I, Matthew J. Norris, declare as follows:

1.     I am an attorney actively licensed to practice law in the State of California, and my firm (Norris Law Group, P.C.) and I represent the Defendants (known for purposes of the arbitration as the Respondents) in this action.  I am of suitable age and discretion and competent to testify in court.  I submit this Declaration in support of the Defendants' Motion to Confirm Final Arbitration Award.  I have personal knowledge of the facts stated in this Declaration, and, if called as a witness to testify to the facts set forth in this Declaration, I could and would testify competently to each of those facts.  By setting forth the facts in this declaration, I do not intend to waive any protections or privileges that may apply, including without limitation the attorney-client privilege.  My clients have not authorized me to waive any privileges.

2.     The Plaintiff, Swarm, LLC ("Swarm") brought an action in this Court via the filing of a Complaint on April 28, 2010, naming Micah A. Cohen, a former Swarm employee, and Micah Cohen's mother Nancy Sidonie Cohen as defendants.  Swarm brought claims against Defendants (later arbitration Respondents) Micah Cohen and Nancy Cohen for trademark infringement, false designation of origin, federal and state unfair competition, intentional interference with economic relations, breach of duty of loyalty and declaratory judgment.

3.     On or about May 20, 2010, Plaintiff filed a Notice of Opposition with the Trademark Trial and Appeal Board ("TTAB"), contesting Nancy Cohen's application for registration of a trademark ("Ms. Cohen's Trademark Application"), which has been a subject of the present action.  On or about May 21, 2010, Plaintiff filed a Motion to Suspend Opposition with the TTAB to stay those proceedings as to Ms.

1  Cohen's Trademark Application and Swarm's Opposition thereto during the pendency

2  of the present action.

3      4.    The parties later stipulated to hold a mediation followed by binding

4  arbitration before a JAMS arbitrator, and on June 9, 2010, this Court ordered the

5  matter to be resolved via binding arbitration if mediation was not successful.

6  Mediation failed to produce a settlement, and the parties submitted to arbitration

7  before JAMS, with the Honorable George P. Schiavelli, U.S.D.J. (Ret.) (the

8  "Arbitrator") serving as the duly appointed arbitrator throughout the entirety of the

9  proceedings.

10      5.    Following prehearing discovery, prehearing motions, and an eleven-day

11  arbitration hearing spanning over a month in duration because of scheduling conflicts,

12  the Arbitrator issued an Interim Award on March 27, 2012, finding in favor of the

13  Defendants on all issues.

14      6.    Following further briefing on the issue of attorney fees, the Arbitrator

15  issued an Attorney's Fee Award on August 20, 2012, awarding the Defendants, Micah

16  Cohen, Nancy Cohen, and All Shades United, LLC (the company for which Micah

17  Cohen now works and an additional defendant added at the outset of the arbitration

18  proceedings) their attorney fees and costs.

19      7.    The Arbitrator combined the Interim Award and the Attorney Fee's

20  Award and issued a Final Award (the "Final Arbitration Award") on October 5, 2012.

21  A true and correct copy of the Final Arbitration Award is attached hereto as Exhibit 1

22  to this declaration.

23      8.    On September 29, 2010, Swarm filed its Demand for Arbitration, which

24  contained no independent substantive allegations, but attached the previously filed

25  district court Complaint.

26

27

28

**DECL. OF MATTHEW J. NORRIS ISO MTN. TO CONFIRM FINAL ARBITRATION AWARD**
CASE NO. CV 10-3188 DDP (FFMX)

1    9.    Fact discovery, consisting of the exchange of well over two thousand

2    pages of written documents and the taking of six separate depositions, concluded on

3    June 23, 2011.

4    10.    On June 30, 2011, one day before the last day to conduct depositions,

5    Swarm served a motion to add a new claim for misappropriation of trade secrets to

6    this litigation.  The Arbitrator denied the motion.  Shortly thereafter, the Defendant-

7    Respondents filed a motion for summary judgment, which the Arbitrator denied after

8    oral argument.

9    11.    The arbitration hearing began on August 15, 2011, and lasted eleven

10   nonconsecutive days, ending on September 23, 2011.

11   12.    The Arbitrator heard testimony from approximately 15 witnesses,

12   including testimony by Jeff Port, Swarm's principal owner, lasting for several days.

13   13.    The Arbitrator enforced the Federal Rules of Evidence during the

14   proceeding, and the hearing was "litigation-like," in the nature of a bench trial.

15   14.    Following the conclusion of the hearing, the parties submitted closing

16   briefs and replies totaling in excess of 100 pages, and following the issuance of the

17   Interim Award, at the invitation of the Arbitrator, the parties submitted additional

18   expansive briefing concerning the amount of attorney fees that should be awarded to

19   the Defendant-Respondents.  As part of that submission, the Defendant-Respondents

20   supplied detailed, itemized (and only minimally redacted) time records from their

21   counsel.

22   15.    On October 23, 2012, I contacted the JAMS case manager, Reina

23   Navarrete, who administered this matter on behalf of JAMS and the Arbitrator.  At my

24   request, Ms. Navarrete provided me with complete and final documentation indicating

25   the total amount of fees that the Defendant-Respondents paid to JAMS, as

26

27                                    -4-

28   **DECL. OF MATTHEW J. NORRIS ISO MTN. TO CONFIRM FINAL ARBITRATION AWARD**
     CASE NO. CV 10-3188 DDP (FFMX)

1  administrative fees and arbitrator compensation, in this matter.  A true and correct

2  copy of this documentation is attached hereto as Exhibit 2 to this declaration.

3    16. As noted above, All Shades United LLC, a California limited liability

4  company, was added to these proceedings via motion made by Swarm at the outset of

5  the arbitration.  All Shades is the company for which Micah Cohen now works and

6  designs his clothing lines, and which his parents formed following Micah Cohen's

7  resignation from Swarm.  All Shades thereafter participated fully in the arbitration as a

8  Respondent and Cross-Claimant, represented by the same counsel as the Cohens.

9    17. Jeff Port, the principal owner of Swarm, was added to this litigation by

10  the Defendant-Respondents, via the filing of an Answer and Cross-Complaint after

11  referral to arbitration, brought against Swarm and Jeff Port for breach of contract,

12  conversion, and an accounting.

13    18. Jeff Port participated fully in the arbitration proceedings after he was

14  added as a Cross-Respondent as described above.  He was represented by the same

15  counsel, testified at length at the arbitration hearing, and attended every one of the

16  eleven days of the arbitration hearing in person and in their entirety.

17

18    I hereby declare under penalty of perjury under the laws of the State of

19  California that the foregoing is true and correct.

20

21    Executed this 12th day of November, 2012 at Los Angeles, California.

22

23

24  _____

25    Matthew J. Norris

26

27        -5-

28    **DECL. OF MATTHEW J. NORRIS ISO MTN. TO CONFIRM FINAL ARBITRATION AWARD**
    CASE NO. CV 10-3188 DDP (FFMX)

# EXHIBIT 1

# JAMS ARBITRATION CASE REFERENCE NO. 1220041905

**SWARM, LLC,**

**Claimant,**

**And**

**MICAH COHEN, NANCIE SIDONIE COHEN**

**Respondents.**

## <u>FINAL AWARD</u>

## INTRODUCTION

The parties stipulated to this matter properly submitted to binding arbitration before JAMS. The Hon. George P. Schiavelli, United States District Judge (Ret) was duly appointed the neutral arbitrator. The Arbitrator heard evidence in the arbitration starting on August 15, 2011, and concluding on September 23, 2011, for a total of eleven days of testimony. Predicated upon the testimony of the witnesses at the hearing and the exhibits introduced into evidence, the following is the Interim Award.

This case arises out of a dispute over ownership of a trademark, SHADES OF GREIGE. Respondent Micah Cohen ("Cohen") designed a clothing line under that trademark while employed by Claimant, Swarm, LLC ("Swarm"). After a falling out with Swarm's majority member, Jeff Port ("Port"), Cohen started a competing clothing line called SHADES OF GREY BY MICAH COHEN. Swarm filed this case alleging claims for: (1) trademark infringement, false designation of origin, and unfair competition under the Lanham Act and California law; (2) declaratory relief; (3) intentional interference with economic relations; and (4) breach of the duty of loyalty.

Respondents cross-claimed for (1) breach of contract; (2) accounting; and (3) conversion.

1

# FINDINGS OF FACT

Cohen is a fashion designer of men's clothing.  Testimony of Micah Cohen ("M. Cohen Test.") Transcript Day 5, 1448:24-25.  At the end of 2006, Port and Cohen discussed partnering on a new clothing line.  M. Cohen Test., Day 5 at 1444: 1-13.  In late 2006, Port and Cohen started working together to create the SHADES OF GREIGE clothing line, with Port taking on the financial responsibilities, and Cohen acting on the creative side as the clothing designer.  *Id.* at 1448:14-25, 1449:14-1450:14.  In late 2006 or early 2007, Cohen began officially working for Port's company, which later became Swarm.  *Id.*  Port owns at least ninety-nine percent of Swarm.  Testimony of Jeff Port ("Port Test."), Day 4 at 923:8-10.

## A. The SHADES OF GREIGE Trademark

In 2006, Port and Cohen decided to call their new clothing line SHADES OF GREIGE.  M. Cohen Test. Day 5, 1449:24-1451:18.  The word "greige" is a term in the fashion industry referring to unprocessed textiles, with a beige color.  M. Cohen Test., Day 7 at 1847:2-18.  According to the testimony of Cohen; Steve Wolski of the marketing firm of BPMW; and Christopher Corrado of BPMW, the word is pronounced "grayzh," rhyming with the word "beige."  M. Cohen Test., Day 7 at 1842:24-1844:20; Testimony of Steve Wolski ("Wolski Test.") Day 4 at 1075: 9-23, 1078: 7-18; Testimony of Christopher Corrado ("Corrado Test."), at 62:9 to 63:3.  Further, Cohen testified that a Cordouroy Magazine article published around June 2009, as well as a rap song by artist Killian Wells, indicated the correct pronunciation is  "greige" to rhyme with "beige."  M. Cohen Test., Vol 9 at 2285:11-2286:19; Ex. 5087.

Claimant submitted the testimony of Port and several witnesses to the effect that "greige" is pronounced "gray," rhyming with the word "bay."  *See* Testimony of Jeffrey Enoch, Day 2 at 457:18-458:22; Testimony of John Flores, Day 8 at 1937:14-18; Testimony of Kimberly Koral, Day 11 at 2681:2-21; Testimony of Angie Duckwitz, Day 11 at 2685:15-2686:23; Testimony of Joel Barnett, Day 11 at 2723:8-17; Testimony of Ryan Port, Day 11 at 2721:9-15.  Kimberly Koral testified that she heard Micah Cohen pronounce the word "greige" as "gray."  Koral Test., Day 11 at 2681:2-21.  Further, Port informed the PTO that the word "greige" was pronounced

"gray" so that it could differentiate the mark SHADES OF GREIGE from the mark GREIGE. M. Cohen Test., Day 6: 1531; Day 7 at 1846:8-1847:12.

I conclude the parties pronounced the word to rhyme with "beige" while Cohen worked for Swarm. I think the pronunciation in the Corduroy Magazine article and in the rap song combined with the arbitration testimony are highly probative. Indeed, the article and song were contemporaneous with Cohen's employment.

Cohen and Port orally agreed that each of them would own 50% of the SHADES OF GREIGE trademark. M. Cohen Test., Day 7 at 1852: 4-20; Port Test., Day 2 at 568:9-570:15. Cohen and Port agreed that Cohen would file an application with the U.S. Patent and Trademark Office ("PTO") for the mark. Port Test., Day 2 at 583:3-7. On January 31, 2007, Cohen submitted a trademark application for the proposed mark SHADES OF GREIGE with the PTO, listing himself and Port as the trademark owners. M. Cohen Test., Day 7 at 1852:11-22; Ex. 491, 492. In May 2007, the PTO rejected Cohen's trademark application because of confusing similarity with the registered mark GREIGE. Ex. 53. While Port e-mailed the PTO a response, *see* Ex. 5005, neither Port nor Cohen properly contested the rejection, and the PTO ultimately determined that the application had been abandoned. Ex. 487.

The Employment Agreement, which the parties signed in May 2008 with an effective date of May 1, 2007, states that Port and Cohen co-own the SHADES OF GREIGE trademark. Ex. 5006, Recital D. As discussed further below, I find that Port did, in fact, sign the Employment Agreement, and that the Agreement is valid and enforceable. The Employment Agreement gave Swarm the right to use the SHADES OF GREIGE mark, royalty free, so long as both Cohen and Port were employed by Swarm. *Id.* at 8 (Article 8.2).

On March 17, 2010, Swarm and Port filed a new application with the PTO for the mark SHADES OF GREIGE. Ex. 99. This application did not list Cohen as a co-owner of the trademark, or mention Cohen in any way. *Id.* As part of the trademark examination process, Swarm disclaimed the world GREIGE. Port Test. Day 5 at 1301:12-1305:22; *see* Ex. 5082.

On September 28, 2010, Port signed an assignment to Swarm of his interest in the SHADES OF GREIGE trademark. Ex. 103. This assignment states that it is retroactively effective as of April 17, 2007. *Id.* Port testified that he always intended that Swarm would own the trademark for SHADES OF GREIGE. Port Test., Day 1 at 261:9-15.

On March 1, 2011, the U.S. PTO issued a certificate of registration naming Swarm as the owner of the trademark SHADES OF GREIGE. Ex. 105 (Registration Number 3924774). Because I conclude the Employment Agreement is valid and binding, and therefore that Cohen co-owns the SHADES OF GREIGE trademark, I must also conclude Swarm's registration of the SHADES OF GREIGE mark was improper and find it must be cancelled and stricken from the Principal Register.

## B. The Employment Agreement

Cohen and Port engaged in lengthy negotiations over a written Employment Agreement between Cohen and Swarm beginning in 2007. *See* M. Cohen Test. Day 6, at 1460:1-15, 1469:13-17. In May 2007, Port sent Cohen a proposed five-year Consulting Agreement. Ex. 458. In mid-June 2007, Cohen gave Port a counterproposal for a three-year Employment Agreement. M. Cohen Test., Day 7 at 1860:21-1861:6, *see* Ex. 465. Throughout 2007 and the first few months of 2008, Cohen and Port continued to exchange drafts of a written employment agreement. M. Cohen Test., Day 6 at 1472:12-16. All drafts acknowledged that Cohen and Port co-owned the SHADES OF GREIGE trademark.

On March 21, 2008, Port e-mailed Cohen saying, "Please bring in the signed agreement this morning." Ex. 18. Cohen responded that he had added to Recital E, and if that change was acceptable to Port, Cohen would print copies and sign them. *Id.* However, negotiations continued regarding Section 3.3, which provided for Cohen's continued employment by Swarm in the event of Port's death. M. Cohen Test., Day 7 at 1880:4-1881:4.

Port testified that he never reached a meeting of the minds with Cohen regarding all terms of the Employment Agreement, and never signed the contract. Port Test., Day 1 at 78:22-

79:18; 258:9-25. According to Port, an oral agreement governed Cohen's employment relation-ship with Swarm. Port Test., Day 1 at 135:13-136:2. However, I have found that testimony un-persuasive. A crucial piece of the record on this issue is that Port referred to the written Em-ployment Agreement several times in documented evidence and suggested that its terms were binding. *See* Exs. 15, 5104 (letter and e-mail attempting to extend Micah Cohen's term under the Employment Agreement); 5102 (Nov. 5, 2009 e-mail from Jeff Port referencing an "em-ployment agreement" with Cohen that Port tried to extend; mentions that Port "reread the agree-ment").

During approximately the third week of May 2008, Cohen signed two copies of the Em-ployment Agreement and gave them to Port at Swarm's offices in Van Nuys, California.[1] M. Cohen Test. Day 6 at 1481:9-16; Day 7 at 1885:16-1886:17. Port signed the copies and gave one copy back to Cohen, who stored it in a filing cabinet at Swarm's Van Nuys facility, which copy he never retrieved. M. Cohen Test., Day 7 at 1891:10- 1893:12. Cohen has not been able to find any signed copy of the alleged written May 1, 2007 Employment Agreement, but submitted an unsigned copy of the Agreement. Ex. 5006. On May 28, 2008, Cohen forwarded this unsigned copy of the agreement to his father, Gary Cohen, stating "this is the one that got signed." Ex. 244.

The Employment Agreement contains several key provisions that are relevant to this arbi-tration:

- Cohen was to work for Swarm for a three-year term, commencing on May 1, 2007, and ending on April 30, 2010. Ex. 5006 at 3, Article 3.1.
- Port and Cohen co-owned the trademark SHADES OF GREIGE. *Id.* at 1, Recital D. Cohen has not assigned his interest in the mark to Swarm. *Id.* at 8, Article 8.2.

---

[1] Swarm contends that the record shows Cohen was actually in China during this time. *See* Claimant's Post-Arbitration Brief at 12-13. This argument is completely speculative and based on a very misleading and highly strained interpretation of Cohen's testimony.

5

- Swarm was permitted to use the SHADES OF GREIGE mark without payment of royalty only so long as Cohen was employed by Swarm, and so long as Cohen and Port continued to own the mark. *Id.* at 1, Recital E; at 8, Article 8.2.
- Cohen received a salary of $75,000 per year. *Id.* at 4, Article 5.1(a).
- Cohen was to receive a bonus of 20% of Swarm's first $500,000 net profits, and 30% of net profits in excess of $500,000 each year. *Id.* at 4, Article 5.1(b).
- Swarm was to provide Cohen with benefits, including medical insurance. *Id.* at 5, Article 5.2.
- Net profits were to be determined by Swarm's independent accountant, and Cohen had the right to inspect the books and records of Swarm to determine the accuracy of the calculation of net profits. *Id.* at 12, Schedule A.
- Swarm had an option to extend the Agreement if Cohen's compensation was at least $125,000 each year of the first three years. *Id.* at 3, Article 3.1.
- Cohen and Swarm had the right to immediately terminate the Agreement after notice and failure to cure any material breach of the Agreement by the other. *Id.* at 4, Article 3.2 and 3.3.

### C. Cohen's Departure from Swarm

While employed by Swarm, Cohen designed seven seasons of clothing (two per year) under the mark SHADES OF GREIGE. *See* M. Cohen Test., Day 7 at 1823:20-1826:19. Swarm sold the clothing to retail buyers, who resold the clothes to the general public in stores and via the internet. *Id.*, Day 7 at 1832:13-17; Wolski Test., Day 4 at 1073:16-1074:20. Swarm paid Cohen a salary of $75,000 per year and expenses. Port Test., Day 1 at 31:8-11; Ex. 5006.

In mid-2009, Cohen asked Port for copies of Swarm's profit statements as required by Schedule A of the Employment Agreement. M. Cohen Test., Day 7 at 1905:18-1906:8. In October and November 2009, Cohen repeated his request for a proper accounting, but never received one. M. Cohen Test., Day 9 at 2373:10-20; Ex. 359. Port testified that Cohen had access to Swarm's financial books and records, and therefore had all the information he needed. Port Test., Day 5 at 1278:13-18, 1282:17-25. Port had profit and loss statements for Swarm created by accountant Gary Diamond, but did not give those to Cohen. *Id.*, Day 5 at 1283:1-5. Swarm produced these profit and loss statements, as well as other financial documents, during this case.

6

*See* Exs. 451, 452, 453 (2007 to 2009 profit & loss statements); 443-46 ( Swarm tax returns for 2007-2010). For the purposes of litigation, Respondents have also created their own calculations of Swarm's net income, in light of Swarm's tax returns, financial statements, and Cohen's knowledge of Swarm's expenses. Ex. 5095.

In July 2009, during a conversation at a picnic table outside Swarm's Van Nuys facility, Port asked Cohen whether Cohen would continue working for Swarm after the expiration of their Employment Agreement in 2010. M. Cohen Test., Day 5 at 1485:9-1486:21. Port wanted to extend the term of the Employment Agreement, and also modify terms of the Employment Agreement to reduce Cohen's salary. *Id.* A few days prior to that meeting, Port asked Cohen for a copy of their Employment Agreement, and Cohen sent Port an unsigned copy of the same Employment Agreement he sent his father on May 28, 2008. M. Cohen Test., Day 5 at 1483:6-1484:17, Ex. 245.

On October 31, 2009, Port hand-delivered a signed, written letter to Cohen's mother, Respondent Nancy Cohen. This letter stated Swarm's intent to extend Cohen's employment *"[i]n accordance with article 3, section 3.1, of your employment agreement dated May 1, 2007*." Ex. 15; emphasis added. Port also faxed a copy of the letter, as required by section 3.1 of the Employment Agreement, and e-mailed the same language to Cohen on November 1, 2009. Exs. 13; 367 at 2.

In October and November 2009, Cohen was developing the Fall/Winter 2010 clothing collection for SHADES OF GREIGE, despite having told Port that he would not extend his employment beyond April 2010. M. Cohen Test., Day 6 at 1600:21-1601:19, 1605:13-23, 1619:19-24, Ex. 361. Cohen testified that he continued to develop Swarm's Fall/Winter 2010 line because he believed that he and Port might still be able to work out an agreement for SHADES OF GREIGE to continue. M. Cohen Test., Day 6 at 1612:13-20, 1620:4-14.

However, Port and Cohen did not negotiate a new agreement. On November 13, 2009, Cohen delivered to Port at Swarm's Van Nuys facility a letter terminating their Employment Agreement. Port Test., Day 5 at 1408:19-22; Ex. 14. This letter stated that Swarm was in ma-

7

terial breach of the Employment Agreement because: (1) Swarm failed to make timely payments to venders for production and development; (2) Swarm failed to provide Cohen with certain benefits, including medical, car, and life insurance; and (3) Swarm failed to provide Cohen with a quarterly estimate of net profits, an annual report determined by Swarm's independent accountant, and access to Swarm's books and records. Ex. 14.

After receiving the letter, Port asked Cohen to leave the premises and turn over his keys to the building. Port Test., Day 1 at 250:11-25. Cohen testified he left his signed copy of the Employment Agreement in his filing cabinet at the Swarm office. M. Cohen Test., Day 7 at 1891:10- 1893:12.

On November 18, 2009, Port wrote to Cohen asking him to "please forward me a copy of the agreement you contend governs the terms of your relationship with Swarm LLC?" Ex. 251. On December 2, 2009, Port wrote a letter stating that "[a]fter a review of our records, I am unable to find an executed copy of the Employment Agreement referenced in your letter [of November 13, 2009]. Accordingly, despite whatever we may have thought, there is no formal agreement in place." Ex. 254. Also in 2009, Port faxed copies of the Employment Agreement to several of his attorneys for their advice, and asked whether two of the attorneys (Soibelman and Feldman) had any signed copies of the Agreement in their possession. Port Test., Day 3 at 898:17 to 900:6., 901:25 to 902: 14; Testimony of Adam Soibelman, Day 3 at 771:19-23, 781:3-15. In an e-mail to friends who were advising him, Jeff Port noted that "it is safe to assume that the worst case scenario is to figure that the agreement that was written by Micah/Father is the agreement in play for our negotiations. Clearly if we go to court or try to force our position we still have the options to use the agreement that was prepared by my attorney or that there is no agreement in play at all. Clearly the latter possibility becomes more difficult with all the correspondence and referrals to an agreement being [in] place." Ex. 5104.

## D. SHADES OF GREY BY MICAH COHEN

On October 19, 2009, Cohen's mother, Respondent Nancy Cohen, filed an intent to use application with the PTO for the trademark SHADES OF GREY. Testimony of Nancy Cohen

8

("N. Cohen Test.") Day 10 at 2577:3-16; Ex. 55. After leaving Swarm, Cohen began a new clothing line and marketed it under the name SHADES OF GREY BY MICAH COHEN. M. Cohen Test., Day 8 at 1993:24-1994:9. Respondent, All Shades United, LLC ("All Shades") is owned by Micah Cohen, Gary Cohen and Nancy Cohen, and manufactures and sells the SHADES OF GREY BY MICAH COHEN line. *See* Ex. 307. Cohen hired the same company, BPMW, to market his clothing line that Swarm had previously employed, and hired the same clothing manufacturer, Shanghai Onglory, that Swarm had used. Wolski Test., Day 4 at 1083:3-23; Testimony of Steven Zhou ("Zhou Test."), Day 4 at 1173:12-19. The SHADES OF GREY BY MICAH COHEN line has been targeted to many of the same customers as SHADES OF GREIGE. M. Cohen Test., Day 7 at 1833:24-1834:21.

Port testified that Swarm stopped selling clothes under the SHADES OF GREIGE brand because he believed the SHADES OF GREIGE line would be too similar to SHADES OF GREY BY MICAH COHEN, and believed his marketing company and manufacturer would no longer work with him while also working with Cohen. Port Test. Day 1 at 197:24-198:3, Day 11 at 2715:15-21. However, Steven Zhou, Christopher Corrado, and Steve Wolski all testified that they would have continued doing business with SHADES OF GREIGE and SHADES OF GREY BY MICAH COHEN at the same time. Zhou Test., Day 4 at 1164:4-1167:7; Corrado Test. at 188:23-189:6, 209:3-9; Wolski Test., Day 4 at 1084:2-17. Wolski did testify, however, that Micah Cohen is well known as a designer in their niche of the men's contemporary fashion industry, and retailers might have been less likely to buy SHADES OF GREIGE after Cohen stopped designing that line. Wolski Test., Day 4 at 1087:8-1088:4.

Swarm has alleged in this arbitration that Cohen did not actually create brand new designs for the SHADES OF GREY BY MICAH COHEN Fall/Winter 2010 line, but rather misappropriated Swarm's Fall/Winter 2010 designs to his own use. In support of this claim, Swarm submitted Shanghai Onglory invoices for SHADES OF GREIGE and SHADES OF GREY BY MICAH COHEN, respectively, showing similar style numbers between Swarm's Fall/Winter 2010 line on the one hand, and Micah Cohen's Fall/Winter 2010 collection on the other. *See* Exs. 7 and 377. Swarm also submitted the opinion testimony of Jeff Port's son Ryan Port re-

9

garding similarity of the SHADES OF GREY BY MICAH COHEN designs to past seasons of SHADES OF GREIGE. *See* R. Port Test., Day 11 at 2767:2-2768:7, 2770:5-2774:9.

However, I find Cohen did not steal Swarm's designs. Cohen testified that he began working on the SHADES OF GREY BY MICAH COHEN Fall/Winter 2010 collection only after he resigned from Swarm, and worked very hard to complete his new collection in the shortened time available. M. Cohen Test. Day 6 at 1681:17-1682:19; Day 8 at 1996:23- 1997:5, 2008:21-2009:1, 2031:6-2032:4. Steven Zhou likewise testified that Micah Cohen brought entirely new designs when he returned to China in November 2009 to work on the SHADES OF GREY BY MICAH COHEN protos for Fall/Winter 2010. Zhou Test., Day 4 at 1164:10-19; Day 7 at 1746:14-1747:22.[2]

On October 27, 2009, before he left Swarm, Cohen composed an e-mail to his parents stating that he would rather "start SHADES OF GREY tomorrow than have to drag this out with [Port] and risk missing a season. I'm doing all the prep work for Fall 2010 samples right now, so there shouldn't be an issue getting them done." Ex. 361. Swarm contends this e-mail shows Cohen intended to steal Swarm's designs. Cohen testified that, at the time he wrote this e-mail, he still believed that he and Port might be able to work out an agreement for SHADES OF GREIGE to continue. M. Cohen Test., Day 6 at 1612:13-20, 1620:4-14. Cohen testified that he knew he had to create brand new designs for his new clothing line after he left Swarm; indeed, his father so advised him in an e-mail dated November 11, 2009, in response to which Cohen said "I'll make sure there are differences between my new pieces and the old Swarm/SofG stuff, not a problem." Ex. 356; M. Cohen Test., Day 8 at 2033:25-2034:7. Regarding the similar invoices that Shanghai Onglory sent to SHADES OF GREIGE and SHADES OF GREY BY MICAH COHEN, respectively, Cohen testified that he used the same style numbers for the convenience of the technicians at Shanghai Onglory, not because he copied Swarm's designs. M. Cohen Test., Day 9 at 2558:20-2260:11.

---

[2] Claimant tries to undermine Zhou's testimony by asserting that Zhou refused to show Port the "proto" samples or patterns of Swarm's Fall/Winter 2010 line, and that Zhou deleted the patterns for the designs and tried to dissuade Swarm from going forward with its Fall/Winter 2010 line. Port Test., Day 5 at 1386:17-1387:20; 1393:16-.394:24. On the other hand, Zhou testified that he sought to send Port the patterns for Swarm's fall/winter 2010 designs, and did show Port the protos. Zhou Test., Day 7 at 1741:22-1743:10, 1766:4-18.

In response to Claimants' allegations that Cohen's designs for SHADES OF GREY BY MICAH COHEN were inspired by his past designs for Swarm, Cohen testified extensively and in detail regarding differences between his designs for SHADES OF GREIGE, and his own Fall/Winter 2010 line for SHADES OF GREY BY MICAH COHEN. M. Cohen Test., Day 11 at 2791:6-2813:13. As Cohen pointed out in his testimony, if he had to make new clothing for SHADES OF GREY BY MICAH COHEN that bore no similarities to his work for Swarm, he would be able to make no clothing at all. *Id.*, Day 11 at 2803:10-21. Two blazers, for example, will necessarily have some similarities: both must have sleeves, lapels, and buttons. *Id.* Steve Wolski likewise testified that, for contemporary menswear, representative samples from different lines and different designers will often have a similar appearance, and retailers may carry similar styles from different designers. Wolski Test., Day 4 at 1111:17-1113:25. Thus, Claimant's attempt to stress the similarities between the designs is not convincing.

Finally, Claimant points to Exhibit 497 in support of its claim that Cohen stole the Fall/Winter 2010 SHADES OF GREIGE designs. Claimant produced Exhibit 497 for the first time on the day seven of the arbitration. The exhibit purports to be an email sent by Micah Cohen to Steven Zhou of Shanghai Onglory on November 13, 2009, with a list of the Fall/Winter 2010 SHADES OF GREIGE designs, along with notations describing the new designs as "basically the same as [styles from previous SHADES OF GREIGE seasons]," but with minor changes. According to Claimant, Exhibit 497 proves that Cohen was instructing Zhou to prepare these Swarm designs for his own SHADES OF GREY BY MICAH COHEN line.

Respondents challenge the authenticity of Exhibit 497. Cohen testified that he did not recall ever seeing this document and did not recall sending it to Zhou. Cohen Test., Day 8 at 2154:1-16, 2156:25-2157:2. He testified that, although he sent Zhou many proto lists while employed by Swarm, he never sent a SHADES OF GREIGE proto list to Zhou after he resigned from Swarm. M. Cohen Test., Day 8 at 2165:13-21. Respondents also point out that the message that Cohen purportedly sent Zhou was dated "Monday Nov 13 2009," although I took judicial notice that November 13, 2009 was a Friday. Transcript Day 8 at 2158:6-8.

In light of the evidence, I give Exhibit 497 little weight. First, the mislabeling of the date as a Monday raises serious questions whether the date of the e-mail was altered. Second, the list

of SHADES OF GREIGE designs attached to the e-mail is not the smoking gun that Claimant suggests. Taking away the date, there is no indication on the e-mail or its attachment that Cohen was trying to instruct Zhou to misappropriate the Fall/Winter 2010 SHADES OF GREIGE protos for Cohen's new line.

### E. Evidence of Confusion

Port testified that Cohen's use of the name SHADES OF GREY BY MICAH COHEN has created actual confusion in the marketplace. Using the Google.com search engine, Port found several websites that purportedly demonstrate confusion between Swarm's SHADES OF GREIGE clothing line and Cohen's SHADES OF GREY BY MICAH COHEN clothing line. *See* Port Test., Day 11 at 2727:24-2730:25; *see, e.g.*, Exs. 183, 505. Swarm also presents purchase orders issued by Urban Outfitters, a clothing retailer, to All Shades United in 2010 and 2011 that refer to various forms of the names SHADES OF GREIGE and SHADES OF GREY, allegedly showing that Urban Outfitters was confused by the names. Ex. 379. Swarm also points to an e-mail from a Bloomingdale's buyer in February 2010 asking Swarm whether its label would read SHADES OF GREIGE or SHADES OF GREY, Ex. 196, and a check Swarm received in May 2010 that was made out to SHADES OF GREY, Ex. 177.

Steve Wolski of BPMW, the company that both Swarm and Micah Cohen used to market their clothing lines, testified that he knows of no retail customers who expressed confusion between the SHADES OF GREIGE and SHADES OF GREY BY MICAH COHEN marks. Wolski Test., Day 4 at 1085:16-21. Wolski testified that BPMW made clear to customers the fact that SHADES OF GREY BY MICAH COHEN was a new collection from Micah Cohen's new company. *Id.*

Cohen testified that he had no intention to infringe on SHADES OF GREIGE or deceive customers by using the name SHADES OF GREY BY MICAH COHEN. M. Cohen Test., Day 8 at 1988:25-1990:3. Regarding retailer Urban Outfitters, Cohen testified that he has never failed to receive payment on purchase orders for SHADES OF GREY BY MICAH COHEN made by Urban Outfitters. M. Cohen Test., Day 8 at 2182:15-18, 2190:6-9.

12

### F. Procedural History

Swarm filed suit against Micah Cohen and Nancy Cohen in United States District Court for the Central District of California on April 28, 2010. The parties stipulated to binding arbitration before JAMS. On September 29, 2010, Swarm filed its Demand for Arbitration.

The Court heard evidence in the arbitration starting on August 15, 2011, and concluding on September 23, 2011, for a total of eleven days of testimony.

## CONCLUSIONS OF LAW

## ANALYSIS OF SWARM'S CLAIMS

### I. Validity of the May 1, 2007 Employment Agreement

As stated above, I have concluded that Jeff Port did, in fact, sign the Employment Agreement. I find particularly probative the occasions that Port referred to the employment agreement in other writings, and the manner in which Port conducted himself in accordance with the terms of that Agreement until after Cohen resigned. *See* Exs. 15, 367; M. Cohen Test., Day 5 at 1485:9-1486:21 (discussing Port's attempt to extend the term of the Employment Agreement and modify compensation terms in July 2009).[3]

In any event, even if Port did not sign the actual agreement, the record demonstrates that Port both affirmed the Agreement and performed under it. He is also estopped to deny the

---

[3] According to Swarm, there could never have been a true meeting of the minds because, under the terms of the Employment Agreement, Swarm could have manufactured and sold clothes for the Fall/Winter 2010 season and not been able to sell them if Cohen left his employment on the agreed-upon date of April 30, 2010, and refused to give Swarm permission to continue using the SHADES OF GREIGE trademark. Swarm asserts this outcome would be nonsensical, and therefore no party could actually have agreed to this. "The presence of an ambiguous material term may indicate that no meeting of the minds occurred when the document was signed." *Local Motion, Inc. v. Niescher*, 105 F.3d 1278, 1280 (9th Cir. 1997). However, Claimant does not assert that any particular terms relating to the end date of the Employment Agreement are ambiguous; rather, Claimant argues that the parties did not completely consider all the possible implications of the end date for Cohen's employment. This is not a ground for mutual mistake, and Claimant submits no other evidence of mutual mistake that would support its argument.

Agreement because he knew that Cohen believed the agreement was binding, and that Cohen performed his services for Swarm in reliance on that agreement. For example, in July 2009, Port asked Cohen for a copy of their contract, and Cohen sent Port an unsigned copy of the Employment Agreement. M. Cohen Test., Day 5 at 1483:6-1484:17. Cohen also referred to the Employment Agreement in correspondence with Port multiple times. *See, e.g.*, Exs. 367; 375. Yet Port never disputed that the Agreement was binding until after Cohen resigned. M. Cohen Test., Day 7 at 1896:13-1897:8.

In *Bartlett v. Rogers*, 103 Cal. App. 2d 250, 254 (1951), the court held that "[o]ne is bound by a written contract which he has not signed, if by signed letter he expressly refers to and adopts such contract." The evidence in the record suggests that, even if Port had not signed the Employment Agreement, he expressly referred to and relied on that Agreement in his letter of October 31, 2009, and intended to adopt that contract. *See* Ex. 15 (October 31, 2009 letter). This letter, which Port delivered to Nancy Cohen's home, purported to extend the term of Cohen's employment for Swarm "[i]n accordance with article 3, section 3.1, of your employment agreement dated May 1, 2007." Ex. 15. Thus, Port expressly referred to and adopted the Employment Agreement in a signed writing. Port was both acting in accordance with the Employment Agreement, and trying to obtain the benefits of it (i.e. extending Micah Cohen's employment).

As Respondents point out, "it is not the presence or absence of a *signature* which is dispositive; it is the presence or absence of evidence of an *agreement ...* which matters." *Banner Entertainment, Inc. v. Superior Court*, 62 Cal. App. 4th 348, 361 (1998). There is ample evidence in the record that Port did agree to the terms of the Employment Agreement. Further, the doctrine of partial performance is helpful to Respondents here. *See Pilch v. Milikin*, 200 Cal. App. 2d 212, 225-226 (1962) (holding that where the parties have partially performed an unsigned agreement, one party cannot pick and choose which terms of the contract it likes, and claim a lack of agreement on less favorable provisions). For all of these reasons, the record shows that Port did in fact agree to the terms in the Employment Agreement and should be bound by that Agreement.

14

## II. Trademark Claims

Swarm asserts three claims under the Lanham Act, 15 U.S.C. § 1114, *et seq*: (1) trademark infringement; (2) false designation of origin; and (3) unfair competition. Swarm claims that Respondents have violated the Lanham Act by selling a clothing line under the trademark SHADES OF GREY BY MICAH COHEN, which Swarm contends is confusingly similar to its trademark, SHADES OF GREIGE.

### A. Swarm's Standing to Pursue Lanham Act Claims

Respondents argue that Swarm lacks standing to pursue its Lanham Act claims because Cohen is a co-owner of the trademark, and Swarm has no right to use the SHADES OF GREIGE trademark without Cohen's permission.

"To establish standing to sue for trademark infringement under the Lanham Act, a plaintiff must show that he or she is either (1) the owner of a federal mark registration, (2) the owner of an unregistered mark, or (3) a nonowner with a cognizable interest in the allegedly infringed trademark." *Halicki Films, LLC v. Sanderson Sales & Mktg.*, 547 F.3d 1213, 1225 (9th Cir. 2008). In addition, to maintain a claim under Section 43(a) for false designation, a plaintiff must show "commercial injury based upon a misrepresentation about a product, and also that the injury was 'competitive,' i.e., harmful to the plaintiff's ability to compete with the defendant." *Barrus v. Sylvania*, 55 F.3d 468, 470 (9th Cir. 1995).

Swarm relies upon an assignment from Jeff Port as its basis for standing. On September 28, 2010, Port assigned to Swarm, nunc pro tunc, "any and all of his right, title and interest in and to the trademark Shades of Greige and associated goodwill," effective April 17, 2007. Ex. 103. Port testified that he always intended that Swarm own the trademark. Port Test., Day 1 at 261:9-15. Respondents assert that the Court should find the assignment ineffective because a nunc pro tunc assignment is inappropriate where, as here, it contradicts Cohen's and Port's original intention to co-own the trademark, and even if Port's nunc pro tunc assignment to Swarm

15

were proper, it is insufficient to confer standing to Swarm because it occurred after litigation began.

In *Gaia Technologies, Inc. v. Reconversion Technologies, Inc.*, 93 F.3d 774, 779-780 (Fed. Cir. 1996), the court ruled that a trademark assignment must be in writing, and a vague intention to make an assignment at some point in the future is not sufficient to convey standing. Furthermore, a nunc pro tunc assignment of trademark rights cannot create standing where the assignment takes place after the date the complaint is filed.  As the *Gaia* court stated, "parties should possess rights before seeking to have them vindicated in court. Allowing a subsequent assignment to automatically cure a standing defect would unjustifiably expand the number of people who are statutorily authorized to sue." *Id.* at 780 (quoting *Procter & Gamble Co. v. Paragon Trade Brands, Inc.*, 917 F. Supp. 305, 310 (D.Del. 1995); *see also Enzo APA & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090, 1093 (Fed. Cir. 1998) (same).

According to Claimant, the nunc pro tunc assignment was proper because Port always intended that Swarm own the SHADES OF GREIGE trademark.  Port never testified that that he actually assigned his rights to Swarm on April 17, 2007; nor would such testimony be credible given the recital of co-ownership in the Employment Agreement, which was signed in May 2008.  Thus, the facts here are analogous to *Gaia Technologies*; a mere intent to make an assignment is not sufficient to confer standing, and a nunc pro tunc assignment after the complaint is filed is not enough to cure the defect.

Thus, Respondents are correct that Port's September 28, 2010 assignment to Swarm, which occurred after the date Swarm filed its complaint on April 23, 2010, was insufficient to grant standing to Swarm.  Swarm does not have standing to pursue claims under the Lanham Act against Respondents for trademark infringement.  The same is true of Claimant's section 43 false designation claim.  Without a proper assignment, and as a mere former licensee, Swarm does not have a sufficient commercial interest to confer standing.  *See Barrus*, 55 F.3d at 470.[4]

---

[4] Claimant's state law claims, including unfair competition, likely survive this standing problem.  In any event, as discussed below, I conclude that these claims fail on their merits as well.

16

**B. Ownership of the SHADES OF GREIGE Mark**

Swarm contends that it owns the trademark SHADES OF GREIGE because Swarm is the only entity to have used that mark in commerce. However, "[o]wnership rights in a trademark or service mark can be acquired and maintained through use of the mark by a controlled license, even when the first and only use of the mark was made, and is being made, by the licensee." 3 McCarthy on Trademarks and Unfair Competition §18:46 (4th ed. 2011); *see Freecycle Sunnyvale v. Freecycle Network*, 626 F.3d 509 (9th Cir. 2010) (a trademark owner retains ownership, despite a license without any contractual right to control quality, so long as there is actual evidence of quality control). Because the record demonstrates that Cohen exercised extensive quality control over the SHADES OF GREIGE brand, *see* Port Test., Day 2 at 403:22-25, the fact that Swarm was the only entity to use the mark in commerce is irrelevant. Swarm had a controlled license, and Port and Cohen acquired their ownership rights through Swarm's use of the mark.

Swarm also contends that Cohen and Port abandoned the SHADES OF GREIGE trademark because they never properly challenged the PTO's rejection of their 2007 trademark application, and the PTO ruled that the registration application had been abandoned. However, Swarm cites to no authority for the proposition that Cohen and Port actually abandoned the trademark in this manner. The PTO merely stated that Cohen and Port abandoned the registration application. *See* Ex. 487. That ruling had no effect on the parties' agreement to co-own the trademark. Nor does the record demonstrate any intent on Port or Cohen's behalf to abandon the actual SHADES OF GREIGE trademark at that time.[5]

I have found that Port signed the Employment Agreement, and that the Employment agreement is valid and binding. As stated in the Employment Agreement, Port and Cohen co-

---

[5] 15 U.S.C. §1127 provides:

A mark shall be deemed to be "abandoned" if either of the following occurs:

(1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

(2) [not relevant]

owned the SHADES OF GREIGE mark at the time that Agreement was signed. Further, as discussed above, Port's nunc pro tunc assignment of his interest in the trademark to Swarm was ineffective to confer standing in this case. Thus, Port and Cohen are currently co-owners of the SHADES OF GREIGE mark.

### C. Trademark Infringement Suits Involving Co-Owners

Respondents argue that they cannot have infringed the SHADES OF GREIGE mark because Micah Cohen is co-owner of that mark, as memorialized by the Employment Agreement. According to Respondents, Port cannot use the SHADES OF GREIGE mark without Cohen's permission, and therefore Port cannot maintain an infringement suit against Cohen. Respondents ask the Court to rule that neither Port nor Cohen can use the SHADES OF GREIGE mark going forward.

Several courts have considered who should own a trademark when a group of people create and use the mark jointly in commerce, such as a music act, and later have a falling out. In several such cases, courts have held that the group as a whole owns the trademark, and the individual members of the group may not separately use the mark. For example, in *Lunatrex, LLC v. Cafasso*, 674 F. Supp. 2d 1060 (S.D. Ind. 2009), members of a team created the Lunatex trademark and began using it in commerce. The team members had no agreement defining their ownership rights in the mark, and a dispute arose. The court held that the entire team owned the mark as a joint venture, and therefore "each team member is harmed when an entity other than the entire team uses the mark. Each team member has the right to put a stop to any use by an entity other than the entire team." *Id.* at 1072.

Likewise, the court in *Durango Herald, Inc. v. Riddle*, 719 F. Supp. 941, 951 (D. Colo. 1988), ruled that neither member of a dissolved joint venture could individually use the trademark owned by the joint venture because "joint control of a jointly-held mark is the only means of preventing injury to the immeasurable interests of one member in the good will of the group." The court further reasoned that "[t]he mark cannot be used without triggering the public perceptions which make up the joint venture's reputation," *id.* at 945, and therefore the "[o]verriding

concerns of trademark law for consumer information require that we enjoin independent use of the joint mark," *id.* at 951.[6]

The *Lunatrex* and *Durango Herald* courts outlined several important considerations for determining ownership of, and right to use, a trademark after a disagreement between the joint owners: (1) the existence of an agreement defining individual rights in the trademark at issue; (2) whether any one member of the group made the most valuable contribution to the goodwill associated with the trademark; and (3) the danger of harm to the public from confusion regarding the source of goods. *See Lunatrex, LLC,* 674 F. Supp. 2d at 1073-74; *Durango Herald, Inc.,* 719 F. Supp. at 945-951; *see also Bell v. Streetwise Records, Ltd.,* 640 F. Supp. 575, 580 (D. Mass. 1986)(quoting *In re Polar Music International AB,* 714 F.2d 1567 (Fed. Cir. 1983)) ("[I]n the case of joint endeavors, where prior ownership by one of several claimants cannot be established, the legal task is to determine which party controls or determines the nature and quality of the goods which have been marketed under the mark in question.").

Respondents assert a finding *could* be made that Cohen contributed more significantly to the goodwill associated with the trademark because he was more directly involved with designing and marketing the SHADES OF GREIGE clothing line. However, Respondents do not seem to want to me to reach any such ruling. Instead, Respondents ask me to enjoin the use of the trademark by either party, and rule that neither has the right to use it under the Employment Agreement without the other's consent. According to Respondents, this outcome would be more consistent with the holdings of *Durango Herald* and *Lunatrex. See Lunatrex,* 674 F. Supp. 2d at 1073-1075 (expenditures of cash by one co-owner did not signify greater contribution to goodwill; all co-owners contributed talent and efforts to the mark, leading to injunction against any party using the mark without the others' consent).

Weighing the factors outlined in *Lunatrex* and *Durango Herald,* I agree with Respondents and will enjoin both Micah Cohen and Port from using the SHADES OF GREIGE mark.

---

[6] The court, however, rejected the plaintiff's request for an accounting. *Durango Herald,* 719 F. Supp. at 944. The court awarded only the injunction on the trademark claim. There is a dearth of trademark infringement cases between co-owners in which damages were awarded for the improper use of the mark by one owner.

19

While the second and third factors (goodwill and harm to the public)[7] favor awarding the trademark to Cohen, the parties' agreement, as embodied by the Employment Agreement, show that Cohen and Port intended to co-own the trademark equally.[8]

In concluding to enjoin both Port and Micah Cohen from using the SHADES OF GREIGE trademark, I must turn to the next question of whether I must also enjoin[9] use of the SHADES OF GREY BY MICAH COHEN mark.

## D. Likelihood of Confusion Between SHADES OF GREIGE and SHADES OF GREY BY MICAH COHEN

For Swarm's claims under the Lanham Act, the key issue is whether Respondents' use of the SHADES OF GREY BY MICAH COHEN trademark creates a likelihood of confusion among consumers. *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1178 (9th Cir. 1988) ("The 'ultimate test' for unfair competition is exactly the same as for trademark infringement: 'whether the public is likely to be deceived or confused by the similarity of the marks.'") (citation omitted); *Auto-chlor Sys. Of Minnesota, Inc. v. Johnsondiversey*, 328 F. Supp. 2d 980, 1019 (D. Minn. 2004) (false designation of origin claim under 15 U.S.C. § 1125(a)(1)(A) requires likelihood of confusion between trademarks). "Likelihood of confusion exists when consumers are likely to assume that a product or service is associated with a source other than its actual source

---

[7] First, the record suggests that Micah Cohen has made a greater contribution to the goodwill associated with the SHADES OF GREIGE mark. *See* Port Test., Day 2 at 427:22-.428:15, 443:13-25 (testifying that Cohen designed the product, supervised manufacturing, and handled marketing with BPMW). Further, because the customers for the clothing line are sophisticated retail buyers, who usually have direct contact with marketing companies like BPMW to educate them about the designers and companies behind the brand, there is little danger of harm to the public. Importantly, Micah Cohen was associated with both of these clothing lines, and as Steve Wolski testified, some customers of SHADES OF GREIGE would have followed Micah Cohen to his new line for the sole reason that Micah Cohen was the designer. *See* Wolski Test., Day 4 at 1087:8-1088:4.

[8] This ruling would also, of course, apply to Swarm should Port execute a proper assignment of his interest in SHADES OF GREIGE to the company because Swarm would merely be standing in Port's shoes.

[9] It is far less clear that I may award damages for Micah Cohen's use of the SHADES OF GREY BY MICAH COHEN trademark, even if there is an appreciable likelihood of confusion with SHADES OF GREIGE. First, Swarm does not have standing in this case for its Lanham Act claims, and it therefore could not receive a damages award on those claims. Second, even if Port were the Claimant, there appear to be no cases in which a Court awarded damages to a trademark co-owner for infringement of the mark by another co-owner. In any event, as discussed below, I find no appreciable likelihood of confusion between the two trademarks and therefore the claims fail on their merits as well.

20

because of similarities between the two sources' marks or marketing techniques." *Meritage Homes Corp. v. Hancock*, 522 F. Supp. 2d 1203, 1216 (D. Ariz. 2007) (quoting *Shakey's Inc. v. Covalt*, 704 F.2d 426, 431 (9th Cir. 1983)).

"To determine whether a 'likelihood of confusion' exists, we employ the eight factor test set forth in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir.1979), *abrogated in part on other grounds as recognized in Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792 (9th Cir.2003): '1. strength of the mark; 2. proximity of the goods; 3. similarity of the marks; 4. evidence of actual confusion; 5. marketing channels used; 6. type of goods and the degree of care likely to be exercised by the purchaser; 7. defendant's intent in selecting the mark; and 8. likelihood of expansion of the product lines.'" *One Indus., LLC v. Jim O'Neal Distrib., Inc.*, 578 F.3d 1154, 1162 (9th Cir. 2009). "Some factors [of the *Sleekcraft* analysis] are much more important than others, and the relative importance of each individual factor will be case-specific. Although some factors—such as the similarity of the marks and whether the two companies are direct competitors—will always be important, it is often possible to reach a conclusion with respect to likelihood of confusion after considering only a subset of the factors." *Brookfield Communications, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1053-54 (9th Cir. 1999).

A finding of likelihood of confusion "cannot be predicated on dissection of a mark, that is, on only part of a mark." *In re Nat'l Data Corp.*, 753 F.2d 1056, 1058 (Fed. Cir. 1985). However, the Federal Circuit has also noted that "'[o]nce all the features of the mark are considered ... it is not improper to state that, for rational reasons, more or less weight has been given to a particular feature of the mark, provided the ultimate conclusion rests on a consideration of the marks in their entireties.'" *In re Chatam Intern., Inc.*, 380 F.3d 1340, 1342 (Fed. Cir. 2004) (quoting *Packard Press, Inc. v. Hewlett-Packard Co.*, 227 F.3d 1352, 1357 (Fed. Cir. 2000)).

Respondents assert that there is no likelihood of confusion here because: (1) SHADES OF GREIGE is not a strong mark; (2) SHADES OF GREY BY MICAH COHEN, when viewed in its entirety, is not similar to SHADES OF GREIGE in sight, sound, or meaning; (3) Swarm has no evidence of actual confusion; (4) Respondents had no intent to infringe; (5) the clothing lines were not sold in proximity to each other; (6) the customers of both brands of clothing were

21

highly sophisticated; and (7) Swarm has no plans to continue or expand using the SHADES OF GREIGE mark.

Swarm argues that likelihood of confusion is established because (1) the SHADES OF GREIGE and SHADES OF GREY BY MICAH COHEN marks represent similar goods, similarly marketed, which causes confusion even for weak marks; (2) the goods are proximate, i.e. sold to the same class of purchasers and identical in use; (3) the marks are similar in pronunciation, sight, and meaning; (4) there is evidence of actual confusion; (5) Cohen's intent to cause confusion can be inferred from the circumstances; and (6) Swarm intends to resume using the SHADES OF GREIGE mark when this case concludes.

### 1. Strength of the Mark

The parties spent very little time in their briefs addressing the strength of the SHADES OF GREIGE mark, and presented virtually no evidence on this factor at arbitration.

"A 'strong' mark is one which is used only in a fictitious, arbitrary, and fanciful manner. The best example is a name made up by the user. A 'weak' mark is a mark that is a meaningful word in common usage or is merely a suggestive or descriptive trademark." *Alpha Indus. v. Alpha Steel Tube and Shapes, Inc.,* 616 F.2d 440, 445 (9th Cir. 1980).

Here, SHADES OF GREIGE is suggestive of clothing. GREIGE refers to unfinished textiles that have a beige color. *See* M. Cohen Test., Day 7 at 1847:2-18. The phrase SHADES OF is clearly also related to color, and is a commonly used phrase. Because of this reference to color and textile, the mark suggests a clothing line, although the substitution of the word GREIGE for a more predictable color like "grey" does give it a fanciful bent. Thus, while the mark is not weak, it is not very strong either. This factor does not weigh very heavily on either side.

### 2. Proximity, Marketing Channels, and Customers

22

SHADES OF GREIGE and SHADES OF GREY BY MICAH COHEN were both used to represent contemporary men's clothing lines that were designed by Micah Cohen, produced by the same manufacturer, marketed by the same company (BPMW), and sold to many of the same retailers.  Thus, the two lines are in direct competition, which weighs in favor of finding a likelihood of confusion.  Respondents point out, however, that the two clothing lines were not actually sold at the exact same time because Swarm discontinued the SHADES OF GREIGE line after Micah Cohen left, and under the Employment Agreement, Swarm could not have continued to use the SHADES OF GREIGE mark.

While proximity and marketing channels favor Claimant here, the sophistication of the customers is extremely important in this case.  As Steve Wolski of BPMW (who had direct contact with customers of both SHADES OF GREIGE and SHADES OF GREY BY MICAH COHEN) testified, the identity of a clothing designer is important to retail buyers.  Buyers knew that Micah Cohen had started a new clothing line because BPMW, the marketing company through whom buyers purchased SHADES OF GREY BY MICAH COHEN, so informed them.  Wolski Test., Day 4 at 1085:16-21, 1087:8-1088:4.  Given the guidance provided by BPMW, the celebrity of Micah Cohen, and the importance of the identity of designers, the customers would likely pay close attention to the actual source of the goods.  *Compare Alpha Indus.*, 616 F.2d at 444 (9th Cir. 1980) (holding that ALPHA STEEL TUBE was not confusingly similar to ALPHA in part because purchasers were "knowledgeable, sophisticated specialists in their areas").  Thus, I recommend that the Court conclude that the degree of care factor weighs heavily in favor of Respondents.

### 3. Similarity of Sight, Sound, and Meaning

Most of the testimony regarding the similarity of sight, sound, and meaning between the two marks focused on the pronunciation of the word GREIGE.[10]  Both sides produced multiple

---

[10] Respondents assert that Port, acting on behalf of Swarm, disclaimed the word GREIGE in Swarm's 2010 application for the SHADES OF GREIGE mark before the PTO. Ex. 51.  Thus, according to Respondents, Swarm cannot rely upon any similarity between the words "greige" and "gray."  The Federal Circuit has held that a disclaimer in an application to register a mark has no effect on the likelihood of confusion analysis.  "[I]t is inappropriate to give the presence or absence of a disclaimer any legal significance."  *In re Nat'l Data Corp.*, 753 F.2d 1056, 1059 (Fed. Cir. 1985).

witnesses who testified to the pronunciation of GREIGE as either rhyming with "beige" or "bay." According to Swarm, the words GREIGE and GREY have an identical pronunciation, and therefore are indistinguishable. Respondents contest that point, and assert that Swarm's actual customers always pronounced GREIGE to rhyme with "beige." The Respondents also offered into evidence a Corduroy Magazine article written in 2009 setting forth the Respondents' stated pronunciation of GREIGE. *See* ex. 5087. Further, Micah Cohen testified that a rapper, Killian Wells, recorded a song in 2009 with SHADES OF GREIGE in the lyrics, pronounced to rhyme with "beige." M. Cohen Test., Day 9 at 2286: 11-19.

Even accepting Cohen's preferred pronunciation, the sounds "grayzh" and "gray" are similar to the ear. Further, as Micah Cohen testified, the two words have a related, although not identical meaning. Both words refer to color or lack of color. GREIGE refers to a beige color, which like GREY is a neutral shade. *See* M. Cohen Test. Day 7 at 1847:2-18.

On the other hand, the differing spellings of the words GREIGE and GREY are significant to the appearance of the marks. The Federal Circuit has noted that differences in spellings, even for words that are pronounced the same, can dispel similarity. *See Champagne Louis Roederer, S.A. v. Delicato Vineyards*, 148 F.3d 1373, 1374–75 (Fed. Cir. 1998) (finding CRISTAL and CRYSTAL CREEK dissimilar); *Citigroup, Inc. v. Capital City Bank Group, Inc.*, 637 F.3d 1344 (Fed. Cir. 2011) (finding a significant difference between CITI and CITY).

Swarm urges the Court to focus on the similarity of the phrases SHADES OF GREIGE and SHADSE OF GREY, and to discount the Respondents' addition of the phrase BY MICAH COHEN. Swarm relies upon *In re Mighty Leaf Tea*, 601 F.3d 1342, 1348 (Fed. Cir. 2010), in which the Federal Circuit affirmed the Trademark Trial and Appeal Board's decision that the addition of the words "MARK LEES" to the mark ML MARK LEES did not necessarily eliminate the likelihood of confusion with the mark ML because "ML" comprised the dominant feature of both marks, and both marks were to be used on the same type of goods. Importantly, the court held that ML would likely be perceived by purchasers as a shortened version of ML MARK LEES.

24

The Federal Circuit distinguished the *In re Mighty Leaf Tea* case in *Citigroup, Inc. v. Capital City Bank Group, Inc.*, 637 F.3d 1344 (Fed. Cir. 2011).  In the *Citigroup* case, the court noted that the mark CAPITAL CITY BANK was not identical to CITIBANK; it was spelled differently, and was neither a short nor long form of plaintiff Citigroup's existing marks.  Further, third-party usage of other marks ending in the words "City Bank" suggested that the public would pay attention to the defendant's use of the word CAPITAL.  *Id.* at 1352.

The *Citigroup* case is more analogous to the situation before the Court than *In re Mighty Leaf Tea*.  Here, GREIGE and GREY are spelled differently.  There is also no indication that a buyer of men's clothing for Swarm or Cohen's retail customers would believe that SHADES OF GREIGE is a shortened form of SHADES OF GREY BY MICAH COHEN, as the Federal Circuit feared in *In re Mighty Leaf Tea*.  Rather, given the sophistication and degree of care exercised by retail buyers, as discussed above, and the difference in appearance between GREIGE and GREY, it is more likely that customers would perceive the marks as representing two different brands.

Further, the addition of BY MICAH COHEN to Respondents' mark mitigates possible confusion because it is analogous to a housemark.  *See Sleekcraft*, 599 F.2d at 351 (noting that the addition of a defendant's housemark to an allegedly infringing trademark may decrease the likelihood of confusion); *Cohn v. Petsmart, Inc.*, 281 F.3d 837 (9th Cir. 2001) (finding defendant's use of its housemark with allegedly infringing slogan was a critical factor in finding no likelihood of confusion); *Worthington Foods, Inc. v. Kellogg Co.*, 732 F. Supp. 1417, 1443 (S.D. Ohio 1990) ("The house mark can be part of the 'mark as a whole' and is therefore relevant . . . .[T]he display of a company's own familiar mark on a product reduces the likelihood of confusion which might stem from the simultaneous use of another's mark.").  As Micah Cohen testified, the phrase BY MICAH COHEN is always present on his clothing labels.  He never uses the mark SHADES OF GREY by itself.  Retail buyers would likely pay attention to the phrase BY MICAH COHEN because this indicates the designer of the line, an important consideration for clothing buyers.  *See* Wolski Test., Day 4 at 1087:8-1088:4.

Given the overall impression of the entire mark, I find a lack of similarity of sight and meaning between SHADES OF GREIGE and SHADES OF GREY BY MICAH COHEN, and, thus, this factor weighs heavily in favor of Respondents.

### 4. Intent to Confuse

Respondents assert that Micah Cohen actually believed his new mark SHADES OF GREY BY MICAH COHEN was different enough from SHADES OF GREIGE to avoid any confusion. According to Swarm, however, Cohen purposefully chose a similar name so that he could capitalize on the success of SHADES OF GREIGE, the brand that Jeff Port worked so hard to build.

This factor does not weigh heavily either way. There is certainly some similarity between the marks in that both use the phrase "Shades of," but as discussed above the overall marks are dissimilar. I have concluded Cohen had no intent to confuse consumers, although the other factors already weigh strongly in favor of finding no likelihood of confusion.

### 5. Actual Confusion

"Evidence of actual confusion constitutes persuasive proof that future confusion is likely." *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 902 (9th Cir. 2002) (internal quotation marks omitted). "[I]f a party produces evidence from which a reasonable jury could surmise that an *appreciable* number of people are confused about the source of the product, then it is entitled to a trial on the likelihood of confusion--although it will not necessarily prevail at that trial." *Id.*

Claimant submits several pieces of evidence that it purports show actual confusion. Port testified that he found several websites by using the Google.com search engine that purportedly demonstrate confusion between Swarm's SHADES OF GREIGE clothing line and Cohen's SHADES OF GREY BY MICAH COHEN clothing line. *See* Port Test. Day 11 at 2727:24-2730:25; *see, e.g.*, Exs. 183, 505. Swarm further presents purchase orders issued by Urban Outfitters, a clothing retailer to All Shades United in 2010 and 2011 that alternate between various

forms of the names SHADES OF GREIGE and SHADES OF GREY. Ex. 379. Swarm also
points to an e-mail from a Bloomingdale's buyer in February 2010 asking Swarm whether its
label would read SHADES OF GREIGE or SHADES OF GREY, Ex. 196, and a check Swarm
received in May 2010 that was made out to SHADES OF GREY, Ex. 177.

On the other hand, Respondents elicited testimony that no one at Urban Outfitters ever
indicated any confusion as to the source of the Respondents' goods to BPMW or to Cohen.
Wolski Test., Day 4 at 1085: 14-21; M. Cohen Test., Day 8 at 2174:22 to 2175:7. Micah Cohen
testified that he has never failed to receive payment on purchase orders for SHADES OF GREY
BY MICAH COHEN made by Urban Outfitters. M. Cohen Test., Day 8 at 2182:15-18, 2190:6-9.

As Respondents correctly point out, Swarm has produced no testimony from any custom-
ers who were confused about the respective sources of the SHADES OF GREIGE and SHADES
OF GREY BY MICAH COHEN lines. On the contrary, Steve Wolski of BPMW, who had di-
rect contact with both Swarm's customers and Micah Cohen's customers, testified that he knows
of no retailers who have had any confusion regarding the SHADES OF GREIGE and SHADES
OF GREY BY MICAH COHEN marks. Wolski Test., Day 4 at 1085:16-21. Wolski testified
that BPMW made clear to customers the fact that SHADES OF GREY BY MICAH COHEN
was a new collection from Micah Cohen's new company. *Id.*

A payment sent to the competing business can be evidence of actual confusion. In *Du-
rango Herald*, the plaintiff, a former member of a joint venture who wished to enjoin the defen-
dant co-venturer's use of the joint venture's trademark, submitted evidence that several custom-
ers sent payment to the former joint venture itself, rather than the defendant. While the Court
pointed out that evidence of actual confusion is not necessary, it found this evidence very persua-
sive on the issue of likelihood of confusion. Here, in contrast, no customers of SHADES OF
GRAY BY MICAH COHEN accidentally sent payment to Swarm. While one customer of
Swarm did write the incorrect name on a check in May 2010 (before SHADES OF GREY BY
MICAH COHEN existed), that customer correctly sent its payment to Swarm; it did not send the
check to Swarm by mistake. *See* Ex. 177.

A major factor here that may account for any "confusion" between the two brands, as shown by many of the websites offered into evidence by Swarm, is the fact that Micah Cohen was actually the designer for both.  It is likely that the identity of the designer and the similarity of the styles (both men's contemporary) could make the public think that the two clothing lines are related, or that SHADES OF GREY BY MICAH COHEN is somehow a successor to SHADES OF GREIGE.  Perhaps many people would still identify SHADES OF GREIGE with Micah Cohen's new line even if his new line had an entirely different name, such as "Micah Cohen" alone.  In any event, the evidence submitted by Claimant does not show that any particular customer, even Urban Outfitters, was actually confused.  The Urban Outfitters purchase orders show that someone entering data for Urban Outfitters may have been confused by the name, but neither Urban Outfitters' website, nor their payment department, made any mistake regarding who actually sold SHADES OF GREY BY MICAH COHEN.  *See* M. Cohen Test., Day 8 at 2182:11-14, 2182:15-18, 2190:6-9, 2186:23- 2187:22.  Thus, Claimant's evidence is weak at best.

### 6. Conclusion on Likelihood of Confusion

A court must find that likelihood of confusion is probable, not just possible. *See M2 Software v. Madacy Entertainment*, 421 F.3d 1073, 1085 (9th Cir. 2005) (affirming trial court's ruling as a matter of law that there was no likelihood of confusion between M2 and M2 EN-TERTAINMENT).  Further, the similarity of the marks must be likely to confuse an appreciable number of customers as to the source of the product.  *Id.*

Given this standard, I find no likelihood of confusion between SHADES OF GREIGE and SHADES OF GREY BY MICAH COHEN.  The dissimilarity of the marks in sight and meaning and the degree of care exercised by customers very strongly indicate that confusion is not probable.  Claimant's attempt to introduce evidence of actual confusion is not strong enough to tip the balance of the *Sleekcraft* factors in its favor.

Accordingly, I find Respondents not liable for trademark infringement, false designation of origin, or unfair competition under the Lanham Act.

28

### III. California Unfair Competition

In addition to the federal Lanham Act claims, Swarm claims that Respondents violated California's unfair competition law by using the SHADES OF GREY BY MICAH COHEN trademark. Thus, Swarm's state unfair competition claim is based upon the same grounds as the Lanham Act claims. *See Academy of Motion Picture Arts and Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1457 (9th Cir. 1991) ("An action for unfair competition under Cal. Bus. & Prof. Code 17200 et seq. is substantially congruent to a trademark infringement claim under the Lanham Act[.]") (internal citations and quotation marks omitted); *One Industries, LLC v. Jim O'Neil Distrib., Inc.*, 578 F.3d 1154, 1166 n.5 (9th Cir. 2009) (same).

The same conclusion regarding lack of likelihood of confusion applies here to Claimant's state law unfair competition claim. Respondents are not liable for unfair competition.

### IV. Intentional Interference with Economic Relations

The elements under California law for a claim of intentional interference with economic relations are: "(1) an economic relationship between the plaintiff and a third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) the defendant's intentional and wrongful conduct designed to interfere with or disrupt this relationship; (4) interference with or disruption of this relationship; and (5) economic harm to the plaintiff proximately caused by the defendant's wrongful conduct." *Sole Energy Co. v. Petrominerals Corp.*, 128 Cal. App. 4th 212, 241 (2005). To succeed on its claim, Swarm must prove that Respondents engaged in wrongful conduct apart from the fact of the interference itself. *Id.* "An act is independently wrongful 'if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard.'" *Id.* (quoting *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1159 (2003)).

Swarm asserts that Cohen stole the designs from Swarm's Fall 2010 collection and sold those designs under a confusingly similar name. The economic relationship that Swarm alleges

29

Cohen interfered with is the relationship between Swarm and its retailer customers.  Swarm also contends that Cohen's actions caused harm to Swarm because Swarm could not continue its SHADES OF GREIGE line in competition with Cohen's similarly named SHADES OF GREY BY MICAH COHEN clothing line.

Respondents argue that (1) Cohen committed no wrongful act that interfered with Swarm's business relations; and (2) any harm to Swarm's business was caused by Port voluntarily discontinuing production of the clothing line, and making no real effort to replace Cohen as designer.

As discussed in the findings of fact, *supra*, I find that Cohen did not steal Swarm's Fall/Winter 2010 designs.  Cohen testified that he began working on the SHADES OF GREY BY MICAH COHEN Fall/Winter 2010 collection only after he resigned from Swarm, and worked very hard to complete his new collection in the shortened time available.  M. Cohen Test. Day 6 at 1681:17-1682:19; Day 8 at 1996:23- 1997:5, 2008:21-2009:1, 2031:6-2032:4. Steven Zhou likewise testified that Micah Cohen brought entirely new designs when he returned to China in November 2009 to work on the SHADES OF GREY BY MICAH COHEN protos for Fall/Winter 2010.  Zhou Test., Day 4 at 1164:10-19; Day 7 at 1746:14-1747:22.  Cohen also testified extensively regarding differences between his designs for SHADES OF GREIGE, and his own Fall/Winter 2010 line for SHADES OF GREY BY MICAH COHEN.  M. Cohen Test., Day 11 at 2791:6-2813:13.

Further, to the extent that Claimant argues that Cohen stole Swarm's manufacturer and marketing company, thus driving Swarm out of business, that accusation is not supported by the evidence.  First, as discussed above, the SHADES OF GREY BY MICAH COHEN mark was not confusingly similar to SHADES OF GREIGE given the degree of care exercised by customers.  Second, Steven Zhou, Christopher Corrado, and Steve Wolski all testified that they would have continued doing business with Swarm and Micah Cohen at the same time.  Zhou Test., Day 4 at 1164:4-1167:7; Corrado Test. at 188:23-189:6, 209:3-9; Wolski Test., Day 4 at 1084:2-17.

## V. Breach of Duty of Loyalty

The elements of the tort of breach of duty of loyalty are: "(1) the existence of a relation-ship giving rise to a duty of loyalty; (2) one or more breaches of that duty; and (3) damage prox-imately caused by that breach." *Huang Que, Inc. v. Luu*, 150 Cal. App. 4th 400, 410 (2007). "[A]n employer has the right to expect the undivided loyalty of its employees." *Stokes v. Dole Nut Co.*, 41 Cal. App. 4th 285, 295 (1995); *Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.*, 556 F. Supp. 2d 1122, 1142 (E.D. Cal. 2008) (all employees owe a duty of loyalty to their employers).

Claimant asserts that Cohen was Swarm's agent, and therefore had a fiduciary duty to Swarm. Claimant's Post-Arbitration Brief at 50 (citing *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654 (1988), *Fiol v. Doellstedt*, 50 Cal. App. 4th 1318 (1996), *Vai v. Bank of America*, 56 Cal. 2d 329 (1961)). Respondents dispute this, arguing that employees are not fiduciaries. Respon-dents' Rebuttal Brief at 19-20 (citing *Odorizzi v. Bloomfield School Dist.*, 246 Cal. App. 2d 123, 129, *Masters v. San Bernardino County Employees Retirement Assn.*, 32 Cal. App. 4th 30, 45 (1995)).

For its breach of loyalty claim, Swarm relies upon the same evidence as its intentional interference claim: Cohen's allegedly misappropriating Swarm's Fall/Winter 2010 designs and starting a competing clothing line with a confusingly similar name. As discussed above, Cohen did not steal any of Swarm's designs, and did not use a confusingly similar mark. Thus, I con-clude that Cohen is not liable for breach of the duty of loyalty.

## ANALYSIS OF CROSS-CLAIMS

## I. Breach of Contract and Accounting

Respondents assert that Swarm breached the Employment Agreement by failing to pay Cohen a share of profits and failing to provide an accounting. Under the Employment Agree-ment, Cohen was entitled to a bonus of 20% of Swarm's first $500,000 net profits, and 30% of

31

net profits in excess of $500,000 each year. Ex. 5006 at 4, Article 5.1(b). Schedule A of the Employment Agreement states that net profits are determined by Swarm's independent accountant, and Cohen has the right to inspect the books and records of Swarm to determine the accuracy of the calculation of net profits. Ex. 5006, Schedule A. While he was employed by Swarm, Cohen repeatedly asked Port for Swarm's profit statements, but Port never provided them until discovery in this case. Respondents state they are willing to rest on the financials discovered in this litigation, unless I believe further financial information is warranted for the calculation of Swarm's profits.

I believe that the parties have submitted sufficient evidence of Swarm's financials to allow the Court to calculate Swarm's profits, and award Cohen the appropriate share of profits due under the Employment Agreement. The Court has the following evidence of Swarm's profits:

- Swarm financial documents for 2007 to 2009 prepared by Gary Diamond, Swarm's accountant, Exs. 451, 452, 453 (2007 to 2009 profit & loss statements); 443-46 (tax returns for 2007-2010);
- a spreadsheet prepared by Micah Cohen and Gary Cohen showing what they believe to be an accurate reflection of Swarm's financials in light of Micah Cohen's knowledge of Swarm's business and the apparel industry in general, Exhibit 5095.

According to the profit and loss statements and tax returns, Swarm had an ordinary business income of $33,316 in 2007 and $121,365 in 2009 (Swarm had a loss in 2008). At the 20% profit share provided for by the Employment Agreement, this would give Cohen a share of $30,784. Respondents' exhibit 5095 gives several other possible calculations of profits, based upon various proposed adjustments to Swarm's financial information based upon Micah Cohen's evaluation of which Swarm expenses were questionable or unusual, as well as adjustment of cost figures. *See* M. Cohen Test., Day 9 at 2288:21-2289:3.

Regarding expenses, Cohen testified that several of the expenses on Swarm's P&Ls and tax returns were improper (such as auto expenses when Swarm did not own any cars, and adver-

tising expenses after Swarm sold its last season).  *See* M. Cohen Test., Day 9 at 2286:2 to 2292:
25; 2361:14 to 2372:17; 2454:5 to 2459:14.

Claimant offered no testimony or argument to rebut this evidence, apart from Port's va-
gue testimony that he now believes the P&Ls that Diamond prepared for Swarm are inaccurate.
For nearly all of these adjustments to expenses, I see no reason in the record not to accept most
of the adjustment of expenses as reflected in exhibit 5095.  The only exception is the deduction
for legal expenses in 2010.  Respondents provide no legal authority for the proposition that this
expense is improper where, as here, Cohen is not a co-owner of Swarm, but rather an employee.
It is reasonable for Swarm to deduct legal expenses for a lawsuit pursuing its rights against a
former employee (regardless of the merits or eventual outcome of that lawsuit).  Thus, I think do
not accept Respondents' proposed adjustment of Swarm's legal expenses for 2010.

Regarding Swarm's costs, Cohen believed that the costs (specifically cost of samples and
purchases) listed on Swarm's financials were too high for certain years.  Thus, in exhibit 5095,
Cohen re-calculated the financials with Swarm's costs adjusted by either 50% or 60% of reve-
nues.  This adjustment was based upon his experience in the apparel industry; Cohen testified
that 50% of sales is a standard goal for costs, and 60% would be a slightly worse percentage (and
more conservative).  *See* M. Cohen Test., Day 9 at 2455:15-2456:15.  Once again, Claimant did
not attempt to rebut this evidence.

The Court may accept the 50%, 60%, or no adjustment to the costs.  Cohen provided a
reasonable basis for the 50% cost figure, based on his knowledge of the industry, and therefore I
accept it.  With the adjustments to the expenses and costs at 50%, Cohen would be entitled to the
following share of profits (using the 20% net profits figure from the Employment Agreement):

2007: $15,430
2008: $71,513
2009: $24,121
2010: $19,167
Total: $130,231

**II Conversion**

Respondents request the opportunity to submit a short additional declaration concerning the value of certain items that Micah Cohen left at Swarm's warehouse. Respondents do not explain why they failed to introduce this evidence during the arbitration. The request is denied.

**III. Alter Ego**

Respondents assert that the Court should pierce the corporate veil and make Jeff Port jointly and severally liable with Swarm for damages in this case. California courts will "pierce the corporate veil" and disregard the fiction of a separate corporate identity when "an abuse of the corporate privilege justifies holding the equitable ownership of a corporation liable for the actions of the corporation." *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 538 (2000), citing *Roman Catholic Archbishop v. Superior Court*, 15 Cal. App. 3d 405 (1971). "Among the factors to be considered in applying the doctrine are commingling of funds and other assets of the two entities, the holding out by one entity that it is liable for the debts of the other, identical equitable ownership in the two entities, use of the same offices and employees, and use of one as a mere shell or conduit for the affairs of the other." *Id.* at 538-39.

Respondents argue that they have elicited enough evidence during the arbitration to warrant piercing the corporate veil. Port owns 99% of Swarm, and his wife owns the other 1%. Port testified that Swarm had no capital assets and had approximately $250.00 in its bank account at the time of the hearing. Port Test., Day 5 at 1359:1-8, 14. Swarm's attorneys are also counsel for Port personally. Port Test., Day 5 at 1368.23. Port also personally guaranteed the obligations of Swarm on at least two occasions, Port Test., Day 5 at 1371:19-1372:24., and personally paid Swarm's administrative fees for this arbitration, Port Test., Day 5 at 1373:3-7. Respondents also point out that Gary Diamond, Swarm's accountant, produced a list of instances in which Port personally paid Swarm's expenses, totaling more than $400,000.00 for 2007 and 2008 alone, *see* ex. 87.

34

There is enough evidence in the record that Jeff Port had an overall unity of interest with Swarm, such that the Court could pierce the corporate veil should it conclude that would be appropriate. It is a close question. As Respondents contend, Swarm is undercapitalized. "Inadequate capitalization may be considered as a factor in determining whether the corporate entity should be disregarded. The doctrine does not depend on the presence of actual fraud. It is designed to avoid or prevent what would be fraud or injustice, if accomplished." *Talbot v. Fresno-Pacific Corp.*, 181 Cal. App. 2d 425, 431 (1960) (citations and internal quotation marks omitted). There is also evidence that injustice would result if the corporate veil is observed: Cohen would have no possibility of recovering the share of profits he was owed under his Employment Agreement with Swarm because of Jeff Port's bad faith decision to conceal Swarm's true profits and deny that he signed the Employment Agreement. On the other hand, there is no evidence that Port intentionally tried to avoid creditors by keeping Swarm undercapitalized. It is a close question, but I conclude there is sufficient evidence to warrant piercing the corporate veil.

## IV.   ATTORNEY'S FEES

Respondents seek their attorneys' fees as provided by the Employment Agreement, which states at section 12.4 that:

> If any legal action or any mediation or other proceeding is brought for the interpretation or enforcement of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing Party or Parties shall be entitled to recover reasonable attorney's fees and other costs incurred in that action or proceeding, in addition to any other relief to which it or they may be entitled.

Exhibit 5006 at Section 12.4.

A Preliminary Award issued in this matter, and, as the prevailing parties, Respondents filed a motion for attorney's fees seeking $484,977.61. I recognize that this is a very high sum. However, this case was vigorously litigated by both sides at every turn and on every issue. I have

rarely seen a case so aggressively pursued by both sides.  I am also constrained in my analysis of the fee motion in that, as is discussed, the opposition is silent on, and fails to make a detailed attack on, the lengthy and detailed showing of the fees and costs incurred by Respondents.

### 1.      The Declarations Filed by Respondents are Proper.

Claimants, after seeking and receiving several extensions to respond to the motion, filed a somewhat anemic opposition, consisting of six pages, to a very extensive and detailed motion. Indeed, the opposition for the most part fails to take issue with the propriety of the hourly rates of the various attorneys and makes very limited objection to the time reflected in specific entries. Rather, Claimants appear content to focus on more general arguments why fees should be denied completely.  I find none of these arguments persuasive.

The first of these is the claim that I may decide the issue without expert testimony. Respondents have offered expert testimony, including the declaration of Gary J. Cohen to support their showing on the lodestar calculation, including the fee structure and the fees and costs claimed.  The evidence was significant.

As indicated, Claimants responded that I may decide the issues raised by the application for attorney's fees without the benefit of expert testimony. While as a general proposition it is true that a court or arbitrator *may* determine a motion for such fees without expert testimony, such testimony is, of course permissible and admissible.  Moreover, here, the testimony is essentially from counsel themselves, not from a third party retained to review the time for which recovery is sought.

There is no real stated objection to the analysis and conclusions set forth in the declarations in support of the claimed time and fees.  Accordingly, they are admitted, and I will refer to them in deciding the motion.  Claimants, too, were free to utilize expert testimony in opposition to the motion.

Accordingly, I find Claimants' argument that the issues raised herein should be decided without expert testimony to be ill-founded and without merit. I therefore have considered the declarations and will also bring my own experience to bear on the issues as I am permitted to do.

### 2.      The Proper Parties are Seeking Attorney's Fees and Costs

Claimants next contend that *only* Micah Cohen, as a party to the contract, is entitled to fees. I disagree, and, in any event, because there can be no duplicate recovery by Nancy Cohen or All Shades United, the argument has no significance.[11]

As discussed in Respondents' Reply at page 4, Claimant raised contract claims against, and sought contractual recovery and attorney's fees against all Respondents. It is well-established that Civil Code section 1717 provides for mutuality of remedy.

Moreover, in any event, as Respondents make clear. Even if there were Respondents who or which could not recover attorney's fees, Claimants have failed to suggest how the fees could, or, indeed, should, be apportioned.  There is nothing before me to permit me to break fees into recoverable and non-recoverable categories based upon the identities of the Respondents.[12]  The simple fact is that there were differences in how the claims and defenses were handled. Thus, all Respondents may recover the fees.  However, there cannot, of course, be duplicative recovery.

**Sidley Austin Fees Do Overlap the Norris To Some Extent.**

The analysis of an attorney's fee claim begins with determination of the "lodestar", that is, the total numbers of attorney hours spent times the relevant hourly billing rates. The lodestar may be adjusted-up or-down based on the nature the case, its difficulty, the stakes involved, the skill required  and employed in handling the matter, the success or failure, and other-circumstances of the case.  *PLCM Group* v. *Drexler*, (2000) 22 Cal. App 4th 1084, 1095-1096.

The fee applicant bears the burden of documenting the appropriate hours expended in the litigation and must submit evidence in support those hours worked.  *Hensley* v. *Eckerhart* (1983) 461 U.S. 424, at 433, 437 (1983).

It is settled that  "the determination of what constitutes a 'reasonable fee' is left to the discretion of the arbitrator." (See *Stokus* v. *Marsh* (1990), 217 Cal App 3d 647, 656; *Hensley*, *supra.*, 461 US at 437.) An arbitrator has broad discretion in fashion-ing remedies:

---

[11]     Again, in the opposition, Claimants have made no effort to parse the various claims made by the parties in the analysis of attorney fees but as assumed, as have Respondents that all fees are subject to analysis under the contractual fee shifting provision. The parties having adopted that analysis, I will accept it for purposes of this Order.

[12]     See, *e.g.,* footnote 1, *supra.*

The choice of remedy, then, may at times call on any decision maker's flexibility, creativity and sense of fairness. In private arbitrations, the parties have bargained for the relatively free exercise of those faculties. Arbitrators, unless specifically restricted by the agreement to following legal rules, *375 " 'may base their decision upon broad principles of justice and equity .... '[Citations.] As early as 1852, this court recognized that; 'The arbitrators are not bound to award on principles of dry law, but may decide on principles of equity and good conscience, and make their award ex aequo et bono [according to what is just and good]. *Advanced Micro Devices* v. *Intel*, (1994) 9 Cal4th 362, 374-375

Broad adjustments in the attorneys' fees may be made without justifying them by an hour-by-hour or line-item-by-line-item analysis:

[W]hen faced with a massive fee application the ... court has the authority to make across-the-board percentage cuts either in the number of hours claimed or in the final lodestar figure 'as a practical means of trimming the fat from a fee application.' *Gates* v. *Deukmejian* (1992) 987 F.2d 1392, (9th Cir.)

A court is required, though, to supply a concise but clear explanation of its rationale for departures from the lodestar. ld, at 1400. Finally, the tribunal should consider the degree of success attained by the prevailing party in fixing the attorneys fees.

In this case, Respondents' prevailed, and, in their request for attorney's fees have set forth with great specificity the billing rates and hours expended on the case. This is what is required in setting the lodestar regarding the fees. In response, Claimants' again make a general claim but do not point to any specific problem with Sidley Austin/Norris fees other than to assert that no fees should be awarded to more than one lawyer for the periods May 10, 2010 to October 5, 2010 for Sidley and for the period October 5 [sic] 2010 to March 30, 2012 for Mr. Norris.

However, again, Claimants have failed to specify which of the fees for attorneys and/or tasks should be excised from the claimed amounts. However, notwithstanding that, as indicated above, it is the job of the court or arbitrator in such cases to independently review the claimed fees for the purposes of reasonableness. I have carefully reviewed and cross-checked the fees claimed on behalf of the Norris firm and Sidley Austin and have concluded that there is some

overlap that I conclude is not reasonably shifted to Claimants.[13] I hasten to add that my conclusion is not that the fees were not properly incurred. Rather, my conclusion is that the fees for certain time especially that related to transition of the responsibility of the representation ought not be shifted to Claimants.

**Norris Firm reduction:**

| | |
|---|---|
| Oct. 5, 2010: | 357.50 |
| Oct. 6, 2010: | 130.00 |
| Oct. 8, 2010: | 65.00 |
| Oct. 12, 2010 | 32.50 |
| Oct. 15, 2010 | 715.00 |
| Oct. 20, 2010: | 162.50 |
| Oct. 22, 2010: | 357.50 |
| Total: | $1820.00 |

**Sidley & Austin:**

With Sidley & Austin, I have reviewed the billings for the point when the Norris firm came on the scene and tried to excise what I perceived as overlap that should not be reasonably apportioned to Claimants. I again stress that I had to do this with only the billing references from the firm as Respondents made no serious allegations with respect to particular entries. Again, as with the Norris firm billings, I find that the hourly rates charged by the Sidley attorneys are fair and reasonable and the time billed to the tasks catalogued are appropriate. I have only looked to tasks which I perceive as being too overlapping or not providing sufficiently reasonable value in my analysis. I also concluded that the partners' time from November 1, 2010 onward could not reasonably be allocated to Claimants.

I am also cognizant of the serious fee reduction from normal rates that the two principal partners on the file, Ransom and Rubinroit absorbed. (See, Ransom Dec. at p. 5.)

**Ransom:**

| | |
|---|---|
| Oct. 7, 2010 | 116.00 |

---

[13]    This detailed work on the analysis of the fee records provided by Respondents' counsel is the principal cause of the extended time for the issuance of this Order.

| Oct. 8, 2010 | 348.00 |
| Oct. 13, 2010 | 406.00 |
| Post Nov. 1, 2010 | 4060.00 |
| Total | $4,930.00 |

**Rubinroit:**

| Oct. 13, 2010 | 340.00 |
| Oct. 19, 2010 | 204.00 |
| Oct. 20, 2010 | 68.00 |
| Oct. 21, 2010 | 68.00 |
| Oct. 22, 2010 | 68.00 |
| Post Nov. 1, 2010 | 1496.00 |
| Total | $2,244.00 |

**Steinbaum:**

| Oct. 8, 2010 | 60.80 |
| Oct. 12, 2010 | 182.40 |
| Oct.13, 2010 | 851.20 |
| Total | $1094.40 |

**<u>Total Fee Reduction:        $10,088.40</u>**

Beyond these reductions, I find the costs and fees to be reasonable and recoverable. While Respondents' summary judgment motion failed, it was by no means the "slam dunk' that Claimants suggest.  The resolution of the motion required a lengthy and very detailed analysis of the facts of the case and the complex issues relating to contract and intellectual property involved.  My work on the motion had a salutary effect on my understanding and analysis of the issues. It was very helpful to me in reaching the ultimate conclusion that the Respondents should prevail on the merits after the hearing. I am not persuaded that the fees for that motion should be deducted solely because it did not prevail.

40

Finally, the claim relating to Mr. Zhou's travel is moot in that Respondents are not making any claim for that trip. (See, Respondents' reply brief, p. 13.)

## AWARD

1. That the Claimant, Swarm, LLC, have and recover nothing from any of the Respondents on any of the Claimant's causes of action;

2. That an order issue canceling Swarm, LLC's registration of SHADES OF GREIGE, Registration Number 3924774 (Registration Date March 1, 2011), and ordering Swarm to have it striken from the Principal Register;

3. That an order issue denying Swarm, LLC's opposition to Trademark Application Serial No. 77/852,023 for the mark SHADES OF GREY;

4. That all parties to this arbitration, including Jeff Port, be permanently from using the SHADES OF GREIGE mark;

5. That Micah Cohen recover the sum of $130,231 from Swarm and Jeff Port, jointly and severally, representing Micah Cohen's share of Swarm, LLC's net income during Micah Cohen's employment with Swarm;

6. Payment of the Respondents' arbitration fees (including JAMS administrative fees and Arbitrator compensation and expenses pursuant to Rule 24 of the JAMS Comprehensive Arbitration Rules and Procedures), in full, by the Swarm and Jeff Port, jointly and severally;

7. Payment of the Respondents' reasonable attorney fees in the amount of $474,889.21 incurred in the litigation of this matter, including all proceedings before JAMS, by Swarm and Jeff Port, jointly and severally.

DATED: October 5, 2012

_George P. Schiavelli_

Hon. George P. Schiavelli
Arbitrator

41

## <u>PROOF OF SERVICE BY EMAIL & U.S. MAIL</u>

Re: Swarm, LLC et al. vs. Cohen, Micah A., et al.
Reference No. 1220041905

I, Jo-El Fequiere, not a party to the within action, hereby declare that on  October 05, 2012 I served

the attached FINAL AWARD on the parties in the within action by Email and by depositing true copies thereof

enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at Los Angeles,

CALIFORNIA, addressed as follows:

| | |
|---|---|
| Matthew J. Norris Esq. | Lyle R. Mink Esq. |
| Norris Law Group, P.C. | L/O Lyle R. Mink |
| 10940 Wilshire Blvd. | 1801 Century Park East |
| Suite 1600 | Suite 2600 |
| Los Angeles, CA  90024 | Los Angeles, CA  90067 |
| Phone: 310-443-4159 | Phone: 310-553-1010 |
| mjnorris@norrislglaw.com | lyle@lylemink.com |
| Parties Represented: | Parties Represented: |
| Micah A. Cohen | Swarm, LLC |
| Nancy Sidonie Cohen | |

I declare under penalty of perjury the foregoing to be true and correct. Executed at Los Angeles,

CALIFORNIA on  October 05, 2012.

Jo-El Fequiere
Jfequiere@jamsadr.com

# EXHIBIT 2



**THE RESOLUTION EXPERTS®**

October 23, 2012

Matthew J. Norris Esq.
Norris Law Group, P.C.
10940 Wilshire Blvd.
Suite 1600
Los Angeles, CA   90024

RE:   **Swarm, LLC et al. vs. Cohen, Micah A., et al.**
        Reference #: 1220041905

Mr. Norris,

Attached is your statement of account reflecting all payments received from your client for the above referenced matter.

In summary, your client paid a total of $112,743.15.  $5,676.00 of it was an advance for claimant's unpaid fees and $33.00 was the unused retainer which will be refunded to your client.  The total amount paid to JAMS was $112,710.15.

Contact me at 213-253-9732 or Rnavarrete@jamsadr.com if you have questions.

Sincerely,

Reina Navarrete
Senior Case Manager
rnavarrete@jamsadr.com
Fax# 213-620-0100



**THE RESOLUTION EXPERTS®**

## STATEMENT OF ACCOUNT

<u>Statement Date</u>
**10/22/12**

TO:   **Matthew J. Norris, Esq.**
      **Norris Law Group, P.C.**
      **10940 Wilshire Blvd.**
      **Suite 1600**
      **Los Angeles, CA 90024**

Reference #:          **1220041905**   RN
Billing Specialist:   **Tiffany Williamson**
Telephone:            **949-224-4606**
Employer ID:          **68-0542699**

RE:   **Swarm, LLC et al. vs. Cohen, Micah A., et al.**

Representing:   **Micah A. Cohen**
                **Nancy Sidonie Cohen**

Neutrals(s):   **Hon. George Schiavelli (Ret.)**

Hearing Type:   **Arbitration**

**REP# 5**

| Date | Description | Charges | Credits | Balance |
|------|-------------|--------:|--------:|--------:|
| 11/10/10 | INVOICE #0002150120-220 * | 2,500.00 | | 2,500.00 |
| 12/09/10 | CK #958 | | 2,500.00 | 0.00 |
| | 3-20 Paid By: Gary J. Cohen | | | |
| 12/21/10 | CREDIT MEMO # #0002180907 * | | 2,500.00 | (2,500.00) |
| 01/14/11 | INVOICE #0002199574-220 | 400.00 | | (2,100.00) |
| 01/14/11 | CREDIT MEMO # #0002199577 | | 400.00 | (2,500.00) |
| 01/17/11 | INVOICE #0002200184-220 * | 15,080.00 | | 12,580.00 |
| 01/31/11 | INVOICE #0002216490-220 | 12.29 | | 12,592.29 |
| 02/28/11 | INVOICE #0002240668-220 | 270.00 | | 12,862.29 |
| 03/02/11 | CREDIT MEMO # #0002241837 * | | 15,080.00 | (2,217.71) |
| 03/03/11 | INVOICE #0002242418-220 * | 17,540.00 | | 15,322.29 |
| 03/04/11 | INVOICE #0002243074-220 | 300.00 | | 15,622.29 |
| 03/11/11 | CREDIT MEMO # #0002248015 | | 300.00 | 15,322.29 |
| 03/11/11 | INVOICE #0002248016-220 | 300.00 | | 15,622.29 |
| 03/31/11 | INVOICE #0002266296-220 | 600.00 | | 16,222.29 |
| 04/04/11 | INVOICE #0002269994-220 | 300.00 | | 16,522.29 |
| 04/08/11 | CREDIT MEMO # #0002273781 | | 9,000.00 | 7,522.29 |
| 04/08/11 | CREDIT MEMO # #0002274023 * | | 8,540.00 | (1,017.71) |
| 04/29/11 | INVOICE #0002294588-220 | 870.00 | | (147.71) |
| 05/06/11 | INVOICE #0002299470-220 * | 19,767.50 | | 19,619.79 |
| 05/25/11 | INVOICE #0002311262-220 | 2,508.00 | | 22,127.79 |
| 05/31/11 | CREDIT MEMO # #0002318165 | | 330.00 | 21,797.79 |

YOUR ACCOUNT BALANCE IS DUE UPON RECEIPT

Please make checks payable to JAMS, Inc. and mail to:

**P.O. BOX 512850**
**Los Angeles, CA 90051-0850**



**THE RESOLUTION EXPERTS®**

RE:   **Swarm, LLC et al. vs. Cohen, Micah A., et al.**

| | | | |
|---|---|---|---|
| Representing: | **Micah A. Cohen** | Neutrals(s): | **Hon. George Schiavelli (Ret.)** |
| | **Nancy Sidonie Cohen** | | |
| Hearing Type: | **Arbitration** | Reference #: | **1220041905**      **REP# 5** |

| Date | Description | Charges | Credits | Balance |
|---|---|---|---|---|
| 07/07/11 | CK #990 | | 24,305.79 | (2,508.00) |
| | 1-50 Paid By: Gary J. Cohen | | | |
| 07/11/11 | INVOICE #0002353474-220 | 330.00 | | (2,178.00) |
| 07/29/11 | INVOICE #0002372420-220 | 2,640.00 | | 462.00 |
| 08/11/11 | CREDIT MEMO # #0002380263 * | | 6,600.00 | (6,138.00) |
| 08/12/11 | INVOICE #0002380912-220 * | 9,900.00 | | 3,762.00 |
| 08/17/11 | INVOICE #0002384284-220 | 10,626.00 | | 14,388.00 |
| 08/17/11 | CREDIT MEMO # #0002384307 * | | 9,900.00 | 4,488.00 |
| 08/19/11 | INVOICE #0002385572-220 * | 39,600.00 | | 44,088.00 |
| 08/31/11 | INVOICE #0002398348-220 | 1,617.00 | | 45,705.00 |
| 09/15/11 | CK #1087 | | 44,088.00 | 1,617.00 |
| | 2-7 Paid By: Gary J. Cohen | | | |
| 10/31/11 | CREDIT MEMO # #0002446485 * | | 16,500.00 | (14,883.00) |
| 10/31/11 | INVOICE #0002446486-220 | 3,503.36 | | (11,379.64) |
| 11/30/11 | INVOICE #0002472080-220 | 693.00 | | (10,686.64) |
| 12/02/11 | INVOICE #0002475890-220 | 9,801.00 | | (885.64) |
| 12/30/11 | INVOICE #0002494894-220 | 3,366.00 | | 2,480.36 |
| 01/27/12 | INVOICE #0002513278-220 * | 16,500.00 | | 18,980.36 |
| 01/31/12 | INVOICE #0002519850-220 | 957.00 | | 19,937.36 |
| 02/29/12 | INVOICE #0002546116-220 | 2,310.00 | | 22,247.36 |
| 03/13/12 | CK #638 | | 22,247.36 | 0.00 |
| | 11-43 Paid By: Gary J. Cohen | | | |
| 03/22/12 | CREDIT MEMO # #0002560593 * | | 16,500.00 | (16,500.00) |
| 03/22/12 | INVOICE #0002560594-220 | 6,930.00 | | (9,570.00) |
| 03/22/12 | INVOICE #0002560598-220 * | 9,570.00 | | 0.00 |
| 03/22/12 | INVOICE #0002560618-220 * | 3,630.00 | | 3,630.00 |
| 03/28/12 | INVOICE #0002563526-220 | 12,012.00 | | 15,642.00 |
| 03/28/12 | CREDIT MEMO # #0002563825 * | | 13,200.00 | 2,442.00 |



**THE RESOLUTION EXPERTS®**

RE:   **Swarm, LLC et al. vs. Cohen, Micah A., et al.**

| | | | |
|---|---|---|---|
| Representing: | **Micah A. Cohen** | Neutrals(s): | **Hon. George Schiavelli (Ret.)** |
| | **Nancy Sidonie Cohen** | | |
| Hearing Type: | **Arbitration** | Reference #: | **1220041905**     **REP# 5** |

| Date | Description | Charges | Credits | Balance |
|---|---|---|---|---|
| 03/28/12 | CK #643 | | 3,630.00 | (1,188.00) |
| | 1-42 Paid By: Gary J. Cohen | | | |
| 04/30/12 | INVOICE #0002595464-220 | 4,521.00 | | 3,333.00 |
| 05/31/12 | INVOICE #0002617934-220 | 1,287.00 | | 4,620.00 |
| 06/29/12 | INVOICE #0002640778-220 | 2,376.00 | | 6,996.00 |
| 07/06/12 | INVOICE #0002646702-220 * | 3,300.00 | | 10,296.00 |
| 07/16/12 | CK #700 | | 10,296.00 | 0.00 |
| | 2-3 Paid By: Gary J. Cohen | | | |
| 07/31/12 | INVOICE #0002667622-220 | 2,112.00 | | 2,112.00 |
| 08/06/12 | CREDIT MEMO # #0002671085 * | | 3,300.00 | (1,188.00) |
| 08/31/12 | INVOICE #0002693328-220 | 1,155.00 | | (33.00) |
| 10/16/12 | REFUND #CR96421 | 33.00 | | 0.00 |

Outstanding Balance:     0.00