# EXHIBIT 1

1  Lyle R. Mink, SBN 51162
2  A Law Corporation
3  1801 Century Park East, Suite 2600
   Los Angeles, CA  90067
4  Telephone: (310) 553-1010
   Facsimile No.: (310) 284-5743
5
6  Attorneys for Claimant
   SWARM, LLC
7
8
9
10                              **JAMS**
11

| | |
|---|---|
| SWARM, LLC, a California limited liability company, dba Shades of Greige, | Case No. JAMS Ref. No. 1220041905 |
| | **Claimant's Post-Arbitration Brief** |
| Claimant, | |
| v. | [Hon. George P. Schiavelli, Ret., Arbitrator] |
| MICAH A. COHEN, an individual, dba Shades of Grey by Micah Cohen; NANCY SIDONIE COHEN; and ALL SHADES UNITED, LLC, a California limited liability company, | |
| | Trial Date:  August 15, 2011 |
| Respondents. | |
| AND RELATED CROSS-CLAIMS, | |

*Lyle R. Mink*
*Law Offices of Lyle R. Mink*
*1801 Century Park East, Suite 2600*
*Los Angeles, CA  90067*
*Phone: 310.553-1010 • Facsimile: 310.284.5743*

postarbbrief111101.doc

CLAIMANT'S POST-ARBITRATION BRIEF

Ex. 1

# Table of contents

Table of authorities ................................................................................ iv

1.  Introduction. ................................................................................. 2

2.  Statement of facts. ....................................................................... 4

    A.  The Shades of Greige trademark. ......................................... 5

        (1)  *Origin of the name.* .................................................... 5

        (2)  *Pronunciation of the name.* ....................................... 5

        (3)  *Initial application (2007) for registration of the trademark.* ... 7

        (4)  *Intended assignment of the trademark to Swarm.* ...... 7

        (5)  *Abandonment of the trademark.* ................................ 8

        (6)  *Second application (2010) for registration of the trademark.* ... 8

        (7)  *Port's nunc pro tunc assignment of any rights in the trademark to Swarm.* ... 8

        (8)  *Registration (2011) of the trademark.* ..................... 8

    B.  Drafts of the consulting and employment agreements. ......... 9

    C.  Success of the Shades of Greige brand. ................................ 16

    D.  Cohen's plan to leave Swarm and start a competing men's line using Swarm resources, styles, designs, and patterns. ... 18

    E.  Cohen's early termination of his employment without notice. ... 24

    F.  Cohen's use of Swarm's resources and property. ................. 24

        (1)  *Use of Swarm styles, designs and patterns.* ............ 24

        (2)  *Cohen's trip to China.* ............................................ 26

            *a.  Designs.* ....................................................... 26

            *b.  Patterns.* ...................................................... 27

            *c.  Protos.* ......................................................... 28

            *d.  Samples.* ...................................................... 28

        (3)  *Events following Cohen's return from China.* ........... 28

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310-553-1010 • Facsimile: 310.284.5743

i

G.    Public's view of Shades of Greige and Shades of Grey by Micah    31
       Cohen.

       (1)    Likelihood of confusion.    31

       (2)    Actual confusion.    33

H.    Success of Shades of Grey by Micah Cohen.    34

I.    Harm to Swarm.    37

3.    Argument.    38

A.    Claimant's complaint.    38

       (1)    Trademark infringement (15 U.S.C. 1114(a)).    38

              a.    Owner of registered trademark.    39

              b.    Swarm's first use in commerce.    41

              c.    Cohen's use of his mark is without Swarm's consent.    41

              d.    Likelihood of confusion or mistake.    41

                     (i)    Strength of the mark.    41

                     (ii)    Proximity of the goods.    42

                     (iii)    Similarity of the marks.    42

                            Sound    42

                            Sight    43

                            Meaning    44

                     (iv)    Evidence of actual confusion.    45

                     (v)    Marketing channels.    45

                     (vi)    Type of goods and purchaser care.    45

                     (vii)    Intent.    46

                     (viii)    Likelihood of expansion.    47

       (2)    False designation of origin (15 U.S.C. 1125(a)).    47

       (3)    Unfair competition (15 U.S.C. 1125).    47

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310.553.1010 • Facsimile: 310.284.5743

ii

| | | | |
|---|---|---|---|
| (4) | | Unfair competition (Bus. & Prof. Code §§ 17200, 17203, and 17500) | 47 |
| (5) | | Intentional interference with economic relations. | 48 |
| | a. | Economic relationship with probability of future economic benefit. | 48 |
| | b. | Knowledge of the relationship. | 48 |
| | c. | Intentional and wrongful conduct designed to interfere with or disrupt relationship. | 49 |
| | d. | Interference with or disruption of this relationship. | 49 |
| | e. | Economic harm to Swarm proximately caused by respondents' wrongful conduct. | 49 |
| (6) | | Breach of duty of loyalty. | 49 |
| | a. | Duty. | 50 |
| | b. | Breach. | 51 |
| | c. | Burden of proof. | 51 |
| | d. | Damages. | 52 |
| (7) | | Declaratory judgment for withdrawal of respondents' trademark application. | 52 |
| (8) | | Remedies sought by Swarm. | 52 |
| B. | | Respondents' counterclaim. | 54 |
| (1) | | Breach of contract. | 54 |
| (2) | | Declaratory relief. | 54 |
| (3) | | Conversion. | 55 |
| (4) | | Unjust enrichment. | 55 |
| (5) | | Accounting. | 55 |

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310-553-1010 • Facsimile: 310-284-5743

iii

CLAIMANT'S POST-ARBITRATION BRIEF

Ex. 1

# Table of authorities

*Federal cases*

*Accu Personnel Inc. v. Accustaff Inc.*,
    38 U.S.P.Q. 2d 1443 (TTAB 1996) ..................................... 41

*Advertise.com, Inc. v. AOL Advertising, Inc.*,
    616 F. 3d 974 (9th Cir. 2010) ..................................... 43

*AMF Incorporated v. Sleekcraft Boats*,
    599 F. 2d 341 (9th Cir. 1979) ..................................... 41, 42, 44-47

*Arbrook, Inc. v. La Citrique Belge*,
    184 U.S.P.Q. 505 (TTAB 1974) ..................................... 8

*Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.*,
    556 F. Supp. 2d 1122 (E.D. Cal. 2008) ..................................... 50

*Herman Miller Inc. v. Alphaville Design Inc.*,
    2009 WL 3429739 (N.D. Cal. 2009) ..................................... 47

*Hotel Corporation of America v. Inn America, Inc.*,
    153 U.S.P.Q. 574 (TTAB 1967) ..................................... 8

*In re Apparel Ventures, Inc.*,
    229 USPQ 225 (TTAB 1986) ..................................... 43

*In re Chatam Int'l Inc.*,
    380 F. 3d 1340 (Fed. Cir. 2004) ..................................... 44

*In re Chica*,
    84 USPQ2d 1845 (TTAB 2007) ..................................... 43

*In re Collegian Sportswear Inc.*,
    224 USPQ 174 (TTAB 1984) ..................................... 44

*In re Mighty Leaf Tea*,
    601 F. 3d 1342 (Fed. Cir. 2010) ..................................... 43

*In re M. Serman & Co., Inc.*,
    223 USPQ 52 (TTAB 1984) ..................................... 44

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310.551-1010 • Facsimile: 310.284.5743

iv

*In re Riddle,*                                                                    44
    225 USPQ 630 (TTAB 1985)

*In re The U.S. Shoe Corp.,*                                                       43
    229 USPQ 707 (TTAB 1985)

*Intel Corporation v. Americas News Intel Publishing, LLC,*                    39, 47
    2010 WL 2740063 (N.D. Cal. 2010)

*Neilson v. Union Bank of California, N.A.,*                                       54
    290 F. Supp. 2d 1101 (C.D. Cal. 2003)

*Ringcentral, Inc. v. Quimby,*                                                     47
    711 F. Supp. 2d 1048 (N.D. Cal. 2010)

*Watercare Corp. v. Midwesco-Enterprise, Inc.,*                                    44
    171 USPQ 696 (TTAB 1971)

*Westward Coach Manufacturing Co. v. Ford Motor Co.,*                              41
    388 F. 2d 627 (7th Cir. 1968)

*Zobmondo Entertainment, LLC v. Falls Media, LLC,*                                 39
    602 F. 3d 1108 (9th Cir. 2010)

**Federal Statutes**

15 U.S.C. § 1057(b)                                                                39

15 U.S.C. § 1114                                                                   49

15 U.S.C. § 1114(a)                                                            38, 47

15 U.S.C. § 1115(a)                                                                39

15 U.S.C. § 1117(a)                                                                52

15 U.S.C. § 1125                                                               47, 49

15 U.S.C. § 1125(a)                                                                47

28 U.S.C. §§ 2201, 2201                                                            52

Lyle R. Mink
*Law Offices of Lyle R. Mink*
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310-553-1010 • Facsimile: 310.284.5743

v

CLAIMANT'S POST-ARBITRATION BRIEF

postarbbrief111101.doc

*State Cases*

*American Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton,*   51
  96 Cal. App. 4th 1017 (2002)

*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.,*   53
  7 Cal. 4th 503 (1994)

*Casey v. U.S. Bank N.A.,*   54
  127 Cal. App. 4th 1138 (2005)

*City of Atascadero v. Merrill Lynch, et al.,*   53
  68 Cal. App. 4th 445 (1998)

*Cully v. Bianca,*   53
  186 Cal. App. 3d 1172 (1986)

*Doctors' Co. v. Superior Court,*   53
  49 Cal. 3d 39 (1989)

*Greenwood v. Mooradian,*   53
  137 Cal. App. 2d 532 (1955)

*Fiol v. Doellstedt,*   50
  50 Cal. App. 4th 1318 (1996)

*Foley v. Interactive Data Corp.,*   50
  47 Cal. 3d 654 (1988)

*Fowler v. Varian Associates, Inc.,*   2, 50
  196 Cal. App. 3d 34 (1987)

*Huong Que, Inc. v. Luu,*   49, 51
  150 Cal. App. 4th 400 (2007)

*Korea Supply Co. v. Lockheed Martin Corp.,*   48
  29 Cal. 4th 1134 (2003)

*LaMonte v. Sanwa Bank California,*   51
  45 Cal. App. 4th 509 (1996)

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310.553.1010 • Facsimile: 310.284.5743

vi

CLAIMANT'S POST-ARBITRATION BRIEF

Ex. 1

*Pierce v. Lyman,*
  1 Cal. App. 4th 1093 (1991) ....................................................... 53

*Roddenberry v. Roddenberry,*
  44 Cal. App. 4th 634 (1996) ...................................................... 39

*Saunders v. Superior Court,*
  27 Cal. App. 4th 832 (1994) ...................................................... 53

*Sole Energy Co. v. Petrominerals Corp.,*
  128 Cal. App. 4th 212 (2005) ..................................................... 48

*Streeter & Riddell, Inc. v. Bacon,*
  49 Cal. App. 327 (1920) .......................................................... 40

*Vai v. Bank of America,*
  56 Cal. 2d 329 (1961) ............................................................ 50

**State Statutes**

Business & Professions Code

  Section 14100 ..................................................................... 46

  Section 17200 ................................................................. 47, 49

  Section 17203 ..................................................................... 47

  Section 17500 ..................................................................... 47

Labor Code

  Section 2863 .................................................................. 2, 50

**Treatises**

Restatement 2d Torts

  Section 876 ....................................................................... 54

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310-553-1010 • Facsimile: 310-284-5743

vii

Witkin, California Procedure (5th ed.)

Pleading, Section 921 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Witkin, Summary of California Law (10th ed.)

Agency and Employment, Section 4 . . . . . . . . . . . . . . . . . . . 50

Agency and Employment, Section 97 . . . . . . . . . . . . . . . . . . 50

**Other Authorities**

The American Heritage Dictionary of the English Language (4th ed.),   42, 44
Page 771

The Trademark Manual of Examining Procedure

Section 1207.01(b)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Section 1207.01(b)(v) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Section 1207.01(d)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310.553-1010 • Facsimile: 310.284.5743

postarbbrief111101.doc

CLAIMANT'S POST-ARBITRATION BRIEF

Ex. 1

*1. Introduction.*

Micah Cohen owed undivided loyalty to his employer, Swarm, LLC.[1]  As between any clothing business of his own and Swarm's clothing business, he was required always to give preference to the business of Swarm.  (Lab. Code § 2863.)

This case presents a textbook example of unfair competition by an employee so disloyal that he did not simply put his own interests above those of his employer; while still an employee, he actively sabotaged his employer's business in order to advance a new business of his own under a confusingly similar name.

Cohen had twice failed in attempts to establish a successful line of clothing when he went to work for Port—later Swarm LLC—as a designer.  Port invested over $500,000 to develop and promote the line designed by Cohen and sold under "Shades of Greige," pronounced "gray."

The success of Shades of Greige over the next few years gave Cohen the idea that he could, for a third time, pursue his dream of owning his own clothing business.  The third time was the charm.  But it was also unlawful.  While still an employee, he secretly took steps to launch a clothing line with the same clothes as Shades of Greige and, at the same time, eliminate Shades of Greige as his biggest potential competitor.  One of those steps was to secretly apply for "Shades of Grey" as a trademark.

Cohen worked on Shades of Greige styles and designs for the Fall 2010 season but withheld them from Swarm.  He waited until the latest date on which Swarm could begin its proto samples for the Fall 2010 season, then he quit abruptly and without notice.

---

[1] Cf. *Fowler v. Varian Associates, Inc.*, 196 Cal. App. 3d 34, 41 (1987)(employer entitled to "undivided loyalty;" breach of loyalty justifies discharge).

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310.553.1010 • Facsimile: 310.284.5743

postarbbrief111101.doc

- 2 -

1    The next day Cohen went to China and gave Swarm's manufacturer the styles

2    and designs that he had worked on before he quit and that Swarm would have used

3    for its Fall 2010 collection.  This left Swarm with no styles or designs for Fall 2010,

4    and no time to make samples to show at the January 2010 trade shows.  Swarm's

5    manufacturer, who was now working for Cohen, claimed that Swarm's samples and

6    patterns had been destroyed.

7        By that time, too, BPMW—Swarm's sales representative that Port had paid to

8    build the Shades of Greige brand—was working for Cohen and promoting Shades of

9    Grey by Micah Cohen.

10       Without styles, designs, and patterns, and without a manufacturer and sales

11   representative, Swarm was dead in the water.  The coup de grâce was the

12   announcement that Cohen and BPMW sent to Swarm's best existing customers

13   telling them to look for Cohen's Fall 2010 collection at the January 2010 trade

14   shows, where customers place their orders.  Cohen and BPMW then attended those

15   trade shows with Cohen's Fall 2010 line Shades of Grey (pronounced the same as

16   "Greige") by Micah Cohen.  To create the false impression that his new line was

17   merely an outgrowth or update of Shades of Greige, Cohen sold the same kind of

18   clothing using the same style numbers, descriptions, patterns, look, pricing, and sales

19   representative that were used to sell Shades of Greige.  He even used the same style

20   of brochure and the same male model.

21       Cohen's plan to seamlessly acquire the Shades of Greige business for himself

22   worked.  Shades of Grey by Micah Cohen reached a level of sales in its first season

23   that it took Swarm three years to reach, with 84.5% of Cohen's sales made up of

24   purchases by 66 of Swarm's most lucrative customers.

25       Cohen could have acted honorably and legally by completing the Shades of

26   Greige 2010 Fall collection and then giving Swarm notice of his departure.  Then he

27

28

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310.553.1010 • Facsimile: 310.284.5743

- 3 -

CLAIMANT'S POST-ARBITRATION BRIEF

Ex. 1

1   could have started his own business with a name that could not be confused with

2   Shades of Greige, creating his own new designs, and finding his own customers.

3       Instead, Cohen chose to eliminate his employer as a potential competitor and

4   steal its business.  Having made that choice, he should be required to pay for all the

5   damage that he has caused.

6       *2. Statement of facts.*

7       In 2005 and 2006, Micah Cohen made two attempts to succeed in the business

8   of designing and selling men's clothes for the retail market.  (RT 9/13/11:  First –

9   1437:18-19; 1438:5-6; Second – 1438:15-19; 1439:20-24; 1441:10-17.)  His first

10  attempt lasted only nine months because he was unable to produce the kind of

11  product he wanted.  (RT 9/13/11, 1438:5-6, 15-24.)  He ended his second attempt,

12  with Caste, because the owner of the company was not willing to invest more

13  money.  (RT 9/13/11, 1441:22 to 1442:2.)  At the time he terminated his business

14  relationship with Caste, Cohen was not a well-known designer.  (RT 8/15/11, 39:18

15  to 40:3.)

16      In 2006, Cohen made his third attempt to succeed as a men's clothing

17  designer.  Cohen met with Port.  He told Port that he had been unable to get

18  financing.  (RT 8/15/11, 28:12-13.)  Port ultimately agreed to finance a business—

19  that became known as Swarm LLC—to make and sell contemporary menswear that

20  Cohen would design.  (RT 8/15/11, 28:8; RT 9/13/11, 1448:10-23).  Port reposed

21  trust and confidence in Cohen to oversee and be responsible for designing the line

22  and implementing it, i.e., production, marketing, sales, and customer relationships.

23  (RT 8/15/11, 32:2-20; 38:9; RT 9/13/11, 1448:24 to 1449:6; RT 9/14/11, 1529:9-18;

24  1535:1-8; 1628:3-11; RT 9/15/11, 1843:21-25; 1849:16-25; RT 9/23/11, 2814:24 to

25  2815:13.)

26

27

28

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone 310.553.1010  •  Facsimile 310.284.5743

- 4 -

CLAIMANT'S POST-ARBITRATION BRIEF

Ex. 1

*A. The Shades of Greige trademark.*

*(1) Origin of the name.* In late 2006 or early 2007, Micah Cohen and Ryan Port, a friend of Cohen's since little league (RT 9/2311, 2752:19 to 2753:6), were at dinner with friends (*id.* at 2759:13-16). They were discussing the names for the line, and Cohen came up with Shades of Grey. Since Port had been working on a shipment of greige goods for Wish Licensing, he suggested that they spell it "Greige." (*Id.* at 2759:20 to 2760:12.) Cohen thought it was a great idea. (*Id.* at 2760:13-14.)

*(2) Pronunciation of the name.* Cohen testified that "Greige" had *always* been pronounced by Port and Swarm's employees to rhyme with "beige." Cohen called three witnesses to support his testimony. All of them had, and have, substantial economic ties to him. Steven Zhou, who flew in from China to testify for 30 minutes, testified Cohen is responsible for 80 percent of his business. Chris Corrado testified that BPMW receives commissions from the sale of Shades of Grey by Micah Cohen. (Cohen authorized his lawyer, Mr. Norris, to prepare Corrado for his deposition in New York and, also, to represent him at that deposition. (Corrado depo., 15:15-25.) And Steve Wolski, like Corrado, works for BPMW.

On the other hand, Kimberly Koral, who was uncomfortable testifying because she knew both sides (RT 9/23/11, 2680:14-19), said she first heard the name Shades of Greige when Micah Cohen was starting the line (*id.* at 2681:2-8), and that he pronounced it to rhyme with "gray" (*id.* at 2681:9-15). She also heard Jeff Port pronounce it to rhyme with "gray." (*Id.* at 2681:16-21.) She said she never heard anybody pronounce Shades of Greige to rhyme with "beige." (*Id.* at 2682:4-6.)

Jeff Enoch testified that Swarm is a former client. (RT 8/16/11, 456:3-25.) He said that the brand name associated with Swarm was Shades of Greige, which rhymed with "gray" (RT 8/16/11, 457:18 to 458:19), that he never pronounced it to rhyme with "beige" (RT 8/16/11, 458:21-22), that Port pronounced it to rhyme with

Lynne K. Marie
Law Offices of Lynne K. Marie
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310.551.1010 • Facsimile: 310.284.5743

- 5 -

1  "gray" (RT 8/16/11, 461:22-23), and that an employee named Angela pronounced it

2  to rhyme with "gray" (RT 8/16/11, 462:12-18).  Mr. Enoch also testified that the

3  word "greige" is a very common term in the textile and apparel industry (RT

4  8/16/11, 468:8-9), and that he never encountered anyone pronouncing it to rhyme

5  with "beige" (RT 8/16/11, 469:16-21) in all of his 35 years in the industry (RT

6  8/16/11, 470:18-22).

7      John Flores, who set up a data line for Port's fax printer last October (RT

8  9/16/11, 1952:19-24), testified that in 2007 he recorded the following message on

9  Swarm's auto attendant:  "Thank you for calling Shades of Greige.  If you know

10  your party's extension, please enter it now."  (*Id.* at 1937:8-13.)  His pronunciation

11  of Greige rhymed with "gray;" he never pronounced it to rhyme with "beige."  (*Id.* at

12  1937:14-16.)  He further testified that he had at least a "few dozen" conversations

13  with Micah Cohen (*id.* at 1952:2-4), and that he heard the "gray" pronunciation from

14  "everybody" (*id.* at 1950:4-7).

15      Flores said his recording was still being used in 2008 and 2009 (*id.* at 1938:4-

16  11), and that Micah Cohen never asked him why he was calling the name Shades of

17  Greige [to rhyme with "gray"] (*id.* at 1938:15-21).

18      Angela Duckwitz worked for Swarm beginning February 2008.  (RT 9/23/11,

19  2684:7-14.)  She stopped working for Swarm in January 2009.  (*Id.* at 2690:11-12.)

20  She came to work on a daily basis and saw Jeff Port and Micah Cohen.  (*Id.* at

21  2685:9-13.)  The brand that Swarm was producing and selling was Shades of Greige,

22  which rhymed with "bay."  (*Id.* at 2685:15 to 2686:1.)  Micah Cohen and Jeff Port

23  pronounced it to rhyme with "bay" too.  (*Id.* at 2686:12-17.)  When she picked up the

24  phone, she would say Shades of Greige, to rhyme with "bay."  (*Id.* at 2687:6-12.)

25  When customers pronounced the name to rhyme with "beige," she would correct

26  them and tell them it was pronounced to rhyme with "gray."  (*Id.* at 2686.)

27

28

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310.553.1010 • Facsimile: 310.284.5743

- 6 -

CLAIMANT'S POST-ARBITRATION BRIEF

Ex. 1

Joel Barnett worked with Jeff Port at Wish Licensing from 2002 to 2007.  (RT 9/23/11, 2722:18-23.)  In 2006 or 2007 he became familiar with the name Shades of Greige, pronounced to rhyme with "bay." (*Id.* at 2723:8-18.)  He never heard anybody pronounce the name to rhyme with "beige." (*Id.* at 2724:6-8.)

In addition, Port sent an email to the USPTO to dispute its refusal to register the trademark.  (Respondents' exhibit 5005.)  In that email Port stated that Greige was pronounced "like the color gray." (*Id.* [Cohen 083].)

*(3) Initial application (2007) for registration of the trademark.*  In January 2007, Cohen prepared and filed a trademark application for Shades of Greige.  (RT 9/13/11, 1456:4-6.)  The application stated that Cohen and Port were owners of the mark.  (Claimant's Exhibit ("Ex.") 492, pp. 1-2.)

On January 31, 2007, Cohen signed the application as "Creative Director." (Ex. 492, p. 3.)  The "first use in commerce date" was January 30, 2007 (ex. 492, p. 2) because that is the date on which they planned to exhibit the Fall 2007 collection at a trade show for the first time (RT 9/13/11, 1458:8-20).  Cohen did not state the name of the business for which he was creative director because there was no business in place.  (Ex. 492, p. 3; RT 9/13/11, 1459:12-20.)

The business first used the trademark Shades of Greige in commerce on February 13, 2007, when it sold merchandise to Atmosfere in Minnesota.  (Ex. 98.)  Neither Jeff Port nor Micah Cohen, as individuals, used the trademark in commerce.

*(4) Intended assignment of the trademark to Swarm.*  In April 2007, Port contacted Stone, Rosenblatt & Cha to form the business entity that would make and sell the Shades of Greige line, and to draft an agreement regarding the trademark and Cohen's employment.  (Exs., 490, pp. 71-72.)  On April 17, 2007, the Stone firm filed the articles of organization for Swarm, LLC (ex. 75; ex. 490, p. 57), then drafted a consulting agreement (ex. 490, pp. 58-70).  The consulting agreement provided that Port and Cohen "currently" owned the trademark and that it would be

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA  90067
Phone: 310.553.1010   •   Facsimile: 310.284.5743

- 7 -

CLAIMANT'S POST-ARBITRATION BRIEF

Ex. 1

assigned to "the Company." (Ex. 490, p. 59 (recitals D and E); p. 70.) "Company" was defined as Swarm, LLC. (Ex. 490, p. 59 (first para.).) Port testified that it was always his intention that the company would own the brand (RT 8/15/11, 261:9-15), and he never changed his mind about that (*id.* at 262:10-18).

(5) *Abandonment of the trademark.* On May 18, 2007, the USPTO issued an office action refusing to register the proposed mark "Shades of Greige." (Ex. 53.)

On October 31, 2007, Port emailed the USPTO to dispute its refusal to register the trademark. (Respondents' exhibit 5005 [Cohen 083].)

On December 21, 2007, the USPTO deemed it the trademark abandoned because the May 18, 2007 response was untimely. (Ex. 487.)

Almost two years later, on November 13, 2009, Cohen terminated his employment with Swarm. (Ex. 14.) After this termination, he did not use the trademark "Shades of Greige" in commerce.

(6) *Second application (2010) for registration of the trademark.* On March 17, 2010, Swarm filed new trademark application for Shades of Greige. (Ex. 99.) The application states that the first use of the name in commerce was February 13, 2007. (Ex. 99, p. 2.) That was the date of the sale to Atmosfere. (Ex. 98.)

(7) *Port's nunc pro tunc assignment of any rights in the trademark to Swarm.* On September 28, 2010, Port assigned to Swarm "*any* and all of his right, title and interest in and to the trademark Shades of Greige and associated goodwill." (Ex. 103; emphasis added.)[2] This nunc pro tunc assignment was effective as of April 17, 2007 (*id.*), the date Swarm was formed (ex. 75).

(8) *Registration (2011) of the trademark.* On March 1, 2011, the USPTO issued a certificate of registration to Swarm as the owner of the Shades of Greige trademark. (Ex. 105.)

---

[2] A nunc pro tunc assignment of any rights in a trademark is valid. (Cf. *Hotel Corporation of America v. Inn America, Inc.*, 153 U.S.P.Q. 574 (TTAB 1967); *Arbrook, Inc. v. La Citrique Belge*, 184 U.S.P.Q. 505 (TTAB 1974).)

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310.553.1010 • Facsimile: 310.284.5743

CLAIMANT'S POST-ARBITRATION BRIEF

postarbbrief111101.doc

Ex. 1

**B.  *Drafts of the consulting and employment agreements.***

On April 24, 2007, Heidi Feldman sent Port a draft of a consulting agreement between Swarm and Micah Cohen.  (Ex. 490, p. 58.)  Recital D stated that Port and Cohen "currently" co-own the trademark.  (Ex. 490, p. 59.)  This recital was copied on to all subsequent drafts.  (E.g., ex. 244, p. 2.)

On or about May 7, 2007, Port gave a copy of the consulting agreement to Micah Cohen.  On that same date, Micah Cohen faxed it to Gary Cohen.  (Ex. 460.)

On May 8, 2007, Gary Cohen sent his comments to Micah.  (Ex. 461.)  On June 13, 2007, at 11:52 a.m., Gary Cohen changed the name of the agreement to "Employment Agreement," and placed strikethroughs in virtually all of its text.  (Ex. 238; ex. 239.)  Later that day he made more revisions.  (Ex. 465.)  Some of the more significant changes were removal of recital E, stating that the trademark would be assigned to Swarm (ex. 239, p. 1; ex. 465, p. 2); inclusion of a phrase in paragraph 6.2, stating that the identity of Swarm's customers was not proprietary information (ex. 465, p. 6); removal of the provisions in paragraph 8.2, which stated that the trademark would be assigned to Swarm (ex. 239, p. 9; ex. 465, p. 9); and removal of Exhibit A, pertaining to the trademark assignment (ex. 239, pp. 12-13; ex. 465).

On June 18, 2007, Heidi Feldman revised Gary Cohen's draft and "left out most" of his changes.  (Ex. 490, p. 27.)  She also restored the assignment provisions (ex. 490, p. 29 (recital F), para. 6.2 (ex. 490, p. 34), and exhibit A (ex. 490, p. 41).

From June 18, 2007 to March 4, 2008 (ex. 247), there are no emails mentioning either a consulting or an employment agreement.  There are six emails from March 4, 2008 to March 27, 2008.  (Exhibits 247, 5097, 18, 241, 242, and 243.)  As of March 27, 2008, the agreement was not signed.  (Ex. 243.)  From March 27, 2008 until May 28, 2008 (ex. 244), there are no emails mentioning either a consulting or an employment agreement.  (RT 9/21/11, 2406:24 to 2407:5; see also *id.* at 2406:10-14 (sole way of communicating new agreements was through email).)

Lyle R. Mink
*Law Offices of Lyle R. Mink*
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310.553.1105    Facsimile: 310.284.3743

- 9 -

CLAIMANT'S POST-ARBITRATION BRIEF

1    Gary Cohen claimed he sent a "final" revision of the agreement between March 27

2    and May 28 but said he "couldn't find it."  (RT 9/15/11, 1779:22 to 1780: 23.)

3         There were several drafts of an agreement:  Cohen testified there were about

4    13 drafts (RT 9/13/11, 1471:24 to 1472:7); Port testified there were about 15 drafts

5    (RT 8/16/11, 303:3-10); and Gary Cohen testified there were at least seven or eight

6    drafts (RT 9/15/11, 1776:5-7).

7         Gary Cohen did not speak to Port about any of these drafts.  (RT 9/15/11,

8    1785:16-18; RT 9/22/11, 2548:11-13.)  Micah Cohen said that he spoke to Port about

9    certain provisions in the employment agreement.  At his deposition, however, he

10   could not remember anything that was said.  For example, he could not remember

11   the substance of his alleged discussions with Port concerning paragraph 6.2

12   (excluding customer names as proprietary information):

13        Q.  Same set of questions for 6.2, even though

14              that's got the term in there, it's a little different.

15        A.  So, yeah, same -- same answer.  No specific

16              recollection of any additional substance, other than

17              that we discussed what, you know, what I believe, you

18              know -- I mean, this -- this particular section or what

19              this pertains to.

20        Q.  Well, do you remember what you said about

21              section 6.2?

22        A.  No.  No, that I don't remember.

23        Q.  Okay.

24              And -- And not -- not exactly, the gist, the

25              substance?

26        A.  No, no, I don't recall.

27        Q.  Do you remember what he said about section 6.2

28

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA  90067
Phone: 310.553.1010  •  Facsimile: 310.284.5743

- 10 -

CLAIMANT'S POST-ARBITRATION BRIEF

1             in substance?

2        A.  No.  No, I don't recall that.

3        Q.  All right.

4            Do you remember how many times you discussed 6.2?

5        A.  No.

6        Q.  Do you remember when you discussed it, what

7            period of time?

8        A.  No.  (RT 9/21/11, 2400:4 [M. Cohen depo., 334:20 to 335:17].)

9    As to paragraph 8.2 [no assignment of trademark to Swarm], Cohen testified:

10        Q.  Same set of questions, Mr. Cohen.· You said you

11            discussed yesterday 8.2 with Mr. Port; correct?

12        A.  Yes, sir.

13        Q.  All right.

14            Can you separate any of the discussions?

15        A.  No.

16        Q.  Did they all mesh together?

17        A.  Sure.  Yes.

18        Q.  Can you recall when you had these discussions

19            with him about 8.2?

20        A.  No.

21        Q.  Do you recall what you said about 8.2?

22        A.  No.

23        Q.  Do you recall what he said about 8.2?

24        A.  No.  (RT 9/21/11, 2401:2-3

25            [M. Cohen depo., 335:21 to 336:10].)

26    As to Schedule A [definition of net profit], Cohen testified:

27        Q.  You said you discussed yesterday Schedule A with

28

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310.553.1010 • Facsimile: 310.284.5743

- 11 -

1      Mr. Port?

2   A.  Yes, sir.

3   Q.  Do any conversation -- Are you able to separate

4       any conversations?

5   A.  No.  I'm not able to separate any

6       conversations.

7   Q.  So they all mesh together?

8   A.  Yes, sir.

9   Q.  And you recall -- By the way, we're talking

10      about Schedule A; right?

11  A.  Yes, sir.

12  Q.  Do you recall when you had these discussions

13      with him about Schedule A?

14  A.  No, sir.

15  Q.  Do you recall what you said about Schedule A?

16  A.  No.

17  Q.  Okay.

18      Do you recall what he said about Schedule A?

19  A.  No.  (RT 9/21/11, 2402:4 [Cohen depo., 336:15 to 337:9].)

20      Cohen claims he signed the employment agreement "around" the third week in

21  May 2008.  (RT 9/14/11, 1507:12-14.)  The third week of May 2008 began on

22  Monday, May 12 and ended on Sunday, May 18.  (RT 9/14/11, 1508:8-9.)  On May

23  22, 2008, Onglory Shanghai issued its commercial invoice for developing "patterns

24  and protos" for Spring-Summer 2009.  (Ex. 494.)  Cohen testified that he normally

25  went to China *before* Onglory Shanghai issued an invoice.  (RT 9/14/11, 1511:10;

26  see also 1510:13 to 1511:6.)  On May 21, 2008, Port emailed Cohen asking if he

27  needed anything while he was "still there."  (Ex. 290.)  When Cohen was asked

28

Lyle R. Mink
*Law Offices of Lyle R. Mink*
1801 Century Park East, Suite 2600
Los Angeles, CA  90067
Phone: 310.553-1010 • Facsimile: 310.284.5743

- 12 -

CLAIMANT'S POST-ARBITRATION BRIEF

1   where he was on May 21, he said "[I] certainly don't recall where I was three years

2   ago." (RT 9/14/11, 1521:17-24.)

3           Cohen also testified that he signed the agreement a few days before he sent the

4   May 28, 2008 email (with an unsigned employment agreement) to his father stating

5   "This is the one that got signed." (Ex. 244; RT 9/14/11, 1507:21-24.) "A few days"

6   before would have been Sunday, May 25.

7           Cohen's version of the alleged signing was as follows: Cohen signed the

8   agreement then walked into Port's office and gave him two or three copies. (RT

9   9/13/11, 1488:21-24 [reading from Cohen deposition, 93:4-8].) Cohen said "[h]ere

10  are the signed ones . . . [g]ive it back to me once you [sic] signed it." (*Id.* at 93:13-

11  18.) Then he left. (*Id.* at 93:19-20.) The same day, Port returned one copy to him.

12  (*Id.* at 94:12-14.) Port walked back into the Van Nuys warehouse and gave "them"

13  to him. (*Id.* at 92:21-24; 94:15-17.) Port just dropped off a signed copy at Cohen's

14  desk area and walked away. (*Id.* at 95:2-12.) Cohen put a copy with both signatures

15  in the filing cabinet by his desk. (*Id.* at 95:13-16; RT 9/14/11, 1507:3-4.)

16          Cohen said he didn't send his father a fully-executed copy of the agreement in

17  his May 28 email because Swarm had a combination "printer/scanner/copier

18  machine" and he couldn't use some of its "advanced" features." (RT 9/13/11,

19  1476:6-13.) Angela Duckwitz testified that Swarm had a combined scanner and

20  copier, and she could email a scanned document from it. (RT 9/23/11, 2687:14 to

21  2689:5.) She found it easy to use. (*Id.* at 2688:6-8.) Ryan Port testified that the

22  scanner/copier machine was "very simple" to use. (*Id.* at 2762:23-24.)

23          When Cohen was asked why he didn't fax the agreement to his father in May

24  2008, he stated: "I don't know. This -- He asked me to send him a signed

25  agreement but I didn't -- I didn't think this was a problem." (RT 9/13/11, 1476:19-

26  22.) Cohen also testified that, after he emailed his father the unsigned agreement on

27  May 28, his father did not ask for a signed one. (RT 9/13/11, 1476:23-25.)

28

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310.553.1010 • Facsimile: 310.284.5743

- 13 -

CLAIMANT'S POST-ARBITRATION BRIEF

Ex. 1

Gary Cohen said the agreement was important to him and his son (RT 9/15/11, 1782:2-6), but didn't ask his son to send him a signed copy because he "was very busy" (RT 9/22/11, 2524:20).   Gary Cohen later said he "sort of *offhand*, asked him [Micah] if *he* had – if *he* had signed it" (*id.* at 2524:23-24; emphasis added) and "he sent me – he sent me that e-mail, or the attachment" (*id.* at 2525:2-3).   When asked about his "offhand" request, Gary Cohen said:   "It *wasn't a big concern* to me. . . . I asked Micah *casually* in a conversation."   (RT 9/22/11, 2553:4-17; emphasis added.)

On November 13, 2009, Cohen resigned from Swarm.   His termination letter stated he was "terminating [his] contract with Swarm LLC due to breaches of material provisions in our Employment Agreement."   (Ex. 14.)   He testified that he didn't know whether the business was being run poorly or not; he just "disagreed with the way that certain things were being handled."   (RT 9/21/11, 2396:5-13.) Chris Corrado testified that Cohen told him in September or October 2009 that he was leaving Swarm because he was unhappy with delays from the manufacturer in China.   (Corrado depo., 45:22 to 46:3 [this transcript, and the DVD clips, are being submitted with this brief pursuant to the court's instructions].)[3]

Cohen testified that he gathered his personal belongings and left.   (RT 9/14/11, 1522:7-9.)   Two days earlier, he *planned* to go to the office and "remove [his] things" *before* delivering his termination letter to Port.   (Ex. 486, second para. ("I will go in. . . and remove my things, *proceed* to hand him the letter and explain that I am willing to allow him . . . .").)   He could have gone to his filing cabinet—to get the agreement he claimed Port signed—before leaving.   (RT 9/21/11, 2391:1-9.)   Port did not tell him that he could not go to the filing cabinet.   (*Id.*)   But Cohen did not go there.   (RT 9/16/11, 2012:11-13.)

---

[3] Micah Cohen testified that all of Corrado's testimony, played at the hearing, was true.   (RT 9/21/11, 2410:7-21.)

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310.553.1010 • Facsimile: 310.284.5743

- 14 -

On November 18, 2009, Port asked Cohen to send him a copy of the agreement that Cohen contended governed the terms of his relationship with Swarm (i.e., the one Cohen referred to in his November 13 termination letter). (Ex. 251; RT 9/13/11, 1409:19 to 1410:9.) Port wanted to know which agreement Cohen was referring to. (*Id.*) Cohen attached a copy and told Port that *he* had the "original" signed agreement. (Ex. 454.) When Cohen described the events on the day the agreement was allegedly signed, he did not mention an "original."

On November 19, 2009, Port told Cohen: "I do not have a *signed* copy of this agreement, if you have one please produce it." (Ex. 455; emphasis added.) Cohen responded: "I gave you the signed copy. *I don't have a signed agreement.*" (Ex. 456.) Cohen did not tell Port that there was a signed copy in his filing cabinet. (RT 9/14/11, 1524:4 to 1525:6.)[4]

Gary Cohen testified that the agreement was important. (RT 9/15/11, 1782:2-6.) He knew that Micah Cohen claimed a signed copy of the agreement was in his filing cabinet. (RT 9/15/11, 1782:14-20.) He also knew that Port said he did not have a signed copy of the agreement. (RT 9/14/11, 1525:14 -20; RT 9/15/11, 1782:10-13; see also RT 9/22/11, 2554:12 to 2555:5.) But Gary Cohen did not tell Micah Cohen to go to the filing cabinet and get the copy he claimed to have signed. (RT 9/14/11, 1525:22-25; RT 9/15/11, 1782:21 to 1783:16; 1784:3-4.) Gary Cohen initially referred to the agreement as "the one that Micah and Jeff signed" but later said "or [the agreement] that Micah has *testified* that he and Jeff signed." (RT 9/22/11, 2507:24 to 2508:1; emphasis added.)

Mr. Norris asked Gary Cohen why he didn't point out to Port that "*Micah* had signed a copy of the employment agreement and it was located in the filing cabinet."

---

[4] Cohen testified that in 2008 he put a signed copy of the agreement in his filing cabinet, and, as of November 19, 2009, it was still there. (RT 9/14/11, 1524:1-3.)  He also testified that he believed it was important to show that the agreement had been signed. (*Id.* at 1524:8-10, 21-25; 1525:1-6.)

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310.553.1010 • Facsimile: 310.284.3743

- 15 -

CLAIMANT'S POST-ARBITRATION BRIEF

1   (RT 9/22/11, 2526:6-11; emphasis added.)  Cohen said he would have felt "*silly*" at

2   that point asking him [Port] about it" and "*presumed* that the agreement was gone at

3   that point." (*Id.* at 2526:12-19; emphasis added.)

4        Port testified that he did not sign Cohen's employment agreement (RT

5   8/15/11, 259:17 to 260:25) because the issues they did not agree on remained and, in

6   many cases, became even worse (RT 9/23/11, 2719:10 to 2720:10; see also 2720:11

7   to 2721:5).

8        Port testified that he and Cohen had an oral agreement (RT 8/16/11, 416:9-14)

9   the terms of which were consistent with their conduct during the day-to-day

10  operation of the business (RT 8/16/11, 416:23 to 417:3).  Some of those terms were

11  reflected in the various drafts of the agreement that they had been exchanging.  (RT

12  8/16/11, 418:8-17.)  For example, they agreed to a three-year term of employment

13  with an ending date of April 30, 2010.  (*Id.* at 417:8-21.)  They also agreed that

14  Cohen would design the line of clothing (*id.* at 420:6), attend trade shows (*id.* at

15  424:6-20) and be paid an annual salary of $75,000 (*id.* at 418:25).  But Port did not

16  agree that Swarm could not use the trademark if Cohen were no longer employed by

17  Swarm, or that Swarm would pay a royalty to use the trademark.  (E.g., RT 8/15/11,

18  78:22 to 82:10; 262:10-18.)  And although Port agreed to pay Cohen a bonus based

19  on profits, they never agreed on how profits would be calculated.  (*Id.* at 79:10-15.)

20  ***C. Success of the Shades of Greige brand.***

21       From 2007 to 2009, Chris Corrado was the director of sales for BPMW, the

22  sales representative for Shades of Greige.  (Corrado deop., 20:21 to 22:12.)

23  BPMW's primary function was to generate sales, which included outreach to

24  retailers.  (Corrado depo., 33:9-19; 39:8-18.)  Ninety-five to one hundred percent of

25  BPMW's job was getting retailers to come in and look at the merchandise and to

26  place orders.  (*Id.* at 39:12 to 40.)

27

28

Lyle R. Mink
*Law Offices of Lyle R. Mink*
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310.553.1010 • Facsimile: 310.284.5743

- 16 -

CLAIMANT'S POST-ARBITRATION BRIEF

1   BPMW received commissions based on its sales of Shades of Greige. (*Id.* at

2   25:17-22.)  For showroom sales, BPMW made appointments for retail accounts and

3   made sure they came in to decide what their order would be for the next season. (*Id.*

4   at 34:3-11.)  For trade shows, BPMW invited retailers with whom they had long-

5   standing relationships to see the line. (*Id.* at 35:4-19.)

6   BPMW walked retailers through the collection and let them select what they

7   liked by *style numbers*. (*Id.* at 35:4-19; 37:5.)  BPMW sometimes suggested what

8   the retailers should be buying and how much. (*Id.* at 37:12-16.)  BPMW made sure

9   orders were written and that Swarm filled those orders, and it supervised the order

10   process. (*Id.* at 33:3-13.)

11   BPMW also did marketing, or branding, for Swarm, which was getting the

12   Shades of Greige *name* "out there." (*Id.* at 38:2-14.)  Corrado said Shades of Greige

13   could have continued because "buyers would have come back and bought Shades of

14   Greige *just based on that name alone*." (*Id.* at 208:18 to 209:1; emphasis added.)

15   During the time BPMW worked for Swarm, things had been constantly

16   improving. (*Id.* at 40:11-25.)  The client and brand were on an upward trajectory.[5]

17   (*Id.* at 49:19-21.)  The product was selling because of word of mouth. (*Id.* at 42:6.)

18   It was selling through the retailers. (*Id.* at 42:7.)

19   Swarm's business was constantly improving, and its sales volume was steadily

20   increasing, even during the recession. (Corrado depo., 40:20-21 ("[t]hings were

21

22   ─────────────────

23   [5] On June 12, 2008, Corrado made projections for Swarm's business. (Ex. 383; Corrado depo., 94:17 to 95:20.)  He projected $2 million in sales for the Fall 2010 line. (Ex. 383.)  He said the projections were conservative and it was important for a brand like "Shades" not to "exceed a critical mass of accounts." (*Id.*)  He recommended increasing volume within each door [location] of an account "as opposed to spreading the brand thin." (*Id.*)

24

25

26   On April 28, 2009 Corrado revised his projections for Swarm's sales. (Ex. 123, 397.)  He projected $1.1 million in sales for the Fall 2010 line and a total of $2 million in sales for calendar year 2010. (Ex. 123, p. 3.)

27

28

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310.553.1010  •  Facsimile: 310.284.3743

- 17 -

CLAIMANT'S POST-ARBITRATION BRIEF

constantly improving for Shades of Greige"); 49:19-20 (brand or client were on "upward trajectory"); Port testimony, RT 8/15/11, 138:6-17 (company was growing at difficult time in economy).)  Swarm's tax returns show these increasing sales:

| 2007: | $421,666 (Ex. 445.) |
| 2008: | 1,202,386 (Ex. 447.) |
| 2009: | 1,471,597 (Ex. 443.) |
| 2010: | 788,770 [Spring 2010 season] (Ex. 444.) |
| | 1,577,540 [doubled] |

Port testified that Swarm's breakeven point was about $1 million per season. (RT 8/15/11, 137:21 to 138:5.)[6]  Therefore, after three years, Swarm was approaching its breakeven point.

**D.  Cohen's plan to leave Swarm and start a competing men's line using Swarm resources, styles, designs, and patterns.**

On May 29, 2009, Cohen told Steven Zhou, with whom he had worked before Swarm:

> "I am *now* making plans on leaving him and it will *only be a matter of time*." (Ex. 316; emphasis added.)  Zhou responds: "It is always my aim *to grow together with you. . . .* Hope *we can figure out a good way for you to leave* and for me to survive." (Ex. 316; emphasis added.)

On July 8, 2009, during his meeting with Port, Cohen did not tell Port that he was going to leave before the end of his term, on April 30, 2010. (RT 9/14/11, 1560:9-14.)

---

[6] Cohen said that his breakeven point is roughly $850,000 to $1 million per season. (RT 9/21/11, 2414:19 to 2415:8.) He reached this in his very first season. (See discussion at part 2.H., infra.)

- 18 -

Lyle R. Mink
*Law Offices of Lyle R. Mink*
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310.553.1010 • Facsimile: 310.284.5743

On July 8, 2009, Cohen told Steve Wolski and Chris Corrado, at BPMW: *Just between us* – we're having some problems.  Jeff is refusing to pay the manufacturer for the samples right now – he's claiming poverty." (Ex. 328; emphasis added.)

On July 12, 2009, Port asked Corrado for information about the Spring 2010 samples. (Ex. 405.)  Corrado forwarded that email to Cohen, stating:  "He [Port] *doesn't get it*." (Ex. 405.)

On August 25, 2009, Cohen told Steven Zhou:  "I spoke with Jeff today and told him that I would not be extending the partnership with him *longer than next season – Fall 2010*, when our contract is up." (Ex. 267, p. 2; emphasis added.)  In response, Zhou agreed with Cohen and provided information regarding payments. (Ex. 267, p. 1.)  Cohen replied in part:

> "I will send you an email *soon*, once Jeff and I finalize how we will part ways, [and] about *how I think we should continue and what will need to be done*." (Ex. 267, p. 1; emphasis added.)

On September 17, 2009, at 12:12 p.m., Gary Cohen proposed an email to Port regarding Micah Cohen's separation. (Ex. 335, p. 2.)  Micah Cohen sent a slightly modified version of this email, telling Port that he intended to continue using the trademark "after the term of my contract is up" because "Swarm is prohibited from using it after the end of the term [of the contract]." (Ex. 115, p. 1.)

On September 18, 2009, Cohen told Port that he would be going to China "at some point during the middle of *October* to begin *development on the Fall 2010 collection*." (Ex. 122; emphasis added.)

On September 29, 2009, Cohen emailed Port, stating that he was "increasingly uncomfortable" regarding their situation, and made an "offer that will enable us to end our relationship." (Ex. 204, p. 1; emphasis added.)  Cohen said he didn't think "there [was] *any point in creating the Fall 2010 line* for Swarm given the imminent end of our contract." (Ex. 204, p. 1; emphasis added.)

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA  90067
Phone: 310.553.1010  •  Facsimile: 310.284.5743

- 19 -

postarbbrief111101.doc

1    Beginning October 7, 2009, Micah Cohen sent various photos to Steven Zhou

2    in connection with a Fall 2010 line.  (Ex. 46.)

3        On October 8, 2009, Port told Cohen that he didn't want to terminate their

4    agreement early.  Cohen stated "[t]here is no point to develop the upcoming Fall

5    2010 collection for Swarm *as there is no way for Swarm to sell it* under our current

6    contract," and he proposed that he ultimately own 100 percent of the Shades of

7    Greige trademark for goods produced "*after* the Fall 2010 line."  (Ex. 83; emphasis

8    added.)  Cohen's statement—that there was no way for Swarm to sell the Fall 2010

9    collection—was based on his version of the employment agreement that provides, in

10   substance, that Swarm could produce Fall 2010 *but not deliver it* if Cohen were to

11   leave Swarm.  (RT 9/21/11, 2422:20 to 2423:5.)  As to this provision, Cohen said:  "*I

12   didn't actually have that [result] as a consideration.  Perhaps that kind of timing I

13   didn't think about.*"  (*Id.* at 2423:3-5; emphasis added.)

14       Gary Cohen drafted the provisions of the agreement on which Cohen based his

15   statement that Swarm could produce Fall 2010 but not deliver it if he were to leave

16   Swarm.  (RT 9/22/11, 2549:1-3.)  Gary Cohen testified that before he drafted those

17   provisions he had not read any of the cases on the joint ownership of trademarks,

18   was not aware of the problems that would occur or have occurred when there has

19   been joint ownership of a trademark, and made no provisions in the event that two

20   owners of a trademark had a dispute.  (RT 9/22/11, 2549:1-19.)

21       On October 9, 2009, Cohen told his father:

22       "I'd like to push as hard as possible to *get him out now* or asap.

23   Even if [it] takes a little bluffing.

24       "Worst case scenario is that we agree to nothing – there is no Fall

25   2010 Shades of Greige (*although maybe I have some ways of getting

26   *around that* – SHADES OF GREY)

27

28

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA  90067
Phone 310.553.1010 • Facsimile 310.284.5743

- 20 -
CLAIMANT'S POST-ARBITRATION BRIEF

1     "*He needs to agree to my terms if he wants anything* beyond the

2     end of May 2010, no?  (Ex. 340, p. 1; emphasis added.)

3        On October 9, 2009, he proposed to tell Port:  "My *priority* is to have a *quick*

4     *and seamless transition* to where I am *solely in control* of the SHADES of GREIGE

5     trademark." (Ex. 342; emphasis added.)  Cohen also expressed his belief that if Port

6     didn't agree with his proposal, *Port would be left with nothing.*  (Ex. 342, last para.)

7        On October 19, 2009, Nancy Cohen filed an intent-to-use application for

8     Shades of Grey as a trademark.  (Ex. 55.)  Neither Micah Cohen nor Nancy Cohen

9     told Port of this filing, then or at any time thereafter.  Port discovered it himself.

10    (Ex. 256 (middle of page).)

11       On October 20, 2009, in alternative 2 of his settlement proposal, he offered

12    "*one dollar for the trademark, customer lists*, books and records, etc." (Ex. 211, p.

13    2; emphasis added.)

14       On October 27, 2009—while he was still in China with Steven Zhou (RT

15    9/16/11, 2025:9 to 2026:4)—Micah Cohen emailed Gary Cohen:

16     "[I]t seems like he doesn't understand that. . . . I'm not sure how

17     else to put it to him.  *Fall 2010 isn't happening for Swarm/him.*

18     "I would prefer to nullify the contract (for his breaches; late

19     payments to vendors, not providing profit statements, etc.) and *start*

20     *SHADES OF GREY tomorrow* than have to drag this out with him and

21     *risk missing a season.  I'm doing all the prep work for Fall 2010*

22     *samples right now, so there shouldn't be an issue getting them done.*"

23     (Ex. 361; emphasis added.)

24       On October 31, 2009, Port tried to avoid Cohen leaving on April 30, 2010 by

25    extending his term of employment.  (Ex. 15.)  On November 2, 2009, however,

26    Cohen stated that he was not staying and that he *expected his employment to end on*

27    *April 30, 2010.*  (Ex. 309; emphasis added.)

28

Lyle R. Mink
*Law Offices of Lyle R. Mink*
1801 Century Park East, Suite 2600
Los Angeles, CA  90067
Phone: 310.553.1010 • Facsimile: 310.284.5743

- 21 -

1   On November 4, 2009, Micah Cohen asked Gary Cohen:

2   "How do you think I should *go about handling issues for the Fall*

3   *2010 line (being sampled right now) – He's asking Steven for*

4   *information* regarding how much the samples will cost, how may sets

5   are being made  etc. and they need to be paid for asap."  Gary Cohen

6   says:  "I would continue to act in the ordinary course re Fall 2010."

7   (Ex. 365; emphasis added.)

8   Micah Cohen then asks:

9   "*Should I let Steven* go ahead and issue Jeff an invoice and ask

10   for payment from him?  *Or should I tell Jeff that he should not request*

11   *further information regarding Fall 2010?*"

12   Gary Cohen responded:  "No, don't do this.  Just remind Jeff that Swarm can't

13   sell Fall w/o agreement." (Ex. 365; emphasis added.)  Gary Cohen said this without

14   knowing whether it would present problems.  (RT 9/22/11, 2549:1-19.)

15   On November 7, 2009, Micah Cohen stated that he thought Port was stalling

16   so that he would be "*forced to let Swarm have the Fall 2010 season*" and that he

17   "*[didn't] want that to happen.*"  (Ex. 369; emphasis added.)

18   On November 8, 2009, Micah Cohen asked Gary Cohen:  "*Do you think I*

19   *should address his questions about Fall 2010* in his P.S.?"  (Ex. 370, p. 1; emphasis

20   added.)

21   On November 9, 2009, at 11:35 a.m., Micah Cohen told Gary Cohen and

22   Nancy Cohen that he was heading back to China on Saturday [11/14/09] or Sunday

23   [11/15/09].  (Ex. 360.)  At 11:41 a.m., Cohen told Port he was returning to China at

24   the end of the week.  (Ex. 285, p. 1.)  At 8:05 p.m., Port told Cohen that he was

25   curious why another trip to China was necessary because Cohen had just returned, it

26   was out of the norm, and they had not discussed it.  (Ex. 371.)

27

28

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA  90067
Phone: 310.553.1010 • Facsimile: 310.284.5743

- 22 -

CLAIMANT'S POST-ARBITRATION BRIEF

Ex. 1

On November 10, 2009, at 9:42 a.m., Cohen told Port that during his last trip to China he "began the process of *developing* the Fall 2010 line. Steven has begun the *process of making proto samples* and my next trip would be to continue the sampling process by approving/making changes to the proto samples." He also said: "I do have to point out that Swarm LLC *does not own the Goodwill associated with the trademark,* so there is no reason for me to pay for it." (Ex. 199, p. 2; emphasis added.)

On November 11, 2009, at 10:59 a.m., Cohen told Port that they are "at the beginning of the development process [for the *Fall 2010* merchandise]." As to Fall 2010 development, he stated:

> "Steven [Zhou] has begun the process of making proto samples and my next trip would be to continue the sampling process by approving/making changes to the proto samples. I have attached a PROTO SAMPLES list which Steven is working on. *These proto samples are to be finished by the end of November*." (Ex. 355; emphasis added.)

On November 11, 2009, at 12:38 p.m., Cohen told his father that he would go to the office on Thursday [11/12] or Friday [11/13] and

> "remove my things, proceed to hand him the [termination] letter and explain that I am willing to allow him to continue to use the trademark for the Spring 2010 Merchandise as well as sell off any older merchandise as well." . . . . If he refuses [to let me assist with the production and delivery of the product], *I can get updates from Steven [Zhou] and BPMW.* Also, *everyone has my contact info (not Jeff's), so most requests and communications throughout the season will come through me anyway.*"

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310.553.1010 • Facsimile: 310.284.5743

postarbbrief111101.doc

CLAIMANT'S POST-ARBITRATION BRIEF

Ex. 1

1    "I am *booking my trip to China today – leaving Saturday night

2    [11/14]* and returning Thursday afternoon [11/19]." (Ex. 486; emphasis

3    added.)

4        On November 11, 2009, at 3:44 p.m., Cohen informed Port there would be

5    roughly 65 styles for Fall 2010 "as there are *57 on the list* and I'm planning on

6    adding a few more my next trip." (Ex. 198, p. 4; emphasis added.) He stated that the

7    samples for Fall 2010 would cost $65,000. (*Id.*) Port testified that they had never

8    paid $65,000 for samples for one season. (RT 9/13/11, 1407:6-8.)

9        **E. Cohen's early termination of HIS employment without notice.**

10       On November 2, 2009, Cohen told Port that his contract term was "*up April

11   30, 2010*" and that he expected "to provide a *formal termination notice on January

12   30, 2010*, if they were "unable to reach agreement, either as to a rational way to

13   unwind before then, or on an extension." (Ex. 309; emphasis added.)

14       On November 13—contrary to his November 2 email stating that he expected

15   to provide a formal termination notice on January 30, 2010—Cohen quit his

16   employment with Swarm without any notice. (RT 9/13/11, 1408:19-22.) Just two

17   days before that, Cohen told Port that they were at the beginning of the development

18   process for the Fall 2010 collection. (RT 8/15/11, 238:9-12; 238:23 to 239:4.)

19       **F. Cohen's use of Swarm's resources and property.**

20       *(1) Use of Swarm styles, designs, and patterns.* On November 13, Cohen

21   sent an email to Steven Zhou regarding the *same* Fall 2010 proto samples that

22   appeared on the commercial invoice that Zhou had issued to Shades of Greige on

23   November 12. (Ex. 497; compare *style numbers* on ex. 497, p. 2, with *style numbers*

24   on ex. 7.) Cohen stated in part: "Attached is the list of the *57* Shades of Greige

25   protos. I've added some new styles and cancelled some I don't like, but the total

26

27

28

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA  90067
Phone: 310.553-1010 • Facsimile: 310.284.5743

CLAIMANT'S POST-ARBITRATION BRIEF

1  styles remains *57* unchanged. (Ex. 497, p. 1; emphasis added.) Cohen instructed

2  Zhou how to prepare them for his own line. (Ex. 497, p. 2.)[7]

3      For example, for FW10-OW100, the three-button blazer, he instructs

4  "*basically* as SS10-OW10, but need to add some to body width." (*Id.*; emphasis

5  added.) SS10 was the collection that Shades of Greige sold for Spring-Summer

6  2010. Similarly, for FW10-OW104, the belted band collar moto jacket, he instructs

7  "details as pictures I sent to you on *22 Oct*." (*Id.*; emphasis added.) In October,

8  when Cohen was in China, Steve Zhou was starting to make the proto samples for

9  Shades of Greige. (RT 9/16/11, 2092:19 to 2093:4.) Finally, for FW10-BTM603,

10  slim fit suit pant, he instructs "*same as FW09*-BTM56 – can *use FW09 proto*

11  *sample*." (*Id.*; emphasis added.)

12      Although there is no evidence to explain why "Monday" appears on this

13  November 13 email—because November 13, 2009 was a Friday—Cohen did not

14  deny sending it. (RT 9/21/11, 2447:6 to 2448:3.) Port testified that the email came

15  from his computer. (RT 9/22/11, 2597:13 to 2598:22; 2599:18 to 2600:5.)

16      Paul Buxbaum testified that *style numbers* are important for several reasons.

17  First, they are maintained the customer's system, which makes it easier to continue

18  on with repeat business. (RT 9/16/11, 2047:3 to 2048:25; 2052:14-20.) Cohen used

19  the Swarm style numbers in his Fall 2010 lookbook. (Compare *style numbers* and

20  *descriptions* on ex. 7 with *style numbers* and *descriptions* on ex. 438, p. 10 (items 1,

21  3, 5), p. 11 (items 2, 3, 4, 5, 6));[8]

22      Second, the amount of floor space that a brand is assigned by a retailer

23  depends on how well the brand sells. (RT 9/16/11, 2049:1-9.) The retailer

---

25      [7] Soon after Cohen resigned on November 13, the sampling process for Shades

26  of Griege stopped. (Ex. 78 (4th para. after salutation).)

27      [8] These are only examples. The number of items that have the same style

28  numbers and descriptions is much longer. See exhibit 2 hereto.

Lyle R. Mink
*Law Offices of Lyle R. Mink*
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310.553.1010 • Facsimile: 310.284.5743

- 25 -

CLAIMANT'S POST-ARBITRATION BRIEF

1  anticipates receiving a certain return on the brand, expressed in dollars per square

2  foot. (*Id.* at 2049:18 to 2050:4.)

3     Third, keeping the same style numbers shows that the merchandise is the same

4  as before; it shows *continuity*. (*Id.* at 2048:13-25.) This continuity gives the retailer

5  confidence that the brand is not going to "come out with something off base" and

6  possibly decrease the retailers return on the floor space. (*Id.*) Continuity is

7  important when building a brand. (*Id.*)

8     Fourth, if the retailer is presented with something that looks like something

9  new, the retailer will buy only a few pieces. (RT 8/18/11(Wolski testimony),

10  1116:12-22.) This will result in less floor space for the merchandise. (See RT

11  9/16/11, 2049:1-9.)

12     *(2) Cohen's trip to China.* On Saturday, November 14, 2009—the day after

13  he terminated his employment—Cohen went to China. (Ex. 486; see also RT

14  9/16/11, 2031:15-16.)

15     *a. Designs.* When he arrived in China, Cohen said he gave Steven Zhou the

16  Fall 2010 designs for Shades of Grey by Micah Cohen. (RT 9/21/11, 2421:11-13.)

17     Cohen claimed he made new designs, shown on notes and reference pictures

18  (RT 9/21/11, 2417:1-5) that he verbally explained to Steven Zhou (*id.* at 2419:15 to

19  2420:1), the technicians (*id.* at 2416:23-24), and the pattern maker (*id.* at 2418:8).

20  But Zhou testified that Cohen gave him drawings (RT 8/18/11, 1176:16-22) and

21  Zhou threw them out after using them.   (RT 8/18/11, 1178:7-14.)

22     Cohen implied he did not use his computer for designs; he said he

23  communicated his line "directly." (RT 9/21/11, 2415:21 to 2416:2.) Seven days

24  earlier, however, he testified that his laptop had design work on it. (RT 9/14/11,

25  1528:3-24.) Zhou testified that some of the designs Cohen brought were on his

26  computer. (*Id.* at 1748:2-7, 17-21; emphasis added.) Zhou further testified that

27

28

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310.553.1010 • Facsimile: 310.284.5743

- 26 -

1   Cohen would email his designs to him with photos or pictures and drafts. (RT

2   8/18/11, 1158:25-7.)

3       Zhou claimed he emailed Swarm's designs to Port and deleted them. (*Id.* at

4   1742:11 to 1744:21.) Port never received them. (RT 9/15/11, 1742:17 to 1743:17.)

5       Cohen did not disclose his design notes before the arbitration hearing or at the

6   hearing. Cohen did not know whether he brought his design notes back from China.

7   (RT 9/21/11, 2420:2-4.) He said once they are used, and the protos are in process,

8   the notes don't have much use to him. (RT 9/21/11, 2420:5-9.)

9       Cohen claimed there was a difference between the designs he made for Swarm

10  for Fall 2010 and the designs that he made for Shades of Grey for Fall 2010. (RT

11  9/16/11, 2094:20 to 2095:3.) But he never described that alleged difference.[9] And

12  neither Cohen nor Zhou brought to the hearing any Fall 2010 designs, patterns, or

13  protos for Shades of Greige and Shades of Grey by Micah Cohen so the arbitrator

14  could see whether Cohen had, in fact, made any changes of any relevance.

15      **b. Patterns.** Zhou testified he would make patterns after confirming the

16  designs (RT 8/18/11, 1177:4-8), and he printed CAD patterns [from a computer] on

17  paper then cut the pattern on the paper (RT 9/15/11, 1741:5-6; RT 8/18/11, 1179:20

18  to 1180:3 (patterns made on computer using CAD)).

19      [9] Swarm's counsel did not examine Cohen on exhibit 506 for the purpose of

20  showing that his Fall 2010 collection and the Fall 2010 collection that would have

21  been Swarm's were the *same*. (The examination on exhibit 506 begins at RT
    9/23/11, 2771:25.) Instead, Swarm's counsel examined Cohen on exhibit 506 to

22  show that many of his Fall 2010 pieces looked *similar* to garments that had appeared

23  in Swarm's earlier collections, and, therefore, that they were "inspired" by those
    collections. This examination was for the purpose of impeaching Cohen's earlier

24  testimony that his Fall 2010 collection was not "*inspired*" by any earlier Shades of
    Greige collections. (*Id.* at 2794:3-7.) On examination by Mr. Norris, Cohen merely

25  explained that there were *differences* in the *details* of his Fall 2010 pieces and those

26  Swarm garments from seasons *before* Fall 2010. Cohen did not explain, or bring in
    samples to show, any differences between *his Fall 2010 collection* and those that

27  were intended for *Swarm's Fall 2010 collection*. As a fiduciary, he had the burden

28  to do so. (See part 3.A.(6)a., at p. 50, *infra*.)

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310.553.1004 • Facsimile: 310.284.5743

- 27 -

1   Zhou said he made paper patterns for the 23 Swarm protos but destroyed them
2   (RT 9/15/11, 1741:19 to 1742:5) because he kept them in CAD format (RT 9/15/11,
3   1742:6-10).  Paul Buxbaum testified that patterns are usually reused when a
4   company intends to later make garments with a similar pattern, and the patterns are
5   controlled by the one who develops them.  (RT 9/16/11, 2041:6-16.)
6   In January 2010, while in China, Port asked Zhou for Swarm's patterns but
7   Zhou did not give them to him.  (RT 9/13/11, 1393:22 to 1394:24.)
8   *c. Protos.*  Port also asked Zhou for the protos for Fall 2010 when he was in
9   China.  Zhou did not show them to him.  (RT 9/23/11, 2745:6-25.)  Zhou said he
10   "didn't keep them."  (RT 9/15/11, 1748:22-23.)
11   *d. Samples.*  On November 17, 2009, while still in China, Cohen asked Chris
12   Corrado about the samples for Shades of Grey.  Corrado told Cohen to contact him
13   when Cohen returned from China.  (Ex. 296.)
14   On November 18, 2009, Cohen sent Steven Zhou an email with the following
15   attachment: "Fall 2010 SMS [salesmen's samples] List."  (Ex. 298.)  The body of
16   this email was redacted.  (Ex. 298.)  In addition, the attachment—which would have
17   shown the salesmen's samples for Cohen's Fall 2010 line—was never produced.
18   (RT 9/14/11, 1649:10 to 1650:17.)[10]
19   *(3) Events following Cohen's return from China.*  On Thursday, November
20   19, 2009, according to his earlier email (ex. 486), Cohen returned from China.
21   On November 20, 2009, Shanghai Onglory (Steven Zhou) issued an invoice *to*
22   *Micah Cohen* for development of *proto samples for Fall 2010*.  (Ex. 297; ex. 377.)[11]
23   This invoice contains all of the *same style numbers* that Mr. Zhou listed in his
24   November 12, 2009 invoice *to Shades of Greige* for Swarm's Fall 2010 protos.  (See

25
26   [10] Salesmen samples are made for the trade shows and are the samples on
which bulk orders are based.  (RT 8/18/11, 1160:12 to 1161:10.)
27   [11] He testified that a proto is a piece of cloth that can be tried on.  (RT 8/18/11,
28   1160:3-11; RT 9/15/11, 1750:21 to 1751:4.)

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310.553.1010   Facsimile: 310.284.5743

- 28 -
CLAIMANT'S POST-ARBITRATION BRIEF

ex. 377 and ex. 7; RT 9/15/11, 1750:1-6; 11-14.)[12] Cohen testified that there was a difference between the protos on the November 12 invoice and the November 20 invoice but he never described the difference, or brought in any physical evidence that showed the alleged difference. (RT 9/16/11, 2094:20 to 2095:16.)

On November 23, 2009, Steven Zhou wrote to Port:

"We stopped production of FW10 protos immediately when you confirmed Micah's leaving. But we had completed 23 styles before that date. . . . *I don't think it practical to go on with Shades of Greige.* I believe my judgment is correct; you and Micah are the co-owners of the brand. Neither of you could work on Shades of Greige if you two fails [sic] to reach an agreement. . . . I can make all protos for you, if payment for it reaches me. *But what can you do with those protos? It is now too late for the development, and how can you expect a new designer working on previous styles done by others?*" (Ex. 78; emphasis added.)

On November 23, 2009, Nancy Cohen wired $15,000 in payment of the November 20, 2009 invoice. (Ex. 299.)

On November 25, 2009, Cohen filed articles of organization for All Shades United, LLC. (Ex. 205.) On that same date, the operating agreement between Micah Cohen, Gary Cohen, and Nancy Cohen for All Shades United, LLC became effective. (Ex. 307.)

On November 28, 2009, Port asked Zhou for the status of Fall 2010 samples. He asked for the photos, drawings (sketches), descriptions, fabrics and anything else he was given to start the process. (Ex. 501, p. 73.) Zhou told him that there were

---

[12] Zhou gave Cohen a 50 percent reduction in the cost of these protos (RT 9/15/11, 1752:1-11), and later entered into a trademark license agreement with his company for sales in China (ex. 220).

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310.553-1010 • Facsimile: 310.284.5743

CLAIMANT'S POST-ARBITRATION BRIEF

postarbbrief111101.doc

Ex. 1

1    "some" pictures or descriptions from Cohen for those pieces which he did not

2    produce. (Ex. 501, p. 73 (top).)  But Zhou did not send these to Port. (RT 9/23/11,

3    2710:19-25.)

4         On December 1, 2009, Zhou told Port:

5              "*We stopped production of Fall 2010 protos* as we need to be

6         sure that our interest is not harmed. . . . Do you think it is *too late* for us

7         to work on it now?  As a matter of fact, we need advice from designer

8         from time to time whenever there are any questions during our

9         development of paper patterns.  How can we ask for any advice from

10        Micah now?  And it usually take more than 6 weeks to source right yarn

11        and making sweater protos . . . . What is more difficult is, Micah only

12        left us a few pictures of sweaters, but we need more details instructions

13        to make any protos. [¶]  To your interest, *I suggest we don't make other*

14        *protos of fall 2010.*" (Ex. 312; emphasis added.)

15   On December 2, 2009, Zhou told Port:

16             "Further regarding the Fall 2010, I wonder if you intends to make

17        salesmen samples from the protos.  It is difficult for you to do so.  [¶]

18        Let me make some more detailed explanation to you.  You will know

19        the difficulty.  [¶]  1. It is technically impractical. . . . It *takes quite a*

20        *long period* for a designer to go over different shows and exhibitions on

21        fabrics and trims, and select what he wants for his products. . . . The

22        process of reviewing and correcting proto samples *takes many weeks,*

23        *not to mention how difficult and time consuming sourcing all of the*

24        *materials for salesmen samples* can be, even with a designer who can

25        find all of the fabrics and trim as Micah has done in the past.  *It is not to*

26        *your benefit just to hire a designer and rush decision for you.* . . . [¶] 2.

27        It is legally impractical." (Ex. 313; emphasis added.)"

28

Lyle R. Mink
*Law Offices of Lyle R. Mink*
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310.553.1010 • Facsimile: 310.284.5743

postarbbrief111101.doc

CLAIMANT'S POST-ARBITRATION BRIEF

Ex. 1

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310.553.1010 • Facsimile: 310.284.5743

1    On December 4, 2009, Port asked Zhou to send him an invoice for the samples

2    that had been completed, and, also, photos and descriptions of the 65 styles that

3    Cohen had given him but had not yet been started. (Ex. 501, p. 72.) On December

4    5, 2009, Port told Zhou that he needed to see the sketches, worksheets, descriptions,

5    and instructions that Cohen gave to him to start the process; also he asked for

6    "photos of what has been completed to date." (Ex. 501, p. 71.)

7        Port testified that Zhou never showed him photos of the styles that Cohen gave

8    him (RT 9/23/11, 2708:14-22), and never gave him any information that could tell

9    him what had been done (*id.* at 2709:6-22).

10       On December 17, 2009, Cohen sent Corrado an application for the January

11   2010 trade shows in New York and Las Vegas. (Ex. 301.) On that same date, Cohen

12   sent Zhou labels for the salesmen samples which state "Shades of Grey by Micah

13   Cohen." (Ex. 302.)

14       In January 2010, Cohen and BPMW sent an announcement to *existing Swarm*

15   *accounts*, informing them of Cohen's departure and his new line. (Corrado depo.,

16   63:8 to 64:12.) Respondents did not produce this announcement. Corrado said the

17   announcement was part of BPMW's process of getting buyers to come in, look at the

18   merchandise, and place orders (*id.* at 39:12 to 40). Corrado said Cohen had

19   established relationships with those buyers when he was employed by Swarm. (*Id.* at

20   59:24-25.) In January 2010, the Shades of Grey Fall 2010 collection was displayed

21   at a trade show attended by *Swarm's existing accounts*. (*Id.* at 64:11, 85:12-16.)

22       **G.  *Public's view of Shades of Greige and Shades of Grey by Micah Cohen.***

23       **(1) *Likelihood of confusion.*** The following are a few examples of evidence

24   showing likelihood of confusion.[13]

25

26       [13] On September 23, 2011, the following exhibits were deemed to have been
     shown in addition to any others that appear in the transcript. The exhibits identified
27   on September 23, 2011, from 2741:8 to 2743:17, do not appear in numerical order in
     the reporter's transcript but they have been placed in numerical order here, as
28

- 31 -

postarbbrief111101.doc

CLAIMANT'S POST-ARBITRATION BRIEF

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA  90067
Phone: 310.553.1010  •  Facsimile: 310.284.5743

After Cohen left Swarm and began to use the name Shades of Grey, statements appeared on the Internet that said—and *still* say:  Shades of Grey was *formerly* Shades of Greige (ex.171, fourth entry from top; emphasis added); "*Formerly* Shades of Greige, Shades of Grey . . . had one of the largest collections" (ex. 480; emphasis added); "*Formerly* Shades of Greige, Shades of Grey by Micah Cohen . . ." (ex. 173; emphasis added); Shades of Greige *founded* by Micah Cohen (ex. 171, fifth entry from top; emphasis added); "As of F/W10 Shades of Griege *became* Shades of Grey" (ex. 180, penultimate entry; emphasis added); and "As of F/W10, Shades of Greige *became* Shades of Grey and *all current and future collections should be recognized under the new label*" (ex.155 (SWARM 06881); emphasis added; ex. 153 (second entry from top); ex. 481 (bottom paragraph)).

There are also places where Shades of Grey, Shades of Grey by Micah Cohen, and Shades of Greige are in close proximity to each other, giving the impression they are the same or closely related. (E.g., ex. 180 (penultimate entry); ex. 154 (Shades of Greige at top and Shades of Grey by Micah Cohen in body); ex. 159 (search for Shades of Greige shows page with "Shades of Grey" merchandise); ex. 160; ex. 161 (second entry from top); ex. 162 (In 2006, Micah Cohen decided to "launch Shades of Greige;" and in 2009, Micah "launched Shades of Grey by Micah Cohen"); ex. 178 (third entry from top); ex. 183; ex. 192 (third entry from top); ex. 482.)

On August 26, 2010, the Sanity Style Website showed Shades of Grey merchandise right next to Shades of Greige merchandise. (Ex. 170; see also ex. 158 (same, as of 5/10/11).)  The paper exhibit does not show the juxtaposition of these items.  The online version was shown at the hearing.  Attached as exhibit 1 is a copy of the page shown at the hearing, albeit dated after the hearing.)

On September 23, 2010 (the Fall 2010 season), the Revolve website showed merchandise from Shades of Grey by Micah Cohen then stated, in the *present tense:*

follows: 153 – 156, 158, 159, 160 – 162, 165, 167, 169 – 173, 177 – 181, 183, 192, 195, 410, 480 – 484, and 505.

- 32 -

CLAIMANT'S POST-ARBITRATION BRIEF

1   "The creation of LA based designer Micah Cohen, Shades of Griege, *provides*

2   fashion forward clothing that *is* wearable . . . . Shades of Griege *embodies* a clean,

3   youthful yet sophisticated aesthetic that *balances* the line between too much and too

4   little." (Ex. 167; emphasis added.)  But Shades of Greige was not selling clothing

5   for the Fall 2010 season.

6          On June 4, 2011, the BPMW website showed Shades of Greige (ex. 410, p.

7   17) *and* Shades of Grey (ex. 410, p. 13).

8          *(2) Actual confusion.*  There is also evidence of actual confusion.  For

9   example, on February 2, 2010, Nahid Kermali, a buyer for Bloomingdales, emailed

10  Tatiana at Swarm and asked:  "[P]lease advise if the tag on the items will read

11  '*Shades of Grey*,' '*Shades of Greige*,' or 'Shades of Beige.'  We would like to make

12  sure that the signage provided on the shop floor matches the tags on the items." (Ex.

13  196; emphasis added.)

14         Shortly after May 3, 2010, Shades of Greige received a *check made payable to*

15  *Shades of Grey*, sent to the Barrington Address, which was the address for Shades of

16  Greige.  (Ex. 177; RT 8/16/11, 370:10 to 372:10.)

17         On May 5, 2010, Steven Wolski, a BPMW sales representative (RT 8/18/11,

18  1062:15-22), emailed Tatiana at Swarm regarding Shades of Greige.  He attached a

19  re-order from an account stating:  "Brand: Shades of Grey."  (Ex. 493.)

20         On November 15, 2010, the Revolve website featured clothing from Shades of

21  Grey by Micah Cohen and Shades of Greige.  (Ex. 183.)  But Shades of Greige was

22  not selling clothing in November 15, 2010.

23         In 2010, Cohen sold Shades of Grey by Micah Cohen to Urban Outfitters, a

24  Swarm account.  In 2011, Urban Outfitters produced documents pursuant to a

25  deposition subpoena.  (Ex. 379, pp. 3-4.)  One of those documents was a list of the

26  merchandise it bought from Cohen's company, All Shades United, for Fall 2010.

27  Under the column "Vendor Style No." appears many of the Swarm style numbers for

28

Lyle R. Mink
*Law Offices of Lyle R. Mink*
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310.553-1010 • Facsimile 310.284.5743

- 33 -

CLAIMANT'S POST-ARBITRATION BRIEF

the Fall 2010 season.  (Ex. 379, pp. 16-19.)  Under the column "Style Description" the styles are described with one of three words or phrases at the beginning of the description:  "*Shades,*" "*Shades of G,*" "*Shades of Greige,*" and "*Shades of Grey.*" (Ex. 379, pp. 18-19; emphasis added.)

Similarly, the purchase orders issued by Urban Outfitters for Fall 2010 merchandise contains the same style numbers and descriptions that Swarm was going to use for the Fall 2010 season.  (Ex. 379, pp. 20, 22. 25, 28 – 30, 33, 35 – 37, 39, 40, 45 – 57, 60, 61, 65.)  Also, those same purchase orders use the following names to indicate the vendor:  "*Shades of Greige,*" "*Shades,*" and "*Shades of G.*"  (*Id.*; emphasis added.)

Finally, on September 11, 2011, Port received a Google alert for Shades of Greige, advertising the sale of a varsity jacket, stating "brand is Shades of Greige, *now known as* Shades of Grey by Micah Cohen."  (Ex. 505; emphasis added.)

**H. Success of Shades of Grey by Micah Cohen.**  Cohen had been planning to leave Swarm since at least May 29, 2009.  (Ex. 316.)  From that time until November 13, and unbeknownst to Jeff Port, he planned to work with Swarm's manufacturer (Steven Zhou (Onglory Shanghai) after he left (ex. 316) and he filed an application with the USPTO for Shades of Grey (ex. 55).  Cohen did not tell Port he had filed this application.  (RT 8/16/11, 360:25 to 361:10.)  Port discovered it himself.  (Ex. 256.)

Cohen quit on November 13 without any notice.  (RT 9/13/11, 1434:2-24.)  He then began to make, and later sell, clothing for the Fall 2010 season using

- the same kind of clothing: contemporary menswear (RT 8/18/11, 1112:3-25);

- the same *style numbers* as Shades of Greige (exs. 7, 377; RT 9/14/11, 1671:2-17);

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310.553.1010 • Facsimile: 310.234.5743

- 34 -

CLAIMANT'S POST-ARBITRATION BRIEF

Ex. 1

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA   90067
Phone: 310.553-1010 • Facsimile: 310.284.5743

1      • the same descriptions as Shades of Greige (compare *style numbers* and

2      *descriptions* on ex. 7 with *style numbers* and *descriptions* on ex. 438, p.

3      10 (items 1, 3, 5), p. 11 (items 2, 3, 4, 5, 6));[14]

4      • the same designs as Shades of Greige (RT 9/21/11, 2450:16-18 (design

5      is same as style); RT 9/14/11, 1671:2-17);

6      • the same patterns or similar as Shades of Greige (exs. 495, 496;

7      respondents' ex. 5046);

8      • the same look as Shades of Greige (RT 9/14/11, 1671:19-22);

9      • the same manufacturer as Shades of Greige (RT 9/14/11, 1672:23-25);

10      • the same or similar pricing as Shades of Greige (RT 9/14/11, 1671:25 to

11      1672:7);

12      • the same designer as Shades of Greige (RT 9/14/11, 1671:23-24);

13      • the same male model as Shades of Greige (RT 9/14/11, 1672:14-16);

14      • the same or similar style of brochure as Shades of Greige (RT 9/14/11,

15      1672:17-19);

16      • the same sales representative (BPMW) as Shades of Greige (RT

17      9/14/11, 1672:20-22);

18      • the same channels of trade as Shades of Greige (i.e., same sales

19      representative (BPMW) selling to Swarm's customers (exs. 104, 321,

20      233; RT 9/15/11, 1785:12-15); see discussion at p. 36, infra, regarding

21      percentage of Swarm customers who purchased Shades of Grey by

22      Micah Cohen; the same tradeshows; and the same showrooms where

23      they sold Shades of Greige); and

24      • similar names: Shades of Grey and Shades of Grey by Micah Cohen.

25    This sameness gave the impression of *continuity* from Shades of Greige to

26  Shades of Grey by Micah Cohen and made selling the latter easier.  It allowed Cohen

27

28

---

[14] In the interest of space, these are only examples.  The number of items that have the same style numbers and descriptions is much longer.  See exhibit 2 hereto.

CLAIMANT'S POST-ARBITRATION BRIEF

Ex. 1

to sell virtually the same quantities that Shades of Greige had sold to the same customers. (See sales figures below.)  And because the quantities of merchandise were about the same, it allowed Cohen to obtain the same amount of floor space that had been assigned to Shades of Greige.  (See RT 9/16/11, 2049:1-9.)

The first season for Shades of Grey by Micah Cohen was Fall 2010.  Steve Wolski testified that customers will buy only a few pieces of a *new* line because they want to see how it will sell.  (RT 8/18/11(Wolski testimony), 1116:12-22.)  But the first season for Shades of Grey by Micah Cohen resulted in customers buying *more* than a few pieces of merchandise.  For example:

|  | *Shades of Greige* **[Exhibit 321]** Four seasons: 1/1/06 to 7/1/09 (RT 9/14/11, 1675:9-13) | *Shades of Grey by Micah Cohen* **[Exhibit 233]** One season: FW10 (RT 9/14/11, 1674:15-19) |
|---|---|---|
| Bloomingdales | $173,208.15 | $20,216.00 187,154.00 32,819.00 |
| Metropark | 312,099.35 | 174,240.00 |
| Urban Outfitters | 441,590.53 | 109.562.40 100,258.00 |

Swarm's accounts are listed on exhibit 104.  (See also ex. 321 (Swarm sales summary).)  The All Shades United accounts are shown on its sales summary for the Fall 2010 season.  (Ex. 233.)  Sixty-six of the Swarm accounts listed on exhibit 104 appear on the All Shades United sales summary for the Fall 2010 season.  (Ex. 233.) Those 66 Swarm accounts constituted 56.8% of the All Shades United accounts shown on exhibit 233.  But the purchases made by those 66 accounts constituted 84.5% of Cohen's total sales of $1,362,404.74 for the Fall 2010 season, as shown on

- 36 -

Lyle R. Mink
*Law Offices of Lyle R. Mink*
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310-553-1010 • Facsimile: 310-284-5743

CLAIMANT'S POST-ARBITRATION BRIEF

Ex. 1

exhibit 233.[15]  (It took Swarm three years to reach that same level of sales (ex. 443).)
Cohen testified that *his* breakeven point is roughly $800,000 to $1 million per
season.  (RT 9/21/11, 2414:19 to 2415:8.)

### I.  Harm to Swarm.

Cohen abruptly quit on November 13, 2009, right at the time when Swarm
was beginning the development of the Fall 2010 collection.  (RT 8/15/11, 238:9-12;
238:23 to 239:4.)  Port had to find another designer.

Seven days later, November 20, Port still did not know that Zhou was working
with Cohen.  (Ex. 137.)  But Port came to believe that he would have to find another
manufacturer when he discovered that Zhou was working with Cohen, when Zhou
tried to dissuade Port from making a collection for Fall 2010 (RT 9/13/11, 1390:14-
19), when Zhou was not interested in hearing his side of the story (RT 9/13/11,
1392:18 to 1393:4), and when Zhou refused to give him information (RT 9/23/11,
2711:17 to 2712:2; 2712:8-10).[16]

On December 8, Port wrote to Paul Buxbaum stating that he needed to find out
if his sales team (BPMW) was still on board or if they had already jumped ship like
the factory was attempting to do.  (Ex. 502.)

In view of these events, Port did not believe he would be able to gather all of
the resources necessary to produce a Fall 2010 collection in time for the January
2010 trade shows.  (RT 8/15/11, 195:5-25; *id.* at 197:24 to 198:3.)

---

[15] The gross sales shown on the tax return were slightly different, $1,323,968.
(Ex. 442.)  Steve Wolski, a BPMW sales representative, testified that Shades of Grey
by Micah Cohen reached $2 million in sales for the Fall 2010 season.  (RT 8/18/11,
1107:9-15.)

[16] On November 23, Zhou told Port it was too late to develop Fall 2010 protos,
and it was not practical to continue with Shades of Greige.  (Ex. 78.)  On December
1, Zhou told Port it was too late to make Fall 2010 protos, and suggested that he not
make them.  (Ex. 312.)  On December 2, Zhou told Port it would be impractical to
make salesmen samples from the Fall 2010 protos because it would take too long.
(Ex. 313.)

Lynn K. Pulok
Law Offices of Lynn K. Pulok
1801 Century Park East, Suite 2600
Los Angeles, CA  90067
Phone: 310.553.1010 • Facsimile: 310.284.5743

- 37 -

On January 9, 2010, Port told Buxbaum that it was likely the Shades of Greige sales representatives (BPMW) were in cahoots with Cohen. (Ex. 503.) Port did not believe that BPMW could represent two lines with similar names, similar products and everything else almost parallel. (RT 9/23/11, 2715:12 to 2716:1; see RT 8/18/11, 1112:21-25; RT 8/15/11, 196:1-18; see similarities, at pp. 34-35, supra.)

Port also believed that he would not be able to sell Shades of Greige because Cohen had preempted him by developing a line for Fall 2010, by announcing his new line under a similar name to Swarm's customers, in appearing at the January 2010 trade shows, and by actually selling virtually identical clothing under a confusingly similar name to a limited market. (Corrado depo., 213:22 to 214:9 (300 accounts)); Cohen testified there were less, possibly 200 accounts (RT 9/15/11, 1833:24 to 1834:21).) Paul Buxbaum testified that a retailer would not put both brands on the same floor. (RT 9/16/11, RT 2051:9 to 2052:12.)

Swarm invested more than $515,000 in Shades of Greige. (Ex. 87; RT 8/16/11, 373:2 to 378:17.) Gary Diamond verified these amounts. (RT 9/21/11, 2323:1 to 2324:22.) Cohen did not challenge them. In addition, Swarm has lost goodwill, profits, the Shades of Greige brand has been damaged, and Swarm has incurred substantial attorney fees and expenses.

### 3. Argument.

#### A. Claimant's complaint.

Claimant's complaint contains the following claims:  Trademark infringement, false designation of origin, unfair competition, intentional interference with economic relations, and breach of duty of loyalty, and declaratory judgment.

*(1) Trademark infringement (15 U.S.C. § 1114(a)).* A trademark infringement claim requires the plaintiff to prove that (1) it owns a registered trademark; (2) its use of that mark began before defendant's use; (3) defendant's use is without plaintiff's consent; and (4) defendant's use is likely to cause confusion, or

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310.553.1010 • Facsimile 310.284.5743

- 38 -

CLAIMANT'S POST-ARBITRATION BRIEF

Ex. 1

1   to cause mistake, or to deceive.  (*Intel Corporation v. Americas News Intel*

2   *Publishing*, LLC, 2010 WL 2740063 at *2 (N.D. Cal. 2010).)

3        ***a. Owner of registered trademark.***  The USPTO registered Shades of Greige

4   in the name of Swarm, LLC. (Ex. 105.)  This registration is prima facie evidence of

5   Swarm's ownership (15 U.S.C. §§ 1057(b), 1115(a)), and placed on respondents the

6   burden to show by a preponderance of the evidence that Swarm does not own the

7   mark (e.g., *Zobmondo Entertainment, LLC v. Falls Media, LLC*, 602 F. 3d 1108,

8   1113-1114 (9th Cir. 2010)).

9        Respondents claim Cohen and Port, as individuals, are co-owners of the mark

10  based on a signed written employment agreement.  Cohen, as the proponent of such

11  an agreement, had the burden to prove that agreement.  (Cf. *Roddenberry v.*

12  *Roddenberry*, 44 Cal. App. 4th 634, 654 (1996).)

13       Respondents failed to satisfy these burdens.  For example, although email was

14  the sole method of communicating new agreements, there are no emails from March

15  27, 2008 until May 28, 2008.  Gary Cohen claims he sent a final revision of the

16  agreement between March 27 and May 28 but claimed he "couldn't find it."  On

17  May 28, Micah sent Gary an unsigned employment agreement stating "This is the

18  one that got signed."  But after receiving that unsigned copy, Gary didn't ask Micah

19  to send him a signed one.

20       Micah Cohen claimed a signed copy was in his filing cabinet but never sent a

21  signed copy to his father, and could not explain why he did not do so except to say

22  he didn't think it was a problem.  (RT 9/13/11, 1476:19-22.)

23       When Port told Micah Cohen that he didn't have a signed copy, Cohen didn't

24  say he had one (in his filing cabinet) much less tell Port to go to the filing cabinet

25  and get it.  And when Micah told Gary that Port said he didn't have a signed copy,

26  Gary didn't tell Micah to get the one in the filing cabinet.

27

28

Lyle R. Mink
*Law Offices of Lyle R. Mink*
1801 Century Park East, Suite 2600
Los Angeles, CA  90067
Phone: 310.553.1010  •  Facsimile: 310.284.5743

postarbbrief111101.doc

CLAIMANT'S POST-ARBITRATION BRIEF

Ex. 1

1       Micah Cohen implies there was a meeting of the minds on the employment

2   agreement but he could not remember what he allegedly discussed with Port on such

3   important provisions as paragraphs 6.2 and 8.2 and Schedule A.  Gary Cohen, who

4   made substantial revisions, never spoke or wrote to Port concerning them.[17]  In fact,

5   Gary Cohen seemed to have some doubt whether there was a signed agreement when

6   he referred to the agreement as "the one that Micah and Jeff signed" but later said

7   "or [the one] that Micah has *testified* that he and Jeff signed."  (RT 9/22/11, 2507:24

8   to 2508:1; emphasis added.)

9       Despite all of the work that Gary Cohen put into the agreement, and his

10   testimony that it was an important agreement to him and Micah,[18] he never asked for

11   a signed copy.  In fact, he tried to marginalize the issue by disingenuously testifying

12   that it was not "a big concern" to him.

13       Therefore, there is no credible evidence, much less evidence sufficient to

14   sustain Cohen's burden, that Port signed the agreement.

15       Even if Cohen were to argue that an oral agreement was sufficient to give him

16   ownership rights, a bald agreement that he owns a trademark is not sufficient to

17   confer ownership.  It's analogous to two persons agreeing that they are partners.  A

18   agreement that the parties are partners is ineffective without conduct that satisfies the

19   elements of a partnership.  (Cf. *Streeter & Riddell, Inc. v. Bacon*, 49 Cal. App. 327

20

21

22       [17] Based on the allegation that Micah Cohen was a co-owner of the trademark,

23   Gary Cohen drafted provisions that would have allowed Swarm to *manufacture and*

24   *sell* merchandise *but not deliver* it if Micah left the business.  Micah Cohen said he

"didn't think about" that situation (RT 9/21/11, 2423:3-5); Gary Cohen said he

25   drafted no provisions to address that possibility (RT 9/22/11, 2549:1-19).

26       [18] Micah Cohen also testified that he thought it was important to show that the

27   agreement had been signed.  (RT 9/14/11, 1524:8-10, 21-25; 1525:1-6.)

28

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA  90067
Phone: 310.553.1010 • Facsimile: 310.284.5743

- 40 -

CLAIMANT'S POST-ARBITRATION BRIEF

1  (1920)(contract that parties were not forming partnership was ineffective because

2  they associated to carrying on business and divide profits).)

3      Here, an agreement that a person is a trademark owner, without more, is not

4  sufficient.  There must be actual use in commerce.  Neither Cohen nor Port as

5  individuals used Shades of Greige in commerce.  The predecessor business to Swarm

6  first used it in commerce, and that use was sufficient to confer ownership rights in

7  the later-formed Swarm.  (Cf. *Accu Personnel Inc. v. Accustaff Inc.*, 38 U.S.P.Q. 2d

8  1443 (TTAB 1996)(commercial enterprise entitled to claim intention to use).)

9      ***b. Swarm's first use in commerce.***  Swarm first used Shades of Greige on

10  February 13, 2007.  (Ex. 98.)  Cohen, as an individual, did not use Shades of Greige

11  at all.  Cohen first used the confusingly similar Shades of Grey and Shades of Grey

12  by Micah Cohen in January 2010.  Therefore, Swarm used the mark in commerce

13  before Cohen.

14      ***c. Cohen's use of his mark is without Swarm's consent.***  Swarm has not

15  consented to Cohen's use of Shades of Grey or Shades of Grey by Micah Cohen.

16      ***d. Likelihood of confusion or mistake.***  The factors in *AMF Incorporated v.*

17  *Sleekcraft Boats*, 599 F. 2d 341, 350 (9th Cir. 1979) are discussed in the order they

18  appear in the case.

19      ***(i) Strength of the mark.***  Sleekcraft states:  "[O]nly if the marks are quite

20  similar, and the goods closely related, will infringement be found."  (*Id.* at 350; see

21  *Westward Coach Manufacturing Co. v. Ford Motor Co.*, 388 F. 2d 627, 634 (7th Cir.

22  1968)(weak mark protected only against similar goods, similarly marketed).)

23      Here, Shades of Greige and Shades of Grey by Micah Cohen are quite similar.

24  The goods were not only closely related, they were virtually identical before Cohen

25  scuttled Swarm's business.  They were both contemporaneous menswear; they had

26  the same designer, style numbers, descriptions, designs, patterns and look, and

27  pricing; they had the same manufacturer; and they had the same male model, style of

28

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310.553.1010 • Facsimile: 310.284.5743

- 41 -

brochure and sales representative (BPMW) and channel of trade, i.e., BPMW sells to Swarm's customers at the same trade shows and in the same showrooms where they sold Shades of Greige.  Therefore, this factor weighs in favor of claimant.

*(ii)  Proximity of the goods.*  Unquestionably, the goods made and sold by Swarm and those made and sold by Cohen are related.  "Related goods" are those which would be reasonably thought by the buying public to come from the same source if sold under the same mark. (*Sleekcraft*, supra, 599 F. 2d at 348 fn. 10.)  Thus the danger presented is that the public will mistakenly assume there is an association between the producers of the related goods, though no such association exists.  The more likely the public is to make such an association, the less similarity in the marks is requisite to a finding of likelihood of confusion. (*Id.* at 350.)

The two marks are very similar.  But Swarm does not have to show they are very similar:  Less similarity will suffice when the goods are sold to the same class of purchasers or the goods are similar in use and function. (*Id.* at 350.)  Here, the goods are sold to the same class of purchasers and they are identical in use and function.  Therefore, this factor weighs in favor of claimant.

*(iii)  Similarity of the marks.*  Similarity is tested on three levels:  Sight, sound, and meaning.   Each must be considered as they are encountered in the marketplace.  Similarities weigh more heavily than differences. (*Id.* at 351.)

*Sound:*  The primary pronunciation of "Greige" is "grā, as in "grey." (The American Heritage Dictionary of The English Language (4th ed.), p. 771.)

Swarm  contends "Greige" was always pronounced to rhyme with "Grey."  Respondents, seeking to distance themselves from this sound factor, now contend it was always pronounced to rhyme with "beige."  The evidence on this point favors Swarm.  All of the witnesses who testified on behalf of Cohen that the sound rhymes with "beige" have substantial economic connections to him.  If he loses this case, Zhou loses 80 percent of his business, and BPMW loses substantial commissions.

Lyle R. Mink
*Law Offices of Lyle R. Mink*
1801 Century Park East, Suite 2600
Los Angeles, CA  90067
Phone: 310.553.1010  •  Facsimile: 310.284.5743

- 42 -

On the other hand, Swarm's witnesses were not clothed with such built-in biases. In fact, Kimbery Koral said she was uncomfortable testifying because she knew both sides. And there was no bias or lack of objectivity apparent with Swarm's other witnesses (except, admittedly, Ryan Port) on this issue. Therefore, the court should find that the name was always pronounced to rhyme with "Grey."

The fact that Micah Cohen insisted on this pronunciation when this litigation began in order to distance himself from Greige should weigh heavily against his credibility on other issues as well. Pronunciation may seem like a small point in the big picture, but it's a huge credibility issue. Micah Cohen continued to press the transparently false pronunciation of Greige, which then required Swarm to call additional witnesses—not originally planned—to rebut this pronunciation.

**Sight:** Confusion is not avoided between otherwise confusingly similar marks merely by adding matter that is descriptive or suggestive of the named goods. (The Trademark Manual of Examining Procedure (TMEP) § 1207.01(b)(iii).)[19] Sometimes, the rule is expressed in terms of the dominance of the common term. (*Id.*) If the dominant portion of both marks is the same, then confusion may be likely notwithstanding peripheral differenced. (*Id.*) For example, in *In re Mighty Leaf Tea*, 601 F. 3d 1342 (Fed. Cir. 2010), ***ML*** was held likely to be perceived as a shortened version of ***ML MARK LEES*** when used on the same or closely related skin care products. (See also *In re Chica*, 84 USPQ2d 1845 (TTAB 2007)(likelihood of confusion between ***CORAZON*** and ***CORAZON BY CHICA***, both for jewelry); *In re Apparel Ventures, Inc.*, 229 USPQ 225 (TTAB 1986)(***SPARKS BY SASSAFRAS*** for clothing held likely to be confused with ***SPARKS FOR FOOTWEAR***); *In re The U.S. Shoe Corp.*, 229 USPQ 707 (TTAB 1985)(***CAREER IMAGE*** for clothing held

---

[19] The Trademark Manual of Examining Procedure (TMEP) is recognized as authority. (*Advertise.com, Inc. v. AOL Advertising, Inc.*, 616 F. 3d 974, 980 fn. 4 (9th Cir. 2010).)

- 43 -

postarbbrief111101.doc

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310-553-1010 • Facsimile 310-284-5743

Ex. 1

1  likely to be confused with *CREST CAREER IMAGES* for uniforms); *In re Riddle*,

2  225 USPQ 630 (TTAB 1985)(*RICHARD PETTY'S ACCU TUNE* for automotive

3  service stations held likely to be confused with *ACCUTUNE* for automotive testing

4  equipment); *In re Collegian Sportswear Inc.*, 224 USPQ 174 (TTAB

5  1984)(*COLLEGIAN OF CALIFORNIA* held likely to be confused with

6  *COLLEGIENNE*, both for items of clothing).)

7    Here, viewed in their entireties, with non-dominant features discounted, the

8  marks become nearly identical:  Shades of Greige vs. Shades of Grey.  (See *In re*

9  *Chatam Int'l Inc.*, 380 F. 3d 1340, 1343 (Fed. Cir. 2004)(discounting JOSE in *JOSE*

10  *GASPAR GOLD* when comparing it to *GARSPAR'S ALE*).)  In fact, Shades of

11  Grey by Cohen has sometimes been shortened to Shades of Grey on websites.  (E.g.,

12  ex. 480.)

13    ***Meaning:***  Closeness in meaning can itself substantiate a claim of similarity of

14  trademarks.  (*Sleekcraft*, supra, 599 F. 2d at 352.)  Here, Griege means:  "Not

15  bleached or dyed; unfinished."  (The American Heritage Dictionary of The English

16  Language (4th ed.), p. 771.)  One derivation of the word is "from *greggio*, gray, of

17  Germanic origin."  (*Id.*)  Since unfinished goods many times appear gray, there is a

18  closeness of meaning between Greige and Grey.

19    When considering similarity in meaning or connotation, the focus is on the

20  recollection of the average purchaser who normally retains a general, rather than

21  specific, impression of trademarks.  (TMEP § 1207.01(b)(v).)  For example, in *In re*

22  *M. Serman & Co., Inc.*, 223 USPQ 52 (TTAB 1984), *CITY WOMAN* was held likely

23  to be confused with *CITY GIRL*, both for clothing).  (See also *Watercare Corp. v.*

24  *Midwesco-Enterprise, Inc.*, 171 USPQ 696 (TTAB 1971)(*AQUA-CARE* held likely

25  to be confused with *WATERCARE*, both for water-conditioning products).)

26    Here, the evidence shows that Cohen and BPMW commonly referred to

27  Shades of Grey by Micah Cohen as "Shades."  Therefore, the average purchaser who

28

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310.553.1010  •  Facsimile: 310.284.5743

- 44 -

CLAIMANT'S POST-ARBITRATION BRIEF

Ex. 1

1   normally retains a general, rather than specific, impression of trademarks (TMEP §

2   1207.01(b)(v)) would be more likely to remember "Shades."  Even if they

3   remembered Grey, they likely would not distinguish the two spellings.

4       ***(iv) Evidence of actual confusion.***  There is evidence of actual confusion.

5   (See part 2.G.(2), above.)  It is not necessary that Swarm show a significant number

6   of instances of actual confusion.  In *Sleekcraft*, supra, 599 F. 2d at 353, the court

7   said:

8           Because of the difficulty in garnering such evidence, the failure to

9       prove instances of actual confusion is not dispositive.  [Citation.]

10       Consequently, this factor is weighed heavily only when there is

11       evidence of past confusion or, perhaps, when the particular

12       circumstances indicate such evidence should have been available.

13       Here, additional evidence of the kind described above is undoubtedly

14   available.  The Internet is read by millions of persons.  Given the nature of this

15   proceeding (i.e., limited discovery, shortened time to trial, the policy of preventing

16   arbitration from taking on the scope of full-scale litigation in court), it has not been

17   practical to obtain more examples from outside sources.  To be sure, respondents had

18   no incentive to produce additional examples.  Although actual confusion is not

19   required to establish likelihood of confusion (TMEP § 1207.01(d)(ii)), it clearly is

20   present.  Therefore, this factor weighs in favor of claimant.

21       ***(v) Marketing channels.***  Convergent marketing channels increase the

22   likelihood of confusion.  (*Sleekcraft*, supra, 599 F. 2d at 353.)  Here, the marketing

23   channels are not convergent: they are identical.  Cohen's clothing is sold by the same

24   sales representative to the Swarm's customers in exactly the same way, in

25   showrooms and tradeshows.  Therefore, this factor weighs in favor of claimant.

26       ***(vi) Type of goods and purchaser care.***  In assessing the likelihood of

27   confusion, the standard is the typical buyer exercising ordinary caution.  (*Sleekcraft*,

28

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310-553-1010 • Facsimile: 310.284.5743

- 45 -

CLAIMANT'S POST-ARBITRATION BRIEF

Ex. 1

supra, 599 F. 2d at 353.)  The wholly indifferent may be excluded but the ignorant and credulous are included.  (*Id.*)  When goods are expensive, a higher standard is proper but does not preclude a finding that confusion is likely.  (*Id.*)  The care exercised by the typical purchaser may eliminate mistaken purchases but does not guarantee that confusion is unlikely.  (*Id.*)  Here, the goods sold by Cohen are not expensive.  The evidence shows that even persons who should know better have still confused Shades of Grey by Cohen with Shades of Greige.  (See parts 2.G.(1) and (2), above.)  If *they* are confused, can we say that the typical buyer probably will not be confused?  This factor weighs in favor of claimant.

**(vii)  Intent.**  When the alleged infringer knowingly adopts a mark similar to another's, courts presume that the defendant can accomplish his purpose:  The public will be deceived.  (*Sleekcraft*, supra, 599 F. 2d at 354.)  Here, Cohen knew Shades of Grey was confusingly similar to Shades of Greige.  He used that name to give the illusion that his company was simply an extension or outgrowth of Shades of Greige. He created—to use his words, albeit referring to different circumstances—a "seamless transition" (ex. 342) to Shades of Grey by Micah Cohen by making everything appear to be the same.  (See pp. 34-35, supra.)  His definition of "seamless" was keeping the same styles manufacturer, sales representative, and customers.  (RT 9/14/11, 1593:20 to 1594:17.)  His actions led to the confusion that ensued.  (See part 2.G.(1) and (2), pp. 31-33, supra.)

Cohen's actions created the resulting confusion.  He knew, and still knows, about this confusion.  He did not present any credible evidence that he attempted to eliminate it.  He did not eliminate it because it allowed him to benefit from Port's substantial investment in Shades of Greige and its goodwill.[20]  This factor weighs in favor of claimant.

---

[20] "Goodwill" is defined as the "expectation of continued public patronage." (Bus. & Prof. Code § 14100.)  Corrado said Shades of Greige could have continued because "buyers would have come back and bought Shades of Greige *just based on*

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA  90067
Phone: 310.553.1010  •  Facsimile: 310.284.5743

- 46 -

CLAIMANT'S POST-ARBITRATION BRIEF

Ex. 1

1       *(viii)  Likelihood of expansion.*  A strong possibility that either party may

2 expand business to compete with the other will weigh in favor of finding that the

3 present use is infringing. (*Sleekcraft*, supra, 599 F. 2d at 354.)  Here, Port has

4 testified that he intends to resume business under Shades of Greige when this case

5 concluded.  This factor weighs in favor of claimant.

6       *(2)  False designation of origin (15 U.S.C. § 1125(a)).*  The elements of a

7 false designation of origin claim under 15 U.S.C. § 1125(a) are identical to a

8 trademark infringement claim under 15 U.S.C. § 1114(a) but plaintiff's mark need

9 not be registered. (*Intel Corporation v. Americas News Intel Publishing*, LLC, 2010

10 WL 2740063 at *2 (N.D. Cal. 2010).)  Both claims are subject to the same ultimate

11 test:  Whether the public is likely to be deceived or confused by the similarity of the

12 marks.  (*Id.*)  Since the analysis under § 1114(a) and § 1125(a) are the same except

13 for registration, the argument under part (1), above, is not repeated here.

14       *(3)  Unfair competition (15 U.S.C. § 1125).*  Swarm holds a registered

15 trademark for Shades of Greige.  Therefore, the elements that Swarm must establish

16 for unfair competition under § 1125 are the same as those required to show

17 trademark infringement. (*Ringcentral, Inc. v. Quimby*, 711 F. Supp. 2d 1048, 1059

18 (N.D. Cal. 2010).)[21]  Because Swarm has established the elements of its trademark

19 infringement claim, it has also established the elements of its unfair competition

20 claim.  (*Id.*)

21       *(4)  Unfair competition (Bus. & Prof. §§ 17200, 17203, and 17500).*

22       Because Swarm holds a registered trademark on Shades of Greige, the

23 elements that Swarm must establish for a state unfair competition claim under §

24 17200 are the same as those for § 1125(a). (*Herman Miller Inc. v. Alphaville Design*

25 that name alone." (Corrado depo., 208:18 to 209:1; emphasis added.)  The product

26 was selling because of word of mouth. (*Id.* at 42:6.)  It was selling through the
retailers. (*Id.* at 42:7.)

27     [21] Even if the USPTO had not registered the mark, Swarm has also established

28 a claim for infringement of an "unregistered" mark based on its use in commerce.

Lynn K. Mink
Law Offices of Lynn K. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA  90067
Phone: 310.553.1010 • Facsimile: 310.284.5743

- 47 -

CLAIMANT'S POST-ARBITRATION BRIEF

1   *Inc.*, 2009 WL 3429739 at *6 (N.D. Cal. 2009).)  Since the evidence supports

2   Swarm's claim under § 1125(a), that same evidence support its unfair competition

3   claim.

4   **(5)  *Intentional interference with economic relations.***

5   The elements for a state law claim for tort of intentional interference with

6   economic relations are:  (1) an economic relationship between plaintiff and a third

7   party, with the probability of future economic benefit to plaintiff; (2) defendant's

8   knowledge of the relationship; (3) defendant's intentional and wrongful conduct

9   designed to interfere with or disrupt this relationship; (4) interference with or

10  disruption of this relationship; and (5) economic harm to plaintiff proximately caused

11  by defendant's wrongful conduct. (*Sole Energy Co. v. Petrominerals Corp.*, 128 Cal.

12  App. 4th 212, 241 (2005).)  Plaintiff must prove that respondents engaged in

13  wrongful conduct apart from the fact of the interference itself.  (*Id.*)  "An act is

14  independently wrongful 'if it is unlawful, that is, if it is proscribed by some

15  constitutional, statutory, regulatory, common law, or other determinable legal

16  standard.'"  (*Id.* (quoting *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th

17  1134, 1159 (2003)).)

18  **a. *Economic relationship with probability of future economic benefit.***

19  Swarm had economic relationships with all of its customers, on an ongoing basis

20  each year from 2007 through and including the Spring 2010 season.  It sold clothing

21  to them each year.  In fact, its sales representative, BPMW, a firm of very

22  experienced sales representatives, made projections of the amount of Swarm's sales

23  in the coming years.  (See success of the line at part 2.C., at p. 16, and fn. 20, supra.)

24  **b. *Knowledge of the relationship.***  Cohen knew all this.  And he had virtually

25  all the contact with Swarm's customers (RT 9/13/11, 1449:4-6; RT 9/15/11,

26  1849:16-25; RT 9/23/11, 2814:24 to 2815:13), spoke with them and BPMW at the

27  trade shows (RT 9/14/11, 1535:1-8; *id.* at 1628:3-11), and sent them e-mails (RT

28

Lyle R. Mink
*Law Offices of Lyle R. Mink*
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310.553.1010 • Facsimile: 310.284.5743

- 48 -

9/14/11, 1529:9-18).  And he ultimately sold his line to them.  (See part 2.H., at pp. 34-37, supra.)

*c. Intentional and wrongful conduct designed to interfere with or disrupt relationship.*  Cohen told his father that he did not want Swarm to have the Fall 2010 collection to sell then followed through by taking it and selling it in his own business under the confusingly similar name of Shades of Grey and Shades of Grey by Micah Cohen.  His conduct is proscribed not only by 15 U.S.C. §§ 1114 and 1125, but also state unfair competition law under Business and Professions Code § 17200.  (See part 2.D., at p. 18, supra.)

*d. Interference with or disruption of this relationship.*  He told his father that he did not want Swarm to have the Fall 2010 collection to sell then followed through by taking it and selling it in his own business.  This constituted an interference with, and disruption in, Swarm's relationship with its customers.  Cohen gave himself a head start by selling the same merchandise in the same channel of trade under a confusingly similar name.  Swarm was not able to continue selling Shades of Greige for these reasons and those stated in part 2.I., at p. 37, supra.)

*e. Economic harm to Swarm proximately caused by respondents' wrongful conduct.*  The economic harm is the loss of business, which includes the money it invested through Port, and loss of the Fall 2010 collection and all subsequent seasons that it has been prevented from pursuing because respondents' conduct.  (See discussion in part 2.I., at p. 37, supra, and part 3.A.(8), at p. 52, infra.)

*(6) Breach of Duty of Loyalty.*

The elements of the tort of breach of duty of loyalty are: (1) existence of a relationship giving rise to a duty of loyalty; (2) breach of that duty; and (3) damage proximately caused by that breach.  (*Huong Que, Inc. v. Luu*, 150 Cal. App. 4th 400, 410 (2007).)  The duty of loyalty requires an agent "to act loyally for the principal's benefit in all matters connected with the agency relationship." (*Id.* at 411.)

Lytel K. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310.553.1010 • Facsimile: 310.284.5743

- 49 -

1    *a. Duty.* Cohen, as an employee, owed a duty of loyalty to Swarm. (*Hanger*

2    *Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.*, 556 F. Supp. 2d 1122,

3    1142 (E.D. Cal. 2008)(all employees owe a duty of loyalty to their employers);

4    *Fowler v. Varian Associates, Inc.*, 196 Cal. App. 3d 34, 41 (1987)(employer entitled

5    to "undivided" loyalty; breach of loyalty justifies discharge). Therefore, as between

6    any clothing business of his own and Swarm's clothing business, Cohen was

7    required always to give preference to the business of Swarm. (Lab. Code § 2863.)

8    In addition, Port placed trust and confidence in Cohen's integrity and fidelity.

9    For example, Port reposed trust and confidence in Cohen to oversee and be

10   responsible for designing the line and implementing it (i.e., production, marketing,

11   sales, and customer relationships). In that capacity, he acted for and in the place of

12   Swarm for the purpose of bringing Swarm into legal relations with third persons,

13   such as Steven Zhou and BPMW. Therefore, he was not merely an employee; he

14   was also an agent. (Witkin, Summ. Cal. Law, Agency and Employment, § 4 (10th ed.

15   2005); see *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 669 (1988)(employee is

16   agent); *Fiol v. Doellstedt*, 50 Cal. App. 4th 1318, 1328 (1996)(supervising employee

17   is agent of employer); *Vai v. Bank of America*, 56 Cal. 2d 329, 338 (1961)(trust and

18   confidence in integrity and fidelity of another).)

19   As an *agent*, Cohen was a *fiduciary* whose obligation of faithful service was

20   the same as that of a trustee. (Witkin, Summ. Cal. Law, Agency and Employment, §

21   97 (10th ed. 2005).) As an agent, Cohen was required to disclose to Swarm all

22   information relevant to the subject matter of the agency (*id.*) Even after termination

23   of the agency relationship, he remained under a duty not to take advantage of a still-

24   subsisting confidential relationship created during the prior agency relationship. (*Id.*

25   at § 100; *id.* (everything acquired by employee by virtue of his employment belongs

26   to the employer, including a list of customers).)

27

28

Law Offices of Lyle R. Mink
Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone 310.553.1010 • Facsimile 310.284.5743

- 50 -

postarbbrief111101.doc

***b. Breach.*** The duty of loyalty is breached when an employee takes action which is inimical to the best interest of the employer. (*Huong Que, Inc. v. Luu*, 150 Cal. App. 4th 400, 414 (2007).)

Cohen breached his duty of loyalty by all of the things he did before he quit that were inimical to the best interests of Swarm. For example, he told Steven Zhou he planned to leave and it was only a matter of time, but did not tell Port; he disparaged Port to Zhou and BPMW, which gave him a sympathetic ear when it came time for him to encourage them to work for him when he left Swarm; he prepared the Fall 2010 protos, abruptly left, then conspired with Zhou to deprive Swarm of those protos; he instigated Zhou to dissuade Port from pursuing a Fall 2010 collection; he used Swarm's s style numbers, designs, patterns, protos and samples for his own line; and he sent announcements to Swarm's best customers implicitly if not explicitly soliciting them to purchase his new line at the January 2010 trade shows; and he took action to give the illusion that Shades of Grey and Shades of Grey by Micah Cohen were simply an outgrowth or extension of Shades of Greige, or, to use his words, a "seamless transition" (ex. 342) from Shades of Greige to Shades of Grey.

Cohen also breached his duty of loyalty by using Swarm's list of customers to send out his announcements for the January 2010 trade shows. Cohen testified that he had the names of Swarm's accounts on his laptop. (RT 9/14/11, 1529:9-18.)

***c. Burden of proof.*** A claim for breach of the duty is in essence a claim for breach of fiduciary duty. (See *American Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton*, 96 Cal. App. 4th 1017, 1030 (2002).) In an action for breach of fiduciary duty, plaintiff has the initial burden of proving the existence of the duty and the failure to perform it. Once the initial burden is met, the burden then shifts to the fiduciary to justify his actions. (Cf. *LaMonte v. Sanwa Bank California*, 45 Cal. App. 4th 509, 517 (1996).)

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310.553.1010 • Facsimile: 310.284.5743

- 51 -

1    Here, Cohen failed to satisfy his burden of proof to show that his actions,

2    described above, were justified.  For example, he produced no evidence—testimonial

3    or demonstrative—to show that the designs, patterns, protos, and samples he used for

4    Shades of Grey by Micah Cohen for Fall 2010 were, as he claimed, different from

5    the ones intended for the Shades of Greige Fall 2010 collection.  Nor did he produce

6    the announcements he sent to Swarm's customers, which allegedly were not

7    solicitations.  And he did not disclose the conversations he had with Zhou and

8    BPMW concerning Shades of Grey that were inimical to Swarm's best interests.

9        ***d. Damages.***  These damages are discussed at part 2.I., at p. 37, supra.)

10       *(7)  **Declaratory judgment for withdrawal of respondents' trademark***

11   ***application.***

12       Cohen's claimed interest in Shades of Greige is based on an employment

13   agreement that was never signed.  In addition, when he quit on November 13, 2009,

14   he abandoned any claim of interest in Shades of Greige.  In addition, since Shades of

15   Grey and Shades of Grey by Micah Cohen are confusingly similar (see part

16   3.A.(1)d., at p. 41 supra.), his trademark application for Shades of Grey should be

17   declared void, withdrawn, refused, or canceled.

18       *(8)  **Remedies sought by Swarm.***

19       The court ordered that the parties submit a proposed award with their rebuttal

20   briefs.  Swarm will submit a detailed proposed award at that time.  At this time,

21   however, Swarm states generally that it seeks the following remedies against all

22   respondents under 15 U.S.C. § 1117(a):  Injunctive relief, accounting, respondents'

23   profits, Swarm's damages (and treble that amount), attorney fees, and costs.  Under

24   California law, Swarm seeks injunctive relief, an accounting, compensatory

25   damages, punitive damages, attorney fees and costs.  Swarm seeks these remedies

26   against all respondents.  Swarm seeks a declaratory judgment under 28 U.S.C. §§

27   2201, 2202.

28

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA  90067
Phone: 310.553.1010 • Facsimile: 310.284.5743

- 52 -

postarbbrief111101.doc

The bases for relief against Nancy Cohen are as follows:

***Participation in breach of fiduciary duty.*** One who participates in a breach of fiduciary duty has the same liability as the person who breaches it. The elements are: (1) a fiduciary relationship, (2) a breach of the fiduciary duty, and (3) defendant's participation (substantial assistance or encouragement) in the conduct constituting the breach. (*Saunders v. Superior Court*, 27 Cal. App. 4th 832, 846 (1994); *Pierce v. Lyman*, 1 Cal. App. 4th 1093, 1105-1106 (1991).) The participant may be liable where she was acting in furtherance of her own financial gain. (*Id.* at 1104; *Doctors' Company v. Superior Court*, 49 Cal. 3d 39, 47 (1989); *City of Atascadero v. Merrill Lynch, et al.*, 68 Cal. App. 4th 445, 463-464 (1998).)

***Conspiracy.*** A conspiracy is an agreement between two or more people to commit a wrongful act. (Witkin, Cal. Proc. 5th, Pleading § 921.) The elements of conspiracy are: Formation and operation of the conspiracy and damage resulting to plaintiff from an act or acts done in furtherance of the common design. (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 511 (1994).) The agreement need not be express; there may be a tacit understanding. (Cf. *Cully v. Bianca*, 186 Cal. App. 3d 1172, 1176 (1986).) A conspiracy may sometimes be inferred from the nature of the acts done, the relations of the parties, the interests of the conspirators, and other circumstances. (Cf. *Greenwood v. Mooradian*, 137 Cal. App. 2d 532, 538 (1955).) Conspirators can be held liable as joint tortfeasors for all damages ensuing from the wrong, whether or not they were direct actors and regardless of the degree of their activity. (*Doctors' Co. v. Superior Court*, 49 Cal. 3d 39, 44 (1989).)

***Aiding and abetting breach of fiduciary duty.*** Liability may be imposed on one who aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act, or (b) gives substantial assistance to the other

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA 90067
Phone: 310-553-1022 • Facsimile: 310-284-5743

- 53 -

1  in accomplishing a tortious result and the person's own conduct, separately

2  considered, constitutes a breach of duty to the third person.  (*Casey v. U.S. Bank*

3  *N.A.*, 127 Cal. App. 4th 1138, 1144 (2005)(citing Rest.2d Torts, § 876); see *Neilson v.*

4  *Union Bank of California, N.A.*, 290 F. Supp. 2d 1101, 1133 (C.D. Cal.

5  2003)(distinction between conspiracy and aiding and abetting).)  This theory holds

6  those who aid and abet in the wrongful act responsible as joint tortfeasors for all

7  damages ensuing from the wrong.  (*Casey*, supra, 127 Cal. App. 4th at 1133.)

8      Nancy Cohen's liability is based on all of these grounds.  She gave substantial

9  assistance or encouragement to Micah Cohen in his breach of fiduciary duty.  She

10  consciously decided to participate in tortious activity for the purpose of assisting

11  Micah Cohen in performing wrongful acts.  For example, she encouraged him to quit

12  his job at Swarm.  She encouraged him to go to China the next day (ex. 353), where

13  he used Swarm's protos, styles, descriptions, designs, patterns, and samples for

14  Cohen's Fall 2010 collection.  She paid for those protos so Shades of Grey could use

15  them. (Ex. 7, 377, 297, and 299.)  She knew he was going to take Swarm's Fall

16  2010 samples and encouraged him. (Ex. 361.)

17      She applied for the name Shades of Grey as the *owner* of the mark (exs. 44,

18  212, 54), then encouraged him (a) to set up a competing company, and (b) to sell

19  virtually identical merchandise under a confusingly similar name.  She provided

20  initial funding for Shades of Grey, became an owner (ex. 307), and does work for the

21  company. (RT 9/22/11, 2583:12-17; 2585:19-21; 2588:10-16, and 21-24; 2589:3-4.)

22      **B. Respondents' Counterclaim.**

23      **(1) Breach of contract.**  This claim is based on a signed employment

24  agreement.  Since Port did not sign it, or even agree with many of its provisions (as

25  discussed in part 2.B., at p. 16, supra) this claim fails.

26      **(2) Declaratory relief.**  This claim seeks a declaration that the unsigned

27  employment agreement is enforceable, that Port breached it, that Cohen "owns or co-

28

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA  90067
Phone: 310.553.1000 • Facsimile: 310.284.5743

- 54 -

CLAIMANT'S POST-ARBITRATION BRIEF

1    owns" the Shades of Greige trademark, and that Swarm is not entitled to use the

2    mark.  Swarm's responses to these issues are discussed above.

3         **(3)  *Conversion.***  Cohen did not pursue this claim at the hearing.  Also,

4    Swarm's counsel offered evidence that he and prior counsel had asked Cohen to

5    come and get his property.  (RT 9/23/11, 2845:20 to 2847:3.)

6         **(4)  *Unjust Enrichment.***  This claim is for monies allegedly due Cohen based

7    on a share of Swarm's profits.  Cohen contends that his bonus is based on Schedule

8    A of the employment agreement.  But since Port never agreed to Schedule A, and

9    since Port and Cohen never agreed on a formula to determine the bonus (see part

10   2.B., at p. 16, supra), this claim should be denied.

11        **(5)  *Accounting.***  Cohen seeks an accounting under the employment

12   agreement.  But Port did not sign the agreement, and did not believe that Cohen was

13   entitled to the accounting he seeks, this claim should be denied.

14

15                                        Lyle R. Mink

16                                        A Law Corporation

17                                        By

18                                            Lyle R. Mink

19                                        Attorney for Swarm, LLC

20

21

22

23

24

25

26

27

28

Lyle R. Mink
Law Offices of Lyle R. Mink
1801 Century Park East, Suite 2600
Los Angeles, CA  90067
Phone: 310.553-1010 • Facsimile: 310.284.5743

- 55 -



SANITYSTYLE.COM

1.800.865.0907 | free shipping
why shop sanitystyle | sign in / sign out
Wish List
Live Chat

about us | customer care | blog

view cart (0 Items / $0.00) checkout

women .. men .. just in ..

shades of greige go

**brands** | **categories**

32 flavors by yfb
malin + goetz
adam by adam lippes
*alternative apparel*
anama
another enemy
aryn k.
a.y. not dead
bb dakota
black halo
cass & co.
c & c california
cc skye
cheap monday
clione
corpus
current elliott
daftBird
diesel
erik hart
factory by erik hart
faith connexion
free people
funktional
glamour campaign
gorjana
*heartloom*
help malawi
james jeans
joe's jeans
kenneth jay lane
kai-aakmann
kill city
l.a.m.b
libertalia
literature noir
lna
mackage
many belles down
meghan fabulous
melissa shoes
mink pink
mizmi
mk2k
morphine generation

enter email to join vip mailing list

e-mail address:

sign up

new items:

shades of greige at sanitystyle - Free Shipping                              Page 1 of 15



1.800.865.0907 | free shipping
why shop sanitystyle | sign in / sign out      
Live Chat

  Wish List

about us | customer care | blog              view cart (0 items / $0.00)      checkout

women          men          just in

[ go ]

Sort by Category  ▾      Sort By Price:  ▾

brands | categories

32 flavors by yfb
malin + goetz
adam by adam lippes
alternative apparel
anama
another enemy
aryn k.
a.y. not dead
bb dakota
black halo
cass & co.
c & c california
cc skye
cheap monday
clione
corpus
current elliott
daftBird
diesel
erik hart
factory by erik hart
faith connexion
free people
funktional
glamour campaign
gorjana
heartloom
help malawi
james jeans
joe's jeans
kenneth jay lane
kai-aakmann
kill city
l.a.m.b
libertalia
literature noir
lna
mackage
many belles down
meghan fabulous
melissa shoes
mink pink
mizmi
mk2k
morphine generation



Preview
Shades of Grey Hooded
all weather Jacket
$199.00 $128.70

Preview
Shades of Grey L/S 2
Layer Tee
$59.00

Preview
Shades of Greige
Double Layer V Neck
Tee
$57.00 $35.00

Preview
Shades of Greige 60's
Plaid Button Down
$94.00

Preview
Shades of Greige Light
Weight Jacket
$150.00

Preview
Shades of Greige 2
Button Blazer
$198.00

Sort by Category  ▾      Sort By Price:  ▾

enter email to join vip
mailing list
e-mail address:

[ sign up ]

## Same styles and descriptions

| Style Number | Description | 11/12/09 Invoice to Shades of Greige<br><br>Exhibit 7 | 11/20/09 Invoice to Micah Cohen<br><br>Exhibit 377 | Shades of Grey by Micah Cohen Lookbook & Linesheet Fall-Winter 2010<br><br>Exhibit 438 |
|---|---|---|---|---|
| **Outerwear** | | | | |
| FW10-OW100 | 3 Button Blazer | X | X* | Page 10* |
| FW10-OW101 | Double Breasted Blazer | X | X* | Page 10* |
| FW10-OW102 | 2 Button Blazer | X | X* | Page 10* |
| FW10-OW103 | 1 Button Shawl Collar Dinner Jacket | X | X* | -- |
| FW10-OW104 | Belted Band Collar Moto Jacket | X | X* | Page 11* |
| FW10-OW105 | Multi-Pocket Photographer's Jacket | X | X* | Page 11* |
| FW10-OW106 | Crossover Knit Collar Jacket | X | X* | Page 11* |

**\* Same number and description as the 11/12/09 invoice, exhibit 7.**

**Brackets contain slightly changed name.**

1

# Exhibit 2

| | | | | |
|---|---|---|---|---|
| FW10-OW107 | Removable Fur Collar Flight Jacket | X | X* | Page 23<br><br>[Removable Collar Flight Jacket] |
| FW10-OW108 | All-Weather Jacket with Fur Lined Hood | X | X* | Page 32<br><br>[Hooded All-Weather Jacket] |
| FW10-OW109 | Lightweight Windbreaker | X | X* | -- |
| FW10-OW110 | Toggle Coat with Removable Fur Collar | X | X* | Page 23<br><br>[Toggle Coat] |
| FW10-OW111 | Trench Coat | X | X* | Page 11* |
| FW10-OW112 | Overcoat with Removable Fur Collar | X | X* | Page 24* |
| FW10-OW113 | 2-in-1 Naval Coat | X | X* | Page 33* |
| FW10-OW114 | Shawl Collar Jacket | X | X* | Page 34* |
| FW10-OW115 | Outdoor Jacket with Corduroy Collar | X | X* | Page 24<br><br>[Outdoor Jacket] |
| FW10-OW116 | Varsity Blazer | X | X* | Page 11* |

2

Ex. 1

| FW10-OW117 | Quilted Faux Leather Rib Collar Bomber Jacket | X | X* | Page 34<br><br>[Quilted Bomber] |
|---|---|---|---|---|
| FW10-OW118 | Baseball Jacket | X | X* | Page 34* |
| FW10-OW119 | Quilted Letterman Jacket | X | X* | Page 35* |
| FW10-OW120 | All Over Quilting Round Collar Coat | X | X* | Page 25<br><br>[Quilted Round Collar Coat] |
| **Vests** | | | | |
| FW10-VST200 | Shawl Collar Vest | X | X* | -- |
| FW10-VST201 | Down Vest w/Faux Leather Accents | X | X* | Page 26<br><br>[Down Vest] |
| FW10-VST202 | Suit Vest | X | X* | Page 12* |
| **Woven Shirts** | | | | |
| FW10-WVN300 | Quilted Zip-Up Overshirt | X | X* | Page 12<br><br>[Quilted Flannel] |
| FW10-WVN301 | Funnel Neck Shirt | X | X* | Page 12* |

3

Ex. 1

| FW10-WVN302 | All Over Quilting Overshirt | X | X* | -- |
|---|---|---|---|---|
| FW10-WVN303 | 2 Pocket Band Collar Overshirt | X | X* | Page 12 [Band Collar Overshirt] |
| FW10-WVN304 | Padded Nylon Overshirt | X | X* | -- |
| FW10-WVN305 | Peter Pan Collar Shirt | X | X* | -- |
| FW10-WVN306 | 2 Pocket Shirt | X | X* | Page 12* |
| FW10-WVN307 | Denim/Chambray 2 Pocket Shirt | X | X* | Page 38 [Denim 2 Pocket Shirt] |
| **Tees** | | | | |
| FW10-JK400 | L/S Crew Neck Tee | X | X* | Page 15 [L/S Tee] |
| FW10-JK401 | L/S Boat Neck Pocket Tee | X | X* | Page 15 [L/S Tee] |
| FW10-JK402 | L/S Woven Placket Henley | X | X* | Page 16 [Woven Placket Henley] |

4

| FW10-JK403 | S/S Boat Neck Tee | X | X* | Page 16* |
| FW10-JK404 | S/S Scoop Neck Slouchy Pocket Tee | X | X* | -- |
| FW10-JK405 | L/S Slouchy Pocket Henley | X | X* | Page 39 [L/S Henley] |
| FW10-JK406 | L/S Cowl Neck with Slouchy Pocket | X | X* | Page 28 [L/S Slouchy Cowl Neck Tee] |
| **Fleece** | | | | |
| FW10-FL500 | Baseball Fleece | X | X* | -- |
| FW10-FL501 | Moto Fleece Hoodie | X | X* | Page 40 [Moto Fleece] |
| FW10-FL502 | Asymmetrical Double Zip Hoodie | X | X* | Page 40* |
| FW10-FL503 | 5 Button Woven Placket Henley | X | X* | Page 17* |
| FW10-FL504 | Sherling Trimmed Cardigan | X | X* | Page 18* |
| FW10-FL505 | 3 Button Fleece Blazer | X | X* | Page 18 [3 Button Knit Blazer] |

5

Ex. 1

| Bottoms | | | | |
|---|---|---|---|---|
| FW-10 BTM 600 | 5 pocket "jean" | X | X* | -- |
| FW-10 BTM 601 | Casual Pant | X | X* | Page 19 [Flat Front Chino] |
| FW-10 BTM 602 | Twill Harem Pant | X | X* | Page 30* |
| FW-10 BTM 603 | Slim Fit Suit Pant | X | X* | Page 19* |
| FW-10 BTM 604 | Multi-Pocket Pant | X | X* | Page 20* |
| **Knit Sweaters** | | | | |
| FW10-KNS700 | Striped Naval Crew Neck Sweater | X | X* | Page 20* |
| FW10-KNS701 | Winter Shawl Collar Cardigan | X | X* | Page 31* |
| FW10-KNS702 | Shawl Collar Pullover | X | X* | Page 31* |
| FW10-KNS703 | Basket Weave Shawl Collar Sweater | X | X* | Page 42 [Basket Weave Sweater] |

6

| FW10-KNS704 | Toggle Closure Mock Turtle Neck Sweater | X | X* | -- |
|---|---|---|---|---|
| FW10-KNS705 | Holiday Fair Isle Sweater | X | X* | -- |
| FW10-KNS706 | Crew Neck Sweater | X | X* | Page 20* |

7

Ex. 1

⑦

*SPRING 2010 PHOTOS INVOICE*

# SHANGHAI ONGLORY TRADING (INT'L)CO., LTD.

No 226, Lane 288, Laifang Road, Jiuting, Songjiang District, Shanghai 201615, China
TEL: 86 21 6616 0876   FAX: 86 21 6775 8782   EMAIL: steven@onglorysh.com

## Commercial Invoice

TO:
**SHADES of GREIGE**
**15920 Arminta St.**
**Van Nuys, CA 91406**
**USA**

INV NO: ONG1102-09
DATE: 12-Nov-09

| DESCRIPTION | | QTY (SET) | UNIT PRICE |
|---|---|---|---|
| **CHARGES FOR DEVELOPMENT OF FW10** | | | |
| **Outerwear** | | | |
| FW10-OW100 | 3 Button Blazer | 1 | $150.00 |
| FW10-OW101 | Double Breasted Blazer | 1 | $150.00 |
| FW10-OW102 | 2 Button Blazer | 1 | $150.00 |
| FW10-OW103 | 1 Button Shawl Collar Dinner Jacket | 1 | $150.00 |
| FW10-OW104 | Belted Band Collar Moto Jacket | 1 | $150.00 |
| FW10-OW105 | Multi-Pocket Photographer's Jacket | 1 | $150.00 |
| FW10-OW106 | Crossover Knit Collar Jacket | 1 | $150.00 |
| FW10-OW107 | Removable Fur Collar Flight Jacket | 1 | $150.00 |
| FW10-OW108 | All-Weather Jacket with Fur Lined Hood | 1 | $150.00 |
| FW10-OW109 | Lightweight Windbreaker | 1 | $150.00 |
| FW10-OW110 | Toggle Coat with Removable Fur Collar | 1 | $150.00 |
| FW10-OW111 | Trench Coat | 1 | $150.00 |
| FW10-OW112 | Overcoat with Removable Fur Collar | 1 | $150.00 |
| FW10-OW113 | 2-in-1 Naval Coat | 1 | $150.00 |
| FW10-OW114 | Shawl Collar Jacket | 1 | $150.00 |
| FW10-OW115 | Outdoor Jacket with Corduroy Collar | 1 | $150.00 |
| FW10-OW116 | Varsity Blazer | 1 | $150.00 |
| FW10-OW117 | Quilted Faux Leather Rib Collar Bomber Jacket | 1 | $150.00 |
| FW10-OW118 | Baseball Jacket | 1 | $150.00 |
| FW10-OW119 | Quilted Letterman Jacket | 1 | $150.00 |
| FW10-OW120 | All Over Quilting Round Collar Coat | 1 | $150.00 |
| | | | |
| **VESTS** | | | |
| FW10-VST200 | Shawl Collar Vest | 1 | $150.00 |
| FW10-VST201 | Down Vest w/ Faux Leather Accents | 1 | $150.00 |
| FW10-VST202 | Suit Vest | 1 | $150.00 |
| | | | |
| **WOVEN SHIRTS** | | | |
| FW10-WVN300 | Quilted Zip-Up Overshirt | 1 | $150.00 |
| FW10-WVN301 | Funnel Neck Shirt | 1 | $150.00 |
| FW10-WVN302 | All Over Quilting Overshirt | 1 | $150.00 |
| FW10-WVN303 | 2 Pocket Band Collar Overshirt | 1 | $150.00 |
| FW10-WVN304 | Padded Nylon Overshirt | 1 | $150.00 |
| FW10-WVN305 | Peter Pan Collar Shirt | 1 | $150.00 |
| FW10-WVN306 | 2 Pocket Shirt | 1 | $150.00 |
| FW10-WVN307 | Denim / Chambray 2 Pocket Shirt | 1 | $150.00 |

SWARM 02578

Ex. 7, p. 1

Ex. 1

| DESCRIPTION | | QTY (SET) | UNIT PRICE |
|---|---|---|---|
| **TEES** | | | |
| FW10-JK400 | L/S Crew Neck Tee | 1 | $150.00 |
| FW10-JK401 | L/S Boat Neck Pocket Tee | 1 | $150.00 |
| FW10-JK402 | L/S Woven Placket Henley | 1 | $150.00 |
| FW10-JK403 | S/S Boat Neck Tee | 1 | $150.00 |
| FW10-JK404 | S/S Scoop Neck Slouchy Pocket Tee | 1 | $150.00 |
| FW10-JK405 | L/S Slouchy Pocket Henley | 1 | $150.00 |
| FW10-JK406 | L/S Cowl Neck with Slouchy Pocket | 1 | $150.00 |
| | | | |
| **FLEECE** | | | |
| FW10-FL500 | Baseball Fleece | 1 | $150.00 |
| FW10-FL501 | Moto Fleece Hoodie | 1 | $150.00 |
| FW10-FL502 | Asymmetrical Double Zip Hoodie | 1 | $150.00 |
| FW10-FL503 | 5 Button Woven Placket Henley | 1 | $150.00 |
| FW10-FL504 | Sherling Trimmed Cardigan | 1 | $150.00 |
| FW10-FL505 | 3 Button Fleece Blazer | 1 | $150.00 |
| | | | |
| **BOTTOMS** | | | |
| FW10-BTM600 | 5 pocket "jean" | 1 | $150.00 |
| FW10-BTM601 | Casual Pant | 1 | $150.00 |
| FW10-BTM602 | Twill Harem Pant | 1 | $150.00 |
| FW10-BTM603 | Slim Fit Suit Pant | 1 | $150.00 |
| FW10-BTM604 | Multi-Pocket Pant | 1 | $150.00 |
| | | | |
| **KNIT SWEATERS** | | | |
| FW10-KNS700 | Striped Naval Crew Neck Sweater | 1 | $150.00 |
| FW10-KNS701 | Winter Shawl Collar Cardigan | 1 | $150.00 |
| FW10-KNS702 | Shawl Collar Pullover | 1 | $150.00 |
| FW10-KNS703 | Basket Weave Shawl Collar Sweater | 1 | $150.00 |
| FW10-KNS704 | Toggle Closure Mock Turtle Neck Sweater | 1 | $150.00 |
| FW10-KNS705 | Holiday Fair Isle Sweater | 1 | $150.00 |
| FW10-KNS706 | Crew Neck Sweater | 1 | $150.00 |
| **TOTAL** | | 57 | |

*SAY U.S. DOLLARS EIGHTY THOUSAND FIVE HUNDRED AND .*

SWARM 02579

Ex. 7, p. 2

Ex. 1

| AMOUNT |
|---|
| |
| |
| $150.00 |
| $150.00 |
| $150.00 |
| $150.00 |
| $150.00 |
| $150.00 |
| $150.00 |
| $150.00 |
| $150.00 |
| $150.00 |
| $150.00 |
| $150.00 |
| $150.00 |
| $150.00 |
| $150.00 |
| $150.00 |
| $150.00 |
| |
| $150.00 |
| |
| $150.00 |
| $150.00 |
| $150.00 |
| |
| |
| $150.00 |
| $150.00 |
| $150.00 |
| |
| |
| $150.00 |
| $150.00 |
| $150.00 |
| $150.00 |
| $150.00 |
| $150.00 |
| $150.00 |
| $150.00 |

SWARM 02580

**Ex. 7, p. 3**

Ex. 1

| AMOUNT |
| --- |
| $150.00 |
| $150.00 |
| $150.00 |
| $150.00 |
| $150.00 |
| $150.00 |
| $150.00 |
| |
| $150.00 |
| $150.00 |
| $150.00 |
| $150.00 |
| $150.00 |
| $150.00 |
| |
| $150.00 |
| $150.00 |
| $150.00 |
| $150.00 |
| $150.00 |
| |
| $150.00 |
| $150.00 |
| $150.00 |
| $150.00 |
| $150.00 |
| $150.00 |
| $150.00 |
| $8,550.00 |

*FIFTY ONLY.*

**SWARM 02581**

**Ex. 7, p. 4**

Ex. 1

(377)

# SHANGHAI ONGLORY TRADING (INT'L)CO., LTD.

No 226, Lane 288, Laifang Road, Jiuting, Songjiang District, Shanghai 201615, China
TEL: 86 21 6616 0876   FAX: 86 21 6775 8782   EMAIL: steven@onglorysh.com

## Commercial Invoice

TO: Micah Cohen

INV NO: ONG1102-09

DATE: 20-Nov-09

| STYLE | DESCRIPTION | QTY (SET) | UNIT PRICE | AMOUNT |
|---|---|---|---|---|
| | **CHARGES FOR FW10 PROTOS** | | | |
| **Outerwear** | | | | |
| FW10-OW100 | 3 Button Blazer | 1 | $75.00 | $75.00 |
| FW10-OW101 | Double Breasted Blazer | 1 | $75.00 | $75.00 |
| FW10-OW102 | 2 Button Blazer | 1 | $75.00 | $75.00 |
| FW10-OW103 | 1 Button Shawl Collar Dinner Jacket | 1 | $75.00 | $75.00 |
| FW10-OW104 | Belted Band Collar Moto Jacket | 1 | $75.00 | $75.00 |
| FW10-OW105 | Multi-Pocket Photographer's Jacket | 1 | $75.00 | $75.00 |
| FW10-OW106 | Crossover Knit Collar Jacket | 1 | $75.00 | $75.00 |
| FW10-OW107 | Removable Fur Collar Flight Jacket | 1 | $75.00 | $75.00 |
| FW10-OW108 | All-Weather Jacket with Fur Lined Hood | 1 | $75.00 | $75.00 |
| FW10-OW109 | Lightweight Windbreaker | 1 | $75.00 | $75.00 |
| FW10-OW110 | Toggle Coat with Removable Fur Collar | 1 | $75.00 | $75.00 |
| FW10-OW111 | Trench Coat | 1 | $75.00 | $75.00 |
| FW10-OW112 | Overcoat with Removable Fur Collar | 1 | $75.00 | $75.00 |
| FW10-OW113 | 2-in-1 Naval Coat | 1 | $75.00 | $75.00 |
| FW10-OW114 | Shawl Collar Jacket | 1 | $75.00 | $75.00 |
| FW10-OW115 | Outdoor Jacket with Corduroy Collar | 1 | $75.00 | $75.00 |
| FW10-OW116 | Varsity Blazer | 1 | $75.00 | $75.00 |
| FW10-OW117 | Quilted Faux Leather Rib Collar Bomber Jacket | 1 | $75.00 | $75.00 |
| FW10-OW118 | Baseball Jacket | 1 | $75.00 | $75.00 |
| FW10-OW119 | Quilted Letterman Jacket | 1 | $75.00 | $75.00 |
| FW10-OW120 | All Over Quilting Round Collar Coat | 1 | $75.00 | $75.00 |
| FW10-OW121 | Sherling Collar Jean Jacket | 1 | $75.00 | $75.00 |
| **VESTS** | | | | |
| FW10-VST200 | Shawl Collar Vest | 1 | $75.00 | $75.00 |
| FW10-VST201 | Down Vest w/ Faux Leather Accents | 1 | $75.00 | $75.00 |
| FW10-VST202 | Suit Vest | 1 | $75.00 | $75.00 |
| **WOVEN SHIRTS** | | | | |
| FW10-WVN300 | Quilted Zip-Up Overshirt | 1 | $75.00 | $75.00 |
| FW10-WVN301 | Funnel Neck Shirt | 1 | $75.00 | $75.00 |
| FW10-WVN302 | All Over Quilting Overshirt | 1 | $75.00 | $75.00 |
| FW10-WVN303 | 2 Pocket Band Collar Overshirt | 1 | $75.00 | $75.00 |
| FW10-WVN304 | Padded Nylon Overshirt | 1 | $75.00 | $75.00 |
| FW10-WVN305 | Peter Pan Collar Shirt | 1 | $75.00 | $75.00 |
| FW10-WVN306 | 2 Pocket Shirt | 1 | $75.00 | $75.00 |
| FW10-WVN307 | Denim / Chambray 2 Pocket Shirt | 1 | $75.00 | $75.00 |
| FW10-WVN308 | Band Collar Shirt | 1 | $75.00 | $75.00 |
| FW10-WVN309 | Standard Button Down Collar Shirt | 1 | $75.00 | $75.00 |

COHEN-HIGHLY CONFIDENTIAL-1075

**Ex. 377**

Ex. 1

| STYLE | DESCRIPTION | QTY (SET) | UNIT PRICE | AMOUNT |
|---|---|---|---|---|
| **TEES** | | | | |
| FW10-JK400 | L/S Crew Neck Tee | 1 | $75.00 | $75.00 |
| FW10-JK401 | L/S Boat Neck  Pocket Tee | 1 | $75.00 | $75.00 |
| FW10-JK402 | L/S Woven Placket Henley | 1 | $75.00 | $75.00 |
| FW10-JK403 | S/S Boat Neck Tee | 1 | $75.00 | $75.00 |
| FW10-JK404 | S/S Scoop Neck Slouchy Pocket Tee | 1 | $75.00 | $75.00 |
| FW10-JK405 | L/S Slouchy Pocket Henley | 1 | $75.00 | $75.00 |
| FW10-JK406 | L/S Cowl Neck with Slouchy Pocket | 1 | $75.00 | $75.00 |
| FW10-JK407 | L/S 2 Layer Tee | 1 | $75.00 | $75.00 |
| FW10-JK408 | S/S Rolled Sleeve Tee | 1 | $75.00 | $75.00 |
| **FLEECE** | | | | |
| FW10-FL500 | Baseball Fleece | 1 | $75.00 | $75.00 |
| FW10-FL501 | Moto Fleece Hoodie | 1 | $75.00 | $75.00 |
| FW10-FL502 | Asymmetrical Double Zip Hoodie | 1 | $75.00 | $75.00 |
| FW10-FL503 | 5 Button Woven Placket Henley | 1 | $75.00 | $75.00 |
| FW10-FL504 | Sherling Trimmed Cardigan | 1 | $75.00 | $75.00 |
| FW10-FL505 | 3 Button Fleece Blazer | 1 | $75.00 | $75.00 |
| FW10-FL506 | Button-Up Turtle Neck Pullover | 1 | $75.00 | $75.00 |
| FW10-FL507 | Contrast Cardigan | 1 | $75.00 | $75.00 |
| **BOTTOMS** | | | | |
| FW10-BTM600 | 5 pocket "jean" | 1 | $75.00 | $75.00 |
| FW10-BTM601 | Casual Pant | 1 | $75.00 | $75.00 |
| FW10-BTM602 | Twill Harem Pant | 1 | $75.00 | $75.00 |
| FW10-BTM603 | Slim Fit Suit Pant | 1 | $75.00 | $75.00 |
| FW10-BTM604 | Multi-Pocket Pant | 1 | $75.00 | $75.00 |
| FW10-BTM606 | Sweatpant | 1 | $75.00 | $75.00 |
| FW10-BTM607 | Cuffed Side Pocket Pleated Pant | 1 | $75.00 | $75.00 |
| **KNIT SWEATERS** | | | | |
| FW10-KNS700 | Striped Naval Crew Neck  Sweater | 1 | $75.00 | $75.00 |
| FW10-KNS701 | Winter Shawl Collar Cardigan | 1 | $75.00 | $75.00 |
| FW10-KNS702 | Shawl Collar Pullover | 1 | $75.00 | $75.00 |
| FW10-KNS703 | Basket Weave Shawl Collar Sweater | 1 | $75.00 | $75.00 |
| FW10-KNS704 | Toggle Closure Mock Turtle Neck Sweater | 1 | $75.00 | $75.00 |
| FW10-KNS705 | Holiday Fair Isle Sweater | 1 | $75.00 | $75.00 |
| FW10-KNS706 | Crew Neck Sweater | 1 | $75.00 | $75.00 |
| FW10-KNS707 | Chunky Zip Up Cardigan | 1 | $75.00 | $75.00 |
| FW10-KNS708 | Hand Knit Fair Isle Cardigans (2 different patterns) | 1 | $75.00 | $75.00 |
| **TOTAL** | | **68** | | **$5,100.00** |

*SAY U.S. DOLLARS FIVE THOUSAND ONE HUNDRED ONLY.*

COHEN-HIGHLY CONFIDENTIAL-1076

Ex. 377

Ex. 1

# SHANGHAI ONGLORY TRADING (INT'L)CO., LTD.
No 226, Lane 288, Laifang Road, Jiuting, Songjiang District, Shanghai 201615, China
TEL: 86 21 6616 0876   FAX: 86 21 6775 8782   EMAIL: steven@onglorysh.com

## Proforma Invoice

TO: Micah Cohen

INV NO:  ONG1103-09
DATE: 20-Nov-09

| DESCRIPTION | | | | AMOUNT |
|---|---|---|---|---|
| | | | | |
| PREPAYMENT FOR FW10 SMS | | | | $10,000.00 |
| | | | | |
| | | | | |
| | | | | |
| BALANCE TO BE PAID AFTER WITHIN 1 WEEK SHIPMENT OF SMS | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| TOTAL | | | | $10,000.00 |

*SAY U.S. DOLLARS TEN THOUSAND ONLY.*

COHEN-HIGHLY CONFIDENTIAL-1077

**Ex. 377**

Ex. 1