# EXHIBIT 3

1  Matthew J. Norris, Esq. (SBN 257505)
2  NORRIS LAW GROUP, P.C.
   10940 Wilshire Boulevard, Suite 1600
3  Los Angeles, CA 90024
   (310) 443-4159  (phone)
4  (310) 443-4220 (facsimile)
5  mjnorris@norrislglaw.com

6  Attorneys for Respondents Micah A. Cohen, Nancy
7  Sidonie Cohen, and All Shades United, LLC

8
                        **BEFORE JAMS**
9

| | |
|---|---|
| 10  SWARM, LLC, a California limited | JAMS Ref. No.:  1220041905 |
| 11  liability company, dba Shades of Greige, | Hon. George P. Schiavelli, Ret. |
| 12            Claimant, | Arbitrator |
| 13       vs. | |
| 14  MICAH A. COHEN, an individual, dba | **RESPONDENTS' POST-ARBITRATION MEMORANDUM** |
| 15  Shades of Grey by Micah Cohen; NANCY SIDONIE COHEN, an | **Arbitration Dates:  August 15-18, September 13-16, 21-23, 2011** |
| 16  individual; and ALL SHADES UNITED, LLC, a California limited liability | |
| 17  company, | |
| 18 | |
| 19            Respondents. | |
| 20 _____ | |
| 21  AND RELATED CROSS-CLAIMS. | |

22

23         Respondents Micah A. Cohen, Nancy Sidonie Cohen, and All Shades United, LLC,
24  through their counsel of record, hereby file this Post-Arbitration Memorandum in order to
25  summarize the record testimony, and to provide the Respondents' final arguments concerning
26  all matters of law and fact.  As the Arbitrator is abundantly familiar with the facts of the case,
27  the Respondents will dispense with any formal preliminary recitation, instead relating the
28  facts to each of the Respondents' fifteen areas of argument.

-1-

**RESPONDENTS' POST-ARBITRATION MEMORANDUM**
JAMS Ref. No.:  1220041905

Ex. 3

1

2  **I.   JEFF PORT'S SINGULAR LACK OF CREDIBILITY**

3           The vast majority of the evidence presented by the Claimant at hearing involved the

4  testimony of one person: Jeff Port, the Claimant's managing member and 99% owner, and a

5  cross-defendant in his individual capacity.  Considering the breadth of its causes of action,

6  and the proof needed to support its expansive factual and legal allegations, the Claimant

7  produced surprisingly scant evidence, apart from Mr. Port's contradictory and obfuscatory

8  testimony.  Other than Port, the non-adverse witnesses that the Claimant initially produced to

9  testify were Gary Diamond, the Claimant's accountant, who showed that Swarm was

10 profitable in 2007 and 2009 (Diamond Testimony, Day 9 Hearing Testimony 2344:19 to

11 2345:19) [1], Jeff Enoch, John Flores, Jessie Reider (an attorney for the Claimant opining on

12 trademark law, whose views are rebutted in Section VIII of this Memorandum), and

13 Christopher Corrado (an executive with BPMW, the agency that provided sales services to

14 the Claimant and All Shades United, LLC).  In rebuttal to the Respondents' case-in-chief, the

15 Claimant produced Kimberly Koral, Angela Duckwitz, Joel Barnett, and Jeff Port's son,

16 Ryan, and further testimony from Jeff Port.

17          Enoch, Flores, Koral, Barnett and Duckwitz testified concerning only one narrow

18 issue: the supposed pronunciation, in Swarm's offices, of the word "greige" in the trademark

19 SHADES OF GREIGE, the mark formerly used by the Claimant to sell a line of men's

20 clothing.  Corrado's testimony, recorded at a trial deposition in June of 2011, supported the

21 Respondents' positions.  Ryan Port's testimony was somewhat broader than that of the five

22 "pronunciation witnesses," but was minimal and thoroughly rebutted by Micah Cohen's

23 subsequent testimony.  The only other witnesses that the Claimant called to testify were

24 adverse: Respondents Micah Cohen and Nancy Cohen, and attorney Gary Cohen, Micah

25

---

26  [1] The testimony of witnesses will hereafter be abbreviated for convenience as follows.  The citation will

27  include the last name of the witness (and where necessary, also the witness' first initial) and the
   abbreviation "Test.", followed by a notation of the hearing day when the cited testimony took place, in

28  Arabic numerals, followed by "H.T." for hearing transcript, and concluding with page and line numbers.

1   Cohen's father and a member of Respondent All Shades United, LLC ("All Shades United").

2   Jeff Port thus provided virtually the only testimony in the Claimant's favor concerning every

3   contested factual and legal element of this action.

4          Unsurprisingly, given the central and nearly exclusive role that Port played in the

5   presentation of the Claimant's evidence, his credibility is of the highest importance in

6   assessing the Claimant's allegations.  However, his testimony was utterly and completely

7   incredible on almost every key point (and even many collateral issues).  While the

8   Respondents have treated the main legal and factual issues in depth in the sections below,

9   they first examine Port's testimony in detail, in order to illustrate the yawning gap in

10  credibility that was its hallmark.

11         **A.      *Port Encounters Initial Credibility Problems***

12         Port ran into trouble almost immediately, attempting to bolster his personal connection

13  with Micah Cohen by claiming that he was Cohen's Little League coach.  (Jeff Port

14  Testimony, 1 H. T. 19: 11-12.)  However, he wasn't.  (M. Cohen Test., 7 H.T. 1818: 14-16.)

15  In fact, Port was actually just one of the coaches on an all-star team on which Cohen played

16  for one or two games.  (M. Cohen Test., 9 H.T. 2382: 6-14.)  Although this particular

17  misrepresentation has nothing to do with the central issues of this case, Port's inability to

18  testify accurately about a tangential fact at the outset of the hearing was an unmistakable

19  harbinger of the remainder of his testimony.

20         **B.      *Port's Credibility Challenges with Respect to Micah Cohen's Employment***
21                   ***Contract***

22         Port spent a great deal of time and effort in his testimony attempting to explain

23  Swarm's contractual arrangement with Micah Cohen.  Port testified that he and Cohen began

24  to discuss a written employment agreement at the beginning of 2007.  (Port Test., 1 H.T.

25  55:12-23.)  Port retained attorneys at the firm of Stone, Rosenblatt & Cha ("SRC") to assist

26  him with the drafting.  (Port Test., 1 H.T. 56:1-12.)  SRC first prepared a "Consulting

27  Agreement."  (Port Test., 1 H.T. 59:5-12.).  Micah and Gary Cohen later revised the

28  Agreement, retitled it an "Employment Agreement," and sent it back to Port.  (Port Test., 1

-3-

1   H.T. 74:19 to 77:13.)  Port testified that he had immediate concerns about the Employment

2   Agreement, which issues he "could tell you just off the top of my head because they

3   remained the same from the beginning to the end." (Port Test., 1 H.T. 78:19 to 79:6.)

4   However, under questioning by his own counsel and the Arbitrator, and after reviewing what

5   the Respondents contend to be the signed Employment Agreement, Port recalled only "who

6   owned the trademark," "formula issues" about "bonuses," "issues regarding confidentiality"

7   and his refusal to agree to Schedule A of the Agreement.  (Port Test., 1 H.T. 78:18 to 81:23.)

8   Port later expanded these four areas of alleged disagreement under point-by-point cross-

9   examination, but his failure to provide more initial detail about the supposed areas of trouble

10   he had with the Employment Agreement, after boasting that he could easily recall them,

11   throws into serious question just how extensive his problems with the Employment

12   Agreement actually were.

13          1.   *Port invents the fiction of a "blended oral agreement"*

14          Port further contended that the Employment Agreement was never signed, and Swarm

15   and Micah Cohen proceeded, during Micah Cohen's tenure as a Swarm employee, under a

16   loose "oral agreement" that was "reached on practice." (Port Test., 2 H.T. 416:18 to 417: 3.)

17   This "oral agreement," according to Port's testimony, was a remarkably flexible verbal

18   instrument, changing scope periodically according to Port's and Swarm's needs. (Port Test.,

19   2 H.T. 474: 2 - 476: 20.)  Port claimed that the "oral agreement" contained elements of both

20   the original, SRC-drafted Consulting Agreement and the later Employment Agreement.  (Port

21   Test., 2 H.T. 477: 19-25.)  For some reason, Port never attempted to memorialize the terms of

22   this intricate "blended oral agreement" in writing, and he was evidently content to have his

23   company's key employee, Cohen, who was responsible for designing every piece of clothing

24   that Swarm produced, work for Swarm under a nebulous, ill-defined verbal contract, which

25   he tried to extend in October of 2009.  Absurdly, at one point during cross-examination, Port

26   even testified that he would have to "look at the oral agreement" to see if some of Cohen's

27   duties were included therein.  (Port Test., 2 H.T. 442: 8-21.)

28          Port had no convincing explanation for his reactions to Micah and Gary Cohen's

-4-

**RESPONDENTS' POST-ARBITRATION MEMORANDUM**
JAMS Ref. No.:  1220041905

1    extensive efforts to revise the Employment Agreement.  According to Port, each time that

2    Micah Cohen approached him about revising the Employment Agreement, over a period of

3    many months and spanning dozens of e-mail messages, Port visited Micah in person and told

4    him, again and again, that Port would not agree to sign any Employment Agreement

5    containing certain terms to which he objected.  The only evidence that Port produced on this

6    point was a copy of a draft Employment Agreement with Port's handwritten comments, each

7    of which were addressed in Port's favor in subsequent drafts of the Agreement.  (Cl. Exh.

8    474; Port Test., 1 H.T. 330:24 to 333:12.)  Port never made any written record of any of these

9    conversations, and could not explain why Cohen denied that such discussions ever took

10   place.  Port also could not explain why Cohen, reminded each time (verbally, of course) that

11   Port would not sign the Agreement, persisted in continuing to send Port additional revisions.

12   Cohen's far more persuasive testimony is that he and Port discussed the agreement over time,

13   made various revisions, and eventually arrived at a final version, which both parties signed.

14   (M. Cohen Test., 7 H.T. 1893:13 to 1894:10.)

> **2.** *The parties engage in a series of negotiations about provisions of the Employment Agreement*

17   In fact, multiple e-mail exchanges introduced into evidence reveal just such a bilateral,

18   interactive process between Port (acting for Swarm) on the one hand, and Micah Cohen

19   (assisted by his father Gary, a transactional and corporate attorney) on the other.  For

20   example, on March 7, 2008, Cohen e-mailed Port a new version of the agreement with a May

21   1, 2007 start date, which was eventually incorporated into the final agreement.  The parties

22   had discussed start dates that were both earlier and later in time.  (Cl. Exh. 476; M. Cohen

23   Test., 7 H.T. 1874: 2-19.) [2]

24   In another example, on March 21, 2008, Port sent an e-mail to Cohen, asking him to

25   bring in a signed copy of the agreement that morning.  In response, Micah Cohen sent an e-

26   mail to Port, indicating that Cohen had made a change to the Agreement, adding a Recital E.

27

28   _____
[2] The Claimant's hearing exhibits are referred to as "Cl. Exh.," followed by the number.

-5-

1    (Cl. Exh. 18; M. Cohen Test., 7 H.T. 1879:1 to 1881:3.)  Port failed to explain why, if he

2    supposedly had so many fundamental problems with the written employment agreement, he

3    was asking Cohen to bring it in for signature, at this or any point.

4            Only five days later, Port queried Micah over e-mail as to whether or not Gary had

5    provided alternate language concerning Article 3.3 of what Micah contends is the final signed

6    Employment Agreement.  (Port Test., 1 H.T. 89:12-24; Cl. Exh. 242.)  Article 3.3 of the

7    agreement, which was revised at Port's insistence to protect his family, provided for Cohen's

8    continued employment if Port were to pass away.  (M. Cohen Test., 7 H.T. 1880:20 to

9    1881:8.)  Gary Cohen revised the language to Port's specifications (G. Cohen Test., 7 H.T.

10   1777:9 to 1778:12), but Port denied both Micah and Gary's testimony on this point, and

11   claimed that the Section 3.3 that he was discussing in his March 26, 2008 e-mail was part of

12   the "oral" agreement, and that this Section 3.3 and Section 3.3 of the Consulting Agreement

13   were the same.  In fact, they were not at all similar.  (Port Test., 2 H.T. 491:10; R. Exh. 5003,

14   Article 3.3; R. Exh. 5006, Article 3.3.)  As Port testified repeatedly (but unconvincingly), he

15   and Micah never agreed on the elements of an employment agreement, and Port proceeded as

16   if only those elements upon which he and Micah did agree were in place, in the form of a

17   "blended oral agreement."  Notably, Port did not produce, and cannot produce, a single shred

18   of documentary evidence to show that he believed this fiction during Micah Cohen's

19   employment, much less that he ever contemporaneously informed Micah Cohen about it.

20           After the changes to Section 3.3 (favoring Port) were made by the Cohens, Port told

21   Cohen that the change was fine (M. Cohen Test., 7 H.T. 1884: 5-14), and no further revisions

22   were made to the Agreement.  (G. Cohen Test., 7 H.T. 1778: 7-12.)  The next written record

23   of any exchange concerning negotiations about the Agreement is an e-mail from Micah to his

24   father Gary on May 28, 2008, attaching an unsigned copy of the final Employment

25   Agreement, and stating, "This is the one that got signed."  (Cl. Exh. 244; M. Cohen Test., 5

26   H.T. 1474:17 to 1475:20.)  After this, there is no further record of any written

27   communications by anyone regarding negotiations over the agreement.

28

3.   *For the remainder of Micah Cohen's employment, Port continues to act as though the written Employment Agreement is in place*

The capstone of Port's unbelievable testimony concerning the Swarm-Cohen employment agreement is his treatment of the agreement, on behalf of Swarm, <u>after</u> Micah Cohen contends that both parties signed the agreement, in May of 2008. (Micah Cohen Test., 5 H.T. 1481:13-19.) According to Port, he never signed the document, but for the remaining 18 months of Micah Cohen's employment with Swarm, the supposedly unwritten, unsigned employment agreement arose on more than one occasion. In July of 2009, Port asked Cohen to send him a copy of the Employment Agreement, and Cohen did so by e-mail, on July 7, 2009 (Cl. Exh. 245), in preparation for a private meeting the next day at a picnic table outside Swarm's offices. (M. Cohen Test., 5 H.T. 1483:6 to 1484:9.) At this July 8, 2009 meeting, Port discussed the Agreement with Cohen, and asked Cohen to accept a reduction in compensation, by reducing his share of Swarm's profits. Port also asked Cohen to extend the term of the Employment Agreement, which was due to expire on April 30, 2010. (M. Cohen Test., 5 H.T. 1486: 4-19.)

Port's testimony on this matter was all over the proverbial map. When initially queried about this sequence of events on direct examination, Port stated that he did not recall asking Cohen to take a pay cut. (Port Test., 1 H.T. 138:18-20.) Later, however, Port testified on cross-examination that he did "remember talking about one issue of the employment agreement" in the July 2009 meeting. (Port Test., 3 H.T. 878: 21-23.) In any event, Cohen declined the opportunity to take a reduction in pay and, at the same time, extend the term of his employment with Swarm. (M. Cohen Test., 6 H.T. 1486: 9-15.) Port could not explain how he planned to extend a verbal agreement, and staunchly testified that he could not recall why, near the time of the July 2009 meeting, Cohen sent him a copy of the Employment Agreement that Cohen maintains that both parties signed. (Port Test., 3 H.T. 876:25 to 877:5; Port Test., 3 H.T. 879: 5-7.)

Although the July 2009 meeting would seem to have presented an ideal opportunity for Port to correct Micah Cohen's belief that there was a written employment agreement (signed

-7-

RESPONDENTS' POST-ARBITRATION MEMORANDUM
JAMS Ref. No.: 1220041905

1 | or unsigned) in effect, Port did not do so, and indeed, attempted to negotiate with Micah

2 | Cohen concerning its terms.  Notably, Port also slipped up in recounting the "upshot" of this

3 | July 2009 meeting on direct examination, testifying as follows:

> My recollection of the -- the upshot of the
> meeting was is that we both came away, at least from my
> point of view, knowing where each other stood.
> I felt that he was gone -- he was on board, and we
> were just moving forward from that point on like we
> would have -- like we did the -- the time we signed the
> deal to begin with.  And when I say "signed," I mean
> signed on together, not signed.

(Port Test., 1 H.T. 138:23 to 139:5.)  Although Port caught himself, his reference to "the time

we signed the deal to begin with" is revealing, and his quick attempt to explain away his

unambiguous wording is unconvincing.  The entire sequence of events surrounding the July

2009 meeting – including Port's reasons for calling it, Port asking for the Employment

Agreement beforehand, Port failing to object when Cohen sent it to him, and Port's

subsequent discussions with Cohen about reducing his profit share and extending the written

Employment Agreement – are fully consistent with the premise that Cohen and Swarm had a

binding written agreement in place.

In September and October of 2009, Port grew more anxious about extending Cohen's

term of employment with Swarm.  Port and Cohen communicated over e-mail about whether

or not Cohen would extend his employment (with Cohen refusing to do so, and consistently

telling Port that the two should arrange some sort of transition agreement to continue the

SHADES OF GREIGE brand after April 30, 2010), but Port never once mentioned his

ridiculous, litigation-convenient "blend" theory concerning the parties' employment

agreement, and has offered no explanation at all for his failure to do so.

On October 31, 2009, exactly 180 days before the contractually based end of Cohen's

employment, and after consulting with his advisors Paul Buxbaum and Scott Rusczyk, Port

hand-delivered (to Micah Cohen's mother Nancy, at her home), e-mailed, and faxed a letter

-8-

1  purporting to extend the Employment Agreement to Cohen, and also provided a copy to SRC,

2  Port's former attorneys in Woodland Hills.  Amazingly, the letter referred to "Article 3,

3  Section 3.1 of your employment agreement," and claimed to act in accordance therewith.  All

4  of this – the letter, its contents, its timing, and its means of delivery to Cohen and Port's

5  former lawyers – was in strict and precise compliance with the exact language of the

6  Employment Agreement, including its notice provisions.[3]  Port attempted to disavow having

7  written the letter, alleging instead that Scott Rusczyk had done so, and Port had (for some

8  unexplained reason) copied down what Rusczyk said, word for word.  (Port Test., 1 H.T.

9  218:5 to 219:22.)  Port further claimed that the reference to the Employment Agreement by

10  name and section simply represented Port's attempt (through Rusczyk) to account for "the

11  worst case scenario," by which Port apparently meant that the written Employment

12  Agreement was in effect.  (Port Test., 1 H.T. 217:5 to 220:8.)

13  　　　　Accordingly, Port's expansive verbal agreement apparently had article and section

14  numbers, could be cited in a written instrument such as Port's October 31 letter, and

15  contained detailed provisions that coincidentally tracked the written agreement between the

16  parties exactly, right down to the notice provisions of Section 12.1 thereof.  (Notably, these

17  specific notice provisions appeared only in the final version of the Employment Agreement,

18  and did not appear in the Consulting Agreement.)  Port had no explanation for any of this;

19  under sustained cross-examination on the topic, he bafflingly insisted that he only meant to

20  refer to the "blended" verbal agreement, an apparently intricate and quite lengthy – yet most

21  definitely unwritten – mixture of the Consulting Agreement and Employment Agreement.

22  (Port Test., 2 H.T. 480:8 – 481:1.)  A day later, Port sent Cohen an e-mail stating that Cohen

23  "should have received the notification that I have sent earlier requesting to have the

24  employment agreement extended for an additional three years.  I would also like to make it

25

26  _____

[3] Port even went so far as to send the October 31, 2009 letter to Micah Cohen by fax – using Swarm's fax

27  machine to send the letter to the same machine.  (Cl. Exh. 13; M. Cohen Test., 8 H.T. 2027:12 to

2028:24.)  The only possible reason for Port taking this step is that it is exactly what Section 12.1 of the

28  final Employment Agreement – and no other agreement – required.

-9-

1   clear that I am willing to continue our negotiations regarding your request for termination of

2   the agreement upon your return." (R. Exh. 5014.)[4]

3   However, Cohen testified that between his receipt of the October 31 letter and his

4   resignation from Swarm just 13 days later, Port never informed Cohen that Port was

5   attempting to extend an "oral agreement," a "blended oral agreement," or anything of the

6   kind. Cohen also responded to the October 31 letter by e-mail to Port on November 4, 2009

7   (R. Exh. 5015), quoting from the language of the final written employment agreement. (M.

8   Cohen Test., 8 H.T. 2107:14 to 2108:18.) Port responded to Cohen by e-mail on November 9

9   (R. Exh. 5016), but he didn't tell Cohen that the parties had an oral agreement or a blended

10  agreement of any sort, or even mention the idea. (M. Cohen Test., 8 H.T. 2108:20 to

11  2109:8.)

12  In fact, Cohen did not become aware that Port was espousing the concept of a "blended

13  oral agreement" until after his resignation. (M. Cohen Test., 8 H.T. 2096: 1-20.) This is

14  exceedingly odd, given Port's insistence that he believed at the time that the "blended oral

15  agreement" was in place. Of course, the true reason for Port's inconsistent behavior, and

16  failure to mention the "blend" to Cohen before November 13, 2009, is that he hatched the

17  "blended oral agreement" scheme only _after_ Cohen resigned and Port conferred with his

18  advisors.

19          4.    _Following Micah Cohen's resignation from Swarm, Port continues to_
                  _behave as though the Employment Agreement is in effect_
20

21  Micah Cohen resigned from his employment with Swarm on November 13, 2009.

22  (Port Test., 1 H.T. 159: 2-3.) Cohen delivered written notice of his resignation to Port by

23  hand that day. (Cl. Exh. 14; Port Test., 1 H.T. 248: 2-6.) Just before and after Micah's

24  resignation, Port faxed copies of the final Employment Agreement (the version that Cohen

25  contends that he and Port signed) to a host of advisors, including attorney Howard Fishman,

26  businessman Paul Buxbaum, and SRC attorneys Adam Soibelman and Heidi Feldman. (Port

27

28  _____
    [4] The Respondents' hearing exhibits are referred to as "R. Exh.," followed by the number.

Test., 3 H.T. 898:17 to 900:6.)  Port testified, preposterously, that he sent the agreement to Soibelman and Feldman only to determine if their firm had a signed copy of it in their files. (Port Test., 3 H.T. 901:25 to 902: 14.)  Port was completely unable to explain why SRC would have such an agreement in their files, when Port has unequivocally denied ever having signed it.  As for Fishman and Buxbaum, Port has been unable to explain why he would bother to ask for advice about an agreement that he steadfastly claimed that he never signed.

Obviously, Port knew he had actually signed the written Employment Agreement, and most likely discovered (fortuitously for Port and Swarm) that Micah Cohen had left Cohen's signed copy of the Agreement behind, after Port asked Cohen to leave the premises following Cohen's resignation.  Port doubtless reached out to Soibelman and Feldman just to make sure that SRC had not retained a signed copy of the inconvenient (to Port and Swarm) agreement. As for Buxbaum and Fishman, Port solicited their advice because he knew that the Employment Agreement had been signed and was in effect.

Astoundingly, Port also contacted Micah Cohen by e-mail on November 18, 2009, just days after Micah's resignation, and asked if Cohen would forward him "a copy of the agreement you [Cohen] contend governs the terms of your [Cohen's] relationship with Swarm, LLC." (Cl. Exh. 251.)  Cohen responded the same day that Port had a signed copy of the agreement, and attached an unsigned electronic copy of the Employment Agreement.  (Cl. Exh. 251, pp. 2- 14.)  Port responded with a claim that he did not have a signed copy of "this agreement," and further demanded that Micah "produce it." (Cl. Exh. 251, p. 15.)  Port was attempting to learn if Cohen had any additional copies of the signed agreement in his possession, before Port embarked on his campaign of deceit and deception, in which he would earnestly claim that he and Cohen never signed the agreement.

Port's direct examination testimony on this point is also quite interesting.  When asked why he was asking Cohen for a copy of the agreement, Port stated that he had done so "because he [Cohen] called me up and asked for it."  Swarm's counsel immediately asked Port two questions seeking clarification, and Port reiterated his answer, twice. (Port Test., 1 H.T. 254: 3-9.)  However, Port instantly corrected himself, stating "I take that back.  That --

-11-

**RESPONDENTS' POST-ARBITRATION MEMORANDUM**
JAMS Ref. No.:  1220041905

1    That's absolutely totally not a correct statement. I think I wanted him -- I don't remember

2    exactly why, but I just wanted him to send me something that showed that we had an

3    agreement." (Port Test., 1 H.T. 254: 11-15.) Irrespective of Port's difficulties recalling these

4    important events, the question of why Port needed Cohen to convince Port that Swarm and

5    Cohen had a signed agreement, when Port claims that they never did, remains unanswered.

6        Port's actions, and his explanations for those actions, strain credulity to the breaking

7    point. If Port is to be believed, he adamantly knew that he had never signed any written

8    employment agreement between Swarm and Micah Cohen. However, six days after Cohen

9    resigned, Port asked Cohen to produce a signed copy of the agreement (and, for good

10    measure, contemporaneously asked his former lawyers if they had a signed copy). Any

11    rational person in Port's claimed position would never have contacted Cohen or SRC; he or

12    she would simply have rested secure in the belief that no signed agreement existed, because

13    Port never signed it. Instead, the record reveals Port reaching out to Cohen and his former

14    attorneys, seeking a signed agreement that he should have known with certainty, based on his

15    litigation posture, did not and could not possibly exist.

16        Port's actions lead to only one logical conclusion: he discovered that Micah Cohen left

17    his signed copy of the agreement behind, and decided to implement a careful strategy of

18    making sure that no one else, including Cohen and Port's former lawyers, had another signed

19    copy of the agreement. Once Port verified this to his satisfaction, he comfortably embarked

20    on his preposterous campaign to convince the Respondents, and now the Arbitrator, that

21    Swarm intended all along to rely on a "blend" or "mixture" of the long-dead Consulting

22    Agreement and the Employment Agreement. (It remains unclear why Port did not assert the

23    somewhat simpler position that no agreement existed at all.) However, that retroactively

24    conceived strategy, while highly convenient for Swarm's litigation position, gives rise to a

25    host of inconsistencies in Port's behavior while Micah Cohen was a Swarm employee. Port's

26    testimony did absolutely nothing to dispel those inconsistencies, or to provide any reasonable

27    explanation for their existence.

28

RESPONDENTS' POST-ARBITRATION MEMORANDUM
JAMS Ref. No.: 1220041905

Ex. 3

1
2
    C.    *Port's incredible testimony concerning the ownership of the SHADES OF GREIGE trademark*

3    Port's considerable credibility problems at the hearing of this matter did not stop with

4 the Claimant's interpretation of the contractual rights of the parties.  Port also had great

5 difficulty explaining the Claimant's position that Micah Cohen does not own one-half of the

6 SHADES OF GREIGE trademark.  In essence, Port played the role of a naïf who was led to

7 the important decisions concerning the trademark by his attorneys at the Buchalter Nemer

8 firm.  Most notably, Port did not appear to understand the significance of an assignment nunc

9 pro tunc, dated September 29, 2010, in which Port purported to convey his interest in the

10 trademark to Swarm, retroactive to April 17, 2007, the date of Swarm's formation as a

11 California LLC.  (Cl. Exh. 103.)  When asked on direct examination about the assignment,

12 Port stated that Jessie Reider of Buchalter (who appeared as a hearing witness for the

13 Claimant) "suggested" the document, and Port signed it "[b]ecause they asked me to."  (Port

14 Test., 2 H.T. 386: 6-22.)  Port apparently expects the Arbitrator to believe that his attorneys at

15 Buchalter cooked up the strategy behind the assignment, and then placed the document in

16 front of Port for his signature.  On cross-examination, Port indicated that he didn't know why

17 his attorneys drafted the assignment, and had no recollection of why they asked him to sign

18 it.  (Port Test., 5 H.T. 1327: 6-24.)

19    Port's self-portrayal as an unwitting tool in the schemes of his attorneys fails to track

20 with any of his conduct as Swarm's principal during Micah Cohen's employment.  Although

21 Port is a sophisticated businessman with 30 years of experience, who supposedly has robust

22 plans to revivify Swarm as a going concern should it prevail here, he was supposedly willing

23 to sign anything that his attorneys put in front of him concerning his intellectual property

24 rights in the SHADES OF GREIGE mark, the alleged infringement of which rights is the

25 gravamen of the Claimant's grievances.  Port's only response to repeated questioning on this

26 topic was to insist that his plan all along was for Swarm, not Jeff Port, to own some portion

27 of the mark.  However, that assertion is thoroughly belied by the fact that Port knowingly

28 allowed Micah Cohen to apply to the U.S. Patent and Trademark Office ("PTO") to register

-13-

1  the mark in January of 2007 (Port Test., 1 H.T. 48:18-25 to 49:1-4), with Cohen and Port

2  listed as co-owners.  (M. Cohen Test., 7 H.T. 1852: 11-22.)  Even more damningly, Port

3  allowed the attorneys at SRC, in preparing the first Consulting Agreement, to state

4  unambiguously in an introductory recital that he and Cohen co-owned the mark.  (R. Exh.

5  5003, Recital D.)  That assertion of co-ownership was never challenged, and that state of co-

6  ownership has never changed, up to the present day (ineffective assignments

7  notwithstanding).  Finally, Port admitted on cross-examination that he knew that Micah

8  Cohen, in filing the 2007 application with the PTO, was doing so for both Cohen and Port, in

9  their individual capacities.  (Port Test., 5 H.T. 1319:14 to 1320:3.)  Port's claims that he

10  intended all along for Swarm to own SHADES OF GREIGE defy belief.

11      It is far more likely that Port completely understood the point of the assignment, as

12  explained by his lawyers, and readily grasped the concept of trying to confer standing on

13  Swarm, which otherwise has no articulable interest in this litigation, causing its trademark

14  infringement claims to fail.  While some degree of confusion on Port's part concerning legal

15  maneuvering (particularly highly questionable tactics such as the assignment) might be

16  understandable, Port's inability to recall any discussions with his attorneys about the

17  assignment, or explain the purpose of the assignment, is completely incredible.

18  **D.    *Port's e-mails with Paul Buxbaum, Scott Rusczyk and Michael Taitelman***
19  ***show him cynically weighing his options and conceiving his current litigation***
20  ***strategy***

21      Port's general depiction of himself in his extensive testimony as an honest, yet

22  uncurious businessman who was fleeced by the devious Micah Cohen, if not already

23  sufficiently deficient, utterly fails in light of numerous e-mails exchanged between Port, Paul

24  Buxbaum, Buxbaum's employee Scott Rusczyk, and attorney Michael Taitelman.  Oddly,

25  Swarm never turned these dozens of e-mails over to the Respondents during the discovery

26  process.  Only the Respondents' decision to subpoena Buxbaum and his records concerning

27  Port and Swarm brought these e-mails – and the accurate portrait of Jeff Port that they convey

28  – into view.

-14-

**RESPONDENTS' POST-ARBITRATION MEMORANDUM**
JAMS Ref. No.: 1220041905

Ex. 3

In Port's first relevant e-mail interactions with Buxbaum and Rusczyk, which occurred after Cohen made clear that he intended to leave Swarm at the end of the Employment Agreement's term on April 30, 2010, Buxbaum, Rusczyk and Port plotted the extension of Cohen's Employment Agreement and delivery of the October 31, 2009 extension notice.  (R. Exh. 5102.)  Notably, every reference to the employment agreement between Swarm and Cohen in these communications is in the singular, and there is no mention of any "blended oral agreement."  Later, after Cohen resigned from Swarm for cause, and Port confirmed that neither Cohen nor any third party had a signed copy of the signed Employment Agreement, Port exchanged further e-mails with Buxbaum, Rusczyk, and Taitelman.  (R. Exh. 5104.)

In these later e-mail discussions, Port cynically weighed the benefits of various litigation strategies, and demonstrated obvious knowledge of the existence and probable validity of the written Employment Agreement between Swarm and Micah Cohen.  Notably, Port never mentioned his now well-developed litigation strategy, that there was a "blended" oral agreement, which is surprising, given the candor of the e-mail discussions and Port's current adamant stance about the "blended" agreement.  Moreover, Buxbaum and Taitelman counseled Port that he and Cohen each owned one-half of the SHADES OF GREIGE trademark, and Port did not rebut any of their contentions with arguments concerning a Port-Swarm trademark assignment, nor did he even inform his advisors that he planned "all along" for Swarm to own all of the SHADES OF GREIGE mark.  Instead, Port baldly stated:

> I think it is safe to assume that the worst case scenario is to figure that the agreement that was written by Micah/Father is the agreement in play for our negotiations.  Clearly if we go to court or try to force our position we still have the options to use the agreement that was prepared by my attorney or that there is no agreement in play at all.  *Clearly the latter possibility becomes more difficult with all the correspondence and referrals to an agreement being place.*

(R. Exh. 5104, Jan. 12, 2010 e-mail, ¶6) (emphasis added in italics.)  Given the lengths to which he has gone to persuade the Arbitrator of the validity of his "blended oral agreement"

-15-

theory, Port's words are frankly shocking. It is obvious that Port was prepared to adopt any

strategy necessary in order to prevail in court and "force [his] position," even if those

strategies were "more difficult" (i.e., harder to lie about) due to the inconvenient presence of

various documents.

Port's e-mails with Buxbaum, Rusczyk, and Taitelman provide a revealing window

into Port's true beliefs concerning Swarm's contract with Cohen, and Cohen's rights of

ownership to the SHADES OF GREIGE trademark. Port likely never expected the e-mails to

come to light, and proceeded with his creative litigation strategy, featuring the "blended" oral

agreement, the nunc pro tunc assignment, and other incredible elements. The e-mails,

however, amply demonstrate that Port's current version of events is a work of deliberate,

cynical fiction.

### E.   *Port was unable to testify credibly concerning Swarm's finances*

Port's misleading and flatly unbelievable testimony extended further into the realm of

his company's financial affairs. While Port conceded that Micah Cohen was owed a share of

Swarm's profits as part of the "blended" oral employment agreement, Port denied that Swarm

ever made a profit. Port also supplied his then-lawyers with "financial statements," to be

given to Gary Cohen, which have now been proven to be knowingly false. (R. Exhs. 5028,

5029; G. Cohen Test., 10 H.T. 2486: 2 to 2499: 4). Swarm's own financial records and tax

returns, however, show that the company earned a net profit in both 2007 and 2009. With

regard to 2007, Port suddenly contended at the hearing of this matter, for the first time, that

his and Swarm's accountant Gary Diamond had made a mistake in his calculations, showing

a profit when the company in fact lost money. For his part, however, Diamond testified that

he prepared and signed off on the financial statements and tax returns that he prepared for

Swarm, and indicated that Port never told him that Port believed the figures to be in error for

2007. (Diamond Test., 9 H.T. 2319:22 to 2320:5; Diamond Test., 9 H.T. 2321: 15-23;

Diamond Test., 9 H.T. 2341: 5-13.) Diamond also does not believe that any of the Swarm

tax returns or financial statements that he prepared are inaccurate. (Diamond Test., 9 H.T.

2355:11 to 2356:2.)

-16-

1    Port's gaping credibility deficit, together with the near-total reliance that the Claimant

2    has placed on the validity of his testimony, is extremely significant.  Not only should Port's

3    testimony not be credited, but the unbelievability of his current version of events, which lacks

4    any independent support and is completely contradicted by the Respondents' testimony and

5    the written record, are fatal to all of the Claimant's causes of action, as detailed further

6    below.

7

8    ## II.   THE ONLY CONTRACT THAT EXISTS AND IS IN EFFECT IS THE
9         EMPLOYMENT AGREEMENT

10        For several reasons, the only contract in effect between the parties is not Port's

11   "blended oral agreement" – rather, it is the final Employment Agreement.

12        ### A.   *Additional record evidence pertaining to the Employment Agreement shows
13             that Port behaved as though it was in effect*

14        Port initially testified that between May 10, 2007, when Port first sent Micah Cohen

15   the Consulting Agreement prepared by his attorneys, and early March of 2008, he didn't

16   recall receiving "any communications" from Micah Cohen, apparently meaning any

17   communications regarding the employment agreement.  (Port Test., 1 H.T. 76: 4-9.)

18        Port testified that he recalled an incident, at some unspecified point in 2008, when

19   Cohen visited him with a final copy of the agreement, Port looked it over, then walked over

20   to Cohen's workspace at the Swarm facility and handed Cohen the agreements unsigned,

21   because he did not agree with some of its provisions.  (Port Test., 1 H.T. 257:13 to 258:25.)

22   Asked by Swarm's counsel to identify some of these problems that Port had with the final

23   agreement, represented by Claimant's Exhibit 454 (the unsigned copy of the Employment

24   Agreement that Micah Cohen sent to Port by e-mail on November 18, 2009 in response to

25   Port's strange request for it), Port testified as follows:

26

27        **Q. Well, for example, look at the last page.
28        Schedule A.**
        A. Yes.

-17-

**Q.  "Net Profit."  Is that the one that you --**
A.  Well, that's one that stands out.  I mean, clearly, as I mentioned before, there was -- we had a major issue in terms of -- in our discussions that against all business practices, they wanted to calculate profit as sales less cost of goods, did not want to include anything else, including commissions and expenses and rent and telephone and anything that was a general and normal expenses of a business.  So that clearly did not resonate with me.

(Port Test., 1 H.T. 260:13-25.)

Port's testimony does not come close to what Schedule A of the final Employment Agreement actually says.  Schedule A indicates that Net Profits will be defined in accordance with generally accepted accounting principles and Swarm's financial statements, with a few items that cannot be deducted, such as interest, taxes, and salaries and other payments paid to the owner of the company and his family.  (Cl. Exh. 454, Schedule A, p. 13.)  Contrary to Port's claim of expansive provisions preventing Swarm from subtracting "general and normal expenses of a business," Schedule A says nothing of the kind.  It is unclear whether Port never read Schedule A, or, as seems far more likely, he simply cannot remember what disagreements he has retroactively invented to justify his supposed decision not to sign the employment agreement.

Port has never explained why, in May of 2008, the numerous drafts of the employment agreement between Port and Micah Cohen suddenly stopped.  Prior to that month, the parties bandied a host of drafts of the agreement back and forth, and Micah Cohen even agreed to some provisions that benefited Port, not Cohen (such as changing gross profits to net profits to calculate Cohen's profit share; Section 3.3, providing for continuation in the event of Port passing away; and a change in the contract start date from 2006 to 2007).  (Gary Cohen Test., 10 H.T. 2506:14 to 2507:13.)  After May of 2008, however, no further exchanges of drafts, contract discussions, or negotiations took place, and there is no documentary evidence or testimony on the Claimant's side establishing why they ceased.  The actual reason for this is that Port and Cohen signed the Employment Agreement in late May 2008, making further

-18-

Ex. 3

1   negotiations and discussion unnecessary.  Port's lack of any explanation for the sudden

2   cessation of contract negotiations, never to be resumed while Cohen remained an employee

3   of Swarm for another 18 months, is significant.

4        As further evidence that Port only conceived the "blended oral agreement" strategy

5   after Micah Cohen resigned from Swarm, Port wrote a letter to Micah Cohen dated December

6   2, 2009, the earliest-dated document in the record to reflect any expression whatsoever of the

7   idea that Cohen and Swarm did not have an employment agreement. (Cl. Exh. 254.)  Port's

8   particular choice of language in the December 2 letter is especially intriguing; Port informed

9   Cohen that "[d]espite whatever we may have thought, there is no formal agreement in place."

10  (Cl. Exh. 254.)  Just as he did with the October 31, 2009 letter purporting to extend Micah

11  Cohen's employment with Swarm, Port attempted to distance himself from the December 2

12  letter in his testimony, indicating that it was written completely by Scott Rusczyk, or written

13  "with the help" of Mr. Rusczyk.  (Port Test., 1 H.T. 270: 5-10; Port Test., 274: 13-16.)  Port

14  testified on direct examination that he did not question Rusczyk's purported use of the term

15  "formal agreement," because in Port's view, "what we were operating on was a verbal

16  acknowledgment and a continuation, like I said, of three years of experience.  And to me, at

17  least from my point of view, it's like shaking somebody's hand.  That was an agreement."

18  (Port Test., 1 H.T. 275: 9-13.)

19       The December 2, 2009 letter clearly indicates Port's view that at one time, Port and

20  Cohen "thought" that there was a "formal agreement in place."  (Cl. Exh. 254.)  This, of

21  course, runs directly counter to Port's extensive (and incredible) testimony that since at least

22  2008, Port proceeded as though Swarm and Cohen had only some sort of blended mixture of

23  the Consulting Agreement and the Employment Agreement "in place," which was hardly a

24  "formal agreement."  The language of the December 2, 2009 letter is yet another nail in the

25  coffin of this already moribund premise, as it unambiguously expresses Port's view that at

26  one time, Port and Cohen thought that they had a formal agreement, but once Cohen

27  departed, and no signed copy of that agreement could be located, suddenly no such agreement

28  was "in place."  In other words, the path was now clear for Port to assert his "blended oral

-19-

1   agreement" theory, and adopt whatever provisions of the contract best suited his litigation

2   position.  The threats contained in the December 2 letter, and Port's cold and calculating

3   discussions in his e-mails with Buxbaum, Rusczyk and Taitelman, harmonize perfectly with

4   this change in Port's strategy.

5          Moreover, Port's testimony that he and Cohen were operating on a verbal agreement

6   and a continuation of three years of conduct during Cohen's employment is very difficult to

7   square with the language of Port's December 2 letter.  If Port thought that he and Cohen were

8   acting pursuant to both a verbal agreement and the parties' course of conduct over a three-

9   year period, and if to Port, this was "like shaking somebody's hand," then in fact, Port <u>did</u>

10   think that the parties had a formal agreement.  The December 2 letter firmly establishes that

11   until Port learned that no one had a signed copy of the Employment Agreement, he did

12   indeed believe that Cohen and Swarm had a "formal agreement in place."  Port's attempts to

13   explain the language of the letter in his testimony confirm this, and Scott Rusczyk's

14   testimony further bolsters this premise.  Rusczyk testified that when he and Port created the

15   October 31, 2009 letter to Micah Cohen (purporting to extend Cohen's employment with

16   Swarm and explicitly referring to the Employment Agreement by article and section number),

17   Port "had an agreement with him at that time, and I don't remember exactly, but that would

18   have been the agreement I was referring to." (Rusczyk Test., 9 H.T. 2430: 12-15.)  Port,

19   meeting with Rusczyk prior to their preparation of the October 31, 2009 letter, showed

20   Rusczyk <u>only one agreement</u>. (Rusczyk Test., 9 H.T. 2439: 20-22.)  This could only have

21   been the Employment Agreement, and not the Consulting Agreement, because Rusczyk and

22   Port used the words "employment agreement" in the October 31 to refer to that agreement,

23   and because the October 31, 2009 letter was designed to give Cohen notice exactly 180 days

24   in advance of the termination date, just as Article 3.1 of the Employment Agreement requires.

25   (R. Exh. 5006, Article 3.1, lines 5-6.)  By contrast, the Consulting Agreement provides for

26   notice <u>no less than 210 days</u> in advance of the termination date.  (R. Exh. 5003, Article 3.1,

27   lines 4-5.)  By October 31, 2009, the Consulting Agreement's notice trigger date (210 days

28   before April 31, 2010) had long since expired.  The record amply establishes that Port meant

**RESPONDENTS' POST-ARBITRATION MEMORANDUM**
JAMS Ref. No.: 1220041905

Ex. 3

1  to adopt the Employment Agreement in his letter of October 31, 2009.

2      As a result, it was completely reasonable for Cohen to rely on the idea that Cohen and

3  Swarm had a written employment contract – the Employment Agreement.  In contrast to Port,

4  whose current position is thoroughly incompatible with his behavior while Cohen worked for

5  Swarm, every step of Cohen's conduct during the term of his employment with Swarm is

6  consistent with Cohen's belief – and the Respondents' contentions in this litigation – that

7  Swarm and Cohen had a signed and binding written agreement.

8
9      **B.**    *The record evidence shows that Swarm and Cohen partially performed the Employment Agreement*

10      Partial performance of a contract (whether oral, written, or written and unsigned and

11  therefore oral) by any party thereto demonstrates that party's acceptance of the contract under

12  California law.  *Vitagraph, Inc. v. Liberty Theatres Co.*, 197 Cal. 694, 697 (1925); *see also*

13  *Pilch v. Milikin*, 200 Cal. App. 2d 212, 225-226 (1962) (written agreement enforced despite

14  lack of signature due to partial performance by both parties).

15      The evidence here shows that Swarm and Cohen were partially performing the written

16  Employment Agreement that Micah Cohen contends that he signed.  If Port's version of

17  events were true, and the "blended oral agreement" were in effect, one would reasonably

18  expect to see <u>at least one</u> mention of the "blend" concept in the written record during Cohen's

19  employment. There is none.  Instead, the record shows:

20      1.    Port asking for Cohen for a copy of the Employment Agreement in July of

21  2009, then attempting to modify its terms and its compensation provisions the next day.

22      2.    Port's preference for a written agreement with Cohen, and Port retaining SRC

23  and negotiating with Cohen to that end.  (Port Test., 2 H.T. 427: 5-21.)

24      3.    No mention by Port that the negotiations over an agreement ever ceased or

25  failed.

26      4.    A sudden cessation of those negotiations in May of 2008, coinciding with the

27  time that Port, according to Cohen, signed the Agreement.

28      5.    Port bringing <u>only</u> the Employment Agreement to Rusczyk for his advice.

-21-

6.     Port (and Rusczyk) writing the resulting October 31, 2009 letter to Cohen, attempting to extend the Employment Agreement by explicit reference, and complying with complete precision with the notice provisions of the Agreement.

7.     Port checking with his former attorneys at SRC in the wake of Cohen's resignation to see if they had a signed copy of the Agreement, for unexplained reasons.

8.     Port asking Cohen to produce a signed copy of the Agreement.

9.     Port sending the Agreement to Buxbaum and Fishman for their review.

10.     Port telling Cohen in December of 2009 that "whatever we may have thought, there was no formal agreement in place," and for the first time claiming the existence of an oral agreement, clearly indicating that Port had previously believed that there was some other agreement, a "formal agreement," in place.

11.     Cohen telling his father in May of 2008 that the Agreement was signed.

12.     Cohen repeatedly asking Port for an accounting to determine his profit share.

This list is not even exhaustive.  All of this evidence indicates that the parties were performing the written Employment Agreement, and the Claimant can convincingly explain none of it.  Port's evasions and failures to recollect key facts should not obscure the conclusion that the written agreement was in effect as of May of 2008, and the parties were performing their obligations in accordance with its provisions.

**C.     *Port and Swarm are equitably estopped from denying the existence of a contract***

Swarm and Port are also equitably estopped from claiming that no contract exists, because Micah Cohen relied on the existence of a written employment contract and changed his position to his detriment as a result.  In California, "four elements must be present in order to apply the doctrine of equitable estoppel: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury."  *Driscoll v. City of Los Angeles*, 67 Cal. 2d 297, 305 (1967) (internal citations and

-22-

1  quotation marks omitted).

2        First, Swarm and Port were apprised by Cohen of the facts of the Employment

3  Agreement (its existence and its provisions) on numerous occasions.  Second, Swarm clearly

4  intended that the contract be acted upon, because Swarm employed Micah Cohen, accepted

5  and directed his services, paid him the exact salary called for in the agreement, and used the

6  SHADES OF GREIGE trademark via a license granted by Cohen.  Third, there is no

7  evidence in the record that Micah Cohen had any idea that Port and Swarm claimed or

8  believed that the written Employment Agreement was not "in place."  Port readily confirmed

9  that he never told Cohen about Port's "blended oral agreement" theory of Cohen's contract

10  (Port Test., 2 H.T. 477: 19 to 478: 9), so Cohen could not have known that this was the rubric

11  under which he was actually (according to Port) employed.  Fourth, Micah relied to his

12  detriment on the existence of a valid employment contract by working for Swarm as long as

13  he did, and proceeding as if the Employment Agreement was in effect, when in fact Port

14  (supposedly) believed that it was not.  Swarm came forward with no evidence to contradict

15  any of this.

16       **D.    *Port and Swarm adopted the Employment Agreement in writing via the letter*
17               *of October 31, 2009*

18        As set forth above, the October 31, 2009 letter and the identical November 1, 2009 e-

19  mail from Port to Cohen are express written adoptions by Port and Swarm of the

20  Employment Agreement.  The letter, explicitly incorporating by reference "article 3, section

21  3.1" of Cohen's Employment Agreement, is sufficient to bind Swarm to the terms of the

22  Agreement, regardless of whether Port ever signed the Agreement, or signed it, then lost his

23  copy and Cohen's.  *Rogers v. Bartlett*, 103 Cal. App. 2d 250, 254 (1951) ("One is bound by a

24  written contract which he has not signed, if by signed letter he expressly refers to and adopts

25  such contract"); *Banner Entertainment, Inc. v. Superior Court*, 62 Cal. App. 4th 348, 361

26  (1998) ("it is not the presence or absence of a signature which is dispositive; it is the presence

27  or absence of evidence of an agreement . . . which matters"); *see also Id.* at 358 (if the parties

28  agree to a proposed written agreement, "the mere fact that a formal written agreement to the

-23-

**RESPONDENTS' POST-ARBITRATION MEMORANDUM**
JAMS Ref. No.: 1220041905

1  same effect has not yet been signed does not alter the binding validity of the oral

2  agreement").

3         This authority controls here.  It is difficult to conceive of a more express adoption of

4  an agreement in a subsequent writing than the October 31, 2009 letter and the next day's e-

5  mail, and Port's contention that the letter intended to refer only to whatever provisions he

6  likes is unavailing.  Obviously, Port was earnestly trying to convince Cohen to sign a longer-

7  term deal.  However, the Claimant now asks the Arbitrator to believe that Port and Swarm

8  were actually trying to get Cohen to agree to an extension of whatever Port and Swarm

9  thought the deal *might* be, the details of which they never shared with Cohen in any recorded

10  evidence.  Indeed, the record contains no documentation of even the <u>concept</u> of the "blended

11  oral agreement" now championed by Port.  On October 31, 2009, Port was attempting to do

12  what he had been trying to do since meeting with Cohen that July – extend Cohen's written

13  Employment Agreement.  There is no other reasonable conclusion on this record.

14         For all of these reasons, the entire written Employment Agreement should be deemed

15  to be valid and binding upon the parties.

16

17  **III.   BECAUSE AN ENFORCEABLE CONTRACT EXISTS, MICAH COHEN CO-**
18  **OWNS THE SHADES OF GREIGE TRADEMARK**

19         While it is not necessary for any contract to exist for Micah Cohen to co-own the

20  SHADES OF GREIGE trademark, as discussed in Section IV of this Memorandum, below,

21  should the arbitrator agree with the Respondents that the final written Employment

22  Agreement is in effect, that agreement firmly establishes and confirms Cohen's co-ownership

23  of the mark.

24         Specifically, two of the contract's introductory recitals, Recitals "D" and "E," squarely

25  illustrate this.  Recital "D" flatly states that Cohen and Port co-own the mark, just as the

26  original Consulting Agreement prepared by Port's attorneys did.  (R. Exh. 5006 (Final

27  Employment Agreement), Recital D; R. Exh. 5003 (Consulting Agreement), Recital D.)

28  Recital "E" of the Employment Agreement provides that Cohen and Port have previously

-24-

1  allowed an affiliated entity to use the mark, but will now license it to Swarm.  (R. Exh. 5006,

2  Recital E.)

3        Section 8.2 of the Employment Agreement is also relevant; it provides that "Employee

4  has not assigned to Company his interest in the Mark or any derivative thereof or any of its

5  goodwill," and further restricts Swarm's use of the mark, providing that Swarm may not use

6  the mark unless (1) Cohen and Port continue to own the mark; (2) Cohen continues to be

7  employed by Swarm, and (3) Port continues to own and control Swarm.  (R. Exh. 5006,

8  Section 8.2.)  These provisions provide conclusive evidence of Cohen and Port's

9  understanding that they shared ownership of the mark, and had agreed to restrict its use if

10  they were no longer working together, unless they agreed otherwise.

11

12  **IV.   EVEN IF NO CONTRACT EXISTS, MICAH COHEN STILL CO-OWNS THE**

13  **TRADEMARK**

14        Even if the arbitrator finds that no enforceable written or oral employment contract

15  between the parties exists, Micah Cohen still owns half of the SHADES OF GREIGE mark.

16  Although Port attempted to evade questioning on this issue though obfuscation, he eventually

17  admitted that in January of 2007, when the mark was first conceived, he allowed Micah

18  Cohen to apply to register it with the USPTO.  Port further testified that he knew that Cohen

19  stated in the application that Cohen and Port were co-owners of the mark.  Indeed, when the

20  application was initially rejected, Port (improperly and ineffectively) sought to challenge the

21  PTO's findings by e-mail, and in so doing, made no attempt to correct Cohen's description of

22  the mark's co-ownership.  Cohen testified that he applied to register the mark with the PTO

23  because he had previous experience doing so, and he did so with Port's full knowledge and

24  authorization – including Port's assent to the description of Cohen and Port as co-owners.

25  This sequence of events conclusively demonstrates that Cohen and Port jointly, equally, and

26  exclusively owned the SHADES OF GREIGE mark by mutual agreement, and acted in

27  accordance with that belief.

28        Moreover, in April of 2007, Port asked his attorneys at SRC to prepare an

-25-

**RESPONDENTS' POST-ARBITRATION MEMORANDUM**
JAMS Ref. No.:  1220041905

1  employment contract between Swarm and Micah Cohen.  The "Consulting Agreement" that

2  SRC attorney Heidi Feldman prepared for Port unambiguously stated, in an introductory

3  recital, that Cohen and Port co-owned the SHADES OF GREIGE trademark.  (R. Exh. 5003,

4  Recital D), as did Ms. Feldman's e-mail to Port of April 3, 2007 discussing the Consulting

5  Agreement.  (Cl. Exh. 490, pages 71-72.)  The Consulting Agreement also attempted to

6  transfer Cohen's interest in the mark to Swarm via an assignment (R. Exh. 5003, Exhibit A),

7  but Cohen rejected that change immediately.  Each and every subsequent iteration of the

8  employment contract exchanged among the parties, until Cohen states that the final

9  Employment Agreement was signed in May of 2008, contains the exact same recital of

10  ownership, and no assignment.  In fact, Cohen never conveyed his interest in the mark to

11  anyone, and never abandoned it in any way.  When Swarm filed suit in April of 2010, just

12  five months after Cohen left Swarm, Cohen counterclaimed for declaratory relief, asking the

13  Court to settle the ownership of the mark.

14      As a result, irrespective of any formal contractual arrangement between the parties,

15  their course of conduct indicates that Cohen continues to own 50% of the SHADES OF

16  GREIGE mark, and the Claimant has not established and cannot establish otherwise.

17

18  **V.  BECAUSE MICAH COHEN CONTINUES TO CO-OWN THE TRADEMARK**
19  **WITH JEFF PORT, NEITHER PARTY CAN USE THE TRADEMARK**
    **WITHOUT THE OTHER'S CONSENT, MAKING INFRINGEMENT BY THE**
20  **RESPONDENTS IMPOSSIBLE**

21      Cohen's continued co-ownership of the mark is important because without Cohen's

22  consent, Port cannot use the mark, and vice versa.  Absent the right to use the mark, Port

23  cannot successfully sue for trademark infringement, because he lacks the standing to do so.

24  (Indeed, Port has not even sued for trademark infringement; Swarm has, which is discussed

25  further in Section VI of this Memorandum, below.)  In *Durango Herald, Inc. v. Riddle*, 719

26  F. Supp. 941 (D. Colo. 1988), the district court permanently enjoined two parties with joint

27  ownership interests in a trademark from using it.  In so doing, the court found that in the

28  absence of any contractual expectations of the parties, the record should be examined for any

RESPONDENTS' POST-ARBITRATION MEMORANDUM
JAMS Ref. No.: 1220041905

1  indications that the goodwill associated with the trademark can be associated with one of the
2  co-owners. *Id.* at 951. The court found no such indications. Testimony in this matter
3  showed that Port contributed financial resources by paying all of the expenses for the
4  clothing lines bearing the SHADES OF GREIGE trademark (Port Test., 2 H.T. 404: 15-24);
5  however, Micah Cohen exclusively designed every single piece of the goods produced,
6  Cohen was the only representative of Swarm who personally visited the suppliers in China to
7  oversee and supervise production, and Cohen was primarily responsible for quality control
8  (Port Test., 2 H.T. 403:20 to 404:6).

9      On this record, the Arbitrator could find that Cohen contributed more significantly to
10  the goodwill associated with the trademark, but it is also possible to conclude that Port and
11  Cohen each contributed to the goodwill of the trademark that they jointly owned. *See*
12  *Lunatrex , LLC v. Cafasso*, 674 F. Supp. 2d 1060, 1073-1075 (expenditures of cash by one
13  co-owner did not signify greater contribution to goodwill; all co-owners contributed talent
14  and efforts to the mark, leading to injunction against any party using the mark without the
15  others' consent). Under this authority, as in *Durango Herald*, the appropriate action for this
16  Court to take is to enjoin the usage of the trademark by either party, since neither has the
17  right to use it without the other's consent.[5] In the absence of any such right, Port (and the
18  Claimant) cannot lawfully use the mark, infringement against the Claimant's use of the mark
19  by the Respondents becomes impossible, and the Claimant's Lanham Act claims necessarily
20  fail.

21

22  **VI.   SWARM HAS NO STANDING TO BRING THIS ACTION, AND THE
23          ASSIGNMENT NUNC PRO TUNC IS INEFFECTIVE AND VOID**

24      To establish standing to sue for trademark infringement, false designation of origin, or
25  unfair competition under the Lanham Act (including Section 43(a), 15 U.S.C. §1125(a),
26

27  [5] This argument applies with equal force to the Claimant if the Arbitrator finds that the September 2010
28  nunc pro tunc assignment of Port's rights was effective to transfer ownership. Swarm would be a co-owner with the same inability to use the mark without Cohen's consent.

1  under which the Claimant brings its claims), a plaintiff must show that he or she is either (1)

2  the owner of a federal mark registration, (2) the owner of an unregistered mark, or (3) a

3  nonowner with a cognizable interest in the allegedly infringed trademark. *Halicki Films,*

4  *LLC v. Sanderson Sales & Mktg.*, 547 F.3d 1213, 1225-1226 (9th Cir. 2008); 15 U.S.C. §§

5  1114(1), 1125(a). In addition, to maintain a claim under Section 43(a), "the plaintiff must

6  show that it has a commercial interest in the allegedly misused mark that is likely to be

7  damaged." *Nat'l Licensing Ass'n, LLC v. Inland Joseph Fruit Co.*, 361 F.Supp.2d 1244, 1256

8  (E.D.Wash. 2004) (internal quotation marks and citation omitted). However, Swarm has no

9  cognizable commercial interest in the SHADES OF GREIGE trademark, of which it is

10  merely a former licensee, with no current right of use.

11      Under the Employment Agreement, Swarm's ability to use the SHADES OF GREIGE

12  trademark free of royalties, as a licensee, ceases upon the end of Micah Cohen's employment

13  with Swarm. (R. Exh. 5006, Section 8.2.) Even if the Arbitrator finds that the Employment

14  Agreement (or Section 8.2 thereof) is not valid or binding, Cohen and Port are co-owners of

15  the mark, and each has the ability to prevent its use by the other. Each also has the ability to

16  prevent use of the mark by a licensee, and Cohen has never consented to Swarm's use of the

17  mark after the end of his employment. Accordingly, any further licensed use of the

18  trademark by Swarm is unlawful.

19      Obviously perceiving this problem, Port and his attorneys engineered a fraudulent

20  assignment of Port's rights in the trademark to Swarm, via an assignment nunc pro tunc dated

21  September 28, 2010, just one day before the filing of the Demand in Arbitration in this

22  matter. (R. Exh. 5050, purported assignment; Claimant's Demand in Arbitration, p. 3, dated

23  September 29, 2010.) Based on this remarkable timing, Port and his attorneys at Buchalter

24  Nemer created the assignment exclusively for the purposes of this litigation. However, there

25  are two fundamental defects that cause the assignment to fail.

26      First, Port and his attorneys have attempted to use an assignment nunc pro tunc when it

27  is not appropriate. "A nunc pro tunc assignment in practice and as meant in law is an

28  assignment made now of something which was previously done, to have effect as of the

-28-

1    former date.  The purpose of such an assignment is to make the record show something which

2    actually occurred, but has been omitted from the record through inadvertence or mistake."

3    *Hotel Corporation of America v. Inn America, Inc.*, 153 U.S.P.Q. 574, 578 (TTAB 1967)

4    (internal quotation marks omitted).  Thus, Port and Swarm must show that the September 28,

5    2010 assignment was a mere written recordation of something done in the past, "something

6    which actually occurred."  The Claimant cannot do so.  Port testified that he did not know of

7    any earlier transaction to which the assignment referred, and could not explain the meaning

8    of its retroactive date.  (Port Test., 5 H.T. 1328:3 to 1329:1.)  The assignment does not record

9    anything that was previously unwritten because of inadvertence or mistake; in fact, it

10   represents the Claimant and Port's cynical attempt to mislead the Arbitrator and the Court

11   into concluding that Swarm had standing to bring this action against the Respondents.

12        Second, in a closely related issue, Port and Swarm's attempt to execute an assignment

13   after the initiation of this litigation is unavailing.  Courts have consistently held that "nunc

14   pro tunc assignments are not sufficient to confer retroactive standing."  *Enzo APA & Son, Inc.*

15   *v. Geapag A.G.*, 134 F.3d 1090, 1093 (Fed Cir. 1998); *see also Gaia Technologies, Inc. v.*

16   *Reconversion Technologies, Inc.*, 93 F.3d 774, 779-780 (Fed. Cir. 1996) (assignment of

17   trademark rights after litigation began was insufficient to confer standing).  Thus, an

18   assignment after litigation begins is invalid, because a litigant must have standing at the

19   outset of the case or controversy.  "As a general matter, parties should possess rights *before*

20   seeking to have them vindicated in court.  Allowing a *subsequent* assignment to

21   automatically cure a standing defect would unjustifiably expand the number of people who

22   are statutorily authorized to sue . . . [p]ermitting non-owners and licensees the right to sue . . .

23   would enmesh the judiciary in abstract disputes, risk multiple litigation, and provide

24   incentives for parties to obtain assignment in order to expand their arsenal and the scope of

25   litigation."  *Procter & Gamble Co. v. Paragon Trade Brands, Inc.*, 917 F.Supp. 305, 310

26   (D.Del.1995) (emphasis supplied in italics).

27        Although Swarm and its attorneys may have believed that this action began on

28   September 29, 2010, with the filing of the Demand in Arbitration, it actually commenced

-29-

RESPONDENTS' POST-ARBITRATION MEMORANDUM
JAMS Ref. No.:  1220041905

1  | with the filing of the Complaint on April 28, 2010.  (Complaint, incorporated by Claimant's
2  | Demand in Arbitration, p.1.)  The parties later stipulated to submit the matter to arbitration,
3  | but the original civil action filed by Swarm on April 28, 2010 in the Central District of
4  | California, bearing Case No. CV10-3188 DDP (FFMx), remains active and is merely stayed
5  | pending the results of this arbitration.  (Demand in Arbitration, Exh. 2, Stipulation of June 4,
6  | 2010.)  This litigation therefore began on April 28, 2010, and the assignment nunc pro tunc
7  | dated exactly five months later is completely ineffective to confer standing on Swarm.  The
8  | assignment is void and invalid.

9  | Cohen and Port co-own the SHADES OF GREIGE trademark, and Swarm is nothing
10 | more than a former licensee with no current rights of use.  Swarm therefore has no interest in
11 | the mark, and lacks standing to pursue any claims for its infringement.  *See Smith v. Montoro*,
12 | 648 F.2d 602, 608 (9th Cir. 1981) (a plaintiff must have at least a "reasonable interest" in the
13 | trademark to bring suit under §43 of the Lanham Act); *Harvey v. Law*, 2007 WL 2990426, at
14 | *5 (N.D. Cal. Oct. 11, 2007) (rejecting §43 claim for unfair competition where plaintiff could
15 | not show any injury, had no interest in the marks, and did not compete in commerce with
16 | defendants).  Swarm's claims under the Lanham Act should be dismissed for lack of
17 | standing.

## VII.   THE CLAIMANT HAS ESTABLISHED NO LIKELIHOOD OF CONFUSION

Although the SHADES OF GREIGE trademark should effectively be extinguished, since its co-owners, Jeff Port and Micah Cohen, will not consent to its use, and although the Claimant lacks standing to assert its Lanham Act claims, the Arbitrator may also wish to consider the Claimant's prima facie case of infringement, and the Claimant's evidence of the likelihood of confusion caused by Micah Cohen's design, manufacture, and distribution of men's clothing under the SHADES OF GREY BY MICAH COHEN mark.

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), the ostensible basis for the Claimant's causes of action, provides liability for "false representations concerning the

-30-

1   origin, association, or endorsement of goods or services through the wrongful use of another's

2   distinctive mark, name, trade dress, or other device." *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093,

3   1108 (9th Cir. 1992). In deciding claims under Section 43(a), "the ultimate test is whether

4   the public is likely to be deceived or confused by the similarity of the marks." *New West*

5   *Corp. v. NYM Co. of California, Inc.*, 595 F.2d 1194, 1201 (9th Cir. 1997). The burden of

6   establishing this likelihood of confusion rests with the plaintiff. *Tie Tech, Inc. v. Kinedyne*

7   *Corp.*, 296 F.3d 778, 783 (9th Cir. 2002). The Claimant has presented virtually no evidence

8   to support a finding that consumers (in this case, sophisticated professional buyers) are likely

9   to confuse goods formerly marketed under the SHADES OF GREIGE trademark with clothes

10  sold under the new trademark SHADES OF GREY BY MICAH COHEN.

11      In the Ninth Circuit, courts evaluate likelihood of confusion by examining eight factors

12  originally set forth in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979).

13  The Claimant focused nearly all of its evidence on just two of the eight *Sleekcraft* factors –

14  actual confusion and similarity of the marks (also known as "sight, sound, and meaning").

15  The Claimant drastically oversimplified the latter factor, merely examining how a few

16  persons, none of them consumers, pronounced the word "greige."

17      The Claimant presented no proof at all concerning the remaining six factors, but the

18  Respondents address them here. First, the <u>strength of the mark</u> was weak, inasmuch as the

19  mark itself was only descriptive or suggestive, and thus entitled to only limited protection.

20  *Sleekcraft*, 599 F.2d at 350. Moreover, the mark in question was part of a "crowded field,"

21  the retail apparel industry, further weakening its strength. *One Industries, LLC v. Jim O'Neal*

22  *Dist., Inc.*, 578 F.3d 1154, 1164 (9th Cir. 2009). This was particularly true given the

23  contemporaneous existence of a men's clothing line and registered trademark known simply

24  as GREIGE. Indeed, the mark was made even weaker when Port, apparently because of cost

25  concerns, decided to direct his attorneys to disclaim the word "greige" in Swarm's 2010

26  registration application, to avoid a dispute regarding similarity to the GREIGE mark. (Cl.

27  Exh. 51, PTO office action showing disclaimer; Port Test., 5 H.T. 1306:8, 1309: 8-18; R.

28

-31-
**RESPONDENTS' POST-ARBITRATION MEMORANDUM**
JAMS Ref. No.:  1220041905

Exh. 5082, e-mail from D. Lipstone; Port Test., 5 H.T. 1297:4 - 1302:14.)[6]   The weakness of

the mark, including the disclaimer of "greige," means that this factor either favors the

Respondents or is neutral, favoring neither party.  The Claimant has presented no evidence to

the contrary.

Second, with regard to the alleged <u>intent to infringe</u>, Micah Cohen testified that in

naming his clothing line SHADES OF GREY BY MICAH COHEN, he had no plans to harm

Jeff Port, Swarm, or the SHADES OF GREIGE trademark.  (M. Cohen Test., 8 H.T. 1988:25

to 1990:3.)  To the contrary, Cohen believed that he could not infringe upon the SHADES OF

GREIGE mark, because, as he expressed in an e-mail to his father Gary on October 9, 2009,

he believed that if Cohen and Port could not agree on a transition agreement, neither one

could use the SHADES OF GREIGE mark after Cohen left his employment with Swarm.

(M. Cohen Test., 6 H.T. 1590:24 to 1591:10.)  Swarm presented absolutely no contrary

evidence concerning the Respondents' intent, and has failed to show the bad faith needed for

this factor to weigh in the Claimant's favor.  As a result, this factor weighs in favor of the

Respondents.  *See, e.g., M2 Software, Inc. v. Viacom, Inc.*, 119 F.Supp. 2d 1061, 1070 (C.D.

Cal. 2000) (lack of proof of bad faith by defendants results in weighing of the "intent" factor

in favor of the defendants).

Third, the <u>proximity of the goods</u>, another factor concerning which the Claimant

provided no evidence, is at the most neutral.  Micah Cohen testified that his new company's

clothes were not sold until August of 2010, by which point Swarm had ceased operations.

Moreover, Cohen confirmed that the two lines were never simultaneously marketed, and were

never available in stores in the same selling season.  (M. Cohen Test., 8 H.T. 2022: 13-22.)

"The closer the parties are in competitive proximity, the higher the likelihood of confusion."

*Rearden LLC v. Rearden Commerce, Inc.*, 597 F. Supp. 2d 1006, 1020 (N.D. Cal. 2009).

Here, the parties were never in "competitive proximity" at all.  Analysis of this factor

---

[6] Unsurprisingly, but consistently, Port claimed to have no recollection of any discussions with his attorneys concerning cost concerns, or indeed any of the reasons behind the disclaimer of the term "greige."  Port Test., 5 H.T. 1302: 2-14.

RESPONDENTS' POST-ARBITRATION MEMORANDUM
JAMS Ref. No.:  1220041905

Ex. 3

1  substantially overlaps with that of several others, including most notably sophistication of the

2  relevant consumers, which also favors the Respondents.

3        With regard to the factor of <u>convergent marketing channels</u>, the Respondents concede

4  that, like any two lines of similarly priced contemporary men's clothing, SHADES OF

5  GREIGE clothing and SHADES OF GREY BY MICAH COHEN clothing used similar or

6  identical marketing channels.  The Claimant presented no evidence of this, however, and

7  while the marketing channels may have been similar, the two lines of clothing never used

8  those channels at the same time.

9        With regard to the <u>degree of care exercised by the consumer</u>, a fifth factor in the

10  *Sleekcraft* test that the Claimant has ignored, the Respondents demonstrated conclusively,

11  through the testimony of Micah Cohen, Jeff Port, and two sales executives who were charged

12  with selling the goods for both companies, that the customers of both lines were

13  sophisticated, professional retail buyers.  (Corrado Test., p. 189: 7-21; Wolski Test., 4 H.T.

14  1074: 8-21.)  "[W]here the relevant buyer class is composed solely of professional or

15  commercial purchasers, it is reasonable to set a higher standard of care than exists for

16  consumers."  *Ykk Corp. v. Jungwoo Zipper Co., Ltd.*, 213 F.Supp.2d 1195, 1205 (C.D. Cal.,

17  2002), quoting Thomas J. McCarthy, 6 McCarthy on Trademarks and Unfair Competition

18  §23:101 (4th ed. 2001); *see also* McCarthy, *Id.* ("it is assumed that such professional buyers

19  are less likely to be confused than the ordinary consumer").  The professional buyers of the

20  SHADES OF GREY BY MICAH COHEN clothing line were likely to exercise a very high

21  degree of care in determining what they were buying, and the Claimant did not produce one

22  iota of evidence to the contrary.  This factor weighs heavily in favor of the Respondents.

23        Finally, the Claimant presented no evidence concerning the <u>expansion of product lines</u>.

24  In examining this element, courts consider whether the allegedly infringing mark is

25  "hindering the plaintiff's expansion plans."  *Surfvivor Media v. Survivor Productions*, 406

26  F.3d 625, 634 (9th Cir. 2005).  The Respondents' use of the SHADES OF GREY BY

27  MICAH COHEN trademark did not hinder the Claimant's plans for expansion at all, as

28  Swarm had no such plans.  The record evidence shows that Swarm ceased operations in May

RESPONDENTS' POST-ARBITRATION MEMORANDUM
JAMS Ref. No.:  1220041905

Ex. 3

of 2010, and Jeff Port merely testified about vague, nonspecific plans to resume, without any concrete evidence in support, such as, for example, hiring another designer (a step that Swarm has still never taken, to date). However, for this factor to weigh in its favor, a plaintiff must offer proof beyond mere speculation or generalized expansion goals. *Surfvivor Media,* 406 F.3d at 634 (no concrete evidence of expansion tilted factor in favor of defendant); *Rearden LLC,* 597 F. Supp. 2d at 1026 (a sole comment from CEO regarding the prospect of expansion weighed against a finding of likelihood of confusion). Swarm failed to do so, and this factor of the test thus weighs in the Respondents' favor.

With regard to the six elements of the *Sleekcraft* test summarized above, upon which the Claimant produced no evidence, two of the factors are neutral, three favor the Respondents, and just one (convergent marketing channels) favors the Claimant. Against this backdrop, the Claimant requires extremely strong evidence in its favor regarding the remaining two *Sleekcraft* factors. In fact, however, the Claimant's evidence is extremely weak, even virtually nonexistent.

The Claimant presented extraordinarily scant evidence of underline(actual confusion in the marketplace). Summarizing the Claimant's evidence in its entirety, (1) Jeff Port testified that one company, Shotwell, wrote "Shades of Grey" on a check that it properly directed to Swarm in payment for Swarm's goods (Cl. Exh. 177; Port Test., 2 H.T. 370:10 to 372:10); (2) Urban Outfitters made six entries on its own underline(internal) order history documents in which it apparently referred, for unknown reasons, to SHADES OF GREY BY MICAH COHEN goods using part or all of the name "Shades of Greige" (Cl. Exh. 379); and (3) Port, surfing the Internet, found a small number of incorrect references to one or both lines of clothing in blogs or online retail listings. Port testified about only underline(five) such instances, although he did not explain how any of them showed consumer confusion. (Cl. Exh. 171, third and fourth entries from the top and Port Test., 2 H.T. 363:14 to 366:1.; Cl. Exh. 180, last entry of the first page and Port Test., 2 H.T. 366: 3-20; Cl. Exh. 155 and Port Test., 2 H.T. 366:21 to 367:17; Cl. Exh. 480 and Port Test 367:18 to 369:16.)

Notably and dispositively, the Claimant presented absolutely no survey evidence to

-34-

1    indicate how widespread any purported consumer confusion might be.  In fact, the Claimant

2    did not present any direct evidence of actual confusion <u>at all</u>.  No retailer or buyer of the

3    goods at issue appeared at the hearing to testify that it was confused as to anything; the

4    Claimant produced only Port's speculative inferences regarding a few documents and a

5    seemingly random series of Internet search results.  No one knows why Shotwell wrote

6    "Shades of Grey" on a check destined for Swarm as payment for Swarm's goods, but the

7    Claimant did not and cannot demonstrate that Shotwell representatives did so because of

8    confusion between Swarm's products and Micah Cohen's.

9         As for the Urban Outfitters documents, the Claimant offered no testimony or evidence

10   that anyone at Urban was confused between the two lines of apparel.  By contrast, the

11   Respondents elicited testimony that no one at Urban ever indicated any confusion as to the

12   source of the Respondents' goods to BPMW or to Cohen (Wolski Test., 4 H.T. 1085: 14-21;

13   M. Cohen Test., 8 H.T. 2174:22 to 2175:7), and Micah Cohen offered uncontroverted

14   testimony that Urban data entry personnel who were not involved in purchasing decisions

15   likely made the handful of incorrect entries on the documents introduced by the Claimant.

16   (M. Cohen Test., 8 H.T. 2182: 11-14; M. Cohen Test., 8 H.T. 2186:23 to 2187:22.)

17   Moreover, the Claimant failed to show that any sales, products, or orders were misdirected as

18   a result of the inaccurate entries; Micah Cohen testified at length that all of the items listed on

19   Urban's internal records were SHADES OF GREY BY MICAH COHEN clothing

20   manufactured by Respondent All Shades United, that All Shades United received payment

21   for all of the items, and that none of the handful of inaccurate entries resulted in any

22   problems.  (M. Cohen Test., 8 H.T. 2178:25 to 2202:8.)  Cohen also showed that the items

23   that were mislabeled on Urban's internal documents were listed properly on Urban's website.

24   (M. Cohen Test., 9 H.T. 2246:8 to 2255:10.)  The Claimant did not rebut Cohen's extensive

25   testimony in any way, and the internal Urban Outfitters documents, in light of Cohen's clear

26   explanations, do not demonstrate any actual confusion on the part of Urban or anyone else.

27        Finally, the Claimant's "Google Alert" search results demonstrate absolutely nothing,

28   other than the ready availability of inaccurate information on the Internet.  Again, the

**RESPONDENTS' POST-ARBITRATION MEMORANDUM**
JAMS Ref. No.:  1220041905

1  Claimant failed to demonstrate that the Internet listings it produced coincided with or resulted

2  in a single instance of real world confusion.  Port explicitly said that he knew of no such

3  confusion.  (Port Test., 11 H.T. 2747: 14-22.)[7]

4        If the Claimant's version of events were true, and actual confusion existed, one would

5  reasonably expect to find a slew of misdirected orders, payments, invoices, and other pieces

6  of correspondence, and a host of phone calls and e-mails from baffled buyers asking for

7  clarification as to the source of Micah Cohen's new clothes.  Quite to the contrary, the

8  Claimant has no such evidence, and indeed produced effectively nothing to substantiate its

9  claims of actual confusion.

10       Finally, the Claimant focused nearly all of its energies in presenting its case for likely

11  confusion by attempting to show that the word "greige" was pronounced to rhyme with the

12  word "bay," instead of rhyming with the word "beige," as Micah Cohen and BPMW sales

13  executives Wolski and Corrado all testified.  (Micah Cohen Test., 7 H.T. 1844: 1-23; Micah

14  Cohen Test., 7 H.T. 1845: 15-23; Wolski Test., 4 H.T. 1075: 9-23; Wolski Test., 1078: 7-18;

15  Corrado Test., pp. 62:9 to 63:3.)  Pronunciation makes up just one part of the eighth and final

16  *Sleekcraft* factor discussed here, <u>similarity of the marks</u> under the "sight, sound and meaning"

17  test.  Each of these three levels of analysis "must be considered as they are encountered in the

18  marketplace," taking into account the actual situations in which consumers are likely to read,

19  hear, and consider the meaning of the terms.  *Sleekcraft*, 599 F.2d at 351-52.

20       The Claimant offered no testimony concerning the "sight" element of the test.  Micah

21  Cohen testified that his goods are marketed under the name SHADES OF GREY BY

22  MICAH COHEN, and that "by Micah Cohen" is always appended to the end of the brand

23  name.  (M. Cohen Test., 9 H.T. 2442: 8-21.)  The Claimant similarly offered no evidence that

24  the meanings of "greige" and "grey" are the same; Micah Cohen testified that "greige" refers

25  to a color that is similar to beige, but different from gray or grey.  (Micah Cohen Test., 7 H.T.

26  at 1841: 2-18.)

27  

---

28  [7] The question and Port's answer extended to all of the exhibits on this topic mentioned in passing by Claimant's counsel, including several about which Port (and the Claimant) did not offer any testimony.

RESPONDENTS' POST-ARBITRATION MEMORANDUM
JAMS Ref. No.: 1220041905

The Claimant's extensive evidence on this point focused exclusively on the "sound" portion of the test, to a prodigious extent. No fewer than five independent witnesses (John Flores, Jeff Enoch, Kimberly Koral, Angela Duckwitz, and Joel Barnett) appeared to testify concerning the pronunciation of "greige" in Swarm's offices, supporting Jeff Port's claims that he always pronounced the word to rhyme with "bay." Ryan Port also testified in support of Jeff Port. (Ryan Port Test., 11 H.T. 2760: 18-20.) However, Enoch, Flores, Koral, and Barnett all testified that they had no contact with customers of Swarm. They can therefore have no idea how the customers of Swarm pronounced the word "greige," making their testimony completely irrelevant as to likelihood of confusion in the marketplace. (Enoch Test., 2 H.T. 468: 10-15; Flores Test., 8 H.T. 1951:5-11; Koral Test., 11 H.T. 2682: 18-22; Barnett Test., 11 H.T. 2724: 17-25.) Apart from Jeff Port's self-serving testimony, and that of his son, only Ms. Duckwitz, who worked for Swarm for eleven months (Duckwitz Test., 11 H.T. 2690: 13-14), supported the Claimant's claims. However, even Duckwitz testified that customers pronounced "greige" to rhyme with "beige," she was unable to recall how often she needed to "correct" them, and she could not identify any specific customers with whom she had such discussions. (Duckwitz Test., 11 H.T. 2691:22 to 2692:2; Duckwitz Test., 11 H.T. 2695:22 to 2696:2.) Duckwitz and Enoch also contradicted each other about how Duckwitz answered Swarm's phone, casting doubt on their recollections. (Duckwitz Test., 11 H.T. 2690:21 to 2691:16; Enoch Test., 2 H.T. 459: 15-22.)

Against this minimal evidence, Micah Cohen testified that everyone at Swarm during his tenure, including Jeff Port, pronounced "greige" to rhyme with "beige." (M. Cohen Test., 8 H.T. 1958:12 to 1959:4.) Cohen's testimony was unequivocally backed by Wolski and Corrado, who were directly responsible for interacting with customers and selling and marketing the SHADES OF GREIGE brand. Both sales executives testified unambiguously that everyone – including all of Swarm's customers, and even Jeff Port – pronounced "greige" to rhyme with "beige." (Wolski Test., 4 H.T. 1075: 9-23; Wolski Test., 4 H.T. 1078: 7-18; Corrado Test., pp. 62:9 to 63:3.) The accounts of Corrado and Wolski, whom Swarm employed to sell its clothing lines by interacting with Swarm's customers on a daily

-37-

1   basis, are much more convincing than the testimony of Duckwitz, who worked for Swarm for

2   a comparatively brief time and was unable to identify how many customers she spoke with

3   about the brand name's pronunciation.

4      In addition, the Claimant failed to produce <u>any customers</u> to testify about the

5   pronunciation of "greige," nor did it show that any person had <u>ever</u> been confused as to the

6   source of any goods by the supposedly identical pronunciations of "greige" and "grey."  By

7   contrast, in addition to the testimony of Wolski and Corrado, the Respondents also offered

8   into evidence a Corduroy Magazine article written in 2009 setting forth the Respondents'

9   stated pronunciation of "greige" (R. Exh. 5087; M. Cohen Test., 9 H.T. 2285:11 to 2286:10),

10   and Micah Cohen testified that a rapper, Killian Wells, recorded a song in 2009 with "shades

11   of greige" in the lyrics, pronounced to rhyme with "beige."  (M. Cohen Test., 9 H.T. 2286:

12   11-19.)  At those times in 2009, Cohen had no reason or motive to proffer an alternate

13   pronunciation of the word.

14      Despite the Claimant's extensive efforts to convince the Arbitrator otherwise, the

15   record evidence simply does not support the Claimant's contentions about the pronunciation

16   of the word "greige" in the SHADES OF GREIGE mark.  Moreover, the Claimant offered no

17   testimony to show that consumers (professional retail buyers) were likely to hear the mark's

18   name spoken, as opposed to seeing it in print or on clothing labels.  Finally, the Claimant also

19   failed to rebut the premise that the addition of the words "by Micah Cohen" to Cohen's new

20   line of clothing would reduce the likelihood of confusion as to the origin of the goods.  The

21   "sight, sound and meaning" test is, from the Claimant's perspective, at best inconclusive.

22   Given the highly weak evidence that Swarm produced, this factor of the *Sleekcraft* analysis

23   certainly does not favor the Claimant.

24      "To prevail on the ultimate question toward which the *Sleekcraft* analysis is directed -

25   the likelihood of confusion of consumers - [plaintiff] must show sufficient evidence to permit

26   a rational trier of fact to find that confusion is 'probable,' not merely 'possible.'"  *M2*

27   *Software v. Madacy Entertainment*, 421 F.3d 1073, 1085 (9th Cir. 2005), citing *Murray v.*

28   *CNBC*, 86 F.3d 858, 861 (9th Cir. 1996).  Even if the Arbitrator finds that the Claimant has

-38-

standing to seek relief from the Respondents for trademark infringement, the Claimant has failed to carry its burden of proof by showing <u>probable</u> likelihood of confusion.  The Claimant has entirely ignored six of the *Sleekcraft* factors, only one of which, convergent marketing channels, is neutral or in the Claimant's favor.  With regard to the two elements of *Sleekcraft* that the Claimant did address at the arbitration hearing, it produced virtually no evidence of actual confusion, and presented an extremely weak argument concerning the similarity of the marks through an exclusive, though ultimately unavailing, focus on the "sound" element of the "sight, sound and meaning" analysis.

The Claimant's evidence of likelihood of confusion is so bare that it cannot support a finding of trademark infringement under the Lanham Act, or any finding in the Claimant's favor on its congruent state law claims for infringement and unfair competition.  As a result, those claims should fail.

## VIII.  THE CLAIMANT'S "EXPERT WITNESS" ON TRADEMARK LAW PROVIDED IRRELEVANT OPINIONS THAT ARE NOT HELPFUL TO THE RESOLUTION OF THIS MATTER

As part of its case-in-chief, the Claimant produced one of its former attorneys, Jessie Reider, apparently to refresh the Arbitrator with a tutorial in the basic premises of trademark law.  As Reider offered virtually no testimony of consequence, with the permission of the Arbitrator, the Respondents decided not to call a witness in rebuttal, and simply address Reider's testimony here.

Reider is an associate attorney with the Buchalter Nemer firm with "about six years" of experience, who practices in trademark prosecution.  (Reider Test., 3 H.T. 598:20 to 599:1.)  Reider's direct examination testimony revealed little beyond common knowledge in the trademark field.  She testified that the identity of the owner of a trademark is a factual determination (Reider Test., 3 H.T. 607:22 to 608:9), and stated that a nunc pro tunc assignment in the trademark arena is "a written memorialization of something that happens in the past, that something being an assignment of trademark rights." (Reider Test., 3 H.T. 626: 10-22.)  This testimony is revealing, given that Jeff Port readily admitted in his testimony that

-39-

1   no previous assignment of trademark rights happened on April 17, 2007, the retroactively

2   effective date of the September 29, 2010 assignment, as noted above in Section VI of this

3   Memorandum.

4        On cross-examination, Reider agreed that two parties can reach an agreement, even an

5   oral agreement, which provides that they are the owners of a trademark.  (Reider Test., 3 H.T.

6   643: 3-18.)  Reider then stated that if two parties agreed in a written or oral agreement to own

7   a trademark, that agreement would be only valid between the parties "if they were the owners

8   of the trademark by action."  (Reider Test., 3 H.T. 643: 18-23.)

9        Regardless of its accuracy, Reider's testimony is irrelevant.  As the leading treatise

10   recognizes, "[o]wnership rights in a trademark or service mark can be acquired and

11   maintained through use of the mark by a controlled license, *even when the first and only use*

12   *of the mark was made, and is being made, by the licensee.*"  3 McCarthy on Trademarks and

13   Unfair Competition §18:46 (4th ed. 2011) (emphasis added in italics).  This statement of the

14   law is confirmed in the Trademark Manual of Examining Procedure:

15            Ownership rights in a trademark or service mark may be acquired

16            and maintained through the use of the mark by a controlled
         licensee even when the only use of the mark has been made, and is

17            being made, by the licensee.

18            Joint applicants enjoy rights of ownership to the same extent as

19            any other "person" who has a proprietary interest in a mark.
         Therefore, joint applicants may license others to use a mark and,

20            by exercising sufficient control and supervision of the nature and
         quality of the goods or services to which the mark is applied, the

21            joint applicants/licensors may claim the benefits of the use by the

22            related company/licensee.

23   Trademark Manual of Examining Procedure, §1201.03(f) (available at

24   http://tess2.uspto.gov/tmdb/tmep/1200.htm) (internal citations omitted).  This is exactly what

25   occurred here:  Micah Cohen and Jeff Port adopted the mark, and then licensed it to Swarm.

26   They were therefore the owners of the mark by action, by licensing it to Swarm.

27        Reider readily confirmed that if "the individual owners [of a trademark] oversee the

28

-40-

**RESPONDENTS' POST-ARBITRATION MEMORANDUM**
JAMS Ref. No.:  1220041905

Ex. 3

1  quality of the goods and services, the use by the licensee can inure to the benefit of the

2  trademark owners." (Reider Test., 3 H.T. 644:12 to 645:10.)  That is also precisely what

3  happened in this case.  Micah Cohen, through his numerous activities during his employment

4  with Swarm, oversaw the quality of the goods that Swarm marketed using the SHADES OF

5  GREIGE trademark.  Accordingly, Swarm's use of that mark inured to the benefit of the

6  trademark owners, Micah Cohen and Jeff Port.  Under follow-up questioning by the Court,

7  Reider also confirmed that in a situation where two separate owners of a mark use that mark

8  in commerce, there would be "two owners who had indivisible equal . . . ownership of the . . .

9  trademark." (Reider Test., 3 H.T. 663:12 to 664:13.)  That is the situation here.  Both Micah

10  Cohen and Jeff Port used the SHADES OF GREIGE mark in commerce, and the two have

11  indivisible equal ownership of the trademark, as argued above in this Memorandum.

12       The only other noteworthy segment of Reider's testimony concerned the phenomenon

13  of "naked licensing."  Reider testified about a recent Ninth Circuit decision dealing with

14  "overseeing quality in a license of agreement," and indicated that there is "an extremely high

15  burden on a licensee and a licensor to have either outlined and followed or to follow certain

16  quality control provisions." (Reider Test., 3 H.T. 688:16 to 689:7.)  Reider confirmed that

17  the Ninth Circuit case in question required that the quality control provisions had to be

18  "followed," but not necessarily expressly spelled out in a license agreement. (Reider Test., 3

19  H.T. 689: 9-16.)  Moreover, Reider stated that under this authority, an oral agreement could

20  supply the required quality control conditions, as long as those conditions were actually

21  followed. (Reider Test., 3 H.T. 689:18 to 690:8.)  Reider did not know the citation or the

22  name of the case, but believed that it had been issued in the past year. (Reider Test., 3 H.T.

23  688:22, 690:14.)

24       Reider evidently meant to refer to *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d

25  509 (9th Cir. 2010).  In *Freecycle*, the Ninth Circuit held that a licensor retained neither

26  contractual nor actual control over control over the quality control measures of a licensee of

27  the mark, and was unreasonable in relying solely upon the licensee's quality control

28  measures.  Accordingly, the licensor had engaged in "naked licensing" and abandoned the

-41-

RESPONDENTS' POST-ARBITRATION MEMORANDUM
JAMS Ref. No.:  1220041905

1   mark. *Id.* at 520.  "The lack of an express contract right to inspect and supervise a licensee's

2   operations is not conclusive evidence of lack of control . . . where courts have excused the

3   lack of a contractual right to control quality, they have still required that the licensor

4   demonstrate actual control through inspection or supervision." *Id.* at 516-517, citing

5   *Barcamerica Int'l. v. Tyfield Importers, Inc.*, 289 F.3d 589, 596 (9th Cir. 2002).  Thus, a

6   finding of naked licensing, and the resulting abandonment of the trademark by the licensor,

7   will not lie unless there is no contractual provision for quality control measures, <u>and</u> there is

8   no actual control over the quality control steps taken by the licensee.

9        The holding of *Freecycle* has no application to these facts.  Even if the Court finds the

10   written agreement (signed or unsigned) between Cohen and Swarm to be either wholly

11   invalid, or valid but lacking in trademark license quality control provisions, Cohen

12   conclusively exercised actual control of Swarm's quality control measures through inspection

13   and supervision.  Port testified that Cohen exercised quality control functions, stating that

14   "Micah was involved a lot into the production and the manufacturing of it, so anything -- any

15   input that he had had an influence on the way the product was being made." (Port Test., 2

16   H.T. 403: 22-25.)  As for Port, he testified that he had "very little" input into the same

17   process.  (Port Test., 2 H.T. 404:1-6.)

18        Indeed, since Swarm was a mere captive entity of Jeff Port (and, as the Respondents

19   argue below, Port's alter ego), and since Cohen was the designer of all of Swarm's goods and

20   the person entrusted with verifying the quality thereof, the quality control measures that

21   Cohen took to preserve the integrity of the SHADES OF GREIGE clothing brand were the

22   same quality control measures that Swarm exercised.  Cohen and Port, as licensors, clearly

23   had the sort of "close working relationship" with Swarm, the licensee, that is "required to

24   establish adequate quality control in the absence of a formal agreement." *Barcamerica*, 289

25   F.3d at 597; *see also Freecycle*, 626 F.3d at 518 (affirming that control is established in the

26   case of a "licensor with a close working relationship with the licensee's employees," where

27   the "pertinent agreement provided that the license would terminate if certain employees

28   ceased to be affiliated with the licensee").  There is simply no case of naked licensing here.

-42-

**RESPONDENTS' POST-ARBITRATION MEMORANDUM**
JAMS Ref. No.:  1220041905

1      In sum, Reider's testimony did not establish any facts or legal conclusions in support

2  of the Claimant's allegations in this matter.

3

4  **IX.   SWARM PRODUCED INSUFFICIENT EVIDENCE TO SUPPORT ITS CLAIM OF TORTIOUS INTERFERENCE**

5

6      In addition to its causes of action under the Lanham Act and congruent state law, the

7  Claimant has asserted tort claims against the Respondents, including a claim for tortious

8  interference with economic relations or prospective economic advantage.  In California, the

9  elements of the tort of intentional interference with economic relations are: (1) an economic

10  relationship between the plaintiff and some third party, with the probability of future

11  economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3)

12  intentional wrongful acts on the part of the defendant designed to disrupt the relationship; (4)

13  actual interference with or disruption of the relationship; and (5) economic harm to the

14  plaintiff proximately caused by the acts of the defendant.  *Korea Supply Co. v. Lockheed*

15  *Martin Corp.*, 29 Cal. 4th 1134, 1153-54 (2003).  In addition, a plaintiff must show wrongful

16  conduct independent of the interference itself.  *Sole Energy Co. v. Petrominerals Corp.*, 128

17  Cal. App. 4th 212, 241 (2005).  An act is sufficiently independent to satisfy this element "if it

18  is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common

19  law, or other determinable legal standard."  *Korea Supply*, 29 Cal. 4th at 1159.

20      The Claimant has failed to carry its burden to establish this claim.  As to the first

21  element, while the Claimant did have relationships with customers as of the date of Micah

22  Cohen's departure, the Employment Agreement prevents Swarm from using the SHADES

23  OF GREIGE trademark after that date.  Moreover, Cohen's departure left Swarm without a

24  designer, a necessary position to fill if Swarm was to continue to produce lines of clothing.

25  In order to continue, Swarm would have had to hire a new designer, and (if the Arbitrator

26  agrees with the Respondents' analysis of either the effectiveness of the Employment

27  Agreement or the validity of Cohen's trademark rights) sell its clothes under a new brand

28  name.  The Claimant's probability of future economic benefit was thus highly speculative,

-43-

1  and cannot sustain a claim. *See, e.g., Allen v. Homeq Servicing, Inc.*, No. C-08-3798 MMC,

2  2008 WL 4534275, *1 (N.D. Cal. Oct. 7, 2008) (interference claim dismissed because

3  plaintiff did not allege that he could expect a "reasonably probable future economic benefit

4  from his relationship with the seller"). The Claimant had every opportunity to present

5  evidence to the contrary, perhaps by producing the testimony of identifiable customers

6  indicating that they would have continued to do business with Swarm if it hired a new

7  designer or carried forward under a new brand name, but it did not do so. Importantly,

8  Steven Zhou of Onglory Trading and Christopher Corrado and Steven Wolski of BPMW all

9  testified that their organizations would have continued to work with Swarm even after Micah

10  Cohen left the company, regardless of what Micah Cohen did. (Zhou Test., 4 H.T. 1164:4 to

11  1167:7; Corrado Test., pp. 188: 23 to 189:6; Corrado Test., pp. 209: 3-9; Wolski Test., 4 H.T.

12  1084: 2- 17.) Swarm's cessation of operations was a completely voluntary act, not the result

13  of any wrongful or tortious conduct on the part of Micah Cohen.

14       The Claimant has also failed to satisfy the third and fourth elements of the test, as it

15  did not establish that the Respondents intentionally engaged in wrongful conduct to disrupt

16  Swarm's economic relationships, and did not prove that any conduct by the Respondents

17  resulted in actual disruption. Micah Cohen testified unambiguously that at no time during his

18  employment with Swarm did he ever take any actions that he intended to be harmful to

19  Swarm. (M. Cohen Test., 7 H.T. 1903: 4-8.) More specifically, Micah Cohen stated that he

20  never actively discouraged Swarm's supplier, Onglory Trading, from doing business with

21  Swarm, either before or after Cohen left Swarm's employ. (M. Cohen Test., 8 H.T. 2017: 6-

22  11; M. Cohen Test., 8 H.T. 2022: 1-9.) Cohen's version of events was fully corroborated by

23  the testimony of Onglory's owner, Steven Zhou. (Zhou Test., 4 H.T. 1163: 11-13.) Cohen

24  further testified that he did not use any of Swarm's work product to create his samples and

25  designs for his new line after resigning from Swarm (M. Cohen Test., 8 H.T. 2033:19 to

26  2034:7; M. Cohen Test., 9 H.T. 2416: 5-7), and did not steal or appropriate the 23 prototype

27  samples that Onglory manufactured for Swarm for the Fall/Winter 2010 season for his new

28  company's use. (M. Cohen Test., 8 H.T. 2093: 5-7.) Once again, Zhou independently

-44-

RESPONDENTS' POST-ARBITRATION MEMORANDUM
JAMS Ref. No.: 1220041905

corroborated Cohen's testimony. (Zhou Test., 4 H.T. 1164: 10-20.) Cohen also stated that he never misled anyone concerning whether or not he was involved with the SHADES OF GREIGE brand after his resignation from Swarm. (M. Cohen Test., 8 H.T. 2100: 3-7.) Finally, Cohen never used any images from Swarm's previous clothing lines in marketing his new brand. (M. Cohen Test., 8 H.T. 2101: 22-25.)

The Claimant raised some questions about an e-mail that Cohen sent to his parents on October 27, 2009 (Cl. Exh. 361, lower e-mail), in which Cohen stated that he would prefer to begin his new venture immediately, rather than wait for Port to respond to Cohen's attempts to find a transitional solution. In this e-mail, Cohen also said that he was doing all of the prep work for the Fall 2010 samples at that time, and the Claimant has implied that Cohen meant that he was preparing samples for his own line of clothing, while still employed by Swarm. However, Cohen unambiguously testified that he was referring to his preparation of Fall 2010 samples for Swarm's SHADES OF GREIGE line. (M. Cohen Test., 8 H.T. 2167:17 to 2168:1.) In other words, Cohen was simply continuing to work for Swarm, while he waited to see if Port would negotiate a transition agreement.

The Claimant has also argued that two invoices sent by supplier Onglory Trading, one to Swarm and one to Micah Cohen's new company, demonstrate that Cohen must have stolen Swarm's designs. However, Cohen explained that these invoices, and the style numbers that they contain, do not reflect his usage of the same designs for Swarm and All Shades United for the Fall/Winter 2010 season, as Swarm contends. Instead, the invoices reflect only Cohen's usage of some of the same style numbers he used before, for the simple convenience of Onglory owner Steven Zhou and Onglory's technicians. (M. Cohen Test., 9 H.T. 2259:21 to 2260:11.) Cohen also went much further, testifying at length about seven of the style numbers appearing on both invoices. Cohen showed, through the use of inspiration pictures that he originally used to create Swarm's designs for Fall/Winter 2010 and pages from All Shades United's Fall/Winter 2010 lookbook for items with the same style number, that the designs Cohen made for Swarm and the designs he later made for his own line, after his resignation from Swarm, were completely different. (M. Cohen Test., 9 H.T. 2261:3 to

**RESPONDENTS' POST-ARBITRATION MEMORANDUM**
JAMS Ref. No.: 1220041905

Ex. 3

1   2283:24.)  Although Cohen testified for convenience about just seven of the common style

2   numbers, he also confirmed that he could illustrate that any and all of the items from his new

3   company's Fall/Winter 2010 clothing line were based on and involved different designs than

4   Cohen used for Swarm's line for the same season.  (M. Cohen Test., 9 H.T. 2283:25 to

5   2284:14.)  Steven Zhou confirmed in his testimony that the two sets of designs were

6   completely different, and that Cohen did not use the Swarm designs or patterns for All

7   Shades United.  (Zhou Test., 4 H.T. 1164: 10-20; 7 H.T. 1768: 6-17.)  Swarm has produced

8   no evidence to controvert Cohen and Zhou's testimony on this issue.

9           In summary, even if the Arbitrator finds that Swarm has proven a legitimate

10  probability of future economic benefit, the record is completely devoid of any evidence of an

11  independent wrongful act by Micah Cohen and the Respondents, there is no proof of any

12  actual interference with the Claimant's economic relationships, and the Claimant has

13  produced no evidence of damages proximately caused by any acts of the Respondents.  The

14  Claimant has failed to satisfy multiple elements of the required test for tortious interference

15  with economic relations, and its claim should fail.

16

17  **X.    SWARM PRODUCED INSUFFICIENT EVIDENCE TO SUPPORT ITS
        CLAIM FOR BREACH OF LOYALTY**

18

19          The elements of a cause of action for breach of a duty of loyalty under California law

20  are: "(1) the existence of a relationship giving rise to a duty of loyalty; (2) one or more

21  breaches of that duty; and (3) damage proximately caused by that breach."  *Huong Que, Inc.*

22  *v. Luu*, 150 Cal. App. 4th 400, 410 (2007).  Employees owe a duty of loyalty to their

23  employers during their employment.  *Stokes v. Dole Nut Co.*, 41 Cal. App. 4th 285, 295

24  (1995).

25          "An employee does not breach his duty of loyalty by *preparing* to compete with his

26  employer."  *Mamou v. Trendwest Resorts, Inc.*, 165 Cal. App. 4th 686, 719 (2008) (emphasis

27  added in italics).  Employees "may plan and prepare to create a competitive enterprise prior

28  to their termination," if they "do so on their own time and with their own resources . . . while

-46-

1  an employee may secretly incorporate a competing business prior to departing, the employee

2  may not use his or her principal's time, facilities or proprietary secrets to build the competing

3  business." *Id.* (internal citations and quotation marks omitted).

4       In this case, Micah Cohen committed no breach of his duty of loyalty to Swarm.  As

5  noted in Section IX above, Cohen created entirely new designs after his resignation from

6  Swarm, and he made absolutely no use of Swarm's designs or other work product in the

7  service of his new venture, which became All Shades United.  (M. Cohen Test., 8 H.T.

8  2033:19 to 2034:7; M. Cohen Test., 9 H.T. 2416: 5-7; Zhou Test., 4 H.T. 1154: 10-20.)  The

9  record even reflects that Gary Cohen reminded Micah Cohen in October 2009 of Micah's

10  obligation not to use any of Swarm's designs in connection with the new venture, All Shades

11  United.  (Cl. Exh. 310.)  The Claimant has produced no evidence in opposition to any of this.

12  The Claimant has also failed to establish that it was proximately damaged by any of Cohen's

13  (allegedly disloyal) conduct.  The Claimant has not met its burden of proof on its breach of

14  loyalty claim, which should consequently fail.

15

16  **XI.   SWARM PRODUCED ABSOLUTELY NO EVIDENCE OF ITS PURPORTED
DAMAGES UNDER ANY LEGAL THEORY**

17

18       Even if the Arbitrator finds for the Claimant on any theory, the Claimant produced no

19  evidence of damages that it sustained due to Respondents' actions, regarding either Swarm's

20  trademark infringement claims and derivative state law claims, or its tort claims for

21  intentional interference and breach of loyalty.  Section 35(a) of the Lanham Act provides that

22  upon a finding of infringement, a trademark holder, "subject to the principles of equity," shall

23  be entitled to recover "(1) defendant's profits, (2) any damages sustained by the plaintiff, and

24  (3) the costs of the action . . . [i]f the court shall find that the amount of the recovery based on

25  profits is either inadequate or excessive the court may in its discretion enter judgment for

26  such sum as the court shall find to be just, according to the circumstances of the case.  Such

27  sum, in either of the above circumstances shall constitute compensation and not a penalty."

28  15 U.S.C §1117(a).

RESPONDENTS' POST-ARBITRATION MEMORANDUM
JAMS Ref. No.:  1220041905

Ex. 3

Courts in the Ninth Circuit have extensively interpreted the Act's statutory language, and have developed additional requirements for a plaintiff to recover monetary damages, as opposed to equitable relief, against infringing defendants. "Trademark remedies are guided by tort law principles." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993). Accordingly, damages must be established with reasonable certainty. *Id.* Moreover, although plaintiffs do not need to show calculations of damages with "absolute exactness," they must provide a "reasonable basis for computation," or damages will be deemed to be "remote and speculative." *Id.*, 982 F.2d at 1407-08. In addition, "[t]he equitable limitation upon the granting of monetary awards under the Lanham Act . . . would seem to make it clear that such a remedy should not be granted as a matter of right." *Maier Brewing Company v. Fleischmann Distilling Corp.*, 390 F.2d 117, 120 (9th Cir. 1968). In this case, the Claimant provided no reasonable basis for computation of its supposed damages under any theory.

In *Lindy Pen*, the Ninth Circuit upheld the denial of the infringing defendant's profits to the plaintiff, finding that an accounting of profits is "not automatic" and that an accounting is appropriate "only in those cases where the infringement is willfully calculated to exploit the advantage of an established mark. The intent of the infringer is relevant evidence on the issue of awarding profits and damages and the amount." *Lindy Pen*, 982 F.2d at 1405-1406 (internal citations and quotation marks omitted). Accordingly, in the Ninth Circuit, willful infringement is necessary in order to support an award of the defendant's profits. *See also Adray v. Adry-Mart, Inc.*, 76 F.3d 984, 988 (9th Cir. 1996) (if plaintiff has not suffered damages based upon lost sales, plaintiff must prove the infringement was willful in order to be awarded the defendant's profits).

In this case, the Claimant introduced no evidence of damages based on lost sales, or indeed any evidence of lost sales at all. The evidence showed merely that the Claimant voluntarily ceased operations after Micah Cohen left its employ, without any attempt to continue in business by hiring another designer, even though both Onglory Trading, the Claimant's supplier, and BPMW, its sales agency, were willing to continue to work with Swarm after Cohen's departure. (Zhou Test., 4 H.T. 1164:4 to 1167:7; Corrado Test., pp.

-48-

188: 23 to 189:6; Corrado Test., pp. 209: 3-9; Wolski Test., 4 H.T. 1084: 2- 17.)  Port admitted that after Micah Cohen left Swarm, Port was doing nothing to "salvage" the then-current season of his business (Fall/Winter 2010), but he added that he was "relying on the fact that Micah was . . . going to figure out a resolution and that there was going to be some offer made to make it work."  (Port Test., 1 H.T. 267:20 to 268:1.)  Port did not explain why it was Cohen's responsibility, as a departing employee, to "make it work" so that Port could continue his business and recover his investment, but in any event, the Claimant showed no evidence that it lost sales for any reason other than the fact that Cohen left, and Swarm *voluntarily* ceased to operate in the aftermath of Cohen's departure.

The Claimant must prove that the Respondents' trademark infringement was willful in order to recover the profits of All Shades United, Micah Cohen's new business venture.  In the Ninth Circuit, willful infringement "carries a connotation of deliberate intent to deceive. Courts generally apply forceful labels such as 'deliberate,' 'false,' 'misleading,' or 'fraudulent' to conduct that meets this standard." *Lindy Pen*, 982 F. 2d at 1406, quoting *Bandag, Inc. v. Al Bolser's Tire Stores*, 750 F.2d 903, 918-19 (Fed Cir. 1984) (applying Ninth Circuit law).  As discussed above with regard to the intent prong of the *Sleekcraft* analysis, the Claimant has totally failed to demonstrate proof of the Respondents' intent meeting this elevated standard.  Therefore, for these several reasons, any award of the Respondents' profits is improper.

The Claimant may also seek recovery of its "actual damages."  A plaintiff must prove both the fact and the amount of damage.  *Lindy Pen*, 982 F.2d at 1407.  The Claimant here produced absolutely no evidence of actual damages, and is therefore entitled to no award. *See, e.g., Coach, Inc. v. Asia Pac. Trading Co.*, 676 F. Supp.2d 914, 925 (C.D. Cal. 2009) ("No evidence before this Court indicates that Plaintiffs suffered any actual damages for which they may recover on their Lanham Act claims").

Although the Lanham Act provides for damage enhancements for willful conduct, and for the recovery of attorney fees by the prevailing party in "exceptional cases," 15 U.S.C. §1117(a), the Claimant has not shown willful conduct in this case, as set forth above.

-49-

**RESPONDENTS' POST-ARBITRATION MEMORANDUM**
JAMS Ref. No.:  1220041905

1    Moreover, "attorney's fees are available in infringement cases where the acts of infringement

2    can be characterized as malicious, fraudulent, deliberate, or willful." *Rio Properties, Inc. v.*

3    *Rio Int'l. Interlink*, 284 F.3d 1007, 1023 (9th Cir. 2002) (attorney fees upheld for malicious

4    conduct with intent to injure the plaintiff).  There is no evidence of malicious, fraudulent,

5    deliberate, or willful conduct by the Respondents.

6        Additionally, as noted above, the Claimant failed to provide any evidence of damages

7    in support of its tort claims for intentional interference and breach of the duty of loyalty.  As

8    a result of this fatal defect, those claims should fail.

9

10   **XII.   MICAH COHEN IS ENTITLED TO AN ACCOUNTING OF SWARM'S**

11          **PROFITS, OR AN AWARD OF A REASONABLE PROFIT SHARE**

12       Even Port admits that Micah Cohen is entitled to an accounting of Swarm's profits.

13   (Port Test., 4 H.T. 934: 2 to 935: 6.)  The Respondents have sought such an accounting, to

14   which Micah Cohen is entitled pursuant to Section 5.1(b) and Schedule A of the Employment

15   Agreement (R. Exh. 5006).  However, the Respondents requested this relief prior to

16   discovery, and after Claimant's then-counsel at Buchalter Nemer provided Gary Cohen with

17   manifestly inaccurate "financial statements" showing repayment of indebtedness as a

18   deduction from net income, and other clear implausibilities (R. Ex. 5028; R. Exh. 5029; G.

19   Cohen Test., 10 H.T. 2486:2 to 2499:4).

20       Since the filing of the Respondents' Answer and Counterclaims, however, the

21   Claimants have produced compiled financial statements for 2007 through 2009.  Diamond

22   testified about these financial statements and Swarm's tax returns, all of which show that

23   Swarm earned ordinary business income of $33,316.00 in 2007, and ordinary business

24   income of $121,365.00 in 2009.  (Diamond Test., 9 H.T. 2344:19 to 2345:19; Cl. Exh. 443;

25   Cl. Exh. 445.)  Even though these statements were not prepared by an independent

26   accountant, nor certified by Swarm's Chief Executive Officer, as the Employment Agreement

27   requires, the Respondents are content to rest to some extent on the financial statements

28   prepared by Diamond, as they are more realistic than the improbable (and now demonstrably

-50-

**RESPONDENTS' POST-ARBITRATION MEMORANDUM**
JAMS Ref. No.:  1220041905

Ex. 3

1 | false) "financials" that Claimant's then-counsel previously provided.

2 | However, the Respondents also wish to call the Arbitrator's attention to a spreadsheet

3 | that they prepared analyzing Diamond's financial statements and tax returns for Swarm.  (R.

4 | Exh. 5095.)  Micah Cohen and Gary Cohen testified extensively about this exhibit, and the

5 | Claimant rebutted neither the exhibit nor any of that testimony.  (M. Cohen Test., 9 H.T.

6 | 2286:2 to 2292: 25; M. Cohen Test., 9 H.T. 2361:14 to 2372:17; M. Cohen Test., 9 H.T.

7 | 2454:5 to 2459:14; G. Cohen Test., 10 H.T. 2515:17 to 2522:16.)  Respondents' Exhibit

8 | 5095, supported by Micah and Gary Cohen's testimony, shows that Micah Cohen's

9 | contractual 20% share of Swarm's net income could range from a minimum of $30,784.00 (a

10 | total based solely on 20% of the net profits shown in Diamond's financial statements) to as

11 | much as $141,810.00 (based upon 20% of a revised net profits total, which the Respondents

12 | generated using a series of assumptions concerning discrepancies and unlikely figures in

13 | Diamond's statements).

14 | The Respondents wish to commit this matter to the sound discretion of the Arbitrator.

15 | Should the Arbitrator find that Micah Cohen is entitled to a share of the Claimant's profits,

16 | the Respondents request either (a) that the Arbitrator award what the Arbitrator believes,

17 | based on the Respondents' evidence (i.e., Diamond's financials, R. Exh. 5095 and related

18 | testimony), to be a reasonable award of net profits to Micah Cohen, or (b) if the Arbitrator

19 | has insufficient information upon which to calculate an award, that the Arbitrator order

20 | Swarm to provide an independent accounting at Swarm's sole expense.

## XIII. MICAH COHEN IS ENTITLED TO THE RETURN OF HIS PROPERTY, OR COMPENSATION FOR ITS LOSS

24 | Under California law, a claim for conversion requires a proof of four elements: (1) that

25 | the party alleging conversion owns or has a right to possess the property at issue; (2) that the

26 | responding party intentionally prevented the first party from having access to the property for

27 | a significant period of time, refused to return the property upon demand, or otherwise

28 | wrongfully disposed of the property; (3) that the first party did not consent, and (4) damages.

1 | *Burlesci v. Petersen*, 68 Cal. App. 4th 1062, 1066 (1998).

2 |     Port and Swarm have retained several items that belong to Cohen without Cohen's

3 | consent, and have never returned them despite due demand. (Respondents' Answer and

4 | Counterclaims, ¶¶ 54-55.) Cohen has suffered damages as a result of the deprivation of his

5 | property, and asks the Arbitrator to order Swarm to return the items that belong to him. If

6 | Swarm is unable to do so, compensation in the form of money damages of the value of the

7 | property, plus interest, is proper. Johns, California Damages: Law and Proof (5th ed. 1996)

8 | §§7.1-7.2(a), pp. 7-2 to 7-3. In that event, the Respondents respectfully request the

9 | opportunity to submit a short additional declaration concerning value.

10 |

11 | **XIV.  JEFF PORT IS PERSONALLY LIABLE FOR ANY AWARD AGAINST**

12 | **SWARM UNDER THE ALTER EGO DOCTRINE**

13 |     Any award that the Arbitrator sees fit to make against the Claimant in this matter

14 | should be issued against not only Swarm, but also against Jeff Port, under the theory of alter

15 | ego liability. California courts will "pierce the corporate veil" and disregard the fiction of a

16 | separate corporate identity when "an abuse of the corporate privilege justifies holding the

17 | equitable ownership of a corporation liable for the actions of the corporation." *Sonora*

18 | *Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 538 (2000), citing *Roman Catholic*

19 | *Archbishop v. Superior Court*, 15 Cal. App. 3d 405 (1971).

20 |     There are two requirements for the alter ego doctrine to apply. "First, there must be

21 | such a unity of interest and ownership between the corporation and its equitable owner that

22 | the separate personalities of the corporation and the shareholder do not in reality exist.

23 | Second, there must be an inequitable result if the acts in question are treated as those of the

24 | corporation alone." *Sonora Diamond*, 83 Cal. App. 4th 523, 538-539 (2000).

25 |     The factors to be considered in applying the doctrine include the commingling of funds

26 | and other assets, use of the same offices and employees, inadequate capitalization, disregard

27 | of corporate formalities, lack of segregation of corporate records, and identical directors and

28 | officers. *Id.; see also Tomaselli v. Transamerica Ins. Co.*, 25 Cal. App. 4th 1269 (1994);

**RESPONDENTS' POST-ARBITRATION MEMORANDUM**
JAMS Ref. No.: 1220041905

Ex. 3

1 | *Associated Vendors, Inc. v. Oakland Meat Co.*, 210 Cal. App. 2d 825, 838-839 (1962).  The

2 | *Associated Vendors* court enumerated several additional relevant factors, including (1) the

3 | treatment by an individual of the assets of the corporation as his own; (2) the holding out by

4 | an individual that he is personally liable for the debts of the corporation; (3) the confusion of

5 | the records of the separate entities; (4) sole ownership of all of the stock in a corporation by

6 | one individual or the members of a family; (5) the use of the same office or business location;

7 | (6) the employment of the same employees and/or attorney; (7) the total absence of corporate

8 | assets; and (8) the disregard of legal formalities and the failure to maintain arm's length

9 | relationships among related entities.  *Id.* at 838-840.  No one characteristic governs the

10 | inquiry; courts examine all of the circumstances to determine whether the doctrine should be

11 | applied.  *Talbot v. Fresno-Pacific Corp.*, 181 Cal. App. 2d 425 (1960).

12 |      Port's testimony conclusively shows a unity of interest and ownership between Swarm

13 | and Port, and further demonstrates that maintaining Swarm's separate existence would

14 | promote injustice.  Applying the factors listed above, Port testified that Swarm had no capital

15 | assets as of the hearing of this matter (Port Test., 5 H.T. 1359: 1-3), and further stated that

16 | Swarm's bank account had approximately $250.00 in it at the time of the hearing (Port Test.,

17 | 5 H.T. 1359: 4-8, 14).  Port confirmed that he owns 99% of Swarm, while his wife owns the

18 | remaining 1%.  (Port Test., 5 H.T. 1359: 17-22.)  Port testified that the same attorneys, SRC

19 | and Swarm's current counsel, Lyle Mink, acted as counsel both to Swarm and to Mr. Port

20 | individually.  (Port Test., 5 H.T. 1368:23 to 1369:15.)  Port stated that Swarm has no

21 | secretary, that it holds no meetings, and that he does not know where the corporate records

22 | are located.  (Port Test., 5 H.T. 1369: 20-25.)  Port confirmed that at least one employee,

23 | Tatiana Wyand, worked simultaneously for Swarm and for a company owned by Port's

24 | daughter, as of May of 2010 and the hearing of this matter.  (Port Test., 5 H.T. 1370: 8-19.)

25 | Port also personally guaranteed the obligations of Swarm on at least two occasions.  (Port

26 | Test., 5 H.T. 1371:19 to 1372:24.)  Astoundingly, Port also revealed that he, not Swarm, paid

27 | Swarm's administrative fees for this arbitration (Port Test., 5 H.T. 1373: 3-7), embarking

28 | upon an extraordinarily expensive litigation adventure on behalf of a shell entity without any

**RESPONDENTS' POST-ARBITRATION MEMORANDUM**
JAMS Ref. No.:  1220041905

1 | ability to satisfy a damages award if it should be found liable.  Finally, Diamond produced a

2 | remarkable list of instances where Port personally paid Swarm's expenses, totaling more than

3 | $400,000.00 for 2007 and 2008 alone.  (Cl. Exh. 87.)

4 |    Port's testimony on these points demonstrates a complete unity of interest between

5 | Swarm, LLC and Jeff Port, such that no separate personalities of Port and his captive, 99%-

6 | owned LLC actually exist.  Indeed, there is virtually no evidence to support the proposition

7 | that Swarm, which ceased to operate in May of 2010, has any current identity at all separate

8 | from Port's individual interest, a premise that extends even to Port's personal payment of the

9 | arbitration fees for this litigation.  If the Arbitrator issues any award against the Claimant,

10 | treating it as the obligation of Swarm alone, and not the joint obligation of Swarm and Jeff

11 | Port, it would be unjust and inequitable to the Respondents.  In effect, Port would be able to

12 | shield himself from liability that he created, by hiding behind his LLC, when he has never

13 | observed or respected the requisite separation between his interests and those of Swarm.

14 |

15 | **XV. THE RESPONDENTS ARE ENTITLED TO AN AWARD OF THEIR**
16 | **ATTORNEY FEES IN THIS MATTER**

17 |    If the Arbitrator finds in favor of the Respondents, and further finds the Employment

18 | Agreement to be valid and binding upon the parties, the Respondents are entitled to an award

19 | of their attorney fees as a prevailing party.  Section 12.4 of the Agreement provides that a

20 | "successful or prevailing Party" in any "legal action or mediation or other proceeding"

21 | involving any of the provisions of the agreement shall be entitled to its reasonable attorney

22 | fees and costs.  (R. Exh. 5006, Section 12.4.)  To the extent that the Arbitrator makes an

23 | award in favor of the Respondents, the Respondents hereby request an award of such attorney

24 | fees and costs, and an opportunity to present a computation of the amount incurred.

25 |

26 | **XVI. CONCLUSION**

27 |

28 |    The Respondents respectfully request that the Claimant have and recover nothing on

-54-

**RESPONDENTS' POST-ARBITRATION MEMORANDUM**
JAMS Ref. No.:  1220041905

all of the causes of action set forth in its Demand for Arbitration and its Complaint; that the Arbitrator issue an award in favor of the Respondents as to the relief requested in the Respondents' Answer and Counterclaims; and that the Arbitrator award the Respondents their reasonable attorney fees and costs incurred in this action as a prevailing party.


DATED:      November 17, 2011


Respectfully submitted,



                              NORRIS LAW GROUP, P.C.


                              By: _____
                              Matthew J. Norris
                              Attorneys for Respondents
                              MICAH A. COHEN, NANCY SIDONIE COHEN and ALL
                              SHADES UNITED, LLC