# EXHIBIT 4

Ex. 4

1  Matthew J. Norris, Esq. (SBN 257505)
2  NORRIS LAW GROUP, P.C.
   10940 Wilshire Boulevard, Suite 1600
3  Los Angeles, CA 90024
   (310) 443-4159  (phone)
4  (310) 443-4220 (facsimile)
5  mjnorris@norrislglaw.com

6  Attorneys for Respondents Micah A. Cohen, Nancy
7  Sidonie Cohen, and All Shades United, LLC

8
                          **BEFORE JAMS**
9

| | |
|---|---|
| 10  SWARM, LLC, a California limited liability company, dba Shades of Greige, | JAMS Ref. No.:  1220041905 |
| 11  | Hon. George P. Schiavelli, Ret. Arbitrator |
| 12           Claimant, | |
| 13       vs. | |
| 14  MICAH A. COHEN, an individual, dba Shades of Grey by Micah Cohen; NANCY SIDONIE COHEN, an individual; and ALL SHADES UNITED, LLC, a California limited liability company, | **RESPONDENTS' REBUTTAL MEMORANDUM** |
| 15  | **Arbitration Dates:  August 15-18, September 13-16, 21-23, 2011** |
| 16  | |
| 17  | |
| 18  | |
| 19          Respondents. | |
| 20  | |
| 21  AND RELATED CROSS-CLAIMS. | |

22

23

24        Respondents Micah A. Cohen, Nancy Sidonie Cohen, and All Shades United, LLC,
25  through their counsel of record, hereby file this Rebuttal Memorandum in response to the
26  Claimant's Post-Arbitration Brief filed by Claimant Swarm, LLC, and Cross-Respondent Jeff
27  Port.
28

## I.   PRELIMINARY STATEMENT

The Claimant's Post-Arbitration Brief presents 38 pages of selective and out-of-context portions of the arbitration hearing transcript, followed by only 17 pages of legal argument. Claimant made virtually no effort to link any legal or factual argument to its lengthy recitation of the hearing testimony. Given the Claimant's overwhelming, nearly exclusive reliance on Jeff Port's confusing, self-contradictory, and ultimately incredible testimony, the lack of substance in Claimant's Post-Arbitration Brief (the "Claimant's Brief") is not at all surprising. The Claimant, as the Respondents have noted, produced a small handful of witnesses concerning Port's supposedly preferred pronunciation of the word "Greige" in the Swarm offices, called Port's son Ryan to argue that Cohen copied his own Swarm designs for his new company, called one of its own attorneys as an expert witness on issues essentially irrelevant to the facts of this case, and summoned its accountant to testify in purported support of Port's allegations (however, the accountant's testimony that Swarm's financial statements in 2007 and 2009 are correct as filed actually supports the Respondents' claims that Swarm owed Micah Cohen a profit share). Apart from the sparse testimony offered by these witnesses, the vast majority of which did not even bolster Claimant's allegations, the Claimant's support for all of its legal theories rests squarely on Port's tortured and unbelievable version of events.

## II.   THE ONLY CONTRACT THAT EXISTS AND IS IN EFFECT IS THE EMPLOYMENT AGREEMENT

The Claimant's Brief completely fails to counter the Respondents' contention that the contract in effect between the parties is not, and never has been, Port's fictive "blended oral agreement." Instead, the final Employment Agreement governs the relationship between Swarm and Micah Cohen.

As the Respondents noted in their Post-Arbitration Memorandum, Cohen fully performed the Employment Agreement until he resigned due to Swarm's uncured breach, and Swarm and Port partially performed the Agreement. Moreover, Swarm and Port are

1   equitably estopped from claiming that no contract exists, because Micah Cohen relied on the

2   existence of a written employment contract and changed his position to his detriment as a

3   result; the record is clear that Cohen would have left Swarm earlier if he believed that he and

4   Swarm were not bound by contract.  In addition, Port (acting on behalf of his captive limited

5   liability company) expressly adopted the Employment Agreement in writing on several

6   occasions, most notably when he attempted to extend the term of the Employment Agreement

7   in October of 2009.

8        The Claimant's Brief contains virtually no mention, let alone any explanation, of

9   Port's letters of October 31, 2009 and December 2, 2009.  These important pieces of

10  correspondence run directly counter to the Claimant's litigation strategy of adopting a bizarre

11  interpretation of contract law and the facts in this matter, and claiming that Swarm and Cohen

12  operated under a "blended oral agreement" for years, unbeknownst to Cohen, and for that

13  matter to Port's friends and advisors Paul Buxbaum and Scott Rusczyk.  The Claimant's

14  Brief also fails to address the damaging window into Port's thought process provided by his

15  voluminous e-mail correspondence with Buxbaum and Rusczyk, not produced by Port during

16  discovery and first disclosed to Respondents during Buxbaum's testimony.  These e-mails

17  show what Port was thinking at the time his LLC employed Cohen, while he plotted his

18  response to Cohen's resignation for cause, and before he initiated this litigation.  Port's

19  current contentions simply cannot be reconciled with these portions of the record, which

20  support the Respondents' contentions of law and fact regarding the validity and effect of the

21  Employment Agreement.

22        The Claimant's Brief offers nothing to refute the Respondents' position.  The entire

23  written Employment Agreement should be deemed to be valid and binding upon the parties.

24

25  **III.   MICAH COHEN CO-OWNS THE SHADES OF GREIGE TRADEMARK**

26

27        As the Respondents have consistently argued, Micah Cohen co-owns the SHADES OF

28  GREIGE trademark whether the Arbitrator finds that Cohen and Swarm have an enforceable

-3-

1  contract or not.  If the contract is enforceable, Recitals "D" and "E" and Section 8.2 of the

2  Employment Agreement show that Cohen and Port agreed that they shared ownership of the

3  mark, and also agreed to restrict its use if they were no longer working together.  However, if

4  the Arbitrator finds that no enforceable written or oral employment contract between the

5  parties exists, Micah Cohen still owns half of the SHADES OF GREIGE mark.  Port

6  authorized Cohen to apply to register the mark with the USPTO with Port and Cohen listed as

7  co-owners.  Later, Port sought (ineffectively) to correspond on his and Cohen's behalf with

8  the USPTO about its rejection of the application.  In April of 2007, Port asked his attorneys at

9  Stone, Rosenblatt and Cha to prepare the first draft of an employment agreement between

10  Swarm and Cohen.  The draft "consulting agreement" indicated in an unambiguous

11  introductory recital that Cohen and Port co-owned the SHADES OF GREIGE trademark.

12  Every subsequent draft of every agreement between the parties contained the same recital,

13  and the Claimant can point to no set of facts or any evidence whatsoever to support the

14  contention that Micah Cohen ever surrendered his co-ownership of the mark, or that Port ever

15  asked him to do so (prior to the parties' current dispute).  Instead, the parties continued to act

16  as they always had, whether a valid contract existed or not.

17       The Claimant's Brief puts forth no argument in opposition to the above.

18

19  **IV.    BECAUSE MICAH COHEN CONTINUES TO CO-OWN THE TRADEMARK**
20  **WITH JEFF PORT, NEITHER PARTY CAN USE THE TRADEMARK**
       **WITHOUT THE OTHER'S CONSENT, MAKING INFRINGEMENT BY THE**
21  **RESPONDENTS IMPOSSIBLE**

22       Because Cohen continues to co-own the SHADES OF GREIGE trademark, Port

23  cannot use the mark without Cohen's consent, and vice versa.  Moreover, without the right to

24  use the mark, Port cannot successfully sue for trademark infringement, because he lacks the

25  standing to do so.  As the Respondents have argued in their Post-Arbitration Memorandum,

26  the Arbitrator should enjoin the usage of the SHADES OF GREIGE mark by Jeff Port and

27  Micah Cohen, since neither has the right to use it without the other's consent.  Without this

28  consent, Port and Claimant cannot lawfully use the mark, they cannot therefore claim

-4-

1  infringement by the Respondents against Claimant's use of the mark, and Claimant's Lanham
2  Act claims necessarily fail.  The Claimant's Brief does not address these contentions directly.
3  Instead, the Claimant's Brief summarily dismisses all of the Respondents' trademark
4  ownership arguments by stating that "a bald agreement that [Cohen] owns a trademark is not
5  sufficient to confer ownership.  It's analogous to two persons agreeing that they are partners."
6  (Claimant's Post-Arbitration Brief at 40: 16-17.)  The Claimant's Brief then adds a citation to
7  a 1920 California case involving partnership law, and concludes that the use of the SHADES
8  OF GREIGE mark in commerce by a "predecessor business to Swarm" conferred (apparently
9  exclusive) ownership rights to the mark upon Swarm.  (*Id.* at 40:17 to 41:7.)  The Claimant's
10  contentions are without any support, do not cite to the record, and are completely unavailing.

## V.  SWARM HAS NO STANDING TO BRING THIS ACTION, AND THE ASSIGNMENT NUNC PRO TUNC IS INEFFECTIVE AND VOID

14          Under the Employment Agreement, Swarm's ability to use the SHADES OF GREIGE
15  trademark free of royalties, as a licensee, ceases upon the end of Micah Cohen's employment
16  with Swarm.  Moreover, even if the Arbitrator finds that the Employment Agreement (or
17  Section 8.2 thereof) is not valid or binding, as co-owners of the mark, Cohen and Port each
18  have the ability to prevent any use of the mark by a licensee such as Swarm.

19          Port and his attorneys attempted to fix this problem through the use of a nunc pro
20  tunc assignment dated September 28, 2010, several months after the Claimant filed this
21  action in district court, and only one day before the Claimant and its attorneys filed the
22  Demand in Arbitration.  However, as the Respondents have noted in their Memorandum, this
23  purported assignment does not record anything that was previously unwritten because of
24  inadvertence or mistake, as an assignment nunc pro tunc must.  In fact, the purported
25  assignment's effective date is before Port wrote to his lawyer Heidi Feldman to inform her of
26  Port and Cohen's joint ownership of the mark.  Moreover, the attempted completion of an
27  assignment after the initiation of litigation is of no legal effect.  The assignment is void and
28  invalid, Swarm has no interest in the SHADES OF GREIGE mark, and Swarm therefore

1 lacks any standing to pursue any claims for its infringement.  The Claimant's Brief does not
2 address any of these issues.
3
4 **VI.    THE CLAIMANT HAS ESTABLISHED NO LIKELIHOOD OF CONFUSION**
5
6      The Respondents have consistently contended that the Claimant has presented utterly
7 insufficient evidence to support a finding that consumers are likely to confuse goods formerly
8 marketed under the SHADES OF GREIGE trademark with clothes sold under the new
9 trademark SHADES OF GREY BY MICAH COHEN.
10      The Claimant's Post-Arbitration Brief, after only a few comments on the contract and
11 trademark ownership issues, joins the legal fray with the likelihood of confusion analysis
12 under *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979).  For the vast
13 majority of its discussion, Claimant's Brief points to no testimony concerning six of the eight
14 elements of the *Sleekcraft* analysis, instead making unsupported statements such as "[t]he two
15 marks are very similar," without any citations or argument.  (Claimant's Post-Arbitration
16 Brief at 42:12.)  The Respondents have addressed these six factors – strength of the mark;
17 intent to infringe; proximity of the goods; convergent marketing channels; degree of care
18 exercised by the consumer; and expansion of product lines – in detail in the Respondents'
19 Post-Arbitration Memorandum.
20      The Claimant has firmly placed nearly all of its eggs in two of *Sleekcraft's* eight
21 baskets (similarity of the marks under the "sight sound and meaning" test and actual
22 confusion), and Claimant's Brief follows suit.  With regard to the "sound" prong of the test
23 for similarity of the marks, the Claimant's Brief argues extensively that Swarm office
24 personnel pronounced the word "greige" to rhyme with the word "bay," instead of rhyming
25 with the word "beige," as Micah Cohen and BPMW sales executives Steve Wolski and
26 Christopher Corrado all testified that they did.  (Micah Cohen Test., 7 H.T. 1844: 1-23; M.
27 Cohen Test., 7 H.T. 1845: 15-23; Wolski Test., 4 H.T. 1075: 9-23; Wolski Test., 4 H.T.
28 1078: 7-18; Corrado Test., pp. 62:9 to 63:3.)

1    The Claimant's Brief leans heavily upon the Claimant's five "pronunciation

2    witnesses" (John Flores, Jeff Enoch, Kimberly Koral, Angela Duckwitz, and Joel Barnett), all

3    of whom, along with Jeff Port's son Ryan, supported the "gray" pronunciation of the word

4    "greige."  However, the Claimant's Brief does not mention that four of these witnesses –

5    Enoch, Flores, Koral, and Barnett – testified that they had no contact with Swarm customers.

6    None had any idea how Swarm's customers pronounced "greige," and their testimony has no

7    bearing on the probable likelihood of confusion in the marketplace that Swarm labors to

8    establish.  The Claimant's Brief also does nothing to address two fundamental problems with

9    the Claimant's overriding emphasis on the pronunciation of the word "greige": (1) the

10   singular absence of any customers who testified about the pronunciation of "greige" (indeed,

11   and quite conspicuously, no customer of Swarm testified about anything in the entire

12   proceeding); and (2) the complete absence of any evidence that any person has ever been

13   confused as to the source of any goods by the supposedly identical pronunciations of "greige"

14   and "grey."

15       The Claimant concludes its discussion of "sound" under *Sleekcraft* by confusing the

16   parties' burden of production, and attesting that Micah Cohen's insistence on a "transparently

17   false" pronunciation of the word "greige" caused the Claimant to call the "pronunciation

18   witnesses" in rebuttal.  (Claimant's Post-Arbitration Brief at 43: 6-11.)  The Claimant's Brief

19   does not explain why Jeff Port's currently preferred pronunciation of "greige" should be

20   credited over Cohen's testimony concerning how customers pronounced it, which is

21   supported by testimony from two professional sales executives (Wolski and Corrado)

22   working for Swarm, who actually interacted with Swarm's customers on a daily basis and

23   earned commissions by selling Swarm's SHADES OF GREIGE clothing to those customers.

24   (The Claimant's brief implies that Wolski and Corrado perjured themselves.)  The only

25   credible evidence of any pronunciation by Swarm customers unequivocally shows that

26   "greige" rhymed with "beige."

27       As the Claimant's Brief succinctly notes, pronunciation is "a huge credibility issue."

28   On this point, the Respondents can agree.  Jeff Port's credibility on the issue of the

-7-

**RESPONDENTS' REBUTTAL MEMORANDUM**
JAMS Ref. No.:  1220041905

179                                                                              Ex. 4

1  pronunciation of "greige" should be evaluated in the context of his litany of credibility

2  challenges, which are amply detailed in the record, and discussed at length in the

3  Respondents' Post-Arbitration Memorandum.

4       The Claimant's Brief adds a new gloss to Claimant's analysis, addressing the "sight"

5  element of the *Sleekcraft* test for similarity of the marks, and discussing excerpts from the

6  Trademark Manual of Examining Procedure and several cases.  The Claimant presumably

7  intended to argue the immateriality of the addition of the words "by Micah Cohen" to

8  "Shades of Grey by Micah Cohen," the name that appears on Cohen's post-Swarm line of

9  clothing, but the Claimant's Brief never quite says so.  However, assuming that this is indeed

10  Claimant's contention, the Claimant's analysis is faulty.  The marks "SHADES OF

11  GREIGE" and "SHADES OF GREY BY MICAH COHEN" should be compared in their

12  entireties, with each individual term in the marks accorded more or less weight depending on

13  each term's effect on the overall commercial impression.  *See, e.g., In re Chatam Int'l. Inc.,*

14  380 F.3d 1340 (Fed. Cir. 2004) 1340, 1342-1345 (discussing and approving this procedure

15  for comparison of marks under Federal Circuit predecent).

16       The case at bar is factually quite similar to *Knight Textile Corp. v. Jones Investment*

17  *Co.,* 75 USPQ2d 1313 (TTAB 2005), a case not discussed in the Claimant's Brief, in which

18  NORTON MCNAUGHTON ESSENTIALS was held to be dissimilar to ESSENTIALS,

19  despite the fact that both marks identified items of women's clothing.  In *Knight*, the TTAB

20  held:

21      The marks obviously are similar in terms of sight, sound and meaning to
22      the extent they both consist of or include ESSENTIALS. Just as
    obviously the marks are dissimilar in sight, sound and meaning to the
23      extent that applicant's mark, but not opposer's, includes and begins with
    the words NORTON MCNAUGHTON, which would be perceived to be
24      applicant's house mark.  In terms of overall commercial impression, we
    find that although the word ESSENTIALS is the entirety of the
25      commercial impression created by opposer's mark, in applicant's mark it
    contributes relatively less to the commercial impression than does the
26      house mark NORTON MCNAUGHTON.

27

28

1   *Id.* at 1315.  Here, the inclusion of "by Micah Cohen" in the name of Cohen's mark, and the

2   difference between the terms "greige" and "grey," creates a distinct commercial impression

3   and makes SHADES OF GREIGE and SHADES OF GREY BY MICAH COHEN

4   dissimilar.   (Wolski's and Corrado's testimony about Cohen's position in the men's design

5   community gives further weight to the differentiation added by the words "by Micah

6   Cohen.")

7        In addition, all of the cases cited in the Claimant's Brief on this issue involve

8   applications for trademark registration.  While this case involves broader legal issues, the

9   Respondents wish to highlight two facts related to trademark registration but not mentioned

10  in the Claimant's Brief.

11       First, Swarm disclaimed the term "greige" in its registration of SHADES OF GREIGE

12  (Cl. Exh. 51, p. 2, Bates No. SWARM-4340, stating "No claim is made to the exclusive right

13  to use Greige apart from the mark as shown"; Jeff Port Test., 5 H.T. 1308:24 to 1310:2), a

14  highly ironic step given Claimant's exhaustive efforts to convince the Arbitrator that the

15  (Claimant's currently preferred) pronunciation of "greige" establishes probable likelihood of

16  confusion.  Swarm's disclaimer of "greige" in SHADES OF GREIGE means that the

17  "greige" term is weak and entitled to more limited protection against other marks.

18       Second, the USPTO examining attorney who evaluated Swarm's application to register

19  SHADES OF GREIGE in 2010 (leading to its approval for inclusion on the Principal

20  Register in 2011, after "greige" was disclaimed) did not conduct any search for marks

21  containing the word "grey" or "gray."  (R. Exh. 5116; Gary Cohen Test., 10 H.T. 2565:13 to

22  2566:9; 10 H.T. 2572: 11-16.)  Although this is not a Trademark Trial and Appeal Board case

23  offering the benefit of a brief by the examining attorney, it is nonetheless obvious from the

24  details of this search that the examining attorney did not consider any mark featuring the

25  terms "shades" or "grey" to be likely to provoke any confusion with SHADES OF GREIGE.

26  The Claimant's analysis of the "sight" prong of the *Sleekcraft* analysis therefore fails

27  completely.  The Claimant's cursory discussion of the "meaning" element of the analysis,

28  which appears to rest on the unsupported conclusions of the author of Claimant's Brief, is

-9-

**RESPONDENTS' REBUTTAL MEMORANDUM**
JAMS Ref. No.:  1220041905

Ex. 4

unavailing for the same reasons.

The Claimant presented extraordinarily scant evidence of <u>actual confusion in the marketplace</u>, but the Claimant's Brief takes up the issue for a few paragraphs.  For the most part, the Claimant confines its discussion to its own apparent frustration with the nature of these proceedings (which, by implication, supposedly precluded a more persuasive demonstration of actual confusion), and the wide reach of the Internet, where almost all of the Claimant's minimal and completely unconvincing evidence of actual confusion resides.  As noted in the Respondents' Post-Arbitration Memorandum, the Claimant has shown only that Jeff Port, while surfing the Internet, found a small number of incorrect references to one or both lines of clothing in blogs or online retail sales listings.  Port testified about only <u>five</u> such instances, and did not explain how any of them showed consumer confusion.  The Claimant's Brief does not establish that these Internet entries constituted or resulted in a single instance of real world confusion, and even more importantly, Port explicitly said that he knew of no such confusion.  (Port Test., 11 H.T. 2747: 14-22.)[1]  There is simply no evidence of actual confusion in this matter.

Claimant has produced no persuasive evidence of likelihood of confusion, and has thus completely failed to meet its burden of proof on its Lanham Act and congruent state law claims.  Those claims should fail.

## VII.   SWARM PRODUCED INSUFFICIENT EVIDENCE TO SUPPORT ITS CLAIM OF TORTIOUS INTERFERENCE

The Respondents have opposed the Claimant's allegations of tortious interference.

---

[1] As noted in the Respondents' Post-Arbitration Memorandum, the cited testimony, including a question and Port's answer thereto, extended to all of the exhibits on this topic mentioned in passing by Claimant's counsel, including several about which Port (and the Claimant) did not offer any testimony. The Claimant's Brief continues this pattern of referring to these additional exhibits, which were not even discussed, let alone authenticated, by Jeff Port or any other witness.  The Respondents disagree emphatically with the contention in the Claimant's Brief that these additional exhibits were or are "deemed to have been shown."  (Claimant's Post-Arbitration Brief at 31-32, n. 13.)

Ex. 4

1   The Claimant's Brief fails to add any new information, and does not cure the substantial

2   defects in the Claimant's attempts to satisfy the prima facie elements of this tort.

3        As the Respondents have noted, the Claimant's cause of action must be characterized

4   (however styled) as a claim for tortious interference with prospective economic advantage,

5   rather than tortious interference with contractual relations or economic relations, because the

6   plaintiff has produced no evidence of specific contracts or current relationships that were in

7   any way negatively affected by the Respondents.  As the Respondents set out in their Post-

8   Arbitration Memorandum, the tort of interference with prospective economic advantage has

9   five elements.  The Claimant has failed to establish any proof of four of these five

10  components.[2]

11       **A.    *The Claimant has not shown any economic relationships with probability of***

12  ***future economic benefit***

13       The Respondents do not dispute that at the time of Micah Cohen's departure from

14  Swarm, Swarm had business relationships with various purchasers (retail stores, chains, and

15  outlets) of its goods, but there is no evidence that Swarm had contracts with any of its

16  customers.  As Cohen and Corrado testified, customers purchased SHADES OF GREIGE-

17  labeled clothing after trade shows for each separate season.  Swarm enjoyed business

18  relationships with its supplier, Onglory Trading, and its sales representatives, BPMW.

19  Steven Zhou of Onglory and Wolski and Corrado of BPMW all testified, without any

20  contrary evidence from Claimant, that Onglory and BPMW would have continued to do

21  business with Swarm if it had continued to produce clothes, regardless of what Micah Cohen

22  did.  Respondents did not interfere with these relationships at all, and the critical, core

23  framework of Swarm's business could have continued beyond Cohen's resignation, but for

24  Port's total inaction.  However, moving forward would have meant hiring a new designer to

25  replace Cohen, and Swarm would have produced clothes that were different by definition,

26

27  _____

28  [2] The Respondents concede without argument that the second element of the test, Cohen's knowledge of
    Swarm's business relationships with various retail customers, is satisfied here.

-11-

**RESPONDENTS' REBUTTAL MEMORANDUM**
JAMS Ref. No.: 1220041905

1   clothes not designed by Cohen, with whom many of the customers had direct contact, and

2   whose designs the customers purchased.  (Cohen exclusively designed every piece of

3   SHADES OF GREIGE clothing.)

4        California courts have held that it must be <u>reasonably probable</u> that the prospective

5   economic advantage would have been realized <u>but for</u> the defendant's interference.  *See, e.g.,*

6   *Worldwide Commerce, Inc. v. Fruehauf Corp.* 84 Cal. App. 3d 803, 811 (1978) (creditor-

7   guarantor relationship would have gone forward absent any interference); *Wilson v. Lowe's*

8   *Inc.*, 142 Cal. App. 2d 183, 190 (1956), *cert. granted,* 352 U.S. 980 (1957), *cert. dismissed,*

9   355 U.S. 597 (1958) ("it must appear that such (prospective) contract or relationship would

10  otherwise have been entered into").   Here there is no evidence of Cohen's interference at all,

11  and Swarm's business did not continue because <u>Swarm</u> voluntarily made no attempt to

12  continue it.

13       In order to establish this first element of interference with prospective economic

14  advantage, the Claimant must show that its business with at least some of its customers

15  would have continued even after Cohen departed.  It is important to remember that Swarm

16  had no right to keep Cohen as an "at-will employee," as the Claimant now labors to

17  characterize him, if Cohen didn't wish to stay.  At bottom, then, this case is really about

18  Swarm's bitterness over Cohen's lawful resignation for cause after Port's continued refusal to

19  provide Cohen with Swarm's financial information, which Port had in his possession all

20  along.

21       Not one customer testified in this proceeding that it would have continued to do

22  business with Swarm without Cohen on board, nor did Swarm make any such claim, let alone

23  offer evidence to support it.  Presumably, Swarm's customers were not buying Swarm's

24  products because of Port's handling of the administrative and financial aspects of the

25  business (however competent it may have been); they were buying SHADES OF GREIGE

26  clothing because they liked Cohen's designs.   The Claimant simply has not established that

27  without Cohen, Swarm had a reasonable probability of maintaining its business with <u>any</u> of

28  its customers.  Indeed, Swarm ceased all operations after Cohen's departure, never produced

-12-

**RESPONDENTS' REBUTTAL MEMORANDUM**
JAMS Ref. No.:  1220041905

1    a single item of new clothing after Cohen left, and some two years and two months later,

2    Swarm has <u>still</u> done nothing to hire a new designer or resurrect or maintain its relationships

3    with any of its former customers.  The Claimant nevertheless asks the Arbitrator to believe

4    that if it prevails in this action, its former customers will flock back to do business with it –

5    but irrespective of the outcome of this matter, the Claimant cannot force Cohen to resume

6    designing clothes for Swarm.

7         As the California Supreme Court has observed, "[t]he courts provide a damage remedy

8    against third party conduct intended to disrupt an existing contract precisely because the

9    exchange of promises resulting in such a formally cemented economic relationship is deemed

10    worthy of protection from interference by a stranger to the agreement.  <u>Economic</u>

11    <u>relationships short of contractual, however, should stand on a different legal footing as far as</u>

12    <u>the potential for tort liability is reckoned</u> . . . [o]ur courts should, in short, bring[] a greater

13    solicitude to those relationships that have ripened into agreements, while recognizing that

14    <u>relationships short of that subsist in a zone where the rewards and risks of competition are</u>

15    <u>dominant</u>."  *Della Penna v. Toyota Motor Sales, U.S.A., Inc.,* 11 Cal. 4th 376, 392 (1995)

16    (emphasis added in underlined text).  In this case, the Claimant did not have existing

17    contracts meriting higher protection, and has produced no evidence that its existing season-

18    to-season customers would have remained with Swarm if it had continued in business with a

19    new designer.  The Claimant had mere expectancies of continued business, which must be

20    analyzed in a factual context.  Here, the Claimant's assertion that it would have realized

21    continuing economic benefit without Cohen flies in the face of the actual (and continuing)

22    events for roughly 26 months after Cohen's departure, during which time the Claimant has

23    not conducted any business or furthered those relationships at all.

24         While the remaining three elements of the test are certainly important, the speculative

25    nature of Claimant's business expectancy, and the Claimant's failure to demonstrate that its

26    economic relationships would have continued if Cohen left and Swarm was forced to proceed

27    with another designer, are fatal to the Claimant's tortious interference claim.

28

-13-

**RESPONDENTS' REBUTTAL MEMORANDUM**
JAMS Ref. No.:  1220041905

***B.    There is no evidence of any intentional and wrongful conduct designed to interfere with or disrupt any relationships of Claimant***

The Claimant's Brief offers almost no discussion of this element, except to point to some of its other causes of action, such as those brought under federal trademark infringement and state unfair competition law.  In other words, the Claimant seeks to bootstrap its tortious interference claim by assuming the merits of its trademark-related claims.  However, for the several reasons that the Respondents have argued at hearing and set forth in their Post-Arbitration Memorandum and this Rebuttal Memorandum, those claims have no basis in the law and should fail.  Without an "independently wrongful" act apart from the interference itself, no claim for tortious interference with prospective economic advantage will lie.  *Della Penna,* 11 Cal. 4th at 392.  The Claimant has failed to carry this burden.

***C.    Plaintiff has not established any interference with or disruption of the relationships***

As with all of its causes of action, the Claimant attempts to satisfy this element of its tortious interference claim with pure speculation.  The Claimant's Brief baldly alleges that Cohen "gave himself a head start" by selling "the same merchandise" under a "confusingly similar name." (Claimant's Post-Arbitration Memorandum at 49: 13-15.)  However, the merchandise was not the same, nor was it based on the same designs; Cohen started his new line from scratch, with new patterns and designs that were not identical to and took no inspiration from any of the designs that Cohen had created for Swarm.  (M. Cohen Test., 8 H.T. 2033:19 to 2034:7; M. Cohen Test., 9 H.T. 2416: 5-7.)  Cohen did not steal or appropriate the 23 prototype samples that Onglory manufactured for Swarm for the Fall/Winter 2010 season, or any other samples, for his new company's use.  (M. Cohen Test., 8 H.T. 2093: 5-7.)  Steven Zhou of Onglory Trading completely corroborated Cohen's testimony on these points. (Zhou Test., 4 H.T. 1164: 10-20.)  Moreover, Cohen's father Gary advised him in writing that the old designs belonged to Swarm and that Micah had to start over. (Cl. Exh. 310; G. Cohen Test., 10 H.T. 2522:18 to 2524:3.)  The Claimant has utterly

-14-

failed to produce any evidence to the contrary, and the Claimant's Brief offers nothing new to support Claimant's baseless allegations.

In further response to this section of argument in Claimant's Brief, the Respondents must regrettably address one piece of evidence that the Claimant produced at the hearing of this matter and discusses in the Claimant's Brief; an e-mail, supposedly from Micah Cohen to Steven Zhou, bearing the temporally impossible date of **Monday,** November 13, 2009. The exhibit included a one-page attachment to the e-mail, a list of SHADES OF GREIGE prototype samples. (Cl. Exh. 497.) The Arbitrator took judicial notice that November 13, 2009 (Cohen's resignation date from Swarm) was a Friday. (Statement of the Arbitrator, 8 H.T. 2158: 6-8.) Regarding this exhibit, Micah Cohen testified that:

(1) he had no recollection of sending Zhou the e-mail;

(2) he did not know why the e-mail was sent to an e-mail address for Zhou that was not the one that Cohen customarily used;

(3) he did not, as the body of the e-mail indicates, forward inspiration pictures to Zhou on October 22, 2009, and no documents produced in the litigation established that he did;

(4) he had no recollection of ever having used the particular font in which the attachment was written;

(5) he did not typically write dates as they were rendered on the attachment, with the number of the day listed first, followed by the month, e.g., "22 October";

(6) he did not, and had no reason to, send Zhou a list of prototype samples or "protos" bearing the SHADES OF GREIGE name after he resigned from Swarm (although he did so on many previous occasions while he was a Swarm employee, which he was until approximately noon local time on Friday, November 13, 2009); and an e-mail sent on Friday, November 13, 2009 at 4:57 P.M, the time displayed in the e-mail, would have been sent after his resignation; and

(7) Cohen understood only that Zhou eventually produced, for Swarm, 23 of the protos shown on the last page of the exhibit; he did not know which of them Zhou produced, he did not ask Zhou to tell him, Zhou never told him, and he, Cohen, didn't need to know.

-15-

RESPONDENTS' REBUTTAL MEMORANDUM
JAMS Ref. No.: 1220041905

Ex. 4

1  (M. Cohen Test., 8 H.T. 2153:17 to 2166:21.)

2          The Claimant's Brief attempts to use Claimant's Exhibit 497 as evidence of Cohen's

3  use of Swarm designs (Claimant's Post-Arbitration Memorandum at 24:20 to 25:15), which

4  is extremely unfortunate, and the exhibit's introduction at hearing was outrageous. The e-

5  mail that Exhibit 497 comprises passed through the hands of both Jeff Port and his son Ryan,

6  but was never produced in discovery (just as the dozens of e-mails between Jeff Port,

7  Buxbaum, and Rusczyk were not produced). Amazingly, the Claimant did not even offer

8  Claimant's Exhibit 497 into evidence until the second phase of the hearing, in September of

9  2011, and the exhibit shows on its face that Port did not provide it to his counsel until

10  September 9, 2011, five days before the Claimant introduced it and questioned Micah Cohen

11  about it on September 14, 2011 (6 H.T. 1685). The e-mail in question is inaccurately dated,

12  Cohen did not recall sending it, and both Jeff Port and Ryan Port handled and forwarded it

13  before Jeff Port finally sent it to Claimant's counsel. While the Respondents wish to

14  emphasize that they do not accuse Claimant's counsel of any wrongdoing, the Respondents

15  have every reason to believe that the e-mail in question was doctored, and less than skillfully,

16  by Jeff Port, Ryan Port, or both to make it appear that Cohen was somehow "using Swarm

17  designs" by sending SHADES OF GREIGE protos to Zhou after Cohen resigned on

18  November 13, 2009.

19          The Claimant's Brief falsely states that Claimant's Exhibit 497 shows that "Cohen

20  instructed Zhou how to prepare them for his own line." It is not clear what the word "them"

21  refers to. (Claimant's Post-Arbitration Memorandum at 25:1-2.) In fact, the exhibit shows

22  nothing of the kind. Claimant's counsel did not question Port about the exhibit, very notably

23  did not ask Zhou about it during either of Zhou's two separate hearing appearances, and

24  Cohen did not remember ever seeing the exhibit before the hearing. Moreover, Cohen did

25  not have any reason to believe that he would have sent it after his resignation. If the

26  Claimant is trying to establish, via the introduction of this apparently falsified e-mail and

27  mere cross-examination, but no direct testimony, that Cohen used Swarm's designs for his

28  own benefit, that effort resoundingly fails. Additionally, the extremely dubious nature of

-16-

**RESPONDENTS' REBUTTAL MEMORANDUM**
JAMS Ref. No.:  1220041905

Ex. 4

1    Claimant's Exhibit 497, and the highly questionable circumstances of its production, combine

2    to deal yet another substantial blow to Jeff Port's credibility.

3            In sum, Cohen testified that he did not mislead anyone about his involvement with the

4    SHADES OF GREIGE brand after he left Swarm. (M. Cohen Test., 8 H.T. 2100: 3-7.)

5    Cohen never used any images from Swarm's previous clothing lines in designing or

6    marketing his new brand. (M. Cohen Test., 8 H.T. 2101: 22-25.) Cohen testified that he

7    based all of the items in his new company's Fall/Winter 2010 clothing line on entirely

8    different designs than those that Cohen had used for Swarm's line for the same season (and

9    previous seasons). (M. Cohen Test., 9 H.T. 2283:25 to 2284:14.) Additionally, after Ryan

10   Port's attempts, using lookbooks from the pertinent collections and other documents, to show

11   similarities between the designs, Cohen demonstrated in extensive rebuttal testimony that the

12   designs were in fact quite different, and that Ryan Port lacked the qualifications to contend

13   otherwise. (M. Cohen Test., 11 H.T. 2790: 8 to 2813: 23.) Steven Zhou testified

14   unambiguously that the two sets of designs were completely different, and that Cohen did not

15   use any Swarm designs or patterns for All Shades United. (Zhou Test., 4 H.T. 1164: 10-20; 7

16   H.T. 1768: 6-17.) Swarm has produced no credible evidence – direct, circumstantial,

17   authentic and correctly dated, or otherwise – to controvert Cohen and Zhou's testimony on

18   this critical issue in any way.

19           There is no proof that Cohen interfered with Swarm's business in any tortious or

20   improper manner.

21

22           **D.    *There is no economic harm to Swarm proximately caused by the allegedly***

23   ***wrongful conduct of the Respondents***

24           Lastly, as with all of its causes of action, Swarm has not demonstrated the required

25   causal link between the Respondents' supposed unlawful actions and damage to Swarm.

26           Indeed, Swarm has not established any damages at all.  Swarm has also failed to show

27   any attempts to mitigate its losses, as it is required to do.  As discussed above, Swarm

28   voluntarily went out of business by, among other things, failing even to attempt to hire a

-17-

**RESPONDENTS' REBUTTAL MEMORANDUM**
JAMS Ref. No.:  1220041905

1   replacement for Micah Cohen.  However, a plaintiff who suffers damage, from either a

2   breach of contract or the commission of a tort, must take reasonable steps to mitigate those

3   damages and will not be able to recover for any losses which could have been thus avoided.

4   *Shaffer v. Debbas*, 17 Cal. App. 4th 33, 41 (1993).  Moreover, "[a] plaintiff may not recover

5   for damages avoidable through ordinary care and reasonable exertion," *Valle de Oro Bank v.*

6   *Gamboa*, 26 Cal. App. 4th 1686, 1691 (1994) (emphasis added in underlined text) (internal

7   citations omitted).

8         In this case, the record indicates that Swarm sat on its rights and did nothing in the

9   face of the supposed damages it suffered as a result of the Respondents' conduct.  Ordinary

10   care and reasonable exertion would and should have meant, at a minimum, attempting to

11   continue the business with another designer as Cohen's replacement, instead of ceasing all

12   operations and hoping for a favorable result in litigation.  A party must avoid any

13   enhancement of its damages "through passive indifference or stubborn insistence upon a

14   conceived legal right . . . ."  *Green v. Smith*, 261 Cal. App. 2d 392, 398-399 (1968).  The

15   Claimant's Brief claims that the Respondents inflicted a "loss" of Swarm's Fall 2010 season,

16   and further prevented Swarm from "pursuing" subsequent seasons, but in fact, the only party

17   preventing Swarm from proceeding in business, from the Fall 2010 season forward, was

18   Swarm itself.[3]  Parenthetically, Swarm's claim that "[t]he economic harm is the loss of

19   business, which includes the money [Swarm] invested through Port" (Claimant's Post-

20   Arbitration Brief at 49: 18-19) is incomprehensible and nonsensical, although it does support

21   the Respondents' contention that Swarm is an alter ego of Port.  Port is not entitled to recover

22   his "investment" in Swarm (the amount of which the Claimant has not established through

23   any evidence whatsoever) merely because Micah Cohen resigned from Swarm's

24   employment.

25

26

27

28   [3] Cohen gave Swarm his express written permission to continue to sell the Spring 2010 SHADES OF GREIGE line after Cohen resigned for cause, and Swarm did so.

-18-

**RESPONDENTS' REBUTTAL MEMORANDUM**
JAMS Ref. No.:  1220041905

1   Swarm has failed to establish any damages, has failed to show the required causal

2   relationship between the Respondents' actions and its supposed losses, and has failed to

3   mitigate its damages to any extent, precluding any recovery.

4

5   **VIII.  SWARM HAS PRODUCED INSUFFICIENT EVIDENCE TO SUPPORT ITS**
     **CLAIM FOR BREACH OF LOYALTY**

6

7   As the Respondents noted in their Post-Arbitration Memorandum, the Claimant has

8   failed to sustain its claim for breach of the duty of loyalty against Micah Cohen.  Employees

9   owe a duty of loyalty to their employers <u>during their employment</u>, *Stokes v. Dole Nut Co.*, 41

10   Cal. App. 4th 285, 295 (1995), but the Claimant's Brief lists a catalog of actions that Cohen

11   allegedly took <u>after</u> he left Swarm.  As a matter of law, these post-employment actions cannot

12   provide the basis for a breach of loyalty claim.  The Claimant's Brief lists only two actions

13   supposedly "inimical to Swarm" that Cohen took while he was still Swarm's employee: (1)

14   telling Steven Zhou that Cohen planned to leave Swarm (which Port already knew, since

15   Cohen told him so on many occasions, and the two were negotiating a transition agreement);

16   and (2) "disparaging" Port to Zhou and employees of BPMW.  The Claimant does not

17   explain how informing Zhou of Cohen's prospective intentions proximately resulted in

18   damage to Swarm, nor does the Claimant link Cohen's supposed "disparagement" of Port to

19   any harm to Swarm.  In fact, the Claimant has failed to establish any harm to Swarm at all as

20   a result of the Respondents' alleged conduct.

21   The Claimant's Brief also plays fast and loose with the law in order to preserve its

22   claim, suddenly arguing for the first time that Cohen was both an agent and a fiduciary of

23   Swarm.  These contentions, which were not alleged in Claimant's Demand in Arbitration or

24   its original Complaint in district court, are meritless, and the Claimant has misapprehended

25   the law.

26   Employees in California are not fiduciaries.  *See, e.g., Odorizzi v. Bloomfield School*

27   *Dist.*, 246 Cal. App. 2d 123, 129 ("no presumption of a confidential relationship arises from

28   the bare fact that parties to a contract are employer and employee; rather, additional ties must

-19-

**RESPONDENTS' REBUTTAL MEMORANDUM**
JAMS Ref. No.:  1220041905

be brought out in order to create the presumption of a confidential relationship between the two"); *Masters v. San Bernardino County Employees Retirement Assn.*, 32 Cal. App. 4th 30, 45 (1995) (medical doctor was "mere employee" of retirement board, and was not subject to claim for breach of fiduciary duty). The Claimant did not make any showing of "additional ties" at the hearing of this matter; indeed, the Claimant invested a substantial portion of its time at the hearing trying to create distance between Swarm and Cohen and attempting to minimize their relationship, making this line of argument in Claimant's Brief quite puzzling.

Even more broadly, the California state law claim for breach of the duty of loyalty "has only been applied in the context of an employee transferring his loyalty from his employer to a competing business by using or disclosing confidential information." *In re Brocade Communications Systems, Inc.*, 615 F.Supp.2d 1018, 1050 (N.D. Cal. 2009) (citing *Huong Que, Inc. v. Luu*, 150 Cal. App. 4th 400, 417 and *Stokes*, 41 Cal. App. 4th at 295-96.) The Claimant cites no authority to support the expansion of its breach of loyalty claim beyond this field (such as, for example, any cases holding that disparaging comments by an employee about his employer constitute a breach of loyalty), and the Claimant's attempt to expand its claims into the arena of misappropriation of confidential information and trade secrets has already been rejected by the Arbitrator.

It is worth noting that the Claimant's eleventh-hour attempt to amend its duty of loyalty claim against Cohen, much like its similarly untimely effort to bring a claim for misappropriation of trade secrets, arises from the Claimant's clumsy efforts to recast its grievances against Cohen as tort claims. In fact, the Claimant appears to be alleging indirectly that Cohen breached his employment contract, but the Claimant's incredible litigation posture, which depends entirely on arguing that no written contract existed, makes that highly difficult or impossible. The Claimant is therefore left in the unwieldy position of arguing that Cohen, a purported at-will employee (in Port's and Ruscyzk's own words in their correspondence to Cohen of December 2, 2009, Cl. Exh. 254) with absolutely no employment contract of any sort beyond a "blended oral agreement" with very limited reach (confined mostly to Cohen's duties and his salary, as Port has exhaustively professed) was

-20-

1 somehow nonetheless both an agent <u>and</u> a fiduciary.  There is no legal support for Claimant's

2 novel theories.

3       As the Respondents have noted, the record shows that Micah Cohen created entirely

4 new designs after his resignation from Swarm, and he made absolutely no use of Swarm's

5 designs or other work product in the service of his new venture, All Shades United.  The

6 Claimant has produced no evidence to establish otherwise, and the Claimant's Brief also fails

7 to do so.  The Claimant has also not shown that it was proximately damaged by any of

8 Cohen's supposedly disloyal conduct.  For the foregoing several reasons, the Claimant's

9 claim for breach of the duty of loyalty against Micah Cohen must fail.

10

11 **IX.   SWARM'S NEW THEORIES OF LIABILITY AGAINST NANCY COHEN
            ARE UNTIMELY AND UTTERLY BASELESS**

12

13       The Claimant's Brief completely alters the relief that the Claimant seeks against

14 Respondent Nancy Cohen.  The Claimant's Demand in Arbitration, which incorporates the

15 Claimant's original district court complaint, and upon which the Respondents are entitled to

16 rely to weigh and contest the allegations made against them in this litigation, brings causes of

17 action against "all defendants" for trademark infringement, false designation of origin,

18 federal and state unfair competition, intentional interference with economic relations, and

19 trademark-related declaratory relief.  The breach of duty of loyalty claim is brought against

20 only Micah Cohen.

21       The Claimant's Brief breaks completely free from these constraints and suddenly

22 announces claims for "participation in breach of fiduciary duty," "conspiracy," and "aiding

23 and abetting breach of fiduciary duty" against Nancy Cohen.  It is unclear whether the

24 Claimant is seeking to amend its Demand and Complaint, but the Respondents hereby object

25 to Claimant's apparent attempt to do so, in accordance with Rule 15(b)(1) of the Federal

26 Rules of Civil Procedure, on the grounds that these causes of action are not within the

27 pleadings.  The Respondents respectfully request that the Arbitrator deny the Claimant's

28 untimely and prejudicial backdoor attempt to amend its causes of action, by refusing to

-21-

**RESPONDENTS' REBUTTAL MEMORANDUM**
JAMS Ref. No.:  1220041905

Ex. 4

1    consider the material contained in the Claimant's Post-Arbitration Brief at 53:2 to 54:21.

2          Should the Arbitrator deem the material in question to be worthy of consideration, it is

3    nevertheless completely without merit.  The Claimant has not established that Micah Cohen

4    breached a fiduciary duty, for the reasons explained above in Section VIII of this Rebuttal

5    Memorandum, so Nancy Cohen cannot be liable for "participating" in such a breach, nor for

6    "aiding and abetting it."  The Claimant's evidence of a "conspiracy" between Micah Cohen

7    and Nancy Cohen to harm Swarm utterly fails; the Claimant has not indicated the nature of

8    the conspiracy, described the Cohens' supposedly wrongful act, provided any evidence of

9    Nancy Cohen's participation in any "common design," nor shown any resulting damage to

10   Swarm.  Liberally construed, Claimant's argument in support of its new claims against Nancy

11   Cohen seems to be that she "encouraged" Micah Cohen (1) to resign from Swarm; (2) to

12   travel to China after leaving Swarm; and (3) to take Swarm's Fall 2010 samples.  The

13   Claimant cites no record support for the first of these instances of "encouragement."  As for

14   encouraging Micah Cohen to travel to China, the Claimant's Brief offers Claimant's Exhibit

15   353, an e-mail exchange between Micah Cohen and his parents.  Nancy Cohen's sole

16   comments in this exchange encourage Micah to save his business receipts – hardly the stuff

17   of conspiracy, and certainly not evidence of any encouragement to commit a wrongful act

18   against Swarm.  (Cl. Exh. 353.)  Finally, the Claimant's Brief points to Claimant's Exhibit

19   361 as support for Nancy Cohen's encouragement to "take Swarm's Fall 2010 samples," but

20   in that exhibit (a pair of e-mails dated October 27 and 28, 2009), Nancy actually encourages

21   her son to work with Port to find a solution to Micah's desire to move on (i.e., the opposite of

22   what the Claimant is arguing), suggests that Micah may wish to have a lawyer speak for him,

23   and asks him how Shanghai is.  (Cl. Exh. 361.)  It is not clear how Claimant arrived at its

24   preposterous new allegations against Nancy Cohen based on this evidence.  These claims

25   should be accorded absolutely no weight and must fail.

26

27

28

**RESPONDENTS' REBUTTAL MEMORANDUM**
JAMS Ref. No.:  1220041905

Ex. 4

## X. SWARM PRODUCED ABSOLUTELY NO EVIDENCE OF ITS PURPORTED DAMAGES UNDER ANY LEGAL THEORY

As noted in the Respondents' Post-Arbitration Memorandum, and as discussed in Section VII.D of this Rebuttal Memorandum, above, the Claimant has produced no evidence of damages that it allegedly incurred as a result of Respondents' actions under any legal theory. Moreover, the Claimant has failed to meet its duty to mitigate its damages under California law. The Claimant's Brief fails to address the issue of damages at all beyond unsupported and conclusory statements.

## XI. CONCLUSION

The Claimant's Post-Arbitration Brief fails to bolster Claimant's allegations, and does nothing to cure the substantial, and fatal, deficiencies in the Claimant's theories of the case. The Claimant is entitled to no relief on any cause of action in this matter.

The Respondents respectfully request that the Claimant have and recover nothing on all of the causes of action set forth in its Demand for Arbitration and its Complaint; that the Arbitrator issue an award in favor of the Respondents as to the relief requested in the Respondents' Answer and Counterclaims, in accordance with the Respondents' Proposed Award (respectfully submitted with this Rebuttal Memorandum); and that the Arbitrator award the Respondents their reasonable attorney fees and costs incurred in this action as a prevailing party.

1  DATED:      January 16, 2012

2

3  Respectfully submitted,

4

5                              NORRIS LAW GROUP, P.C.

6

7                              By: _____
                               Matthew J. Norris
8                              Attorneys for Respondents
                               MICAH A. COHEN, NANCY SIDONIE COHEN and ALL
9                              SHADES UNITED, LLC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-24-
**RESPONDENTS' REBUTTAL MEMORANDUM**
JAMS Ref. No.:  1220041905

Ex. 4